IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE,<br><br>    *Plaintiff,*<br><br>v.<br><br>PUBLIC COMPANY ACCOUNTING<br>OVERSIGHT BOARD,<br><br>    *Defendant.* | Civil Action No. 1:24-cv-780-ACR |
| JOHN DOE,<br><br>    *Plaintiff,*<br><br>v.<br><br>PUBLIC COMPANY ACCOUNTING<br>OVERSIGHT BOARD, et al.,<br><br>    *Defendants.* | Civil Action No. 1:25-cv-186-ACR<br>(consolidated with No. 1:24-cv-<br>780 (lead), 1:25-cv-70) |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The John Doe Plaintiffs in these consolidated cases respectfully move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In support of their motion, Plaintiffs rely upon and incorporate by reference their accompanying Joint Statement of Material Undisputed Facts, Memorandum in Support of Their Motion for Summary Judgement, and exhibits attached thereto.

As more fully detailed in their supporting papers, Plaintiffs are two accountants seeking declaratory and injunctive relief to stop the Public Company Accounting Oversight Board ("Board") from continuing its unconstitutional disciplinary proceedings against them. Those proceedings violate several bedrock constitutional principles, inflicting here-and-now injuries on Plaintiffs, who face expulsion from their profession and fines of more than $1 million each. Among other defects, the proceedings:

1.    Deny Plaintiffs their right to an Article III adjudication and their Seventh Amendment right to a jury trial;[1]

2.    Threaten to strip Plaintiffs of established liberty and property interests, without due process of law, in violation of the Fifth Amendment;[2]

3.    Subject Plaintiffs to prosecution before a hearing officer who is not appointed in accordance with the Appointments Clause and is immune from presidential oversight, in violation of Article II;[3]

4.    Subject Plaintiffs to prosecution by private actors wielding punitive executive power without meaningful supervision from the Executive Branch, in violation of Article II;[4] and

5.    Subject Plaintiffs to prosecution before a private entity that is funded through private fees and taxes in violation of Article I.[5]

For these reasons, Plaintiffs respectfully request that the Court enter summary judgment in their favor on all counts. A Proposed Order is attached to this motion as Exhibit 1.

---

[1] Civ. A. No. 1:24-cv-780-ACR: Count VI;
Civ. A. No. 1:25-cv-186-ACR: Counts I and V.

[2] Civ. A. No. 1:24-cv-780-ACR: Count V;
Civ. A. No. 1:25-cv-186-ACR: Count VI.

[3] Civ. A. No. 1:24-cv-780-ACR: Counts III and IV;
Civ. A. No. 1:25-cv-186-ACR: Counts III and IV.

[4] Civ. A. No. 1:24-cv-780-ACR: Count II;
Civ. A. No. 1:25-cv-186-ACR: Count II.

[5] Civ. A. No. 1:24-cv-780-ACR: Count I;
Civ. A. No. 1:25-cv-186-ACR: Count VII.

Dated: September 26, 2025

Respectfully Submitted,

*/s/ Russell G. Ryan*
Russell G. Ryan (DC Bar # 414472)
Casey Norman (DC Bar # 90016178)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
Telephone: (202) 869-5210
Email: russ.ryan@ncla.legal

*Attorneys for Plaintiffs John Doe 1 (No. 24-cv-780) and John Doe 2 (No. 25-cv-186)*

Thomas K. Potter, III (*pro hac vice*)
Burr & Forman, LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
Telephone: (615) 724-3231
Email: tpotter@burr.com

*Attorney for Plaintiff John Doe 2 (No. 25-cv-186)*

*/s/ Ian D. Roffman*
Ian D. Roffman (*pro hac vice*)
Melanie V. Woodward (*pro hac vice*)
NUTTER, MCCLENNEN & FISH LLP
Seaport West, 155 Seaport Blvd.
Boston, MA 02210
Telephone: (617) 439-2421
Email: iroffman@nutter.com

*Attorneys for Plaintiff John Doe 1 (No. 24-cv-780)*

<u>CERTIFICATE OF SERVICE</u>

I certify that, on September 26, 2025, a copy of the foregoing document was served upon all counsel of record through the Court's ECF system.

*/s/ Ian D. Roffman*

7531388

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE,<br><br>    *Plaintiff*,<br><br>v.<br><br>PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD,<br><br>    *Defendant*. | Civil Action No. 1:24-cv-780-ACR |
| JOHN DOE,<br><br>    *Plaintiff*,<br><br>v.<br><br>PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, et al.,<br><br>    *Defendants*. | Civil Action No. 1:25-cv-186-ACR (consolidated with No. 1:24-cv-780 (lead), 1:25-cv-70) |

## <u>PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>

Ian D. Roffman (*pro hac vice*)
Melanie V. Woodward (*pro hac vice*)
NUTTER, MCCLENNEN & FISH LLP
Seaport West, 155 Seaport Blvd.
Boston, MA 02210
Telephone: (617) 439-2421
Email: iroffman@nutter.com

*Attorneys for Plaintiff John Doe 1 (No. 24-cv-780)*

Russell G. Ryan (DC Bar # 414472)
Casey Norman (DC Bar # 90016178)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
Telephone: (202) 869-5210
Email: russ.ryan@ncla.legal

*Attorneys for Plaintiffs John Doe 1 (No. 24-cv-780) and John Doe 2 (No. 25-cv-186)*

Thomas K. Potter, III (*pro hac vice*)
Burr & Forman, LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
Telephone: (615) 724-3231
Email: tpotter@burr.com

*Attorney for Plaintiff John Doe 2 (No. 25-cv-186)*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS .............................................................................................. 2

I.    STATUTORY AND REGULATORY BACKGROUND ........................................ 2

II.    THE DOE PLAINTIFFS ...................................................................................... 8

ARGUMENT .............................................................................................................. 9

I.    THE BOARD'S DISCIPLINARY PROCEEDINGS DEPRIVE PLAINTIFFS OF THEIR RIGHTS TO AN ARTICLE III ADJUDICATION AND A JURY TRIAL ......... 9

    A.    The Remedies Sought Are Legal in Nature ....................................... 10

    B.    The Board's Enforcement Claims Are Rooted in Common Law ......................... 12

    C.    The Public Rights Exception Does Not Apply ................................... 14

II.    THE BOARD'S DISCIPLINARY PROSECUTIONS THREATEN TO DEPRIVE PLAINTIFFS OF LIBERTY AND PROPERTY INTERESTS WITHOUT DUE PROCESS IN VIOLATION OF THE FIFTH AMENDMENT ....................................... 15

    A.    Board Sanctions Would Violate Plaintiffs' Liberty and Property Interests.......... 16

    B.    The Board's Disciplinary Prosecutions Structurally Deprive Plaintiffs of Due Process ........................................................ 18

        1.    The Board's Captive, In-House Tribunal Is Structurally Biased.............. 18

            a.    The Chief Hearing Officer Is an Employee of the Board and Cannot Be Neutral ........................................................ 19

            b.    The Board Itself Acts as Prosecutor, Judge, and Appellate Authority ............................................................ 20

                i.    The Board Approves the Investigation and Authorizes Prosecution Based on an Ex Parte Communication with Prosecutors and Then Judges the Outcome ...................... 20

                ii.    The Board Cannot Fairly Adjudicate a Case It Has Already Prosecuted ........................................ 22

        2.    The Board's Secrecy Violates Due Process ............................ 24

       a.     The Importance of Precedent Is Deeply Rooted
In the Founding of Our Judicial System ...................................... 25

       b.     Allowing Access to Precedent Does Not Interfere With the
Statutory Requirement that the Board Keep The Identities of
Successful Respondents Confidential ........................................... 26

III.    THE CHIEF HEARING OFFICER IS UNCONSTITUTIONALLY APPOINTED
AND PROTECTED BY UNCONSTITUTIONAL REMOVAL RESTRICTIONS ........ 28

    A.    The Chief Hearing Officer is an "Officer of the United States" ........................... 28

    B.    The Chief Hearing Officer Is Unconstitutionally Appointed .............................. 30

    C.    The Chief Hearing Officer Is Unconstitutionally Protected From Removal ........ 33

    D.    The Unconstitutionality of the Chief Hearing Officer's Appointment
and Removal Protections Causes Harm to Plaintiffs ............................................ 35

IV.    THE NON-GOVERNMENTAL BOARD AND ITS PRIVATE STAFF ARE
UNCONSTITUTIONALLY EXERCISING CORE EXECUTIVE POWER AGAINST
PLAINTIFFS WITHOUT ADEQUATE GOVERNMENTAL DIRECTION AND
SUPERVISION.......................................................................................................... 36

V.    THE BOARD IS UNCONSTITUTIONALLY FUNDING
ITS PROSECUTIONS OF PLAINTIFFS ........................................................ 42

VI.    PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION OF THE
BOARD'S DISCIPLINARY PROCEEDINGS AGAINST THEM ................................ 49

CONCLUSION............................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdelfattah v. U.S. Dept. of Homeland Sec.*,
  787 F.3d 524 (D.C. Cir. 2015) ...............................................................17

*Alpine Sec. Corp. v. FINRA*,
  121 F.4th 1314 (D.C. Cir. 2024) (Walker, J., concurring in the judgment in
  part and dissenting in part), *cert. denied*, 2025 WL 1549780 (2025) ....................17

*Anastasoff v. U.S.*,
  223 F.3d 898 (8th Cir. 2000), *vacated on other grounds*, 235 F.3d 1054 (8th
  Cir. 2000) ...............................................................25, 26, 27

*Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*,
  564 F.3d 462 (D.C. Cir. 2009) ...............................................................9

*AT&T, Inc. v. FCC*,
  149 F.4th 491 (5th Cir. 2025) ...............................................................14

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
  598 U.S. 175 (2023) (Gorsuch, J., concurring)...............................................20, 23, 35

*Baxter v. Palmigiano*,
  425 U.S. 308 (1976)...............................................................41

*Brock v. Roadway Exp., Inc.*,
  481 U.S. 252 (1987)...............................................................18, 26

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009)...............................................................18

*Carter v. Carter Coal Co.*,
  298 U.S. 238 (1936)...............................................................37

*CFPB v. Community Fin. Sers. Ass'n*,
  601 U.S. 416 (2024)...............................................................47, 48

*Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*,
  494 U.S. 558 (1990)...............................................................13

*Cinderella Career & Finishing Sch., Inc. v. FTC*,
  425 F.2d 583 (D.C. Cir. 1970) ...............................................................24

*Collins v. Yellen*,
  594 U.S. 220 (2021)...............................................................35

*Currin v. Wallace*,
   306 U.S. 1 (1939) ....................................................................................................37

*Dep't of Transp. V. Ass'n of Am. R.R.s*,
   575 U.S. 43, 62 (2015) .....................................................................................24, 27

*Doe v. Hill*,
   141 F.4th 291 (D.C. Cir. 2025) ........................................................................24, 27

*Doe v. SEC*,
   114 F.4th 687 (D.C. Cir. 2024) ...............................................................................27

*Doe v. SEC*,
   28 F.4th 1306 (D.C. Cir. 2022) ...............................................................................27

*Doe v. SEC*,
   No. 23-1161, 2024 WL 1208353 (D.C. Cir. Mar. 21, 2024), *reh'g denied*,
   2024 WL 2059561 (D.C. Cir. May 7, 2024), *cert. denied*, 145 S. Ct. 462
   (2024) ......................................................................................................................27

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ................................................................................................49

*FCC v. Consumers' Research*,
   145 S. Ct. 2482 (2025) ..................................................................................44, 45, 46

*First State Bank v. Daniel & Assocs.*,
   519 F. Supp. 2d 1157 (D. Kan. 2007) .....................................................................13

*Free Enter. Fund v. PCAOB*,
   537 F.3d 667 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *rev'd* 561 U.S. 477
   (2010) ........................................................................................................................1

*Free Enter. Fund v. Pub. Co. Acct'g Oversight Bd.*,
   561 U.S. 477 (2010) ..................................................................................... *passim*

*Freytag v. Commissioner*,
   501 U.S. 868 (1991) ................................................................................................28

*Gallier v. Woodbury Fin. Serv. Inc.*,
   171 F. Supp. 3d 552 (S.D. Tex. 2016) .....................................................................13

*Gordon v. Holder*,
   721 F. 3d 638 (D.C. Cir. 2013) ...............................................................................49

*Jarkesy v. SEC*,
   34 F.4th 446 (5th Cir. 2022), *reh'g denied*, 51 F.4th 644 (5th Cir. 2022), *aff'd
   on other grounds*, 603 U.S. 109 (2024) ..................................................................33

*Kennedy v. Braidwood Management, Inc.*,
    145 S. Ct. 2427 (2025) ........................................................................................31

*Lucia v. SEC*,
    585 U.S. 237 (2018) ....................................................................7, 28, 29, 30

*Marshall v. Jerrico, Inc.*,
    446 U.S. 238 (1980) ........................................................................................19

*McKinney v. Dist. of Columbia*,
    142 F.4th 784 (D.C. Cir. 2025) ......................................................................17

*Morrissey v. Brewer*,
    408 US 471 (1972) ....................................................................................18, 22

*In re Murchison*,
    349 U.S. 133 (1955) ........................................................................................20

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
    53 F.4th 869 (5th Cir. 2022) ..........................................................................37

*Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*,
    301 U.S. 292 (1937) ........................................................................................18

*PAZ Sec., Inc. v. SEC*,
    494 F.3d 1059 (D.C. Cir. 2007) ....................................................................17

*In re Reinhart*,
    SEC Rel. No. 34-85964 (May 29, 2019) ........................................................40

*In the Matter of Ronaldo Ocampo, CPA*,
    Notice of Finality of Initial Decision (March 13, 2025) ..................................30

*SEC v. Blinder, Robinson & Co.*,
    855 F.2d 677 (10th Cir. 1988) ......................................................................47

*SEC v. Jarkesy*,
    603 U.S. 109 (2024) ........................................................................... *passim*

*SEC v. Whittemore*,
    659 F.3d 1 (D.C. Cir. 2011), *cert. denied*, 567 U.S. 935 (2012) ............................41

*Seila Law LLC v. Consumer Financial Protection Bureau*,
    591 U.S. 197 (2020) ........................................................................................48

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) (Gorsuch, J., concurring in part and concurring in
    judgment) ........................................................................................................17

*Sobin v. Dist. of Columbia*,
    480 F. Supp. 3d 210 (D.D.C. 2020) ...................................................................16

*Stanley L. Bloch, Inc. v. Klein*,
    258 N.Y.S.2d 501 (N.Y. Sup. Ct. 1965) .............................................................13

*Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*,
    148 F. 4th 121 (3d Cir. 2025) ...............................................................................9

*Sunshine Anthracite Coal Co. v. Adkins*,
    310 U.S. 381 (1940)..............................................................................................37

*Susman Godfrey LLP v. Executive Office of President*,
    2025 WL 1779830, No. 25-1107 (LLA) (D.D.C. June 27, 2025) ....................16, 18

*Texaco, Inc. v. FTC*,
    336 F.2d 754 (D.C. Cir. 1964), *vacated and remanded per curiam on other
    grounds*, 381 U.S. 739 (1965)..............................................................................24

*Tull v. United States*,
    481 U.S. 412 (1987)..............................................................................................10

*United States v. Herrera-Valdez*,
    826 F.3d 912 (7th Cir. 2016) ................................................................................22

*VHS Acquisition Subsidiary No. 7 v. NLRB*,
    759 F. Supp. 35 88, 98 (D.D.C. 2024) ...............................................29, 33, 34, 36

*Wildberger v. Am. Fed'n of Gov't Emps., AFL-CIO*,
    86 F.3d 1188 (D.C. Cir. 1996) .............................................................................20

*Williams v. Pennsylvania*,
    579 U.S. 1 (2016).......................................................................18, 20, 22, 23

*Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of President*,
    784 F. Supp. 3d 127 (D.D.C. 2025) .............................................................16, 49, 50

*Withrow v. Larkin*,
    421 U.S. 35 (1975)............................................................................ *passim*

**Statutes**

5 U.S.C. § 3331...................................................................................................45

5 U.S.C. § 4802...................................................................................................32

5 U.S.C. § 7521...................................................................................................34

15 U.S.C. § 78d................................................................................................31, 32

15 U.S.C. § 78m ................................................................................................43

15 U.S.C. § 78u ...........................................................................................36, 39

15 U.S.C. § 78y .............................................................................................6, 40

15 U.S.C. § 7211 ........................................................................................ *passim*

15 U.S.C. § 7213 ................................................................................................4

15 U.S.C. §§ 7215 ..................................................................................... *passim*

15 U.S.C. § 7217 ...............................................................................6, 11, 38, 40

15 U.S.C. § 7219 ........................................................................................42, 43

## Other Authorities

James F. Strother, *The Establishment of Generally Accepted Accounting Principles and Generally Accepted Auditing Standards*, 28 Vand. L. Rev. 201, 208 (1975) ...............................................................................................4

Maxwell J. Mehlman, *Professional Power and the Standard of Care in Medicine*, 44 Ariz. St. L.J. 1165, 1235 (2012) ..................................................12

Samuel H. Gruenbaum & Marc I. Steinberg, *Accountants' Liability and Responsibility: Securities, Criminal and Common Law*, 13 Loy. L.A. L. Rev. 247, 308 (1980) ...............................................................................................13

## Federal Rules and Regulations

17 C.F.R. § 200.66 ............................................................................................38

17 C.F.R. § 201.1001 ...............................................................................6, 17, 39

Fed. R. Civ. P. 56 ...............................................................................................9

## Public Company Accounting Oversight Board Bylaws and Rules

Bylaw VI.3 .....................................................................................................7, 34

Rule 3100 .............................................................................................8, 13, 14

Rule 3200 .........................................................................................4, 8, 13, 14

Rule 3200T ......................................................................................4, 8, 13, 14

Rule 3400T ............................................................................................13, 14

Rule 5100 .................................................................................................................4

Rule 5102 .................................................................................................................5

Rule 5103 .................................................................................................................5

Rule 5104 .................................................................................................................5

Rule 5110 .........................................................................................................5, 8, 39

Rule 5200 .......................................................................................................5, 29, 36

Rule 5204 ...........................................................................................................5, 29

Rule 5206 .................................................................................................................6

Rule 5303 ...............................................................................................................11

Rule 5441 .................................................................................................................5

Rule 5460 ...........................................................................................................5, 21

Rule 7103 ...............................................................................................................43

**Auditing Standards**

AS 1015 .........................................................................................................8, 13, 14

## PRELIMINARY STATEMENT

In these consolidated cases, two accountants ask this Court to protect them against oppressive and unconstitutional enforcement proceedings by the Public Company Accounting Oversight Board ("Board"), a statutorily created private corporation that Justice Kavanaugh once called "this unprecedented extra-constitutional stew."[1] Plaintiffs worked for Board-registered accounting firms and had spotless careers. Now, they face prosecution by a Board that is poised to expel them from their profession and fine them as much as $1 million each.

The Board's prosecutions violate several bedrock constitutional principles.

Article III and the Seventh Amendment guarantee a jury trial before an Article III judge for all common law claims and claims that seek legal (not equitable) relief. The Board's claims are rooted in common law—professional negligence—and the Board seeks legal remedies in the form of monetary penalties and deprivation of livelihood. Yet the Board's proceedings deny Plaintiffs their constitutional right to a jury trial in an Article III court.

The Fifth Amendment guarantees that "[n]o person shall be … deprived of life, liberty, or property without due process of law." That guarantee includes a fair trial before an impartial tribunal. The Board seeks to strip Plaintiffs of a protected liberty interest in their chosen careers, and of their property by levying enormous fines. But the Board's secret enforcement process is a mere simulacrum of justice: It forces Plaintiffs into a trial before a hearing officer who lacks independence, with supposedly *de novo* appellate review by a Board that has had multiple rounds of *ex parte* communications with the prosecutors and already publicly issued factual findings and legal conclusions on the matters that supposedly are yet to be adjudicated.

---

[1] *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 713 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *rev'd* 561 U.S. 477 (2010).

Article II requires that inferior officers (i) be appointed by the President alone, the Courts of Law, or the Heads of Departments and (ii) operate with presidential oversight. The Board's Chief Hearing Officer ("CHO") assigned to preside over and initially decide the Board's disciplinary prosecutions is an inferior officer who (i) is not lawfully appointed under Article II and (ii) enjoys multiple layers of protection from removal that render him immune from presidential supervision.

Article II also requires that, for the government to remain accountable to the people, it cannot delegate its authority to private actors. The members of the Board, its prosecution staff, and the CHO are all private citizens wielding prosecutorial and punitive executive power, without any meaningful direction or supervision from the President or anyone else in the Executive Branch.

Finally, Article I vests *Congress* with the exclusive power to lay and collect taxes. But the Board is not funded through a congressional appropriation of funds. Instead, the Board is financed through private funding, in violation of Article I.

For each of these reasons, individually and together, this Court should declare that the Board's enforcement prosecutions against Plaintiffs are unconstitutional and enjoin the Board from continuing those prosecutions.

## STATEMENT OF FACTS[2]

## I.      STATUTORY AND REGULATORY BACKGROUND

The Board is a private, non-profit corporation created by the Sarbanes–Oxley Act of 2002 ("SOX"). 15 U.S.C. § 7211, *et seq.*; *see Free Enter. Fund v. Pub. Co. Acct'g Oversight Bd.*, 561

---

[2] Plaintiffs incorporate by reference the facts stated in their Statement of Undisputed Material Facts ("SOMF"), filed herewith.

U.S. 477, 484 (2010).[3] It is governed by five Board members who are appointed by the Securities and Exchange Commission ("SEC"). 15 U.S.C. § 7211(e)(1), (4). Congress specifically provided that "[t]he Board shall not be an agency or establishment of the United States Government" and "[n]o member or person employed by, or agent for, the Board shall be deemed to be an officer or employee of or agent for the Federal Government by reason of such service." 15 U.S.C. § 7211(b).

The Board bears certain resemblances to the self-regulatory organizations in the securities industry. "Unlike . . . self-regulatory organizations, however, the Board is a Government-created, Government-appointed entity, with expansive powers to govern an entire industry." *Free Enter. Fund*, 561 U.S. at 485. The Board's mandate is expansive: As to the auditors of publicly traded companies, it is charged with enforcing SOX, the federal securities laws, SEC rules, the Board's own rules, and professional auditing standards. *Id.* "To this end, the Board may regulate every detail of an accounting firm's practice, including hiring and professional development, promotion, supervision of audit work, the acceptance of new business and the continuation of old, internal inspection procedures, professional ethics rules, and 'such other requirements as the Board may prescribe.'" *Id.* (quoting 15 U.S.C. § 7213(a)(2)(B)).

At its inception, the Board was empowered to adopt "initial or transitional standards" comprised of "'any portion of any statement of auditing standards or other professional standards that the [Board] determine[d] satisf[ied] the requirements of [SOX]," provided that those standards were "proposed by 1 or more professional groups of accountants.'" *Order Regarding Section 103(a)(3)(B) of the Sarbanes-Oxley Act of 2002*, Exchange Act Release No. 47745 (Apr. 25,

---

[3] The then-serving individual Board members were named as additional defendants in Civil Action No. 1:25-cv-186-ACR, but Doe 2, the plaintiff in that case, intends to voluntarily dismiss his claims against those defendants.

2003);[4] *see also* 15 U.S.C. § 7213(a)(3)(A)–(B). The Board adopted Rule 3200T, requiring registered firms and associated individuals to comply with standards commonly referred to as Generally Accepted Auditing Standards ("GAAS"), which outline in "general terms a reasonable definition of an auditor's legal and professional responsibilities." James F. Strother, *The Establishment of Generally Accepted Accounting Principles and Generally Accepted Auditing Standards*, 28 Vand. L. Rev. 201, 208 (1975). After the Board re-organized its audit standards, many of the GAAS standards were reconfigured into separately numbered Board Auditing Standards ("AS"). *See* PCAOB Auditing Standards: Reorganized and Pre-Reorganized Numbering (Jan. 2016).[5]

SOX also authorized the Board to conduct investigations and disciplinary proceedings. *See* 15 U.S.C. §§ 7215(b)(1), (c)(1)(A)–(C). By rule, the Board has delegated many of its statutorily assigned responsibilities to its staff, including its Division of Enforcement and Investigations ("Enforcement Staff") and its CHO. In investigations and disciplinary proceedings, Enforcement Staff —comprised entirely of private citizens who do not work for the government—has extensive law-enforcement power and discretion, including conducting so-called "informal inquiries" without any prior Board authorization. *See* PCAOB Bylaws and Rules ("Rule") 5100, *et seq.*[6] If the Board authorizes a formal investigation, Enforcement Staff is empowered to issue accounting board demands ("ABDs") for testimony and documents, take sworn testimony, and examine books

---

[4]  *Available  at*  https://www.sec.gov/rules-regulations/2003/04/order-regarding-section-103a3b-sarbanes-oxley-act-2002 (last visited Sept. 25, 2025).

[5]  *Available  at*,  https://pcaobus.org/Standards/Auditing/Documents/PrintableReferenceTable.pdf (last visited Sept. 25, 2025).

[6]  *Available  at*,  https://assets.pcaobus.org/pcaob-dev/docs/default-source/rules/documents/rules-booklet898b4bd3-35e5-44af-a587-e28bdeccd3c4.pdf?sfvrsn=f953259d_2 (last visited Sept. 25, 2025).

and records. Rules 5102, 5103, 5104. The Board can, and typically will, harshly penalize auditors who fail to comply with an ABD or otherwise fail to cooperate with an investigation. Rule 5110. And unlike with subpoenas issued by the SEC and other conventional governmental agencies, the Board can impose these harsh sanctions on a noncooperating auditor without first seeking a court order to enforce the relevant ABD. *See* 15 U.S.C. § 7215(b)(3), (c)(4); Board Rule 5110. Board rules provide no process by which auditors can challenge these ABDs in court or otherwise.

The Board is also empowered to conduct adjudicatory proceedings to determine whether an auditor should be disciplined. *See* 15 U.S.C. § 7215(c); Rules 5200 et seq. The Board typically delegates responsibility for conducting such proceedings to the CHO. *See* 15 U.S.C. § 7211(g)(2); Rule 5200. The CHO's duties include, among other things, "issuing accounting board demands"; "receiving relevant evidence and ruling upon the admission of evidence and offers of proof"; "holding prehearing and other conferences; and, except where the rules otherwise provide, "considering and ruling upon all procedural and other motions." Rule 5200(c). The rules provide a catch-all provision empowering the CHO to "regulat[e] the course of a proceeding and the conduct of the parties and their counsel." *Id.* Evidentiary rulings are at the discretion of the CHO. Rule 5441.

After a hearing, the CHO issues an initial decision that "include[s] findings and conclusions, including sanctions, if appropriate, and the reasons or basis therefor, as to all the material issues of fact, law or discretion presented on the record and such other information as the Board may require." Rule 5204(b). The respondent or Enforcement Staff may appeal the CHO's decision to the Board. Rule 5460. The CHO's decision becomes final if no party files a petition for appellate review by the Board. Rule 5204(d).

Board investigations, hearings, and internal appeals are conducted in secret, outside of public view.[7] In those secret proceedings, the Board and its CHO have issued non-public decisions on procedural and substantive law, including decisions that interpret and apply Board rules, SEC rules, and the federal securities laws. (SOMF ¶¶ 33-35.) Because Enforcement Staff prosecutes all Board disciplinary proceedings, Enforcement Staff is aware of and has access to all previous non-public decisions, including any non-public final decisions and all interlocutory decisions. (*Id.* at ¶ 36.) But those non-public decisions are not accessible to the public or to respondents in other Board proceedings. (*Id.* at ¶ 37.) *See* 15 U.S.C. § 7215(b)(5)(A).

SOX empowers the Board to impose harsh punitive sanctions, including a permanent bar or suspension that prohibits accountants from working for any Board-registered accounting firm, and civil money penalties that can exceed $1 million per violation for individuals. *See* 15 U.S.C. § 7215(c)(4); 17 C.F.R. § 201.1001.

Pursuant to SOX, the SEC may review any disciplinary sanction imposed by the Board, either on petition by an "aggrieved" respondent or on the SEC's own initiative. *See* 15 U.S.C. § 7217(b)(2)-(4),(c)(2); Rule 5206(b). If no petition is filed, however, there is no requirement for the SEC to review the Board's decision, and that decision, including any sanctions imposed, becomes final by default. *See* Rule 5206. An accountant or firm aggrieved by a "final" SEC order may challenge that order in a court of appeals. 15 U.S.C. § 78y(a)(1), (b)(1), (c)(1).

In its 23-year history, the Board has encountered multiple issues with the constitutionality of its structure and operations. In 2010, the Supreme Court found unconstitutional the provision of SOX that allowed the SEC to remove Board members from office "only 'for good cause shown,'

---

[7] Although SOX includes a provision that allows respondents to consent to a public hearing, the Board has never held a public disciplinary hearing. (SOMF ¶ 26; <u>Exhibit D</u>, Board's Supplemental Responses to Discovery Requests, Int. No. 16.)

'in accordance with' certain procedures." *Free Enter. Fund*, 561 U.S. at 486 (quoting 15 U.S.C. § 7211(e)(6)). Because SEC commissioners are also widely understood to be removable only for cause, the Supreme Court held that the "dual for-cause limitations on the removal of Board members contravene the Constitution's separation of powers." *Id.* at 492. To cure that infirmity, the Court excised the "for good cause shown" restriction from the statute, leaving the members of the Board subject to removal by the SEC at will. *Id.* at 509.

The Supreme Court later held that SEC administrative law judges ("ALJs") are "Officers of the United States," and thus must be appointed in accordance with the Appointments Clause of Article II of the Constitution. *Lucia v. SEC*, 585 U.S. 237, 251 (2018). Recognizing the possibility that "legal uncertainty . . . about the [Board] hearing officer" could arise in the wake of the Court's holding, the Board changed its rules. *See* Bylaw and Rule Amendments to Provide that the PCAOB's Appointment and Removal of Its Hearing Officers Are Subject to Commission Approval, PCAOB Release No. 2019-001 (Jan. 29, 2019) at 3–6 ("*Lucia* Press Release").[8] Specifically, the Board amended Article VI.3 of its bylaws to provide that "the appointment or removal of any hearing officer shall be made by the Governing Board and shall be subject to the approval of the [SEC]." Bylaw VI.3.

On April 8, 2019, the Board announced that its then-incumbent CHO was belatedly sworn in after his appointment by the Board and was approved by the SEC in accordance with these amended rules and guidelines. (SOMF ¶¶ 18-20.) That CHO recently retired, and the position remains vacant. (*Id.* at ¶¶ 21-22.)

---

[8]    *Available    at*    https://pcaobus.org/Rulemaking/Docket045/Release-2019-001-Bylaws-Amendments.pdf (last visited Sept. 25, 2025).

## II.    <u>THE DOE PLAINTIFFS</u>

Doe 1 is an accountant formerly employed by a Board-registered accounting firm ("Doe 1's Employer"). (SOMF ¶ 1.) In December 2022, the Board instituted formal disciplinary proceedings charging that Doe 1 led an effort to modify audit documentation after an audit was closed and in anticipation of a Board staff inspection, that he lied to Enforcement Staff about the documentation during the ensuing investigation, and that he pressured others to do the same, in violation of, among other things, PCAOB Rule 3100 (Compliance with Auditing and Related Professional Practice Standards), 3200T (Interim Auditing Standards), and 5110 (Noncooperation with an Investigation). (*Id.* at ¶¶ 38-39.)

Doe 2, who has no personal, professional, or other relationship with Doe 1, is likewise an accountant formerly employed by a different Board-registered firm. (*Id.* at ¶ 2.) In September 2023, the Board instituted formal disciplinary proceedings charging him with failing to adequately evaluate certain accounting estimates used by an audit client to value one of its revenue sources and the associated accounts receivable in violation of, among other things, PCAOB Rule 3100 (Compliance with Auditing and Related Professional Practice Standards), PCAOB Rule 3200 (Auditing Standards); and Auditing Standard No. 1015 (Due Professional Care in the Performance of Work). (*Id.* at ¶¶ 40-41.)

Before instituting its disciplinary proceedings against Doe 1 and Doe 2, the Board publicly issued orders announcing settled disciplinary charges against their respective employers. (*Id.* at ¶ 42.) Those orders contained factual findings by the Board that are substantively identical to the allegations the Board has made in its charges against the Doe Plaintiffs. (*Id.*) They also contain legal conclusions by the Board based on those factual findings. (*Id.*)

The Board's disciplinary proceedings against both Plaintiffs are currently stayed.

**ARGUMENT**

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party opposing summary judgment may not create a genuine dispute of fact merely by offering conclusory allegations. *Ass'n of Flight Attendants-CWA*, 564 F.3d 462, 466 (D.C. Cir. 2009).

## I. THE BOARD'S DISCIPLINARY PROCEEDINGS DEPRIVE PLAINTIFFS OF THEIR RIGHTS TO AN ARTICLE III ADJUDICATION AND A JURY TRIAL

The Constitution vests "[t]he judicial Power of the United States ... in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. 3, § 1. That "judicial Power" extends to "all cases, in Law and Equity, arising under [the] Constitution [and] the Laws of the United States." *Id.* § 2. "The judges of those courts enjoy life tenure and salary protection, attributes that preserve an 'independent spirit' that is 'essential to the faithful performance' of their duty." *Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*, 148 F. 4th 121, 127 (3d Cir. 2025) (quoting The Federalist No. 78, p. 469 (C. Rossiter ed. 1961) (A. Hamilton)). "Because non-Article III tribunals lack these important qualities, Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'" *Id.* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1855)).

Closely related, the Seventh Amendment "[b]y its text . . . guarantees that in '[s]uits at common law … the right of trial by jury shall be preserved.'" *SEC v. Jarkesy*, 603 U.S. 109, at 122 (2024) (quoting U.S. Const., am. VII). Whether a suit is one "at common law" depends on "the cause of action and the remedy." *Id.* at 123. Critically, the Supreme Court has long "reject[ed]" the notion that "*both* the cause of action *and* the remedy must be legal in nature before the Seventh

Amendment right to a jury trial attaches." *Tull v. United States*, 481 U.S. 412, 421 n.6 (1987) (emphases added). Rather, an action must proceed before a jury if *either* the claim *or* the remedy so necessitates. And as between the two, the remedy is "the 'more important' consideration." *Jarkesy*, 603 U.S. at 123 (quoting *Tull*, 481 U.S. at 421).

Here, both the threatened sanctions and the causes of action against Plaintiffs are legal, not equitable. The so-called "public rights exception" does not save the Board's unconstitutional prosecutions, because Plaintiff's constitutional rights are private rights. Thus, both Article III and the Seventh Amendment bar the Board's in-house adjudication of the disciplinary proceedings against Plaintiffs.

### A.    The Remedies Sought Are Legal in Nature

In this case, "the remedy is all but dispositive." *Jarkesy*, 603 U.S. at 123. The Board's disciplinary prosecutions of Plaintiffs threaten harsh sanctions, including monetary penalties, debarment from the public auditing profession, and public censure. Those are "common law remed[ies]" that trigger the jury-trial right. *Id.* at 123–25.

In *Jarkesy*, the Supreme Court recognized that "monetary relief can be legal or equitable." *Id.* at 123. "What determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer," rather than "solely [] serv[ing] a remedial purpose …." *Id.* Board penalties are unquestionably designed to punish and deter. They can exceed $1 million *for each violation*.. *See* 15 U.S.C. § 7215(c)(4)(D)(ii) (original maximum penalty amounts); *Adjustments to Civil Monetary Penalty Amounts*, SEC Rel. No. 33-11350[9] (current inflation-adjusted maximum penalty amounts). They are plainly designed to punish and deter, and they are not remedial.

---

[9] *Available at* https://www.sec.gov/files/rules/other/2025/33-11350.pdf (last visited Sept. 25, 2025).

The Board itself has noted that, "[i]f a disciplinary hearing results in a finding that a violation occurred, the rules provide for sanctions designed to *deter* a possible recurrence." Pub. Co. Acct. Oversight Bd., *Rules on Investigations and Adjudications: Rule on Withdrawal from Registration* (2003)[10] (emphasis added). Indeed, the Board and its leaders have repeatedly boasted that the disciplinary sanctions it imposes are intended to "promote deterrence," PCAOB 2024 Annual Report at 4,[11] "deter[] wrongdoing," *id.* at 13, and "[r]emov[e] bad actors from the profession[,] and punish[] wrongdoing," Speech, "PCAOB Chair Williams Delivers Remarks at the Accountants' Liability Conference, June 3, 2025.[12] The Board has never claimed that its penalties are designed exclusively, or even primarily, to compensate injured parties. In fact, both SOX and the Board's rules *forbid* the Board to distribute the penalties it collects to compensate victims of alleged violations. *See* 15 U.S.C. § 7217(c)(2) (directing Board to funnel all penalties into a private scholarship fund for accounting students); Board Rule 5303 (same). In short: The money penalties Plaintiffs face are punitive and legal in nature.

Other remedies the Board has threatened against Plaintiffs—censuring them and barring or suspending them from their profession—are *also* designed to punish and deter. Neither sanction has any impact on those allegedly affected by Plaintiffs' conduct, or any purpose apart from punishing Plaintiffs' alleged misdeeds and deterring other regulated individuals and entities from

---

[10] *Available at* https://assets.pcaobus.org/pcaob-dev/docs/default-source/rulemaking/docket_005/2003-09-29_briefing_paper.pdf?sfvrsn=a1e05590_0 (last visited Sept. 25, 2025).

[11] *Available at* https://assets.pcaobus.org/pcaob-dev/docs/default-source/about/administration/documents/annual_reports/2024-annual-report.pdf?sfvrsn=9cfa1a56_2 (last visited Sept. 25, 2025).

[12] *Available at* https://pcaobus.org/news-events/speeches/speech-detail/pcaob-chair-williams-delivers-remarks-at-the-accountants--liability-conference (last visited Sept. 25, 2025).

engaging in similar conduct. Thus, these are "prototypical common-law remed[ies]" available only in an Article III court of law. *Jarkesy*, 603 U.S. at 123.[13]

###### B. The Board's Enforcement Claims Are Rooted in Common Law

"As Justice Story explained, the Framers used the term 'common law' in the [Seventh] Amendment 'in contradistinction to equity, and admiralty, and maritime jurisprudence.'" *Id.* (quoting *Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. 433, 446 (1830)). "The Amendment therefore 'embrace[s] all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume.'" *Id.* (quoting *Parsons*, 28 U.S. at 447). That a claim may be based on a statute or rule "is immaterial"—so long as an action is legal in nature, it must be heard by a jury regardless of the "'peculiar form [it] may assume.'" *Id.* (quoting *Parsons*, 28 U.S. at 447). As the Supreme Court explained in *Jarkesy*, moreover, a claim need not be identical to a common-law antecedent to warrant a jury trial; a "close relationship" will suffice. 603 U.S. at 126 (differences between common-law fraud claims and SEC securities-fraud claims did not negate the need for a jury trial).

Here, the standards and rules Plaintiffs are accused of violating have their roots in common law negligence and malpractice. "[T]he general concept of professional malpractice was well embedded in English legal theory by the beginning of the 18th century." Maxwell J. Mehlman, *Professional Power and the Standard of Care in Medicine*, 44 Ariz. St. L.J. 1165, 1235 (2012) (quoting James C. Mohr, *American Medical Malpractice Litigation in Historical Perspective*, 283 JAMA 1731, 1732 (2000)) (internal bracket omitted). Consistent with that historical tradition, the

---

[13] The Board cannot plausibly contend that these remedies are equitable in nature. As previously noted, Article III of the Constitution vests the power to decided *all* cases in equity exclusively in the courts, so the Board has no lawful power to order any relief in equity. And even if no jury trial is required for cases solely in equity, those cases must nevertheless be adjudicated by Article III courts, not by private corporations purporting to operate as adjuncts to the Executive Branch.

Supreme Court recognized that a claim for *legal* malpractice "was historically an action at law," not equity. *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 568 (1990) (internal citation omitted).

Accounting negligence and malpractice cases are no different. *See, e.g., First State Bank v. Daniel & Assocs.*, 519 F. Supp. 2d 1157, 1160-61 (D. Kan. 2007) (common law recognized a cause of action for accounting malpractice); *Gallier v. Woodbury Fin. Serv. Inc.*, 171 F. Supp. 3d 552, 565 (S.D. Tex. 2016) (same). Historically, in private civil cases, accountants were held to a standard of care and diligence expected of their profession: "As a general proposition, accountants, as members of a skilled professional class, must exercise that degree of care and competence reasonably expected of persons in their profession in the community." Samuel H. Gruenbaum & Marc I. Steinberg, *Accountants' Liability and Responsibility: Securities, Criminal and Common Law*, 13 Loy. L.A. L. Rev. 247, 308 (1980); *accord Stanley L. Bloch, Inc. v. Klein*, 258 N.Y.S.2d 501, 505 (N.Y. Sup. Ct. 1965) ("At least since 1905, accountants, in this country, have been accepted as a 'skilled professional class … subject to the same rules of liability for negligence in the practice of their profession as are members of other skilled professions'" (quoting *Smith v. London Assur. Corp.*, 96 N.Y.S. 820, 820 (N.Y. App. Div. 1905)). Failure to perform in accordance with applicable standards could result in the accountant being "liable to his client…in tort for failure to exercise due care." Gruenbaum & Steinberg, *supra*, at 308–09.

When the Board adopted GAAS as a means of evaluating accountants' compliance with professional standards, it imported "the old soil" of common-law negligence and malpractice. *Jarkesy*, 603 U.S. at 123. That is apparent in the Board rules Plaintiffs are accused of violating. The Board alleges that, among other rules, Plaintiffs violated Board Rules 3100, 3200, 3200T, and 3400T, and AS 1015. (SOMF ¶¶ 39, 41.) Rule 3100 requires "compl[iance] with all applicable

13

auditing and related professional practice standards" and AS 1015 requires "due professional care in the performance of work"—obviously professional competence standards. Similarly, Rules 3200, 3200T, and 3400T require nothing more than adherence to "auditing standards" including GAAS.

Obviously, then, the rules and standards Plaintiffs are alleged to have breached bear a "close relationship" to common-law claims. *Jarkesy*, 603 U.S. at 125. Indeed, some borrow common law terms like "reasonable care," *AT&T, Inc. v. FCC*, 149 F.4th 491, 499 (5th Cir. 2025), or literally require compliance with "professional practice standards." *See* Rule 3100, AS 1015.[14] Because the Board is essentially accusing Plaintiffs of negligent auditing, and even malpractice, its claims are grounded in common-law concepts and Plaintiffs therefore have a constitutional right to an Article III adjudication and a jury trial.

### C.    The Public Rights Exception Does Not Apply

Although cases sometimes refer to a "public rights" exception to Article III adjudication and the Seventh Amendment's jury-trial guarantee, that narrow exception does not apply here. *Jarkesy*, 603 U.S. at 127. "Public rights are a narrow class defined and limited by history" to revenue collection, customs enforcement, immigration, relations with Indian tribes, administration of public lands, and the granting of public benefits. *Id.* at 152–53 (Gorsuch, J., concurring). The Board plays no role in any of those governmental functions.

Any doubt about whether the Board's prosecutions of Plaintiffs implicate private rather than public rights was conclusively removed last year by the Supreme Court's *Jarkesy* decision,

---

[14] That other rules include technical standards does not sever their ties to the common law. "[T]he key inquiry . . . is not what terminology the [law] uses but whether the [law] 'target[s] the same basic conduct' as the common law claim." *AT&T*, 149 F.4th at 499 (quoting *Jarkesy*, 603 U.S. at 125).

which limited, distinguished, and criticized the public rights exception as "a departure from our legal traditions" that "has no textual basis in the Constitution" and that has been widely disparaged or "simply ignored" by scholars and commentators. 603 U.S. at 131, 138 n.4. Although the Court stopped short of expressly overruling its precedents recognizing the exception, it left little doubt that whatever vestiges of the exception remain after *Jarkesy*, the exception is strictly limited to its historical applications. *Id.* at 128-30. When a part of the government prosecutes a person to penalize and deter alleged wrongdoing, that is a quintessential threat to *private* rights, not public rights.

## II.    THE BOARD'S DISCIPLINARY PROSECUTIONS THREATEN TO DEPRIVE PLAINTIFFS OF LIBERTY AND PROPERTY INTERESTS WITHOUT DUE PROCESS IN VIOLATION OF THE FIFTH AMENDMENT

Article III and the "Seventh Amendment's jury-trial right do[] not work alone." *Jarkesy*, 603 U.S. at 141 (Gorsuch, J., concurring). They operate "together with … the Due Process Clause of the Fifth Amendment" to "limit how the government may go about depriving an individual of life, liberty, or property." *Id.* The Due Process Clause demands that "[n]o person shall be … deprived of life, liberty, or property without due process of law …." U.S. Const. Am. V. That clause, together with Article III and the Seventh Amendment, "vindicate[s] the Constitution's promise of a 'fair trial in a fair tribunal.'" *Id.* (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). Congress reinforced the requirement of due process by requiring the Board to implement "fair procedures for the investigation and disciplining of registered public accounting firms and associated persons of such firms." 15 U.S.C. § 7215(a). The Board's disciplinary proceedings fall far short of these constitutional and statutory requirements.

To establish a due process violation, a plaintiff must show: "'(i) deprivation of a protected liberty or property interest; (ii) by the government;[15] (iii) without the process that is 'due' under the Fifth Amendment.'" *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 163 (D.D.C. 2025) (quoting *N.B. ex rel. Peacock v. Dist. of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015)). Two aspects of the Board's structure—its biased tribunal and the secrecy of its proceedings—make it impossible for the Board to provide the process that is "due" before depriving Plaintiffs of protected liberty and property interests.

### A.    Board Sanctions Would Violate Plaintiffs' Liberty and Property Interests

The Court "must 'first determine whether constitutional safeguards apply at all, i.e., whether [Plaintiffs] ha[ve] a protected property or liberty interest that triggers Fifth Amendment due process protection.'" *Susman Godfrey LLP v. Executive Office of President*, 2025 WL 1779830, No. 25-1107 (LLA) at *19 (D.D.C. June 27, 2025) (quoting *Reeve Aleutian Airways, Inc. v. United States*, 982 F. 2d 594, 598 (D.C. Cir. 1993)). The Board has the power to impose severe punitive sanctions against Plaintiffs that impermissibly infringe on their constitutionally protected liberty and property interests in two ways.

First, the Board threatens to levy substantial civil money penalties, which would deprive Plaintiffs of their property. *See, e.g.*, *Jarkesy*, 603 U.S. at 151 (Gorsuch, J., concurring) (observing that the money "penalty the SEC seeks would 'depriv[e]' [plaintiff] of 'property,'" thereby triggering due process protections); *see also Sobin v. Dist. of Columbia*, 480 F. Supp. 3d 210, 218 (D.D.C. 2020) (money penalties for traffic infractions implicate a "not insignificant" property interest).

---

[15] The Board is treated as part of the government for certain constitutional purposes. *Free Enter. Fund*, 561 U.S. at 486. (SOMF ¶ 4.)

16

Second, the Board threatens to permanently ban Plaintiffs from associating with any Board-registered firm. 15 U.S.C. § 7215(c)(4); 17 C.F.R. § 201.1001. The breadth of these deprivations can be professionally incapacitating. For example, the Board's ban would bar Plaintiffs from being "associated with" registered public accounting firms in even a non-accounting capacity, ban them from associating with any issuer, broker, or dealer in any financial capacity, and even require them to obtain prior Board or SEC approval before taking any job whatsoever with any issuer, broker, or dealer. *See* 15 USC § 7215(c)(7)(B).

The D.C. Circuit has aptly described similar industry bars as "the securities industry equivalent of capital punishment." *PAZ Sec., Inc. v. SEC*, 494 F.3d 1059, 1065 (D.C. Cir. 2007); *accord Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1340 (D.C. Cir. 2024) (Walker, J., concurring in the judgment in part and dissenting in part) ("From a broker's perspective," expulsion from the securities industry is "the 'corporate death penalty.'"), *cert. denied*, 2025 WL 1549780 (2025). Justice Gorsuch recently expressed concern that the consequences of such bars can often exceed those of criminal sanctions, because they "strip persons of their professional licenses and livelihoods." *Sessions v. Dimaya*, 584 U.S. 148, 184 (2018) (Gorsuch, J., concurring in part and concurring in judgment).

"'One of the liberty interests protected by the Fifth Amendment is the right to follow a chosen profession free from government interference.'" *McKinney v. Dist. of Columbia*, 142 F.4th 784, 795 (D.C. Cir. 2025) (quoting *Campbell v. Dist. of Columbia*, 894 F.3d 281, 288 (D.C. Cir. 2018)). When, as here, the "government formally debars a[] [plaintiff] from certain work or implements broadly preclusive criteria that prevent pursuit of a chosen career, there is a cognizable 'deprivation of liberty that triggers the procedural guarantees of the Due Process Clause.'" *Abdelfattah v. U.S. Dept. of Homeland Sec.*, 787 F.3d 524, 538 (D.C. Cir. 2015) (quoting *Trifax*

*Corp. v. Dist. of Columbia*, 314 F.3d 641, 643-44 (D.C. Cir. 2003)). Precluding Plaintiffs from "associating with" virtually every potential employer has "the broad effect of largely precluding [them] from pursuing [their] chosen career'"—auditing—thereby depriving them of a protected liberty interest. *Susman Godfrey LLP*, 2025 WL 1779830, at *19 (quoting *O'Donnel v. Barry*, 148 F.3d 1126, 1140-41 (D.C. Cir. 1998)) (executive order deprived law firm and its attorneys of the right to pursue their chosen profession).

### B.    The Board's Disciplinary Prosecutions Structurally Deprive Plaintiffs of Due Process

Having established "'that due process applies, the question remains what process is due'" and whether the Board's hearing procedures sufficiently provide it. *Brock v. Roadway Exp., Inc.*, 481 U.S. 252, 261 (1987) (quoting *Morrissey v. Brewer*, 408 US 471, 481 (1972)). They do not. At every stage—from investigation, to hearing, to appeal—Plaintiffs face a single institution with unchecked control, no meaningful separation between roles, and institutionalized bias favoring prosecution and punishment. This structure cannot be squared with the constitution. *See, e.g.*, *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) ("[A] biased decision maker [is] constitutionally unacceptable…."); *Morrissey*, 408 U.S. at 485 (adjudication "should be made by someone not directly involved with the case"); *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016) (risks that "endanger[] the appearance of neutrality …must be forbidden if the guarantee of due process is to be adequately implemented") (internal quotation and citation omitted).

### 1.    The Board's Captive, In-House Tribunal Is Structurally Biased

"A fair trial in a fair tribunal is the basic requirement of due process," *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877 (2009) (quoting *Murchison*, 349 U.S. at 136), and an "inexorable safeguard" of individual liberty, *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292, 304 (1937) (quoting *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 73

(1936)). The requirement of neutrality in the adjudicative process has been "jealously guarded by [the Supreme] Court." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242-43 (1980). This requirement applies equally to administrative agencies. *Withrow*, 421 U.S. at 46. Although courts have presumed honesty and integrity in governmental adjudicators, that presumption must yield where, under a "realistic appraisal of psychological tendencies and human weakness," the system presents a risk of bias or prejudgment that is constitutionally intolerable. *Id.* at 47. Moreover, any such presumptions of adjudicative honesty and integrity should be accorded, if at all, only to governmental agency heads appointed by the President and confirmed by the Senate and subject to an array of federal statutes designed to ensure accountability and transparency—not to officers of private corporations who have not undergone any similar vetting before assuming their adjudicative roles and operate almost entirely in secret. In any event, the Board's structure makes neutrality impossible.

a.    The Chief Hearing Officer Is an Employee<br>of the Board and Cannot Be Neutral

The CHO is an *employee* of the Board. (SOMF ¶ 17.) That employment relationship creates an obvious threat to neutrality. Because the Board is the CHO's employer and oversees the CHO's performance, the Board controls both the employment terms and the professional incentives of the adjudicator presiding over the cases against Plaintiffs. "Going in, then, the odds [are] stacked against" Plaintiffs. *Jarkesy*, 603 U.S. at 143 (Gorsuch, J., concurring).

Employment creates pressure, either implicit or explicit, to conform to institutional expectations. When adjudicators "remain servants of the same master—the very agency tasked with prosecuting individuals like [Plaintiffs]—it can be "'extremely difficult, if not impossible, for the [adjudicator] to convey the image of being an impartial fact finder.'" *Id.* 142 (quoting B.

Segal, The Administrative Law Judge, 62 A.B.A.J. 1424, 1426 (1976)). In practice, the CHO cannot reasonably be perceived as independent from the very institution bringing the charges.

> b.    The Board Itself Acts as Prosecutor,
> Judge, and Appellate Authority

A bedrock prerequisite of due process is that prosecutors and adjudicators must not decide their own cases. *See, e.g.*, *Williams*, 579 U.S. at 8-9; *Murchison*, 349 U.S. at 136-37. Yet that is precisely what the Board is poised to do in its non-jury prosecutions of Plaintiffs. The Board's combination of investigative, prosecutorial, and adjudicative roles means that a constitutionally intolerable risk of bias is baked into nearly every stage of its disciplinary proceedings. Although courts have recognized that the combination of these roles in conventional governmental agencies does not automatically violate due process, that structure becomes unconstitutional where "evidence casts doubt on the partiality of the [decisionmaker]." *Wildberger v. Am. Fed'n of Gov't Emps., AFL-CIO*, 86 F.3d 1188, 1195 (D.C. Cir. 1996). The Constitution built "high walls" around individual liberty and "clear distinctions" between enforcers and arbiters with good reason: without them, the government's power to infringe the rights of its citizens would be unbounded. *Jarkesy*, 603 U.S. at 167 (Gorsuch, J., concurring). Here, the Board's disciplinary proceedings knock down those walls at every turn and set up an extraordinarily "tilted … game." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 215 (2023) (Gorsuch, J., concurring).

> i.    The Board Approves the Investigation and Authorizes
> Prosecution Based on an Ex Parte Communication with
> Prosecutors and Then Judges the Outcome

"[C]onferring investigative and adjudicative powers on the same individuals" is impermissible where it "poses [] a risk of actual bias or prejudgment…." *Withrow*, 421 U.S. at 47. The risk may not be obvious: Courts must be "alert to the possibilities of bias that may lurk in the way particular procedures actually work in practice." *Wildberger*, 86 F.3d at 1195-96 (quoting

*Withrow*, 421 U.S. at 54). When the Supreme Court, in *Withrow*, approved of a state medical license suspension procedure that combined investigative and adjudicative functions, it highlighted necessary procedural safeguards that the Board notably lacks here. *Id.* at 54-55.

First, Enforcement Staff must obtain Board approval to initiate a formal investigation, which is done through *ex parte* communications between Enforcement Staff and the Board, excluding the respondent and his counsel. (SOMF ¶ 10-11; Exhibit A, Cox Decl. at ¶¶ 4-5.) Then, before disciplinary proceedings can begin, Enforcement Staff engages in further *ex parte* communications with the Board to obtain approval, again excluding the respondent and counsel. (SOMF ¶¶ 12-14; Exhibit A, Cox Decl. at ¶¶ 4-5.) Unlike *Withrow*, where the respondent had the opportunity to attend *both* the investigative and adversarial hearings, here the respondent is shut out of two critical prosecutorial decisions: the initiation of the investigation and the filing of charges. *See Withrow*, 421 U.S. at 40 (respondent was permitted to "appear before the Board and explain any of the evidence which had been presented"). Secret *ex parte* communications, particularly during critical investigative and charging decisions, compromise the fairness of the process by denying the respondent any opportunity to rebut or contextualize evidence and argument. That structural difference creates an intolerable risk of bias and transforms the Board's process from merely imperfect to constitutionally defective.

Second, after the CHO issues a decision, any appeal is directed to the very same Board that, after hearing evidence and argument from Enforcement Staff on an *ex parte* basis, approved of both the investigation and the resulting disciplinary prosecution. Rule 5460.

This concentration of roles—prosecutor, fact finder, adjudicator, appellate body—is exactly the set of "special facts and circumstances" the Supreme Court warned created "a risk of unfairness [that] is intolerably high." *Withrow,* 421 U.S. at 58. The Board cannot reasonably be

viewed as impartial. As a result, the Board's disciplinary process denies Plaintiffs the basic promise of due process: "a 'fair trial in a fair tribunal.'" *Id.* at 46.

        ii.      *The Board Cannot Fairly Adjudicate a Case It Has Already Prosecuted*

When an appeal from an initial decision is necessary, the appellate decisionmaker cannot be the same decisionmaker who made the decision to prosecute the case. *Withrow*, 421 U.S. at 59, n.25; *see also Williams*, 579 U.S. at 8 ("Of particular relevance to the instant case, the Court has determined that an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case."); *United States v. Herrera-Valdez*, 826 F.3d 912, 919 (7th Cir. 2016) ("We conclude that a reasonable, disinterested observer could assume bias from the fact that the judge presiding over the defendant's prosecution for illegal reentry was the same person who ran the office that pursued, and succeeded in obtaining, the removal order that is the source of his current prosecution."). "Allowing a decisionmaker to review and evaluate his own prior decisions raises problems…" *Withrow*, 421 U.S. at 59, n. 25. The Court need not assume bad motives or perceive hostility in deciding that there should be a different person making preliminary evaluations and final adjudications. *Morrissey*, 408 U.S. at 485-86; *Williams,* 579 U.S. at 4.

Here, the Board made two critical prosecutorial decisions before pivoting to its current role of purportedly neutral and impartial adjudicator of the cases against Plaintiffs: it authorized and initiated the investigations of Plaintiffs and later authorized and initiated the now-pending disciplinary proceedings against them. (*See* SOMF ¶¶ 38, 40.) The Board should not be permitted to sit in judgment of Plaintiffs after making these two critical prosecutorial decisions—just like a grand jury would not be permitted to reassemble and adjudicate an appeal from the conviction of a person it had previously indicted. There is an impermissible risk that the Board "would be so psychologically wedded to [their] previous position as a prosecutor that the [Board] would

consciously or unconsciously avoid the appearance of having erred or changed position." *Williams*, 579 U.S. at 9 (internal citations and quotations omitted).

The way the Board's appellate procedures work in practice also reveals bias on multiple levels. First, an appeal implicates the decision of the CHO, who is employed by the Board and was hand-selected by the Board for that important role. (*See* SOMF ¶ 17.) Overruling the CHO, especially in multiple instances, could easily cast doubt and concern over the Board's own judgment in choosing its most important personnel. Moreover, an appeal implicates the Board's own prior judgments that an investigation and disciplinary charges were necessary, because it calls both decisions into question. Indeed, "[t]he numbers reveal just how titled this game is." *Axon*, 598 U.S. at 215 (Gorsuch, J., concurring). As of 2024, the Board had completed nearly 500 enforcement actions.[16] The public record reveals no instance in which the Board overruled a CHO decision in favor of the Enforcement Staff in its entire 23-year history.

The risk of bias is even more pronounced for the Plaintiffs here. If the disciplinary prosecutions of the Plaintiffs were to proceed, Plaintiffs and the Board would litigate, and the CHO would decide, many hotly contested facts. Here is the problem: in each case, the Board has already resolved those same factual issues, published factual findings on those issues, and pronounced legal conclusions based on those factual findings in public orders against the Plaintiffs' former employers and colleagues. (*See* SOMF ¶ 42.) It defies logic and human nature to deny that a CHO employed, supervised, and compensated by the Board would be reticent to make conflicting factual findings or draw different legal conclusions than the Board has already publicly pronounced. Similarly, the Board itself would naturally be at least subconsciously reluctant to contradict the

---

[16] Cornerstone Research, *PCAOB Enforcement Activity—2024 Year in Review* 1–2 (2025), https://www.cornerstone.com/wp-content/uploads/2025/02/PCAOB-Enforcement-Activity-2024-Year-in-Review.pdf (last visited Sept. 25, 2025).

factual findings and legal conclusions it has already publicly announced. *See, e.g.*, *Cinderella Career & Finishing Sch., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970); *Texaco, Inc. v. FTC*, 336 F.2d 754, 760 (D.C. Cir. 1964), *vacated and remanded per curiam on other grounds*, 381 U.S. 739 (1965); *Antoniu v. SEC*, 877 F.2d 721, 724-26 (8th Cir. 1989).

### 2.    The Board's Secrecy Violates Due Process

Board prosecutions not only deprive the accused of the right to an independent judge, they also deprive the accused of "many of the procedural protections our courts supply in cases where a person's life, liberty, or property is at stake." *Jarkesy*, 603 U.S. at 143 (Gorsuch, J., concurring). Namely, the statutory shroud of secrecy surrounding the Board strips Plaintiffs—not to mention the public at large—of their "presumptive right to transparent judicial proceedings in cases of far-reaching public consequence." *Doe v. Hill*, 141 F.4th 291, 300 (D.C. Cir. 2025). This right is not academic: "secrecy in court proceedings was one of the evils of concern at the Founding." *Id.* Transparency exorcises that evil by allowing Plaintiffs, other enforcement targets, and the public to "understand the issues before the court, the consequences of the court's ruling, and the manner in which the court reached its decision." *Id.*

 The secrecy of the Board's disciplinary process is especially insidious because it is one-sided. In the Board's secret prosecutions over more than two decades, the Board and the CHO have issued an unknown number of non-public decisions interpreting and applying Board rules, SEC rules, and securities laws to the facts before them. (*See* SOMF ¶¶ 33-35.) Moreover, in any past proceedings that were ultimately decided in the respondent's favor, even the final, dispositive decision remains non-public. (*Id.* at ¶ 35.) All those non-public decisions are fully available to the Board's prosecutors as they prepare for and try their cases against Plaintiffs, and when presenting arguments to the CHO and the Board. (*Id.* at ¶ 36.) Meanwhile, Plaintiffs are completely in the dark and denied access to those non-public decisions when preparing and presenting their defense.

(*Id.* at ¶ 37.) As a result, Plaintiffs are robbed of a critical means by which accused parties have defended themselves since time immemorial: the ability to discover and rely on prior adjudications in which other respondents have mounted a successful defense. They are also robbed of any ability to determine whether the Board and the CHO are deciding their cases in an even-handed manner compared with other cases.

And it makes no difference whether these secret precedents are expressly cited in Enforcement Staff briefs or in CHO and Board decisions; what matters is that there is a secret body of precedential rulings to which only the prosecutors and adjudicators are privy. This inside information introduces opportunity for and reasonable suspicion of the proverbial winks and nods among those in the know—with such winks and nods being completely lost on and undetectable to blindfolded respondents and their counsel. It is hard to imagine a more obvious—and easily avoidable—systemic tilting of the playing field in favor of the prosecution.

a.    The Importance of Precedent Is Deeply Rooted
In the Founding of Our Judicial System

Depriving Plaintiffs of access to potentially favorable precedent is to deprive them of one of the founding cornerstones of the American judicial process: precedent "is, and always has been considered, as the great security of our rights, our liberties, and our property." *Anastasoff v. U.S.*, 223 F.3d 898, 904 (8th Cir. 2000), *vacated on other grounds*, 235 F.3d 1054 (8th Cir. 2000). "Inherent in every judicial decision is a declaration and interpretation of a general principle or rule of law…[that] must be applied in subsequent cases to similarly situated parties." *Id.* at 899-90 (citing *Marbury v. Madison*, 5 U.S. 137 (1803)). Holding adjudicators accountable for their past decisions ensures that outcomes are "founded in permanent principles, and not dependent upon the caprice or will" of the adjudicator. *Id.* at 904. A judicial process that ignores precedent, or in this case hides it from the accused and the public, is one that "the framers of the constitution…would

have [] justly deemed an approach to tyranny and arbitrary power…and to the abandonment of all the just checks upon judicial authority." *Id.* Public access to precedent is necessary to avoid the path to tyranny; otherwise, adjudicators would be free to decide cases at their whim, not on sound—and known—legal principles. *See id.*

Yet the Board's secret proceedings allow for exactly that. Plaintiffs and other enforcement targets are forced to defend themselves without a full understanding of the CHO's and the Board's prior "declaration[s] and interpretation[s]" of the substantive rules and laws that they are accused of violating as well as the procedural rules governing the proceeding . This is not due process. The "constitutional [due process] requirement of a meaningful opportunity to respond before a [] deprivation may take effect entails, at a minimum, the right to be informed not only of the nature of the charges, but also of the substance of the relevant supporting evidence." *Brock.*, 481 U.S. at 264-65. It cannot be the case that due process requires disclosure of the substance of supporting evidence without disclosure of prior decisions that applied the law to similar sets of evidence. *Id.* at 265. If failure to disclose relevant supporting evidence creates "an unacceptable risk of erroneous decisions," the same must be true for failure to disclose favorable precedent. *Id.*

> b.  Allowing Access to Precedent Does Not Interfere
> With the Statutory Requirement that the Board Keep
> The Identities of Successful Respondents Confidential

The Board's interest in preserving the anonymity of respondents who have challenged the Board and won, to be sure, is important and statutorily required. *See* 15 U.S.C. § 7215(b)(5)(A), (c)(2). That interest is protectable, however, by anonymizing the names of and redacting other identifying information that might reveal the firms and individual accountants associated with those cases. Anonymizing and redacting personal information is routinely done in litigation

involving, for example, grand jury subpoenas and whistleblowers.[17] *See, e.g., Doe v. SEC*, 114 F.4th 687 (D.C. Cir. 2024); *Doe v. SEC*, No. 23-1161, 2024 WL 1208353 (D.C. Cir. Mar. 21, 2024), *reh'g denied*, 2024 WL 2059561 (D.C. Cir. May 7, 2024), *cert. denied*, 145 S. Ct. 462 (2024); *Doe v. SEC*, 28 F.4th 1306 (D.C. Cir. 2022).[18]

In contrast to the minimal burden of equalized access to anonymized precedent, the benefit would be obvious: it would restore a vital tool for accused persons to build their defense and vindicate two bedrock constitutional principles. First, allowing respondents access to precedent would go at least some distance toward keeping "the Constitution's promise of a 'fair trial in a fair tribunal'" in an otherwise tilted game. *Jarkesy*, 603 U.S. at 141 (Gorsuch, J., concurring) (quoting *In re Murchison*, 349 U.S. at 136). Second, allowing respondents access to favorable precedent would protect Plaintiffs' and "the public's historic and presumptive right to monitor whether" federal adjudicative procedures "are doing justice between parties." *Doe v. Hill*, 141 F.4th 291, 298 (D.C. Cir. 2025).

---

[17] The Board's adjudication docket is far from bulging at the seams. From the information available on the Board's website, over the past 22 years, fewer than 30 disciplinary cases have ever been adjudicated to a final decision by the CHO that was unfavorable to the respondent. (SOMF ¶ 28.) Even assuming there were an equal number of cases with final CHO decisions that were *favorable* to the respondents (i.e., no final sanctions were imposed), and thus have not been publicly disclosed, it should not be burdensome for a regulator with a $400 million annual budget and nearly 1,000 employees to redact and anonymize those nonpublic decisions and post the redacted versions online.

[18] Moreover, there is a middle ground between (i) the Board's black box of secret precedent and (ii) widely distributing (*i.e.*, publishing) decisions where respondents successfully braved the disciplinary process. Respondent-favorable precedent can remain "unpublished," so long as it is made available to those who want it: "'unpublished'… has never meant 'secret.'" *Anastasoff*, 223 F.3d at 904.

**III.    THE CHIEF HEARING OFFICER IS UNCONSTITUTIONALLY APPOINTED AND PROTECTED BY UNCONSTITUTIONAL REMOVAL RESTRICTIONS**

The Appointments Clause of Article II "prescribes the exclusive means of appointing 'Officers.'" *Lucia v. SEC*, 585 U.S. 237, 244 (2018). Officers of the United States, as opposed to mere employees of the Federal Government, must be appointed by the "President, a court of law, or a head of department." *Id.* (citing Art. II, § 2, cl. 2). The CHO is an "Officer of the United States," but is not constitutionally appointed.

**A.    The Chief Hearing Officer is an "Officer of the United States"**

The Supreme Court's decision in *Lucia v. SEC* compels the conclusion that the CHO is an inferior officer subject to the Appointments Clause. The Court found in *Lucia* that the strictures of the Appointments Clause apply to SEC ALJs. 585 U.S. at 251. In so holding, the Court looked back to its decision in *Freytag v. Commissioner*, 501 U.S. 868 (1991), in which it found that "special trial judges" of the Tax Court ("STJs") are inferior officers. *Lucia*, 585 U.S. at 250. *Freytag*, the Court explained, "sa[id] everything necessary to decide" that SEC ALJs are *also* inferior officers. *Id.* at 247. Likewise, *Lucia* said everything necessary to decide that the CHO is an inferior officer.

"To begin," the Court observed, "the [SEC's] ALJs, like the Tax Court's STJs, hold a continuing office established by law." *Id.* (citing *Freytag*, 501 U.S. at 881). Still more, the SEC's ALJs exercise the same "significant discretion" when carrying out the same "important functions" as STJs. *Id.* at 248 (quoting *Freytag*, 501 U.S. at 878). "Both sets of officials[,]" the Court noted, "have all the authority needed to ensure fair and orderly adversarial hearings—indeed, nearly all the tools of federal trial judges." *Id.* The Court then proceeded to examine the responsibilities highlighted in *Freytag*, finding that they applied to SEC ALJs "point for point":

> First, the Commission's ALJs (like the Tax Court's STJs) "take testimony." More precisely, they "[r]eceiv[e] evidence" and "[e]xamine witnesses" at hearings, and

may also take pre-hearing depositions. Second, the ALJs (like STJs) "conduct trials." . . . [T]hey administer oaths, rule on motions, and generally "regulat[e] the course of" a hearing, as well as the conduct of parties and counsel. Third, the ALJs (like STJs) "rule on the admissibility of evidence." They thus critically shape the administrative record (as they also do when issuing document subpoenas). And fourth, the ALJs (like STJs) "have the power to enforce compliance with discovery orders."

*Id.* (citations omitted).

The same is true for the CHO. Like STJs and ALJs, the CHO's position is permanent, not temporary—indeed, the recently retired CHO was in that role for more than 11 years. (*See* SOMF ¶ 21.) And per the Board's rules, the CHO presides over enforcement proceedings, issues ABDs for testimony and documents, receives evidence, rules on admissibility and offers of proof, decides procedural and other motions, and can compel the presence of party representatives at hearings. *See* Rule 5200(c). In short, like STJs and ALJs, the CHO "critically shape[s] the administrative record" and has broad authority to "regulat[e] the course of a hearing, as well as the conduct of parties and counsel." *Lucia*, 585 U.S. at 248 (second alteration in original) (internal quotation marks omitted).

The comparison holds with respect to responsibilities *after* a hearing. In *Lucia*, the Court observed that ALJs maintain more autonomy to issue decisions than STJs because the SEC can opt not to review their decisions, leaving them to "become[] final" and be "deemed the action of the Commission." *Id.* at 249. Likewise, per the Board's rules, an initial decision by the CHO becomes final if no petition for review is filed. Rule 5204(d)(2); *cf. VHS Acquisition Subsidiary No. 7 v. NLRB*, 759 F. Supp. 35 88, 98 (D.D.C. 2024) (finding that NLRB ALJs are inferior officers in part because "if no timely exceptions are filed 'the findings, conclusions, and recommendations contained in the [ALJ's] decision . . . automatically become the decision and order of the [NLRB]'") (alterations in original) (quoting 29 C.F.R. § 102.48(a)). That is not an abstract possibility; according to the limited public information available on the Board's website,

29

approximately half of the initial decisions issued by Board hearing officers were not subsequently appealed to the SEC-appointed Board members and thus became the final decisions of the Board (and thus of the Executive Branch of the federal government). (SOMF ¶ 29).[19]

The Board all but admitted that the CHO is subject to the Appointments Clause when it amended its bylaws, after the Supreme Court's decision in *Lucia*, to give the SEC a role in approving his appointment. But, as explained below, the SEC's role in the CHO's appointment does not cure the constitutional problem.

### B.    The Chief Hearing Officer Is Unconstitutionally Appointed

The Appointments Clause provides that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. With respect to the CHO, Congress made no such determination.

Per the PCAOB's post-*Lucia* policy change, the recently retired CHO was allegedly "appointed" by the Board via a unanimous vote. (SOMF ¶ 18.) Thereafter, the Board sought and apparently obtained the SEC's "approval" of that appointment. (*See id.* at ¶ 19.) Yet in response to Plaintiffs' discovery requests seeking all documents concerning the hiring and appointment of the CHO, the Board produced no official documents—such as a commission or even a Board or SEC resolution—that memorialize either the Board's appointment of the CHO or the SEC's approval of that appointment.

More fundamentally, neither the Board nor the SEC had statutory authority to lawfully effectuate the CHO's appointment. As for the Board, it is not a "Department" for purposes of the

---

[19] Indeed, it happened as recently as this year. *See In the Matter of Ronaldo Ocampo, CPA,* Notice of Finality of Initial Decision (March 13, 2025).

Appointments Clause, and therefore it has no "Head of Department" constitutionally empowered to appoint inferior officers. *Free Enter. Fund*, 561 U.S. at 511; U.S. Const. art. II, § 2, cl. 2.

The SEC has the opposite problem. Just this year, the Supreme Court reaffirmed that, for an appointment to be constitutional, the Head of Department making the appointment must be empowered *by statute* to take that action. *See Kennedy v. Braidwood Management, Inc.*, 145 S. Ct. 2427, 2454 (2025) (validating appointment of inferior officers who "have been appointed by the Secretary of HHS pursuant to a law enacted by Congress"). As the Court previously recognized, the SEC qualifies as a "Head[] of Department[]" in whom Congress *may* vest statutory authority to appoint inferior officers. *Free Enter. Fund*, 561 U.S. at 511–12. But Congress has *not* vested in the SEC the authority to appoint the CHO, nor to approve the Board's selection. Indeed, no statute has ever created or authorized any office of "chief hearing officer;" that office is an invention entirely of the Board, as approved by the SEC.

Under the Exchange Act, the SEC is authorized to "appoint and compensate officers, attorneys, economists, examiners, and other employees in accordance with section 4802 of title 5." 15 U.S.C. § 78d(b)(1). Separately, the Commission is empowered to appoint the five Board members who lead the Board. *See* 15 U.S.C. § 7211(e)(4). Those provisions do not authorize the Commission to appoint the CHO. Rather, the Exchange Act empowers the SEC to hire *its own staff*, not the staff of the Board. And under SOX, responsibility for hiring staff to carry out the Board's functions is entrusted to the *Board*, not the SEC. *See* 15 U.S.C. § 7211(f)(4). Moreover, SOX states that "Board members and employees are not considered Government 'officer[s] or employee[s]' for statutory purposes." *Free Enter. Fund*, 561 U.S. at 485 (alterations in original) (quoting 15 U.S.C. §§ 7211(a), (b)). It is impossible to read the Commission's authority under the

Exchange Act as covering appointment of the Board's CHO without creating an untenable inconsistency between these provisions.

The conclusion that the SEC is not empowered to appoint the CHO is even sharper when 5 U.S.C. § 4802 is taken into account. That provision, which is cross-referenced in the relevant section of the Exchange Act, directs the SEC to determine the compensation of its officers and employees and to maintain "comparability" between the salaries of its employees and those of other specified federal agencies. 5 U.S.C. § 4802(b), (d); 15 U.S.C. § 78d(b)(1); *see also* 5 U.S.C. § 4802(e) (directing the SEC to "consult with the Office of Personnel Management in the implementation of this section").[20] But SOX made clear that the salaries of Board staff, including the CHO, should *not* be set in parity with those of federal agency employees. Rather, those salaries must be fixed "at a level that is comparable to private sector self-regulatory, accounting, technical, supervisory, or other staff or management positions." 15 U.S.C. § 7211(f)(4). As the Supreme Court recognized, Congress made a deliberate choice in SOX to exclude Board staff from the strictures of federal employment to ensure that "[t]he Board [could] … recruit its … employees from the private sector by paying salaries far above the standard Government pay scale." *Free Enter. Fund*, 561 U.S. at 484-85. Accordingly, Section 4802's compensation-related provisions reinforce the conclusion that the SEC's authority to appoint "officers … and other employees" does not extend to the CHO. 5 U.S.C. § 4802(b).

---

[20] Section 4802 provides that "[t]he [SEC] may appoint and fix the compensation of such officers, attorneys, economists, examiners, and other employees as may be necessary for carrying out its functions under the securities laws as defined under section 3 of the Securities Exchange Act of 1934." 5 U.S.C. § 4802(b).

**C.**    **The Chief Hearing Officer Is Unconstitutionally Protected From Removal**

Apart from the CHO's unconstitutional appointment, the Board's rules impermissibly afford the CHO multiple layers of protection from removal by the President. In *Free Enterprise Fund*, the Supreme Court severed the statutory tenure protections for SEC-appointed Board members, explaining that the combined effect of for-cause removal for Board members *and* for the SEC commissioners divorced the Board from presidential oversight, in violation of Article II. *See* 551 U.S. at 495. Because Board members were "safely encased within a Matryoshka doll of tenure protections," they were "immune from Presidential oversight, even as they exercised power in the people's name." *Id.* at 497. And in *Jarkesy*, the Court left undisturbed the Fifth Circuit's holding that SEC ALJs are likewise unconstitutionally protected by multiple levels of restrictions on their removability by the president. *See Jarkesy v. SEC*, 34 F.4th 446, 463-66 (5th Cir. 2022), *reh'g denied*, 51 F.4th 644 (5th Cir. 2022), *aff'd on other grounds*, 603 U.S. 109 (2024). On remand, the Fifth Circuit "reiterate[d]" its original decision in full, including its holding that the ALJ tenure protections were unconstitutional. 132 F.4th 745 (5th Cir. 2024) (per curiam).

Last December, this Court applied similar reasoning to ALJs of the National Labor Relations Board, finding that those officers were also impermissibly afforded multiple layers of removal protection. In *VHS Acquisition Subsidiary No. 7 v. NLRB*, Judge McFadden rejected the position that ALJs are "categorically exempt from the *Free Enterprise Fund* rule," observing that the argument failed to account for *Lucia*'s holding that ALJs are inferior officers and asserted a "myopic" view of the role of an ALJ. 759 F. Supp. 3d at 97. Contrary to the NLRB's position, Judge McFadden opined, ALJs "wield[] the executive power" notwithstanding their adjudicatory role, and do not merely make "recommend[ations]," as their orders can become final if no exceptions are filed. *Id.* at *7 (citing *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013)). Accordingly, a statutory scheme in which ALJs were removable "only for good cause established

and determined by the Merit Systems Protection Board ["MSPB"] on the record after opportunity for hearing" could not stand. 5 U.S.C. § 7521(a). Only by striking both the MSPB determination *and* the for-cause protection from the statute would ALJs be "removable by the [NLRB] at will," leaving "the President separated from [ALJs] by only a single level of tenure" and ensuring that ALJs "are no less subject than the [NLRB's] own functions to Presidential oversight." *VHS Acquisition*, 759 F. Supp. 3d at 101 (alterations in original) (internal quotation marks omitted) (quoting *Free Enter. Fund*, 561 U.S. at 509).

That rationale applies equally to the Board's CHO, who *also* enjoys multiple levels of removal protection. Significant procedural barriers block even the *SEC's* ability to remove the CHO, not to mention the President's. As amended, the Board's bylaws provide that "removal of any hearing officer shall be made by the Governing Board and shall be subject to the approval of the Securities and Exchange Commission." Bylaw VI.3. In other words, the SEC *cannot* unilaterally remove the CHO but must instead await the action of the Board. Importantly, the Board admits that, because it may remove hearing officers only with the approval of the SEC, removal of the CHO is subject to a vote of *both* the Board and the SEC. (SOMF ¶ 24.) Thus, not even the SEC, much less the President, is "fully responsible for the [CHO's] actions" and those actions are in fact "*less* subject than the [SEC's] own functions to Presidential oversight" because of the required additional layer of approval by the Board. *VHS Acquisition*, 759 F. Supp. 3d at 101 (internal quotation marks omitted) (quoting *Free Enter. Fund*, 561 U.S. at 509) (emphasis added). Just like in *Free Enterprise Fund*, *Jarkesy*, and *VHS Acquisition*, those multilayered removal protections are unconstitutional.

**D.    The Unconstitutionality of the Chief Hearing Officer's**
**<u>Appointment and Removal Protections Causes Harm to Plaintiffs</u>**

Although the Supreme Court has observed that unconstitutional, multi-layered protection from removal does not necessarily cause injury sufficient to justify relief, *see Collins v. Yellen*, 594 U.S. 220, 258-59 (2021), that is not the case here. In *Collins*, the Court was careful to point out that "there was no constitutional defect in the statutorily prescribed method of appointment to that office." *Id.* at 257. "As a result," the Court explained, "there is no reason to regard any of the actions taken by the [agency] in relation to the [challenged regulatory action] as void." *Id.* at 257-58. But the "constitutional defect" missing in *Collins* is present here: because neither the SEC nor the Board had authority to appoint the CHO, he is not permitted to undertake official acts on behalf of the Board, including those undertaken in relation to the charges against Plaintiffs. Plaintiffs are thus entitled to relief on their Appointment Clause claims.

Moreover, if the CHO enjoys unconstitutional protection from presidential removal, Plaintiffs face imminent and irreparable injury if they are forced to have their fate determined through a hearing conducted and adjudicated by that unconstitutional officer, and this Court is by no means powerless to grant a meaningful remedy to stop it. Plaintiffs are already suffering, and will continue to suffer, the "here-and-now" constitutional harm of "being subjected to unconstitutional agency authority—a proceeding by an unaccountable [adjudicator]." *Axon/Cochran*, 598 U.S. at 191 (quoting petitioners' briefs; cleaned up); *see also id.* (the harm "is about subjection to an illegitimate proceeding, led by an illegitimate decisionmaker"). The Supreme Court has repeatedly held that this type of "here-and-now injury"—which "may sound a bit abstract"—is not only cognizable but "impossible to remedy once the proceeding is over." *Id.* (quoting *Seila Law*, 591 U.S. at 212) (cleaned up).

And even if the Court might *become* powerless to remedy this constitutional harm *after* it were allowed to occur, the Court has ample power to *prevent* it from happening. The Court might, for example, enjoin the Board's prosecution of Plaintiffs unless and until the Board or the SEC takes appropriate action to bring those cases before a constitutionally tenured adjudicator—such as a federal court (*see* 15 U.S.C. § 78u(d)), the Board itself (*see* Board Rule 5200(b)), any of the Board's SEC-removable members (*see* 15 U.S.C. § 7211(g)(2)), or the SEC itself (*see id.* § 7202(c)(3)). The declaratory relief sought by Plaintiffs in this case would also be meaningful. It would serve as a definitive judicial ruling that the statutory tenure protections enjoyed by the CHO are unconstitutional (and perhaps deter the Board from continuing to assign cases to its CHO). A declaratory judgment could also sever one or more of the statutory tenure protections currently enjoyed by the CHO. *Cf. Free Enter. Fund*, 561 U.S. at 508-09 (judicially excising tenure protections for board members of quasi-governmental regulator); *VHS Acquisition*, 759 F. Supp. 3d at 100-01 (D.D.C. 2024) (judicially excising statutory tenure protection for NLRB ALJs).

## IV.   THE NON-GOVERNMENTAL BOARD AND ITS PRIVATE STAFF ARE UNCONSTITUTIONALLY EXERCISING CORE EXECUTIVE POWER AGAINST PLAINTIFFS WITHOUT ADEQUATE GOVERNMENTAL DIRECTION AND SUPERVISION

Plaintiffs agree with the Board that, for purposes of their claims that the Board's proceedings against them deprive them of their individual constitutional rights—i.e., their rights to an Article III adjudication, a trial by jury, an unbiased adjudicator, due process of law, and a properly appointed and removable hearing officer —the Board should be treated as if it were "part of the government," no less than agencies like the SEC. *See Free Ent. Fund*, 561 U.S. at 486. But the Board erroneously hopes to parlay its concession into an illusory shield to deny the reality that the individual Board members—not to mention *all* of the Board's other nearly 1,000 staff employees—are still *private* actors. 15 U.S.C. § 7211(b) ("No member or person employed by, or

36

agent for, the Board shall be deemed to be an officer or employee of or agent for the Federal Government …"). The Constitution forbids such private actors to wield core governmental power without "pervasive surveillance" and supervision by *actual* government officials. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940).

The Board and its private staff prosecutors are plainly wielding core executive governmental power against Plaintiffs without adequate direction and supervision by the SEC. "A cardinal constitutional principle is that federal power can be wielded only by the federal government. Private entities may do so only if they are subordinate to an agency." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872 (5th Cir. 2022) (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935)); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Currin v. Wallace*, 306 U.S. 1, 15–16 (1939); and *Sunshine Anthracite Coal*, 310 U.S. at 399). Stated otherwise, private entities and citizens can be enlisted as mere "aide[s]" to governmental actors, subject to the government's "pervasive surveillance and authority," but they cannot lawfully wield governmental power themselves. *See Sunshine Anthracite*, 310 U.S. at 388, 399. "If it were otherwise—if people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion." *Black*, 53 F.4th at 880 (quoting THE FEDERALIST No. 51); *see also Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015), (Alito, J., concurring) ("When it comes to private entities, . . . there is not even a fig leaf of constitutional justification" for delegation); *Carter*, 298 U.S. at 311 (giving regulatory power to potentially self-interested private actors "is legislative delegation in its most obnoxious form").

The scantness of the SEC's surveillance and supervision of the Board's enforcement and disciplinary activities is apparent from the applicable statutes and rules. Unlike the Board's

rulemaking and budgeting activities—which require SEC *pre-review* and *pre-approval* before taking effect—the Board's investigative and disciplinary activities require no SEC pre-approval or even real-time monitoring. *Compare* 15 U.S.C. § 7217(b)(2) (requiring SEC preapproval of Board rules) *and id.* at § 7219(b) (requiring SEC preapproval of Board's annual budget) *with id.* § at 7217(c) (requiring only after-the-fact "notice" to SEC and potential SEC review after the Board completes all of its law-enforcement activity and imposes a final disciplinary sanction). Thus, the Board and its private staff have virtually unfettered discretion when they wield the core executive powers of investigating, prosecuting, and disciplining the accountants and firms they regulate. For example, without any SEC input or oversight at all, much less SEC decision-making, the Board and its staff are empowered to unilaterally determine who to investigate;[21] what to investigate; what documentary evidence and testimony to demand; from whom documents and testimony will be demanded; how voluminous and burdensome those demands will be; whether formal disciplinary charges will be lodged; if so, who will be charged and what charges will be alleged; what evidence will be admitted and considered; how to weigh that evidence; what sanctions will be imposed; whether to accept a negotiated settlement; and what sanctions will be demanded in any such settlement. *See* 15 U.S.C. § 7217(c) (opportunity for SEC review only *after* Board disciplinary prosecution is complete). *All* these core executive and pseudo-judicial powers are left to the largely unfettered discretion of the Board—and, more troublingly, to the unfettered discretion of several dozen private citizens who comprise the Board's Enforcement Staff.[22] Equally

---

[21] The SEC has acknowledged that, with respect to its own investigations, "[t]he power to investigate carries with it the power to defame and destroy." 17 C.F.R. § 200.66.

[22] The number of Board staff investigators and prosecutors is an estimate based on limited information published by the Board. Like most details about the Board's operations, and unlike the minute details typically published by government agencies, public information about the number of Board staff conducting investigative and prosecutorial work is hard to come by. But we know the Board's total budget for 2025 is approximately $400 million, and we know that $26

troubling: it all takes place in strict secrecy *where the public can see nothing*. *See* 15 U.S.C. § 7215(b)(5)(A), (c)(2).

In many respects, moreover, the Board's vast prosecutorial powers exceed those of the SEC itself. For example, consistent with the Fourth Amendment, SEC subpoenas are not self-executing; if a recipient refuses to comply, the SEC must first seek judicial enforcement by an Article III court, and only then can further recalcitrance be punished as contempt. *See* 15 U.S.C. § 78u(c). But the Board and its private staff are not burdened by any comparable constraints. When Enforcement Staff issue demands for documents or testimony—no matter how burdensome, duplicative, or unreasonable—obedience is mandatory under threat of debarment and monetary penalties. *See* 15 U.S.C. § 7215(b)(3), (c)(4); Board Rule 5110. Indeed, these are among the very charges that Doe 1 faces in the disciplinary prosecution against him. (SOMF ¶ 39.) Board staff were not required to seek SEC pre-approval or judicial enforcement of their demands, and Doe 1 had no opportunity to affirmatively seek pre-enforcement review by even the Board's SEC-appointed leaders, much less by the SEC or any Article III court. Yet Doe 1 now faces debarment and severe monetary penalties for his alleged noncooperation. *See* 15 U.S.C. § 7215(c)(4); 17 C.F.R. § 201.1001.

The SEC's only meaningful check on the Board's enforcement activities is largely hypothetical and comes far too late to constitute "pervasive surveillance" and supervision. After

---

million of that (i.e., 6.5%) is earmarked for the Department of Enforcement and Investigations. Pub. Co. Acct'g. Oversight Bd., 2025 Budget by Cost Category, at 2, *available at* https://assets.pcaobus.org/pcaob-dev/docs/default-source/about/administration/documents/annual_reports/2024-annual-report.pdf?sfvrsn=9cfa1a56_2https://assets.pcaobus.org/pcaob-dev/docs/default-source/about/administration/documents/annual_reports/2024-annual-report.pdf?sfvrsn=9cfa1a56_2 (last visited Sept. 25, 2025). We also know that the Board's total headcount for 2025 is approximately 945. (*Id.* at 3, n.1). Using the same 6.5% fraction we estimate that approximately 50 to 60 private citizens perform the Board's law-enforcement work.

the Board and its staff have completed *all* of their investigative activity, *all* of their prosecutorial activity, *all* disciplinary proceedings, and *all* internal appeals, and *only if and after* the Board issues a *final* sanctions order to end the matter—a combined process that typically takes at least several years to complete and a princely sum to defend against—an "aggrieved" respondent theoretically can appeal the final sanction to the SEC, which then acts as the next appellate tribunal, much like federal circuit courts sporadically review final adjudicative orders issued by the SEC. *See* 15 U.S.C. §§ 7217(c), 78y(a). But no one would seriously contend that those circuit courts, by sporadically reviewing, after-the-fact, a handful of the hundreds of final SEC enforcement orders the SEC issues each year, are engaging in pervasive surveillance and supervision of SEC's enforcement program.

More importantly, the hypothetical after-the-fact SEC appellate review of Board disciplinary orders almost never happens. The Board's website reveals that it has imposed final sanctions orders in approximately 520 cases since its creation, but the SEC has reviewed only eight of those cases (*i.e.*, about 1.5 percent), with one additional case currently pending on appeal before SEC. (SOMF ¶¶ 27, 31.) None of the Board's hundreds of other enforcement cases (over 98 percent) required any SEC appellate review at all, because sanctions were imposed through settlements, defaults, or adjudicative decisions by the Board or a hearing officer that were not further appealed. (*See id.*) The last time the SEC actually reviewed and decided the merits of any appeal from a final Board sanctions order was more than six years ago. (*Id.* at ¶ 32.) *See In re Reinhart*, SEC Rel. No. 34-85964 (May 29, 2019). Since then, hundreds of Board investigations and disciplinary prosecutions have run their entire yearslong course, from incipient investigation all the way through issuance of a final Board sanctions order, without any after-the-fact appellate review by the SEC. Even more concerning, according to the Board's website, of the Board's

approximately 520 final sanctions orders issued during its 23-year history, only 28 of them were issued after a contested hearing and initial decision by a Board hearing officer (*id.* at ¶ 28) and, of those 28, only half were ever appealed to and decided on the merits even by the SEC-appointed Board members (*id.* at ¶ 29).

In short, the vast investigative and prosecutorial power exercised by the Board and its private staff is largely unchecked and unsupervised by the SEC. And there is no evidence that the SEC in fact engaged in any surveillance and supervision over the Board's investigations and prosecutions of Plaintiffs specifically. In fact, the Board refused to provide *any* discovery concerning what SEC direction and supervision, if any, occurred in connection with the Board's investigations and prosecutions of Plaintiffs, citing the statutory secrecy provisions of Sarbanes-Oxley. (*See* SOMF, <u>Exhibit B</u>, Board's Responses to Discovery Requests, Interrogatory Nos. 9, 10, 11; SOMF, <u>Exhibit C</u>, June 2, 2025, Hrg. Tr. at 12:11-13:21.) As a result, there is no admissible evidence that any such direction or supervision occurred at all. Similar to the adverse inferences routinely drawn by courts (as well as the SEC and the Board), when other defendants refuse to provide evidence based on assertions of constitutional privilege or otherwise, the Court here can and should draw the adverse inference that no SEC surveillance and supervision occurred during the investigations and prosecutions of Plaintiffs. *See generally Baxter v. Palmigiano*, 425 U.S. 308, 318-20 (1976) ("[T]he Court has consistently recognized that in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause" (citing cases)); *SEC v. Whittemore*, 659 F.3d 1, 12 (D.C. Cir. 2011) (upholding district court's adverse inference drawn from Fifth Amendment assertion), *cert. denied*, 567 U.S. 935 (2012);

PCAOB, *Guide to Proceedings Before a PCAOB Hearing Officer*[23] ("[I]n a civil proceeding such as a hearing before the PCAOB, an adverse inference may be drawn from a Respondent's refusal to answer a question based upon an assertion of the Fifth Amendment's protections.").

The unchecked prosecutorial power wielded by the Board and its private staff violates Article II of the Constitution and the principle that the elected Executive Branch must take care that the laws are faithfully executed. The Court should grant summary judgment in Plaintiffs' favor.

## V.    THE BOARD IS UNCONSTITUTIONALLY FUNDING ITS PROSECUTIONS OF PLAINTIFFS

How the Board funds its operations—including its prosecutions of Plaintiffs—is established by statute. Each year, the Board establishes a budget subject to SEC approval. 15 U.S.C. § 7219(b). As relevant here, the budget is payable from "a reasonable annual accounting support fee" that the Board determines, "as may be necessary or appropriate" to maintain the Board. *Id.* § 7219(d)(1). The Board then must "provide for the equitable allocation, assessment, and collection" of the accounting support fee among issuers (more commonly referred to as publicly traded companies) and among brokers and dealers. *Id.* §7219(d)(2).

The total fee is allocated and assessed among issuers using a mathematical formula that is generally based on each issuer's market capitalization relative to the market capitalization of all issuers combined, and among brokers and dealers using a formula that is generally based on each broker or dealer's net capital relative to the total net capital of all brokers and dealers combined. *Id.* § 7219(g), (h). The total amount of fees collected each year "shall not exceed the recoverable budget expenses of the Board." *Id.* § 7219(f).

---

[23]    *Available at* https://pcaobus.org/oversight/enforcement/enforcement-actions/guide-to-proceedings-before-pcaob-hearing-officer (last visited Sept. 25, 2025).

Payment of Board-assessed fees is mandatory. (SOMF ¶ 6.) 15 U.S.C. § 78m(b)(2)(C). The Board's rules prevent any issuer, broker, or dealer who fails to pay its assessment from receiving a "clean" audit from its auditor, and any issuer that fails to pay is punishable under the Exchange Act either administratively or by civil or criminal prosecution. PCAOB Rule 7103(b).

Under this statutory funding scheme, which appears to be unique among federal regulators, the SEC must approve the Board's accounting support fee each year, but Congress plays no role. 15 U.S.C. § 7219(b). Nor do the issuers, brokers, and dealers who are legally required to fund the Board's activities; they have no say in how the Board operates or is governed, nor in how much money the Board may spend and collect each year, nor in how that money should be spent. *See id.* Moreover, under basic economic realities, most or all of the accounting support fee is inevitably passed through to and paid by the millions of shareholders, employees, and/or customers of these publicly traded corporations, brokers, and dealers. With no input or oversight from any elected official or from anyone who foots the bill for the Board's salaries and other expenses, it should come as no surprise that the growth of the Board's self-written budget has far outpaced the rate of inflation or even the growth of the federal government's budget. *See generally* Hester M. Peirce, "Part I.A. Like It's 1999: Statement at the Open Meeting to Consider the Public Company Accounting Oversight Board's 2025 Final Budget and Accounting Support Fee," Dec. 18, 2024 (SEC commissioner noting Board's "striking" budget growth rate of 40% from 2020 to 2025);[24] Mark T. Uyeda, "Statement on 2025 PCAOB Budget," Dec. 18, 2024 (SEC commissioner noting concern about growth of Board's budget outpacing growth of SEC budget);[25] Christina Ho,

---

[24]  Available at https://www.sec.gov/newsroom/speeches-statements/peirce-statement-pcaob-budget-121824 (last visited Sept. 25, 2025).

[25]  Available at https://www.sec.gov/newsroom/speeches-statements/uyeda-statement-pcaob-budget-121824 (last visited Sept. 25, 2025).

"Statement on the Adoption of the 2025 Budget—The Board is Accountable for Good Stewardship and Outcome-Based Performance," Nov. 21, 2024 (SEC-appointed Board member expressing similar concern that the Board's budget has "ballooned by 40%" since 2020).[26]

Article I of the Constitution vests Congress with the exclusive legislative power to "lay and collect Taxes." U.S. Const., Art. I, § 8. Nothing in the Constitution permits Congress to abdicate and reassign its revenue-raising power to a private corporation like the Board. Had Congress transferred (or "delegated") the Board's revenue-raising scheme to a conventional executive branch agency that is fully accountable to the President, this Court might confidently take comfort from the Supreme Court's recent decision in *FCC v. Consumers' Research*, 145 S. Ct. 2482 (2025). There, the Court said it was irrelevant whether the funding scheme for the Federal Communications Commission's "universal service" program was better characterized as a "tax" or a "fee"—in either event, the Court held, its constitutionality would be evaluated under the usual "intelligible principle" test: Whether Congress has made clear both the general policy that the agency must pursue and the boundaries of its delegated authority, and whether Congress has provided sufficient standards to enable both the courts and the public to ascertain whether the agency has followed the law. *Id.* at 2497-98 (citing cases).[27] That was true even though the FCC

---

[26] Available at https://pcaobus.org/news-events/speeches/speech-detail/statement-on-the-adoption-of-the-2025-budget---the-board-is-accountable-for-good-stewardship-and-outcome-based-performance (last visited Sept. 25, 2025).

[27] SEC Commissioners and commentators have recognized that the Board's accounting support fees are best characterized as taxes. As one former SEC Commissioner put it:

> The accounting support fee is a tax. This tax is assessed by a non-profit corporation under authority granted by Congress. The Commission represents the only safeguard to an otherwise unilateral ability to impose the accounting support fee tax on companies and broker-dealers. Companies and broker dealers are required, under penalty of law, to pay money to the Board for the privilege of merely existing. These costs are not ultimately

relied on a private entity to assist it in some of the ministerial and mathematical work needed to calculate how much telecommunications carriers needed to contribute to the fund.

But here, Congress's assignment of the Board's fundraising and spending scheme is materially different than the FCC's universal service scheme for at least two reasons. First, unlike in *Consumers' Research*, Congress in SOX directly assigned the Board's fundraising and spending decisions to the Board itself, which is not only a private corporation, but also an entity that is only remotely and indirectly accountable to the President (not to mention Congress). Among other things, the Board's leaders are neither appointed nor removable at will by the President; the SEC has the exclusive power to appoint those leaders, without any formal involvement by the President (or the Senate), and only the SEC can remove those leaders. Moreover, because it is not a government agency, the Board is exempt from most, if not all, of the federal statutes that protect citizens from overzealous and nontransparent regulatory activity by conventional government agencies, such as the Administrative Procedure Act, the Sunshine Act, the Freedom of Information Act, the Advisory Committee Act, the Equal Access to Justice Act, the Paperwork Reduction Act, and countless other laws applicable to traditional government regulators. Indeed, the Board concedes that the staff members assigned to investigate and prosecute Plaintiffs are not required, like their governmental counterparts, to take an oath to "support and defend the Constitution" and to "bear true faith and allegiance to the same." (SOMF ¶ 15.) 5 U.S.C. § 3331.[28]

---

borne by companies and broker-dealers, but rather their shareholders and customers.

SEC Commissioner Michael Piwowar, *Statement at Open Meeting on 2016 PCAOB Budget*, (Mar. 14, 2016), *available at* https://www.sec.gov/newsroom/speeches-statements/piwowar-remarks-open-meeting-pcaob-031416 (last visited Sept. 25, 2025).

[28] As one former Board leader put it: "The [Board] has struggled with transparency, having been described as 'completely opaque.' SOX did not make mandatory the suite of laws designed to ensure transparency by government agencies." Robert J. Brown, *PCAOB 3.0: The Evolving Role of Investor Protection at the PCAOB*, Nov. 6, 2020, *available at* https://pcaobus.org/news-

This distinction is not cured by the SEC's statutory duty to "approve" the Board's annual budget. With the FCC's universal service program, Congress assigned primary responsibility for all funding and spending decisions to the government agency alone, which in turn relied on the private entity only for assistance with certain largely ministerial and mathematical tasks. With the Board's funding and spending, by contrast, Congress flipped the respective roles of the government agency and the private entity, giving primary responsibility to the private Board to determine its own budget and spending, while reserving to the SEC the mere task of approving or disapproving, once each year, what the Board has already decided.

Equally important is the distinction between the relative degree to which the FCC and SEC—as the agencies ostensibly overseeing a private entity with respect to funding and spending activities—are accountable to and removable by the President. As Justice Kavanaugh emphasized in his concurring opinion in *Consumers' Research*, that distinction raises "substantial questions under Article II of the Constitution." 145 S. Ct. at 2512. During oral argument in *Consumers' Research*, the Government expressly acknowledged that the FCC is *not* an "independent" agency, because the President can remove its commissioners from office with or without cause. *Id.* at 2517 (citing oral argument transcript).

By contrast, the SEC has never stated that its commissioners are removable at will, and it is widely believed by courts and the SEC alike that the SEC *is* an independent agency because the President may *not* remove SEC commissioners except for cause (for "inefficiency, neglect of duty, or malfeasance in office."). *Free Enter. Fund*, 561 U.S. at 487 (noting parties' agreement on the

---

events/speeches/speech-detail/pcaob-3.0-the-evolving-role-of-investor-protection-at-the-pcaob#:~:text=The%20PCAOB%20has%20struggled%20with,of%20the%20PCAOB%2C%20be%20extended (citation omitted) (last visited Sept. 25, 2025).

matter and deciding the case "with that understanding"); *see, e.g.*, *SEC v. Blinder, Robinson &*
*Co.*, 855 F.2d 677, 681 (10th Cir. 1988) ("it is commonly understood that the President may
remove a commissioner [of the SEC] only for 'inefficiency, neglect of duty or malfeasance in
office'"). Indeed, SEC commissioners have been among the most vocal adherents to the position
that they are insulated from political influence and enjoy for-cause removal protection. For
example, a recent SEC chair devoted an entire speech to the agency's long-standing independence,
which included the following passage:

> Under the law, the SEC is an independent agency, consisting of five
> Commissioners, no more than three of whom can be from the same political party.
> As with other independent agencies, the President cannot remove a Commissioner
> without cause and the agency does not report or answer to the White House or any
> part of the administration. This independence and the quality of its people allow the
> agency the freedom to do what it believes is right for investors and our markets,
> without the interference of politics or outside pressures.

SEC Chair Mary Jo White, *The Importance of Independence*, Oct. 3, 2013;[29] *accord* SEC
Commissioner Daniel J. Gallagher, *Remarks at "The SEC Speaks in 2013"*[30] (contrasting tenure
protection of "independent" SEC commissioners with that of Cabinet secretaries, who "serve at
the pleasure of the President").

    Another recent Supreme Court decision regarding agency funding, *CFPB v. Community
Fin. Sers. Ass'n*, 601 U.S. 416 (2024), is also distinguishable and inapposite. That case involved
the funding structure of the CFPB, an otherwise relatively conventional government agency of the
federal government—at least after the Supreme Court removed the statutory tenure protections of
its director in *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 224–225

---

[29] *Available at* https://www.sec.gov/newsroom/speeches-statements/spch100113mjw (last visited
Sept. 24, 2025).

[30] *Available at* https://www.sec.gov/newsroom/speeches-statements/2013-spch022213dmghtm
(last visited Sept. 25, 2025).

(2020). As currently structured, the CFPB is led by a principal officer who is directly appointed by the President, confirmed by the Senate, and directly removable by the President with or without cause. *See id.* at 197, 234-35. The agency is not only directly accountable to the President, but also required to comply with the array of federal laws, regulations, oaths of office, and compensation structures that keep governmental agencies in check and allow citizens and courts to presume fidelity to the policy choices of the elected President.

None of this is true for the Board. The President does not appoint the Board's leadership; the SEC does. *See* 15 U.S.C. § 7211. The President, likewise, cannot remove the Board's leaders, even for cause; the SEC can, but the SEC's leaders themselves are widely understood to be protected from at-will removal by the President. *See Free-Enterprise Fund*, 561 U.S. at 487. In addition, *Community Financial Services* did not present any issue with respect to the constitutional power to lay and collect taxes under Article I, section 8. That case addressed only the constitutional prohibition in Article I, section 9 against money being drawn from the federal treasury without statutory appropriation, a point that Plaintiffs are no longer pursuing in this case. *See* 601 U.S. at 420.

In short, the Board's funding scheme that enables its prosecutions of Plaintiffs—a scheme that allows the Board to raise its own revenue by assessing mandatory fees (or taxes) on publicly traded corporations, broker-dealers, and their owners, shareholders, and customers, with no congressional involvement and subject only to the approval of an independent government agency—goes far beyond anything the Supreme Court has previously upheld as constitutional. The Court should therefore grant Plaintiffs' motion for summary judgment on this claim, declare unconstitutional the Board's funding of its prosecutions of Plaintiffs, and enjoin the Board from continuing with those prosecutions.

## VI.    PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION OF THE BOARD'S DISCIPLINARY PROCEEDINGS AGAINST THEM

Plaintiffs are entitled to permanent injunctive relief if (1) they have "suffered an irreparable injury"; (2) "the remedies at law, such as monetary damages, are inadequate to compensate for that injury"; (3) "considering the balance of hardships between [Plaintiffs] and [the Board], a remedy in equity is warranted"; and (4) "the public interest would not be disserved by a permanent injunction." *Wilmer*, 784 F. Supp. 3d at 171-72; see *generally eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). All factors entitle Plaintiffs to a permanent injunction enjoining the Board from continuing its disciplinary proceedings against them (PCAOB No. 105-2022-006 and PCAOB No. 105-2023-003).

First, "'[i]t has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Wilmer*, 784 F. Supp. 3d at 172. Indeed, "[s]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F. 3d 638, 653 (D.C. Cir. 2013). Here, as explained above, Plaintiffs have shown that the Board's prosecutions against them violate their constitutional rights.

Second, it is well-established that loss that "'threatens the very existence of the movant's'" livelihood constitutes irreparable harm. *Wilmer*, 784 F. Supp. at 172 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Here, as described above, the Board's prosecutions threaten to permanently bar Plaintiffs from participating in their profession and to levy severe monetary penalties. Moreover, as previously discussed, absent an injunction, Plaintiffs will suffer the irremediable "here-and-now" injury of being subjected to illegitimate and unconstitutional proceedings conducted by illegitimate and unaccountable actors. And any remedies at law are

plainly inadequate due to the Board's broad statutory immunity from liability for money damages. 15 U.S.C. § 7215(b)(6).

Finally, the balance of hardships and the public interest support a permanent injunction. Because the Board's disciplinary proceedings are unconstitutional, the Board "do[es] not have a legitimate interest in" continuing those proceedings. *Wilmer*, 784 F. Supp. 3d at 173. "In fact, it is 'obvious' that the 'enforcement of an unconstitutional law is always contrary to the public interest.'" *Id.* (quoting *Gordon*, 721 F.3d at 653). Enjoining the Board's disciplinary proceedings against Plaintiffs "serves the public interest by, for example … preserving the independent and adversarial nature of our judicial system," among the many other constitutional protections that the Board's proceedings violate. *Id.* at 173.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court enter summary judgment in their favor on all counts.

Respectfully Submitted,

*/s/ Russell G. Ryan*
Russell G. Ryan (DC Bar # 414472)
Casey Norman (DC Bar # 90016178)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
Telephone: (202) 869-5210
Email: russ.ryan@ncla.legal

*Attorneys for Plaintiffs John Doe 1 (No. 24-cv-780) and John Doe 2 (No. 25-cv-186)*

Thomas K. Potter, III (*pro hac vice*)
Burr & Forman, LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
Telephone: (615) 724-3231
Email: tpotter@burr.com

*Attorney for Plaintiff John Doe 2 (No. 25-cv-186)*

*/s/ Ian D. Roffman*
Ian D. Roffman (*pro hac vice*)
Melanie V. Woodward (*pro hac vice*)
NUTTER, MCCLENNEN & FISH LLP
Seaport West, 155 Seaport Blvd.
Boston, MA 02210
Telephone: (617) 439-2421
Email:  iroffman@nutter.com

*Attorneys for Plaintiff John Doe 1 (No. 24-cv-780)*

<u>CERTIFICATE OF SERVICE</u>

     I certify that, on September 26, 2025, a copy of the foregoing document was served upon all counsel of record through the Court's ECF system.


               */s/ Ian D. Roffman*

7435523

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE,<br><br>    *Plaintiff,*<br><br>v.<br><br>PUBLIC COMPANY ACCOUNTING<br>OVERSIGHT BOARD,<br><br>    *Defendant.* | Civil Action No. 1:24-cv-780-ACR |
| JOHN DOE,<br><br>    *Plaintiff,*<br><br>v.<br><br>PUBLIC COMPANY ACCOUNTING<br>OVERSIGHT BOARD, et al,<br><br>    *Defendants.* | Civil Action No. 1:25-cv-186-ACR<br>(consolidated with No. 1:24-cv-<br>780 (lead), 1:25-cv-70) |

## <u>PLAINTIFFS' JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

Pursuant to Fed. R. Civ. P. 56(c) and LCvR 7(h)(1), Plaintiff John Doe in Case No. 1:24-cv-780-ACR ("Doe 1") and Plaintiff John Doe in Case No. 1:25-cv-186-ACR ("Doe 2") (collectively, the "Doe Plaintiffs") jointly submit this statement of material facts as to which there is no genuine issue in support of their Motion for Summary Judgment:

## I.    <u>The Parties</u>

1.    Plaintiff Doe 1 is an accountant who previously worked as an auditor at an accounting firm ("Doe 1's Employer") registered with Defendant Public Company Accounting Oversight Board (the "Board"). (Compl., Doe 1 ECF No. 1, at ¶ 3.)

2.    Plaintiff Doe 2 has no personal, professional, or other relationship with Doe 1, and is an accountant formerly employed by a different Board-registered accounting firm ("Doe 2 Employer"). (Compl., Doe 2 ECF No. 1, at ¶ 3.)

3.      The Board is a private, nonprofit corporation, headquartered in the District of Columbia. (Compl., Doe 2 ECF No. 1, at ¶ 4.)

4.      The Board is treated as "part of the government" for purposes of certain constitutional claims. (*Free Enter. Fund v. Pub. Co. Acct'g Oversight Bd.*, 561 U.S. 477, 486 (2010).)

5.      The individual Board members and the Board's other nearly 1,000 staff employees are private actors. (15 U.S.C. § 7211(b).)

## II.      The Board's Structure, Powers, and Disciplinary Process

6.      Every accounting firm—both foreign and domestic—that participates in auditing public companies or broker-dealers under the U.S. securities laws must register with the Board, pay annual fees, and comply with the Board's rules and oversight. (*Free Enter. Fund*, 561 U.S. at 484-85.)

7.      The Board's organization includes a Division of Enforcement and Investigations ("Enforcement Staff"), which is overseen by a Director of Enforcement and Investigations ("Enforcement Director"), who reports to the Board. (*See* Board Bylaws and Rules, Article VI.[1]

8.      The Enforcement Director may undertake informal inquiries of Board-registered firms or individuals associated with such firms. (Board Rule 5100.)

9.      The Enforcement Director may recommend that the Board issue an order of formal investigation of a Board-registered firm or an individual associated with such a firm. (Board Rule 5101.)

---

[1] *Available at* https://assets.pcaobus.org/pcaob-dev/docs/default-source/rules/documents/rules-booklet898b4bd3-35e5-44af-a587-e28bdeccd3c4.pdf?sfvrsn=f953259d_2 (last visited Sept. 23, 2025).

10.     In connection with such recommendations, Board members appointed by the Securities and Exchange Commission ("SEC") routinely receive and consider *ex parte* written communications from Enforcement Staff, and engage in *ex parte* oral discussions with Enforcement Staff, about the relevant facts and legal issues. (Exhibit A, Declaration of Robert H. Cox ("Cox Decl."), at ¶ 4.)

11.     The aforementioned *ex parte* written communications are not disclosed to the accountants and firms who will be investigated, and those accountants and firms are not invited to attend or participate in, and do not attend or participate in, the *ex parte* oral discussions between DEI staff and the Board members. (Exhibit A, Cox Decl., at ¶ 5.)

12.     Enforcement Staff that conducts an investigation of a Board-registered firm or an individual associated with a registered firm may make a recommendation to the Board that it initiate a disciplinary proceeding against that firm or individual. (Board Rule 5109(d).)

13.     In connection with such recommendations, the SEC-appointed Board members routinely receive and consider *ex parte* written communications from Enforcement Staff, and engage in *ex parte* oral discussions with Enforcement Staff, about the relevant facts and legal issues.  (Exhibit A, Cox Decl., at ¶ 4; s*ee* Board Rule 5109(d).)

14.     The aforementioned *ex parte* written communications are not disclosed to the accountants and firms who will be charged, and those accountants and firms are not invited to attend or participate in, and do not attend or participate in, the *ex parte* oral discussions between DEI staff and the Board members. (Exhibit A, Cox Decl., at ¶ 5.)

15.     Enforcement Staff, including Enforcement Staff assigned to investigate and prosecute Plaintiffs, are not required to take any oath office. (Exhibit B, Board Responses to Discovery Requests, Int. No. 5.)

16.    In the Fall of 2013, the Board hired Marc Dorfman as its Chief Hearing Officer. (*See* Exhibit B, Board Responses to Discovery Requests, Int. No. 2.)

17.    The Chief Hearing Officer is an employee of and reports to the Board. (Charter, Office of Hearing Officers of the Public Company Accounting Oversight Board (March 25, 2021) ("Charter"), at 2[2].)

18.    The Board contends that, in or around March 2019, the Board unanimously voted to appoint Mr. Dorfman as the Board's Chief Hearing Officer.

19.    The Board contends that, on or around March 27, 2019, the SEC approved the appointment of Mr. Dorfman as the Board's Chief Hearing Officer.

20.    On April 8, 2019, Mr. Dorfman took the following oath, which was administered by the Chief Accountant of the SEC:

> I, Marc B. Dorfman, a hearing officer of the Public Company Accounting Oversight Board, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of my office. So help me God.

(Exhibit B, Board's Responses to Discovery Requests, Int. No. 4; s*ee* News Release, Marc B. Dorfman Sworn in as the PCAOB's Chief Hearing Officer (April 8, 2019)[3].)

21.    From the Fall of 2013, when he was hired, until June 2025, when he retired, Chief Hearing Officer Marc Dorfman was the Board's only hearing officer. (*See* Press Release, PCAOB

---

[2] *Available at* https://assets.pcaobus.org/pcaob-dev/docs/default-source/enforcement/documents/oho-charter-final.pdf?sfvrsn=f23c6871_4 (last visited Sept. 24, 2025).

[3] *Available at* https://pcaobus.org/news-events/news-releases/news-release-detail/marc-b-dorfman-sworn-in-as-the-pcaob-s-chief-hearing-officer_699 (last visited Sept. 24, 2025).

Names Marc B. Dorfman as Chief Hearing Officer (Oct. 23, 2013)[4]; <u>Exhibit C</u>, June 2, 2025, Hrg. Tr. at 42:23-43:10.)

22.     The role of Chief Hearing Officer is currently vacant. (*See* <u>Exhibit C</u>, June 2, 2025, Hrg. Tr. at 43:7-10.)

23.     Under the Board's current bylaws, the Chief Hearing Officer is removable by a majority of the Board, subject to approval by the SEC. (<u>Exhibit B</u>, Board Responses to Discovery Requests, Int. No. 2; *see* Board Bylaws Art. 6.3(d); *see also* Board Bylaws Arts. 4.3, 4.4; 17 C.F.R. § 202.150; Bylaw and Rule Amendments to Provide That the PCAOB's Appointment and Removal of its Hearing Officers Are Subject to Commission Approval, PCAOB Release No. 2019-001 (Jan. 29, 2019)[5].)

24.     Because the Board may remove hearing officers only with the approval of the SEC, any such removal is subject to a vote of both the Board and the SEC. (<u>Exhibit B</u>, Board Responses to Discovery Requests, Int. No. 2; Charter at 2.)

25.     Board Hearings are conducted in secret, outside of public access, unless the Board orders a public hearing for good cause shown and the parties consent to a public hearing. (15 U.S.C. § 7215(c)(1); s*ee* <u>Exhibit B</u>, Board Responses to Discovery Requests, Req. for Admission No. 9.)

26.     The Board has never held a public disciplinary hearing since its inception. (<u>Exhibit D</u>, Board's Supplemental Responses to Discovery Requests, Int. No. 16.)

---

[4] *Available at* https://pcaobus.org/news-events/news-releases/news-release-detail/pcaob-names-marc-b-dorfman-as-chief-hearing-officer_444 (last visited Sept. 24, 2025).

[5] *Available at* https://pcaobus.org/Rulemaking/Docket045/Release-2019-001-Bylaws-Amendments.pdf (last visited Jan. 1, 2025).

27.     From its creation in 2002 through September 25, 2025, the Board has publicly issued more than 500 final sanctions orders against Board-registered firms and associated persons. *See* https://pcaobus.org/oversight/enforcement/enforcement-actions (searchable public database last visited on September 25, 2025.)

28.     Of those more than 500 publicly issued final sanctions orders, 28 were issued after an adjudicated proceeding conducted by the Chief Hearing Officer or another hearing officer. *See* https://pcaobus.org/oversight/enforcement/enforcement-actions (searchable public database last visited on September 25, 2025.)

29.     Of the 28 final sanctions orders publicly issued after an adjudicated proceeding conducted by the Chief Hearing Officer or another hearing officer, approximately half became final without a subsequent decision on the merits by the SEC-appointed Board members, because no party sought Board review of the hearing officer's decision. https://pcaobus.org/oversight/enforcement/enforcement-actions (searchable public database last visited on September 25, 2025.)

30.     The Board has not reviewed a hearing officer's decision *de novo* and issued a subsequent public decision on the merits since 2017. (https://pcaobus.org/oversight/enforcement/enforcement- actions (searchable public database last visited on September 25, 2025.)

31.     Of the Board's more than 500 publicly issued final sanctions orders since its creation, eight have been subsequently appealed to, and decided on the merits by, the SEC. https://pcaobus.org/oversight/enforcement/enforcement-actions (searchable public database last visited on September 25, 2025.)

32.    The SEC has not reviewed and issued a final decision on the merits with respect to a final Board sanctions order since 2019. https://pcaobus.org/oversight/enforcement/enforcement-actions (searchable public database last visited on September 25, 2025.)

33.    The Chief Hearing Officer and other presiding hearing officers have issued non-public decisions in Board disciplinary proceedings on Board rules and procedural law. (Exhibit B, Board Responses to Discovery Requests, Req. for Admission Nos. 5, 7.)

34.    The Chief Hearing Officer and other presiding hearing officers have issued non-public decisions in Board disciplinary proceedings on the application of the federal securities laws and SEC rules. (Exhibit B, Board Responses to Discovery Requests, Req. for Admission No. 6.)

35.    The Chief Hearing Officer and other presiding hearing officers have issued final, non-public decisions in Board disciplinary proceedings finding in favor of the respondent. (*See* Exhibit C, June 2, 2025, Hrg. Tr. at 46:7-13.)

36.    Because the Enforcement Division is the prosecuting entity in all Board disciplinary proceedings, Enforcement Staff has access to all non-public decisions of the Board and the Chief Hearing Officer or any other presiding hearing officers. (Exhibit A, Cox Decl., at ¶ 6; Exhibit B, Board Responses to Discovery Requests, Req. for Admission No. 10.)

37.    Non-public decisions issued by the Board, the Chief Hearing Officer, or any other presiding hearing officers are not, as a general matter, available to the public or to respondents in Board disciplinary proceedings. (Exhibit B, Board Responses to Discovery Requests, Req. for Admission No. 9.)

### III.    Investigations and Disciplinary Proceedings Against the Doe Plaintiffs

38.    In December 2022, after a formal investigation, the Board instituted its formal disciplinary proceedings against Doe 1 by issuing a confidential Order Instituting Proceedings. (Compl., Doe 1 ECF No. 1, ¶ 57.)

39.     The Order Instituting Proceedings against Doe 1 alleges that he led an effort to modify audit documentation after the fact and in anticipation of a Board inspection, misled Board inspectors about that documentation during the Board's inspection, lied to Board staff about that documentation during the Board's investigation, and pressured others to do the same, in violation of Board Rule 3100 (Compliance with Auditing and Related Professional Practice Standards), Rule 3200T (Interim Auditing Standards), Rule 3500T (Interim Ethics and Independence Standards), Rule 4006 (Duty to Cooperate With Inspectors), Rule 5110 (Noncooperation with an Investigation), Board Standard ET § 102 (Integrity and Objectivity), and Auditing Standard No. 3 (Audit Documentation). (Order Instituting Proceedings, PCAOB No. 105-2022-006.)

40.     In September 2023, after a formal investigation, the Board instituted its formal disciplinary proceedings against Doe 2 by issuing a confidential Order Instituting Proceedings. (Compl., Doe 2 ECF No. 1 at ¶ 59.)

41.     The Order Instituting Proceedings against Doe 2 alleges that he failed, during a 2018 audit, to adequately evaluate certain accounting estimates used by the client to value one of its revenue sources and the associated accounts receivable, in violation of Board Rule 3100 (Compliance with Auditing and Related Professional Practice Standards), Board Rule 3200 (Auditing Standards); Auditing Standard No. 1015 (Due Professional Care in the Performance of Work); Auditing Standard No. 1105 (Audit Evidence); Auditing Standard No. 1201 (Supervision of the Audit Engagement), Auditing Standard No. 1215 (Audit Documentation), Auditing Standard No. 2301 (The Auditors Responses to the Risks of Material Misstatement), Auditing Standard No. 2401 (Consideration of Fraud in a Financial Statement Audit), Auditing Standard No. 2501 (Auditing Accounting Estimates, Including Fair Value Measurements), Auditing Standard No. 2805 (Management Representations), Auditing Standard No. 2810 (Evaluating Audit Results), and

Auditing Standard No. 3101 (The Auditors Report on an Audit of Financial Statements When the Auditor Expresses an Unqualified Opinion). (Order Instituting Proceedings, PCAOB No. 105-2023-003.)

42.    Before instituting the disciplinary proceedings against Doe 1 and Doe 2, the Board filed an Order Instituting Disciplinary Proceedings, Making Findings, and Imposing Sanctions against each of their respective employers, which contained (i) factual findings by the Board that are substantively identical to the unproven allegations made against the underlying Plaintiff and (ii) legal conclusions by the Board based on those same factual findings. (*See* Exhibit C, June 2, 2025, Hrg. Tr. at 34:12-22.)

Dated: September 26, 2025

Respectfully Submitted,

/s/ Russell G. Ryan
Russell G. Ryan (DC Bar # 414472)
Casey Norman (DC Bar # 90016178)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
Telephone: (202) 869-5210

*Attorneys for Plaintiffs John Doe 1 (No. 24-cv-780) and John Doe 2 (No. 25-cv-186)*

Thomas K. Potter, III (*pro hac vice*)
Burr & Forman, LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
Telephone: (615) 724-3231
Email: tpotter@burr.com

*Attorney for Plaintiff John Doe 2 (No. 25-cv-186)*

/s/ Ian D. Roffman
Ian D. Roffman (*pro hac vice*)
Melanie V. Woodward (*pro hac vice*)
NUTTER, MCCLENNEN & FISH LLP
Seaport West, 155 Seaport Blvd.
Boston, MA 02210
Telephone: (617) 439-2421

*Attorneys for Plaintiff John Doe 1 (No. 24-cv-780)*

<u>CERTIFICATE OF SERVICE</u>

I certify that, on September 26, 2025, a copy of the foregoing document was served upon all counsel of record through the Court's ECF system.

/s/ Ian D. Roffman

7380971

10