# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT
                     DISTRICT OF COLUMBIA
 2

 3    JOHN DOE,                    ) CIVIL NO.:
                                   ) 24-0780-ACR
 4           Plaintiff,            )
           vs.                     )
 5                                 )
      PUBLIC COMPANY ACCOUNTING    )
 6    OVERSIGHT BOARD,             )
                                   ) June 2, 2025
 7           Defendant.            ) Washington, D.C.
      _____) 3:30 p.m.
 8

 9                Transcript of Status Conference
                 Before the Honorable Ana C. Reyes
10                   United States District Judge

11    APPEARANCES:

12    For the Plaintiff:

13         Ian D. Roffman, Esquire
           Melanie V. Woodward, Esquire
14         Nutter McClennen & Fish LLP
           Seaport West
15         155 Seaport Boulevard
           Boston, MA 02210
16
           Russell Ryan, Esquire
17         New Civil Liberties Alliance
           4250 North Fairfax Dr.
18         Suite 300
           Arlington, VA 22203
19
      For the Defendant Public Company
20    Accounting Oversight Board:

21         Donald Beaton Verrilli, Jr., eSQUIRE
           Ginger D. Anders, Esquire
22         Munger, Tolles & Olson LLP
           601 Massachusetts Avenue, NW
23         Suite 500e
           Washington, D.C. 20001-5369
24

25
```

1    <u>APPEARANCES</u>: (Cont'd)

2

3    For the Defendant Public Company
     Accounting Oversight Board:

4

5         Robert Kelsey Kry, Esquire
          Mololamken, LLP

6         600 New Hampshire Ave. N.W.
          Suite 500
          Washington, DC 20037

7

8    For the United States of America:

9         Garry Daniel Hartlieb, Esquire
          U.S. Department of Justice
          Civil Division, Federal Programs Branch

10        1100 L Street, NW
          Washington, DC 20005

11

12

13

14

15

16

17

18

19

20

21   Reported by:    Christine T. Asif, RPR, FCRR
                     Federal Official Court Reporter

22                   333 Constitution Avenue, NW
                     Washington, D.C. 20001

23                   (202) 354-3247

24

25   Proceedings recorded by machine shorthand; transcript produced
     by computer-aided transcription

P R O C E E D I N G S

1

2          THE CLERK:  This is civil action 24-780.  John Doe

3   versus Public Company Accounting Oversight Board, et al.

4          Will the parties please come forward and identify

5   themselves for the record, beginning with plaintiff's

6   counsel.

7          MR. ROFFMAN:  Good afternoon, Your Honor.  Do you

8   want us to come here?

9          THE COURT:  Yeah, I -- she needs it for the

10  transcript, unfortunately.

11         MR. ROFFMAN:  Not a problem.

12         Ian Roffman, and with me is Melanie Woodward.  And

13  we are here on behalf of John Doe One, who is the John Doe in

14  the first filed case, as well as John Doe Corporation.  And

15  with us is Russ Ryan, who is co-counsel for John Doe One and

16  sole counsel for John Doe Two.

17         THE COURT:  Is there also a John Doe three, or was

18  that the second --

19         MR. ROFFMAN:  That's John Doe Corporation.

20         THE COURT:  Corporation.  Okay.  All right.  Thank

21  you.  Welcome.

22         Ms. Anders, you speak.

23         MS. ANDERS:  I do indeed.  Good afternoon, Your

24  Honor.  Ginger Anders for the Public Company Accounting

25  Oversight Board.  With me is Don Verrilli and Robert Kry.

1          THE COURT:  All right.  Thank you, everyone.

2          Oh, thank you.  Sorry.  Go ahead.

3          MR. HARTLIEB:  Good morning, Your Honor.  Garry

4    Hartlieb on behalf of the United States of America, the

5    defendant intervenor in all three cases.

6          THE COURT:  Welcome.

7          MR. HARTLIEB:  Pleasure to be here.

8          THE COURT:  Do we still think this is

9    constitutional?

10          MR. HARTLIEB:  Pardon me?

11          THE COURT:  Does the United States still think this

12    is constitutional?

13          MR. HARTLIEB:  Yes, Your Honor.

14          THE COURT:  Okay.  Good to know.

15          All right.  So, Mr. Verrilli, I have, in my two

16    years and four months on this bench, have -- including this --

17    have had exactly two discovery conferences, because I don't

18    like them, and I make it a point not to have them.  And as it

19    turns out, you and Ms. Anders were on the other one as well.

20    So I don't know if you all get paid by the discovery dispute,

21    but quite a small sample size.

22          I have reviewed the joint status report.  Last time

23    we were here, I thanked you for narrowing your disputes.  And

24    you all have clearly done a lot of work to narrow your

25    disputes as best you can.  And I appreciate that.  I see it.

1    If I thought you hadn't done all of that work, I would make

2    you do it before having this status conference.  So I do think

3    we're at a point where, unfortunately, my intervention is

4    required.

5          So I think, so far as I can tell, there are some

6    categories.  And perhaps one easy category to start with are

7    the first set of document requests with respect to documents

8    and interrogatories concerning the actual proceedings in this

9    case in front of the PCAOB, as opposed to proceedings in front

10   of the PCAOB writ large; is that fair?

11         All right.  Can you come up, Mr. Roffman.

12         And I guess I am a little bit concerned that this

13   not turn into a referendum on the proceedings below in this

14   case, because I think Ms. Anders is correct, that if you were

15   just -- if we were just looking at what has happened below,

16   you wouldn't have jurisdiction to be in here.  The only

17   reason, so far as I understand it, that we're here, even

18   though the processes below haven't played out, is that you're

19   making a due process or various constitutional attacks on the

20   PCAOB structure as a whole.

21         So can you explain to me, I guess, in general, sort

22   of what the structural argument is, maybe just give me a

23   refresher, with an eye towards why the discovery you want is

24   necessary for that, as opposed to you just want to know what

25   is happening in this -- in your particular piece of the PCAOB

1    proceedings.  Does that make sense as a question?

2            MR. ROFFMAN:  It make sense, yes, Your Honor.  We

3    believe all of the requests that -- the narrowed requests that

4    are before you in the joint status report relate to structural

5    issues that have caused our client -- in this case, it's John

6    Doe One who the discovery has been specifically related to so

7    far.  But all of the requests relate to structural

8    constitutional issues that have caused John Doe One to be

9    subject to what we believe is an unconstitutional disciplinary

10   hearing.

11           We've divided the discovery requests, similar to the

12   way that you have, in the sense of some may be specific to the

13   particular matters that involve John Doe One and some are more

14   general.  We've also divided them by which claim they relate

15   to in our mind.

16           So if you take, for example, the first set that's

17   addressed in our particular responsive section, which relate

18   to what we believe is the PCAOB's exercise of unsupervised

19   executive power, we've asked four interrogatories.

20           THE COURT:  Can you give me the numbers just so I

21   have it clear for the record.

22           MR. ROFFMAN:  Sure.  If you have the joint status

23   report --

24           THE COURT:  I do.

25           MR. ROFFMAN:  -- in front of you, I'm on page 5,

1     which has the list of the disputed items.

2               THE COURT:  Yeah.

3               MR. ROFFMAN:  Okay.  So the first four.

4               THE COURT:  Yeah.

5               MR. ROFFMAN:  So interrogatories 9, 10, 11, and 12

6     all relate to unsupervised executive power.  Numbers 9, 10,

7     and 11 ask a very simple question that goes both to the

8     overall structural issues, but they also go to those overall

9     structural issues in Mr. Doe's case.  And they ask a very

10    simple question:  Was the PCAOB supervised and, if so, how?

11              And those -- that basic interrogatory -- and so if

12    you look at 9, 10, and 11, they refer to specific numbers.  9

13    Nine, that number is the investigation that led to the

14    disciplinary hearing.  Ten is the settled administrative

15    proceeding against Mr. Doe's former employer.  And 11 is the

16    unsettled disciplinary hearing against Mr. Doe.

17              THE COURT:  Okay.  Can you just -- before you

18    continue, can you just remind me what the current state of

19    this is sort of where -- you guys -- there was an

20    investigation, the employer settled or whatnot, they're off in

21    the wind, and you all are still in the process of having the

22    hearing.  And I don't remember, has that been stayed?

23              MR. ROFFMAN:  The hearing has been stayed,

24    correct.

25              THE COURT:  Okay.  So right now -- okay.  All right.

1    Keep going.

2              MR. ROFFMAN:  Okay.  And so, you know, again,

3    thinking about this from the perspective of discovery, not the

4    merits briefing, we are entitled, during the discovery

5    process, to understand what is the PCAOB's position on the

6    question of whether they exercised unsupervised executive

7    power or not.  And it's simply asking for that position.

8              Now, their answer may be no, we were not supervised.

9    It may be yes, we were supervised, and the way in which we

10   were supervised was through these structural things.  It may

11   be yes, we were supervised, and it was through these more

12   specific.  We don't know what the answer is.  That's the

13   purpose of discovery.  And then we can make our constitutional

14   arguments once we understand what their position is in terms

15   of how they were supervised.

16             Now, interrog- --

17             THE COURT:  Well, that's not exactly right.  I mean,

18   your contention is they're acting in an unsupervised way;

19   right?

20             MR. ROFFMAN:  That's correct.

21             THE COURT:  And before you filed your complaint, you

22   need a good-faith basis to make that assertion; right?

23             MR. ROFFMAN:  Correct.

24             THE COURT:  Okay.  And but your complaint isn't this

25   particular investigation was unsupervised.  Your complaint is

1    investigations are unsupervised; right?

2         MR. ROFFMAN:  Well, yes and no.  I think our

3    complaint is only seeking -- we're not seeking a nationwide

4    injunction in this case.

5         THE COURT:  Well, thank God you're not.  But I

6    understand that, but you're -- but that's different.  That's

7    the relief question.  My question is the merits question; the

8    question that you have on the merits.

9         MR. ROFFMAN:  Yes.

10        THE COURT:  The question that you all are raising

11   and are allowed to raise at this juncture in front of me is

12   that the SEC's -- structurally, does not supervise these

13   investigations.

14        MR. ROFFMAN:  That's correct.

15        THE COURT:  And I imagine that if what you hear back

16   from the other side, and this is in the careful what you wish

17   for category, if they say yes, we actually did investigate

18   you, we had Jane so-and-so who works at so-and-so desk do X

19   and Y, and that -- that's how they supervised this proceeding,

20   that would make you unhappy in some part because that

21   undercuts your claim.  And then you would want a bunch of

22   discovery as to whether that same supervision occurred with

23   respect to other claims to see if maybe they were singling you

24   all out to supervise because they knew this claim was

25   happening.  Then you would want to get into the veracity as to

1    whether or not that was actually supervised.  And then we

2    would be off on a host of other issues.

3              And I'm guessing that if you raised -- if you had

4    discovery as to structural problems, and they said, oh, yeah,

5    but we investigated you, we supervised your investigation, you

6    would say that's not relevant.  The question is whether or not

7    the structure is wrong.

8              MR. ROFFMAN:  Well, I don't think that that's what

9    they're going to say.

10              THE COURT:  Well --

11              MR. ROFFMAN:  Based on --

12              THE COURT:  You know what I can guarantee you

13    Ms. Anders is not going to say if I say respond to this, the

14    response is not going to be yeah, we left it totally

15    unsupervised.  I promise you that's not going to be the

16    response.

17              MR. ROFFMAN:  I -- I won't -- I won't bet money

18    against that.  Your Honor, what I expect them to say, based on

19    what they've said in prior discussions and in prior hearings,

20    is that there is a statute that bars them from describing how

21    they were supervised by the SEC.  And if that's the position

22    that, in fact, they want to take, I don't know if it is or

23    not, but if that's the position that they want to take, I

24    think that they need to take that position so that we can test

25    that.

1          THE COURT:  But they are giving you just -- but

2     haven't they agreed to give you discovery on sort of generally

3     how they do it?

4          MR. ROFFMAN:  I don't believe they have, no.  I

5     mean, I think that's what we're seeking here.

6          THE COURT:  One second.  I'm sorry.

7          Okay.  Go ahead.  I'm sorry.

8          MR. ROFFMAN:  I mean, that's exactly why we phrased

9     these interrogatories in the way that we've done, to get them

10    to take a position as to how it's done.  And I -- you know, as

11    I said, I don't know whether that position is going to be

12    we're not going to tell you because we think we're barred from

13    doing it under the confidentiality statute, or their answer is

14    going to be we do it because of this structure that's in

15    place, but we don't know exactly what that structure is going

16    to be.

17         THE COURT:  So would you be just as happy if the

18    interrogatory said does the SEC supervise PCAOB investigations

19    and, if so, how?

20         MR. ROFFMAN:  Yeah, I -- that's -- yes, I mean,

21    that's -- that's effectively what the combination of those

22    three interrogatories does.  Plus the fourth one, which is --

23    which really goes to the much more general point, which is

24    interrogatory No. 12.  I've just lost my page here.  Here it

25    is.  That says -- that asked the interrogatory as to whether

1    the SEC ever reviewed the PCAOB's enforcement program, and the

2    results of that review.

3           And that interrogatory was drafted specifically

4    because of the confidentiality provision in mind, in that it

5    does not seek any information that's prepared by or received

6    by the PCAOB in a particular investigation.  So there ought to

7    be nothing that's confidential in response to

8    interrogatory 12, which seeks information about this very core

9    supervision question.

10          THE COURT:  Okay.  All right.

11          Ms. Anders, can I hear you on this, please.  Is -- I

12   understand that the responses to 9, 10, and 11 were that they

13   were asserting essentially an as-applied challenge, and I

14   agreed with you on that.  But would you also object if the

15   interrogatory were just, instead of 9, 10, and 11, one

16   interrogatory that said state whether the SEC supervises PCAOB

17   investigations and, if so, how?

18          MS. ANDERS:  Yes, we would, on both relevance and, I

19   think, privilege grounds.

20          THE COURT:  Well, skip relevance.

21          MS. ANDERS:  Okay.  So to turn to privilege first, I

22   think there was a colloquy with Mr. Verrilli about this at the

23   last status conference.  And so Section 15 U.S.C. 7215(b)(5),

24   prohibits from disclosure --

25          THE COURT:  Can you -- can you say that again so I

1    can pull it up, and also slowly so the court reporter can get

2    it.

3         MS. ANDERS:  Sure.  It's --

4         THE COURT:  Give me one moment.

5         Okay.

6         MS. ANDERS:  15 U.S.C. 7215, and it's subsection

7    (b)(5).  And it's titled "Confidentiality," and this says

8    that:  All documents and information prepared or received by

9    or specifically for the Board, and deliberations of the Board

10   and its employees and agents, in connection with, and then

11   inspection or with an investigation under this section, shall

12   be confidential and privileged as an evidentiary matter and

13   not subject to civil discovery or other legal process.

14        And so at the last status conference, there was

15   discussion about whether -- about the breadth of that

16   provision and just how broad it is and the fact that it covers

17   not only documents but all information.  And so we took the

18   position there, and we take the position today, that

19   information about the -- about the deliberations, about the

20   supervision, supervisory communications, that sort of thing,

21   those are protected from discovery by this provision.

22        THE COURT:  Well --

23        MS. ANDERS:  And I believe Your Honor said --

24   invited the plaintiff to brief that issue if they wanted to

25   raise it.  And we talked about it, and they opted not to brief

1    it at that time.  So I think that's where we are on that.

2            THE COURT:  Well, help me out, through.  I mean,

3    they're saying you don't provide sufficient oversight and that

4    that's a constitutional violation, that you don't provide

5    sufficient oversight structurally.  And you're saying can't

6    tell you how we do it.

7            MS. ANDERS:  And that gets to the relevance point,

8    which I think is really important here and is actually our

9    primary argument.  So I think the question whether there's

10    adequate supervision here is answered entirely, in the

11    relevant constitutional sense, by the statute and by the

12    regulatory framework here.  Because the question, as Supreme

13    Court precedent makes clear, is what authority does the SEC

14    have to supervise --

15            THE COURT:  What what?  I'm sorry.

16            MS. ANDERS:  Authority.

17            THE COURT:  Authority.  Okay.

18            MS. ANDERS:  Does the SEC have to supervise the

19    board.

20            So in other words, does the statute provide adequate

21    supervisory authority.  And I think we know that from the

22    *Arthrex* case, where the question was whether PTAB judges were

23    adequately supervised by the PTO director, and the Court said

24    the PTO director need not review every decision.

25            THE COURT:  Is that -- I'm sorry, are you reading

1    from the plurality?

2            MS. ANDERS:  I'm reading from the plurality, yes.

3            THE COURT:  Okay.  So this is four members.

4            MS. ANDERS:  Yes.  So this is four members saying --

5    this is at 594 U.S. at 27 -- what matters is that the director

6    have the discretion to review the decisions rendered by them.

7            And I think that's actually a more general

8    constitutional principle than just, you know, for Appointments

9    Clause purposes, just for *Arthrex* purposes, and the reason for

10   that is, of course, the question there is, is the inferior

11   officer sufficiently accountable to a higher officer to be

12   inferior.  And the question in the private nondelegation

13   context here is, is this allegedly private entity sufficiently

14   accountable to political government actors.

15           So it's the same question.  And then if you look at

16   private nondelegation cases, like the recent Horseman's --

17   National Horseman's Benevolent and Protection Association case

18   from the 5th Circuit, what they look to there is the SEC's --

19           THE COURT:  I'm sorry.  Let me just pull it up while

20   you're reading from it.  And also, people tend to speed up

21   when they read, and by "people," I mean me, and I get in

22   trouble.

23           MS. ANDERS:  So do I.

24           THE COURT:  So you don't get in trouble, when you

25   read it, if you just go a little bit slower.  And one

1    second.

2         MS. ANDERS:  Sure.  So this is at 53 F.4th 869.

3         THE COURT:  I'm sorry, 53 F.3d?

4         MS. ANDERS:  F.4th.

5         THE COURT:  F.4th.

6         MS. ANDERS:  869.

7         THE COURT:  869?

8         MS. ANDERS:  Yes.

9         THE COURT:  The F.4th reminds me, I was helping a

10   law student with a moot, and I asked him to come up with some

11   cases for me on an issue, and he'd only come up with like two

12   or three.  And I said that, well, that can't possibly be

13   right, there must be more.  And he's like, oh, well, the other

14   ones were from before 2000, so I just thought they were too

15   old.  And I like died inside a little bit.  But the 4th is

16   definitely getting up there.  One second.

17        MS. ANDERS:  It's very disconcerting, actually.

18        So the jump cite here is 888.  And the Court there,

19   the 5th Circuit, held that the, quote, SEC's power to abrogate

20   a private organization's rules establishes a, quote, clear

21   hierarchy that satisfies the constitutional requirement for

22   supervision in that context.

23        So I think if you look at the cases in this area,

24   they're always looking to power to supervise, authority to

25   supervise.  So our position here is that whether the board is

1    sufficiently supervised, assuming that it is a private entity,

2    which we don't agree with, but assuming for the moment that it

3    is, the question whether it's sufficiently supervised is

4    answered by the legal framework.  And we're very happy to

5    brief it for summary judgment purposes on that assumption.

6    We'll stand on the statute and the regulatory framework.

7            THE COURT:  Sorry, just give me one moment, please.

8            So I just want to make sure I understand.  You agree

9    that what they're trying to do is say that, as a structural

10   matter, the SEC does not supervise the PCAOB.  And your

11   response is, A, you don't need discovery on that because it's

12   all confidential.  I can't give it to you even if I want to.

13           But more to the point, you don't get discovery on

14   that because the only thing the Court is to look at is whether

15   the statute says we have supervisory power and how we

16   implement it, if we implement it, doesn't matter.

17           Is that basically where we are?

18           MS. ANDERS:  Yeah, I guess I would flip it around --

19           THE COURT:  Right.  Understood.  Okay.  Understood.

20           MS. ANDERS:  -- and say, yeah, the nondelegation

21   claim that the Court has recognized is that the government

22   entity --

23           THE COURT:  But then it sounds like --

24           MS. ANDERS:  -- does not have sufficient authority

25   as a statutory matter.

1          THE COURT:  I mean, and this may be where we are,

2     but then it sounds like what you're asking for is for me to

3     basically make a merits-based decision on a discovery

4     dispute.

5          MS. ANDERS:  Well, I think one thing Your Honor did

6     last time was to say that, you know, we're taking a merits

7     position here.  If we brief it in a different way, then the

8     plaintiff could come back and say at that point, well, now

9     this discovery has become relevant.  They'd be free to make

10    that argument.

11         So yes, we -- our merits position is that it's the

12    legal framework that matters.  That's what we're going to

13    brief it on.  But if, you know -- if they thought we hadn't

14    done that, then they could come back at that point.

15         THE COURT:  And remind me where we left things off.

16    You guys very helpfully decided to try to work through some

17    discovery issues and then come up with a briefing schedule

18    where we would avoid a motion to dismiss because we would have

19    limited discovery and then we would go to summary judgment?

20         MS. ANDERS:  Yeah, that's -- that's the idea,

21    exactly.  So we've been in the process of putting that summary

22    judgment schedule together.  We had proposed something, but we

23    proposed it only this morning.  So I think, you know, the

24    parties have a little bit more talking to do about that, but

25    we would be very happy to do that here.

1              THE COURT:  Okay.  All right.

2              MS. ANDERS:  Because we would like to move to

3      summary judgment.

4              THE COURT:  No, I know.  Okay.

5              Could I see you again for a moment, on just this

6      issue.  I mean, is that kind of where we are?  If I agree with

7      her on the merits, you don't get the discovery and if I agree

8      with you, that it's not as simple as just looking at the

9      statute, then you do have discovery you will need?

10             MR. ROFFMAN:  Yeah, the *Arthrex* case that they're

11     citing, as you pointed out, is an Appointments Clause case.

12     They're making an argument by analogy that the principle that

13     applied in that case to an issue on the Appointments Clause

14     ought to also apply to an issue on unsupervised executive

15     power.  There is other case law on unsupervised executive

16     power that says that the private entity can only be an aid to

17     the executive agency and that the executive agency must have,

18     quote, pervasive surveillance over the activities of the

19     private entity.  That's going to be an issue that I expect

20     we're going to disagree with.

21             But to the point that you made just a few moments

22     ago, they're trying to prevent us from making the merits

23     argument that we want to make by foreclosing us from getting

24     the discovery to be able to simply get their position on how

25     they were supervised as a private entity by the SEC.

1          THE COURT:  Well, I mean, I think their position is

2    it doesn't matter how we did it.  It just matters that we have

3    the statutory right to do it.

4          MR. ROFFMAN:  That's right.  That is the position

5    that they're taking.

6          THE COURT:  And how many of the -- how many

7    discovery issues does that address?  That addresses

8    interrogatories 9, 10, 11, and 12?

9          MR. ROFFMAN:  That's right.  Then there's also three

10   requests for admission.

11         THE COURT:  Which ones are those?

12         MR. ROFFMAN:  Those are 11, 12, and 13.

13         THE COURT:  Okay.  And then any of the admissions --

14   oh, those are the admissions.

15         MR. ROFFMAN:  Yes.

16         THE COURT:  And then that's no document requests.

17         MR. ROFFMAN:  Correct.

18         THE COURT:  Okay.  Let's put those in a separate

19   bucket for now.  I think what I'm going to do is, I don't know

20   if it's summary judgment or presummary judgment or whatnot,

21   but I'm not going to make that kind of decision on a discovery

22   dispute.  So what we're going to do before we leave here is

23   figure out a way to brief that as part of summary judgment.

24   And maybe we just have to have different summary judgments for

25   different counts or something.  We'll figure out an efficient

1    way to do it, but I'm not going to resolve that on a status

2    discovery dispute.  That wouldn't be fair to either of you.

3              MR. ROFFMAN:  Thank you, Your Honor.

4              THE COURT:  Okay.  All right.  And

5    interrogatories -- so what are the next ones?

6              MR. ROFFMAN:  Yeah, let me go to the next one,

7    because I think it's one of the more straightforward ones.

8              THE COURT:  Uh-huh.

9              MR. ROFFMAN:  So this is the only document request

10   that is still a matter of dispute.  And it's on page 6 of the

11   status report.  It's request for production No. 1.  And this

12   relates to appointment and removal.

13             THE COURT:  Okay.  One second.  Let me just read it

14   again.

15             MR. ROFFMAN:  Yup.

16             THE COURT:  Okay.  There are hundreds, if not

17   thousands of people that apparently think I don't actually

18   have a commission.  So I'll just take this opportunity to put

19   this on the record I do have a commission.  Happy to show it

20   to anyone.  But why don't you tell me why you need their

21   commissions.

22             MR. ROFFMAN:  Well, so they've described in

23   interrogatory answers both the appointment process and the

24   removal process, or removal protections.  As we understand

25   it -- and I say this with the caveat of not reading their

22

1    answer in front of me, so if I get it wrong, I apologize.

2                THE COURT:  Sure.  Fair.

3                MR. ROFFMAN:  But essentially, at the appointment

4    level, that the hearing officer was appointed by the board.

5                THE COURT:  Okay.

6                MR. ROFFMAN:  And approved by the SEC.

7                THE COURT:  Okay.

8                MR. ROFFMAN:  And that with respect to the removal

9    powers, that the disciplinary hearing officer is an at-will

10   employee who may be removed by a vote of both the SEC and the

11   board.

12               THE COURT:  Okay.

13               MR. ROFFMAN:  And what we're asking for simply are

14   three documents that memorialize that.  One is the letter of

15   appointment or commission.  The second are the minutes that

16   reflect or whatever document reflects the appointment by the

17   board.  And the third is whatever document reflects the

18   approval by the SEC.

19               THE COURT:  Okay.  I mean, maybe I can understand

20   two and three, but why do you need -- I mean, they're not

21   going to lie about that.

22               MR. ROFFMAN:  No, we don't -- we're not suggesting

23   that they're lying.  But we do know, from letters of

24   appointment for other people who work in similar agencies,

25   that those sometimes set out certain terms of employment.

1    They're clearly relevant to these issues.  They've described

2    the process to us.  They're not privileged.  And they're not

3    burdensome.  It's three documents that we're asking for that

4    are -- and, frankly, we don't quite understand why they're

5    refusing to provide them.  There seems to be no basis to

6    withhold those three documents, which has only, frankly,

7    raised our antennae that much more.

8              THE COURT:  That's what happens.  Okay.  Is that

9    request relevant to any of the other interrogatories?

10             MR. ROFFMAN:  That stands alone.

11             THE COURT:  That stands alone.

12             MR. ROFFMAN:  Yes.

13             THE COURT:  Okay.  Ms. Anders.

14             MS. ANDERS:  Yes, I want to be very clear here about

15    what we've provided.  So we responded to an interrogatory that

16    asks the board to, quote, describe the legal framework

17    governing the hiring and appointment of the hearing officer,

18    as well as termination.  We think that's what's relevant for

19    Appointments Clause purposes.  Once again, it is the statutory

20    framework pursuant to which -- and regulatory framework

21    pursuant to which he is appointed that matters here.

22             And then as discussions went on, in an effort to

23    compromise, we proposed and responded to a supplemental

24    interrogatory that confirmed that the hearing officer in

25    plaintiff's case was appointed in conformance with those

official public procedures.  So we did not deviate from those

procedures.

We have also answered interrogatories explaining

that the officer's offer letter explains that he is an at-will

employee who can be terminated at will for any lawful reason;

that D.C. employment protections, to the extent there are any,

do apply to that, and he cannot be terminated for, you know,

race based or other protected characteristics.

So we have explained the legal framework that

applies to his termination as well as his hiring and

appointment.  And as far as we can tell, that is all that is

necessary for plaintiff's Appointments Clause claim, both the

legal framework and that it applied to him.

It seems to me that the reason they want this

information is just to, you know, verify that we told the

truth in those interrogatories.  And I would say that those

interrogatories are accurate and true, they're verified, and

there's a presumption of regularity, I think, that attends the

board's statements and actions in this.  So, you know, we

do --

THE COURT:  My guess is that he doesn't -- my guess

is that he would say, I'm not suggesting that you haven't --

what you haven't told me isn't true.  I'm suggesting that

sometimes when a lawyer looks at a document, it -- they maybe

garner more from the original document than from opposing

1  counsel's venire, or what do you call it, view of that

2  document.

3          MS. ANDERS:  Well, they're free to ask us additional

4  interrogatory -- you know, we proposed additional

5  interrogatories.

6          THE COURT:  What's the -- I mean, but what's the

7  problem with just produce -- I mean, it's three documents.

8  There's some reason you don't want to give them the documents

9  or you would have given them to them, is his point of view.

10         MS. ANDERS:  Well, I would make a couple points.  I

11  guess the first is that document discovery is just sort of

12  categorically, I think, more burdensome for the entity than --

13         THE COURT:  Ms. Anders, I mean, I'm quite confident

14  that any of the one, two, three, four, five, six, seven,

15  eight, nine people, who are here, I'm guessing at least one of

16  them are from the PCAOB, and my strong guess is that any one

17  of them could call up someone at PCAOB and get those documents

18  emailed to them relatively quickly.  So it's not a burden

19  issue.  So what's the issue.

20         MS. ANDERS:  So two points on that.  We have

21  identified two documents that I think would be -- would

22  confirm the truth of our verified interrogatory response.  So

23  there are two documents.  They memorialize the vote of the

24  board and the SEC and the hearing officers having taken the

25  oath upon appointment.  I understand that to be what they're

1    asking for.  But if we're going to produce them, what we

2    haven't done is make sure that there isn't information on

3    there that we would need to keep confidential, you know, so,

4    in other words, not publicly produce it to them.

5            In this case, we haven't talked about a protective

6    order.  In the Tennessee case, this is Doe Two, we did talk

7    about a protective order back in the fall.  We proposed one to

8    them.  They had -- they wanted to make changes to it.  They

9    never got back to us on it.  So that's where things stood.

10           THE COURT:  Well, guys, can you get them back your

11   protective order language, please.

12           MR. ROFFMAN:  Yes, Your Honor.

13           THE COURT:  Can you do that quickly?

14           MR. ROFFMAN:  Yes, Your Honor.

15           THE COURT:  I'm -- having been in your shoes, I'm

16   fully aware that things get pushed to the fires in front.  But

17   in fairness, they should have a protective order in place

18   before they agree whether they're going to produce this or

19   not.

20           Okay.  Why don't we do this, get the protective

21   order in place.  Do not fight about the protective order.  You

22   guys figure it out.  You're all adults.  Then review that

23   protective order, review the two documents, see if you can

24   produce them.

25           If for whatever reason you feel like there's

1    something about them that can't be produced, for whatever

2    reason, we might just have to have an ex parte conversation

3    about that.  Obviously, we'll do that with notice to the

4    plaintiffs if that's what we do.  Okay?

5         But I'm not inclined -- I'm inclined, if there are

6    discrete subcategories of documents or here -- just discrete

7    documents, for you just to turn them over.  I think that's

8    easiest.  If you need a protective order, highly confidential,

9    attorneys' eyes only, whatever, I'm certainly amenable to

10   that.  Okay.  All right.

11        MR. ROFFMAN:  Your Honor, before we move on to the

12   next category, I think I need to correct a mistake I made a

13   few moments ago.  So the un- -- I think I listed out the wrong

14   request for admission that relate to unsupervised executive

15   powers.

16        THE COURT:  Okay.

17        MR. ROFFMAN:  So the unsupervised executive power

18   discovery requests are interrogatories 9 through 12, and

19   requests for admission 1 through 4.

20        THE COURT:  Okay.  As we figure out how we're going

21   to brief this -- I mean, I do think that we'll brief the

22   actual issue and then we can deal with document discovery or

23   broad discovery thereafter if we need to.  But the way I'm

24   seeing it is, I -- I don't think I'm going to approve these in

25   the current way in terms of they're targeted about this

1   specific investigation.

2           But if I do agree with you and disagree with them

3   that the statute -- if I disagree with them that the statute

4   is all that I need to look at, when we get back to discovery,

5   if I give it to you, it's not going to be about these specific

6   investigations.  It will be just, in general, what they do.

7   Does that make sense?

8           MR. ROFFMAN:  I understand what you're saying, Your

9   Honor.  And I just meant, I think I -- just to be clear, I was

10  just correcting the numbers.

11          THE COURT:  Oh, yeah, yeah, yeah.  No, I get it.

12  No.  No, I know.  I'm just sort of, having looked at it again,

13  want to make sure I'm clear as to why we're going to do what

14  we're going to do.

15          Okay.  So what's next?

16          MR. ROFFMAN:  The third issue are three requests for

17  admission that relate to our claim that the hearing officer is

18  not an impartial tribunal.  These are requests for admission

19  11, 12, and 13.

20          And just to step back a moment, the purpose, as you

21  know, of requests for admission are, frankly, to make

22  unnecessary discovery -- to avoid unnecessary litigation.

23  When there are fact that the parties agree, rather than have

24  to go through the motions to prove them up, if they agree,

25  that can be memorialized in a request for admission.  That's

1    what these three requests for admission seek to do.

2              There are three facts that we believe are -- the

3    board has -- will concede that they're true facts.  And this

4    is just simply an efficient way to avoid having to prove up,

5    through summary judgment briefing or otherwise, facts that the

6    parties ought not disagree on.

7              So this is a --

8              THE COURT:  Explain this to me, that the -- your

9    claim is that the same people who investigate and say that

10   this needs to go to a hearing than actually hear it?

11             MR. ROFFMAN:  Not quite.

12             THE COURT:  Okay.

13             MR. ROFFMAN:  So our claim is a couple of things.

14   So it's that the board itself acts as both the -- the

15   appellate body and also the investigative body.

16             THE COURT:  The appellate body for the hearing

17   officer.

18             MR. ROFFMAN:  For the hearing officer.

19             THE COURT:  Okay, that's -- yes, okay.  Right.  So

20   they investigate.  They say you, prosecutor, go prosecute

21   this.  The chief hearing officer for the case hears it.  And

22   then if there's an appeal, it goes to the board, which were

23   the same people who started the investigation.

24             MR. ROFFMAN:  That's part one of the issue.

25             THE COURT:  Okay.  What's part two?

1          MR. ROFFMAN:  Part two of the issue is because there

2    was a settlement entered with John Doe One's employer, the

3    board has already issued findings of fact on the same facts

4    that the hearing officer is being asked to adjudicate.  And so

5    those facts have already been found by the appellate body.

6          THE COURT:  Do they bind your -- do they bind you in

7    any way?

8          MR. ROFFMAN:  Well --

9          THE COURT:  Or do they have to like refind the

10   facts?

11         MR. ROFFMAN:  So the board has a footnote that they

12   have that claims that these findings of fact are not binding

13   in any other case.

14         THE COURT:  Uh-huh.

15         MR. ROFFMAN:  However, they still are findings of

16   fact that have been made by the board.  And so --

17         THE COURT:  They've been made by the board or the

18   hearing officer?

19         MR. ROFFMAN:  By the board.

20         THE COURT:  Okay.

21         MR. ROFFMAN:  They're made by the board, who is the

22   appellate body for the hearing officer.

23         THE COURT:  But when they come up and they review

24   this case, is it a de novo review, or are they --

25         MR. ROFFMAN:  They claim that it's de novo review,

1   but I think our -- our argument is it can't possibly really be

2   de novo review if they've already made these factual

3   findings.

4          THE COURT:  But why will having the actual factual

5   findings make that --

6          MR. ROFFMAN:  We don't want the factual findings.

7   We just want their admission that they're the same.  So all

8   we're asking them to do is admit that the factual findings

9   that they have made, that they have made factual findings,

10  which are the same as allegations in the case against John Doe

11  One.

12         THE COURT:  Okay.  So that's request for

13  admission 11?

14         MR. ROFFMAN:  I'm sorry?

15         THE COURT:  That's request for admission 11, 12, and

16  13?

17         MR. ROFFMAN:  That's 11; right.  That's right.

18         THE COURT:  I'm sorry, three or just one?  Let me

19  start again.  I'm sorry, I totally messed that up.  That's on

20  me.

21         That issue goes toward request for admissions 11,

22  12, and 13, or just 11?

23         MR. ROFFMAN:  The findings of fact that have already

24  been made goes to 11 only.

25         THE COURT:  Okay.

1          MR. ROFFMAN:  And then 12 and 13 go to the first

2     point Your Honor made, which is that there have been ex parte

3     communications during the course of the investigation between

4     the investigators, who are now the prosecutors, and the

5     appellate body.  And so that's --

6          THE COURT:  About the employer case.

7          MR. ROFFMAN:  No, about our case, about this case.

8          THE COURT:  So the pros- -- the investigators have

9     talked to the chief hearing officer or the prosecutors?

10          MR. ROFFMAN:  The investigators and the prosecutors

11     are one in the same.  So that's the -- that's the enforcement

12     division, call it the enforcement division.

13          THE COURT:  Okay.

14          MR. ROFFMAN:  So the enforcement division, prior

15     to --

16          THE COURT:  I'm sorry, I thought I just asked that,

17     and maybe I just asked it wrong, and you told me that the

18     investigators were also the appellate board.

19          MR. ROFFMAN:  Let me start again.

20          THE COURT:  Why don't we just let it -- Etch A

21     Sketch, we'll just wipe that all clean.  Okay.  Let's just

22     start from the beginning.

23          MR. ROFFMAN:  Okay.  That's right.  So the part of

24     the tribunal claim that you're talking about is that the

25     board, which is the appellate body, are also the supervisors

1    of the people who investigated.  And during the course of the

2    investigation, the investigators communicate with the board.

3              THE COURT:  Okay.

4              MR. ROFFMAN:  Those are ex parte communications.

5    And requests for admission 12 and 13 simply seek an admission

6    that those communications took place and that they are, in

7    fact, ex parte.

8              THE COURT:  With respect to your client and your

9    client's claims.

10             MR. ROFFMAN:  That's right.  But it's true in every

11   case, but yes, we've asked it with respect to our client

12   because that's our case.

13             THE COURT:  Okay.  All right.  And is it -- are

14   those -- is this the next group, these three requests, or is

15   there something else in this group?

16             MR. ROFFMAN:  That's it.  Just those three.

17             THE COURT:  Okay.

18             Ms. Anders.  Why don't we start with the first one

19   with respect to the overlapping factual and legal issues.

20             MS. ANDERS:  Okay.  So this is RFA 11?

21             THE COURT:  Yes, request 11.

22             MS. ANDERS:  Right.  So this is the one that

23   requests, I guess, an admission that Order 34 contains

24   findings on the same factual and legal issues that are alleged

25   in 06.  And our position on this one is that this is just

1    unnecessary and unduly burdensome because plaintiff already

2    has access to all of this information.  The 034 order that

3    concerns the Joe Doe entity, that's the settlement that makes

4    the findings, that is publicly available, because it's a --

5    it's a settlement that contains the findings.

6           THE COURT:  So that's right, what they're saying

7    there?

8           MS. ANDERS:  That's publicly available.  And then

9    the plaintiff already has the 06 order, which is the one

10   instituting proceedings as to him.  So he can look at the two

11   things and --

12          THE COURT:  So based on that public information, is

13   requests for admission correct?

14          MS. ANDERS:  So it is correct that they concern the

15   same subject matter, but it is, I think, very important that

16   the findings in the 034 order do not bind any entity or

17   individual other -- or the board, in any other proceeding.

18   They are relevant only to that one proceeding.  It's just like

19   any other situation where an adjudicative body makes findings

20   that don't then have preclusive effect as to some other

21   individuals.  So for that reason, we don't think it's

22   particularly relevant either, because it's going to be a --

23          THE COURT:  Well, I mean, relevant or no, don't you

24   have your answer?

25          I mean, can she just -- I mean, you can obviously

1    get it from the transcript and put it in your motion, but, I

2    mean, that's what she's going to say.  They're not going to

3    say anything different.

4              MS. ANDERS:  We're not going to dispute that.

5              THE COURT:  Right.

6              MR. ROFFMAN:  Your Honor, to us, that's the point of

7    a request for admission.

8              THE COURT:  Okay.  Why don't we do it this way,

9    since I'm the -- since I'm the person you're going to be

10   ultimately writing to, just cite this part of the transcript.

11   And I will be like, yes, and I will take due note, and they

12   will ellipse the part where you say it's not binding, and I

13   will be like, oh, this means something, and then I'll remember

14   that you said it wasn't binding on you all.

15             MS. ANDERS:  And we'll point it out as well.

16             THE COURT:  Okay.  So 11's done.

17             12 and 13.

18             MS. ANDERS:  So these, we think, are squarely within

19   the privilege that we were discussing before.  So both -- so

20   12 is calling for an answer as to whether the board

21   communicated with the enforcement division about the facts

22   alleged in the order.  So that seems to us very clearly to be,

23   as the statute says, information prepared or received by or

24   specifically for the board in connection with an

25   investigation.

1           I think last time around, the Court acknowledged

2      that board communications are covered by the statute, this is

3      at transcript 26, for instance, and that deliberations in

4      connection with an investigation are covered.  And I do think

5      that these go -- the request goes essentially to the content

6      of the communications, because it is seeking an admission that

7      the board and the enforcement division deliberated about the

8      facts alleged in the orders.  So that is the content of the

9      communication.

10          THE COURT:  Can't you just say -- I mean, what if

11     you just said -- maybe this is confidential and, if so, you

12     just tell me.  I'm not -- this isn't rhetorical.  What if it

13     was just there's no prohibition under the statute or the rules

14     for investigators to talk to the board about a case.

15          MS. ANDERS:  I can take that back and we can see if

16     we can do something based on the legal and regulatory

17     framework.

18          THE COURT:  Yeah.

19          Won't that get you what you need?

20          MR. ROFFMAN:  Yes, Your Honor.

21          THE COURT:  Great.

22          MS. ANDERS:  And to be clear, we actually already --

23     I'll say that we already proposed and responded to several

24     interrogatories about that concerning the rules on separating

25     the board's prosecutorial and quasi judicial functions

1  supplemental interrogatories 18 and 19.  So the rules

2  surrounding when the staff can communicate with the board.  So

3  from our perspective, we already answered that question.

4          THE COURT:  Well, great, just answer it again and

5  then we're all done.  Right?

6          What exactly do you need from them?

7          Ms. Anders, stay up, please.

8          Both of you, sorry.

9          MR. ROFFMAN:  Yeah.  Your Honor, we tried to do this

10 in the least burdensome way possible, which is just simply to

11 have an acknowledgment that those communications exist.

12 That's all we're asking for.  And if that acknowledgment is

13 made in the form of the hearing transcript today or in a

14 formal request for admission, either way is fine.  I

15 understand their position that they're not going to disclose

16 the content.  We're not asking for that.

17         THE COURT:  Well, I mean, I think that they're super

18 sensitive -- I don't mean this in a derogatory way --

19 appropriately so, about not doing anything that might claim or

20 waive or someone, you know, in another case, when this comes

21 up, say, well, you guys waived confidentiality over that

22 because the judge asked you and you answered.  I mean, I think

23 that's their concern.

24         But it seems to me that at a minimum, the PCAOB

25 should be able to say the rules and regulations do not

1    prohibit this or the rules and regulations do prohibit this

2    and then you can make whatever argument you want from there.

3                MR. ROFFMAN:  Your Honor, that may get us there.  I

4    mean, I think, ultimately, our partial tribunal argument, you

5    know, we would like to be able to say not just that they can,

6    but that they do, and we know that they do.  And so it's --

7                THE COURT:  Why do you suspect that they do now?

8                MR. ROFFMAN:  Well, because it's part of the -- it's

9    part of the process that practitioners are very familiar with

10   in what, in the SEC world, is equivalent to an action memo,

11   where the enforcement division presents their case to the

12   board, and the board decides whether or not to issue a formal

13   order of investigation and decides whether or not to institute

14   disciplinary hearings.  So it's -- among practitioners, it's a

15   well-known process.

16               THE COURT:  Well, why don't you just get a

17   practitioner and file an affidavit.

18               MR. ROFFMAN:  We -- again, this gets back to the

19   whole purpose of the request for admission, is to avoid cost

20   and unnecessary litigation.

21               THE COURT:  I hear you, but they're not going to

22   agree to that, for a lot of reasons that make sense to me.

23   And if what we're all doing is just figuring out a way to

24   state the obvious so that I can take it into account, just

25   enter -- see what you can work out.  If you can agree -- agree

1    with the language that nothing prohibits it, and then you get

2    me somebody who does this and says this is how it goes.  And

3    then if you want to challenge them and claim that they don't,

4    then I'm going to put you to the discovery.  So there you have

5    it.

6             MR. ROFFMAN:  Thank you, Your Honor.

7             THE COURT:  Right?  If they challenge -- if you put

8    up somebody, and they're like no, no, no, we're challenging

9    what this person says, then I will give you the discovery.

10   Okay.  All right.

11            MS. ANDERS:  Just to be clear, what we think is

12   privileged is whether any communications occurred in this case

13   or any other case.  But what we'll meet and confer on is --

14            THE COURT:  Right.

15            MS. ANDERS:  -- the legal framework surrounding

16   whether those communications can occur.

17            THE COURT:  Yes.  And you're going to take that back

18   to your client.

19            MS. ANDERS:  Yes.

20            THE COURT:  Okay.

21            All right.  What else do we have?

22            MR. ROFFMAN:  Last one, Your Honor.

23            THE COURT:  That's pretty good, 46 minutes.

24            MR. ROFFMAN:  Ms. Wood and I have flights to catch,

25   so we're going to do this quickly.

1              THE COURT:  Oh, I'm sorry that I pushed this back.
2    I'm so sorry.
3              MR. ROFFMAN:  There's plenty of other flights too,
4    don't worry.
5              THE COURT:  When's your flight?
6              MR. ROFFMAN:  6:45, but that's --
7              THE COURT:  From National?
8              MR. ROFFMAN:  Yeah.
9              THE COURT:  Oh, you're fine.
10             MR. ROFFMAN:  We're fine.
11             So this is interrogatories No. 15 and 17.
12             THE COURT:  Okay.
13             MR. ROFFMAN:  And these relate to the due process
14   claim relating to the secrecy of the proceedings.  We've had
15   colloquy with Your Honor on this before.  And so we have
16   significantly narrowed what we're asking for.  There are only
17   two interrogatories now.
18             So the first is the number of disciplinary hearings
19   instituted since August 30, 2024, which is when they
20   started -- 2004, I'm sorry, when they started doing these
21   sorts of investigations.
22             THE COURT:  Why does that matter?
23             MR. ROFFMAN:  Well, this is a statistic that at
24   times, the PCAOB has published in annual report.  Sometimes
25   they do, sometimes they don't.  And so there's just incomplete

1    information.

2            THE COURT:  But why do you need it?  Why does it

3    matter?

4            MR. ROFFMAN:  So this goes, again, to the question

5    of what is the scope of what they're keeping confidential from

6    the world.  So we just -- we want to be able to have discovery

7    and present to Your Honor information not just of the

8    theoretical existence of these secret disciplinary hearings,

9    but the fact that they actually do exist.  That since the

10   beginning of the PCAOB, there have been X number of secret

11   disciplinary hearings, and that's all --

12           THE COURT:  Are there secret and nonsecret

13   disciplinary hearings, or your position is that they're all

14   secret?

15           MR. ROFFMAN:  Well, the way it works is they're

16   secret at the beginning and if the PCAOB wins, then the

17   decisions in favor of the PCAOB become public.

18           THE COURT:  Okay.

19           MR. ROFFMAN:  So -- but if the PCAOB loses, nobody

20   knows; that's secret.  And so the result of that is there is

21   no precedent that is out there in the world that is favorable

22   to the accountants.  The only precedent that exists is

23   precedent that favors the PCAOB, because that's the only thing

24   that becomes public.

25           THE COURT:  Are those prior opinions precedential?

1          MR. ROFFMAN:  They are -- I think that's a

2     complicated question.  The PCAOB has claimed --

3          THE COURT:  I have a feeling that Ms. Anders is

4     going to tell me they're not, and that's why none of this is

5     relevant.

6          Ms. Anders, is that what you're going to tell me?

7          MS. ANDERS:  Essentially.

8          THE COURT:  Yeah.

9          She would say it better.

10         MR. ROFFMAN:  I think you'll both say it very well,

11    better than me.  They'll -- as a technical matter, they may or

12    may not actually cite to those decisions, but they do create a

13    body of law.

14         THE COURT:  Well, not if they're not precedential.

15    It's like an arbitration.

16         MR. ROFFMAN:  It's like an arbitration over and over

17    again in front of the same arbitrator.  And that's different.

18    Because you start to know where the arbitrator's preferences

19    are, how they feel about certain discretionary issues and so

20    on and so forth.  And those are things that the PCAOB knows

21    that the division of enforcement knows, and that a defense

22    lawyer like myself doesn't know.

23         THE COURT:  How many officers are there to choose

24    from and how are they -- are they just randomly assigned to

25    cases?

1          MR. ROFFMAN:  One.

2          THE COURT:  There's one.  And it's the chief hearing

3    officer.  It's just the hearing officer.

4          MR. ROFFMAN:  Yes.

5          THE COURT:  And how long are those people in their

6    positions?

7          MR. ROFFMAN:  The current one actually just recently

8    announced, I think, that he is stepping down.  And I don't

9    know how long he's been in that position, but it's been a fair

10   amount of time.

11         THE COURT:  Okay.  All right.

12         MR. ROFFMAN:  And then 17 is similar to 15, it's

13   just one level more of detail, which is the number of

14   orders.

15         THE COURT:  But if they're going -- I mean, they're

16   not going to deny that there some that are nonpublic; right?

17         I mean, Ms. Anders, you're not going to deny that;

18   right?

19         MS. ANDERS:  No.

20         THE COURT:  So does it matter how many?

21         MR. ROFFMAN:  We think it does.

22         THE COURT:  Why?

23         MR. ROFFMAN:  Because we think it gives color to the

24   scope of these secret proceedings.  And that's important.  I

25   mean, it gives color to the extent of the information that's

1    kept concealed from accountants and from defense attorneys.

2              THE COURT:  But, I mean -- you're not going to get

3    up and make the argument that you conceal some, but it's not a

4    lot, so therefore, it doesn't matter.  You're going to get up

5    and make the argument that this is structurally a-okay; right?

6              MS. ANDERS:  Yes.

7              THE COURT:  Okay.

8              MR. ROFFMAN:  Well, so if --

9              THE COURT:  I'm going to be the one making that

10   decision; right?

11             MR. ROFFMAN:  You are.

12             THE COURT:  Okay.

13             MR. ROFFMAN:  You are going to be making that

14   decision.

15             THE COURT:  Okay.  I don't care if it's a hundred or

16   500,000, like your point is they only publish what's positive

17   for them and they keep from us the negative ones.  And

18   therefore, even though they're not binding, defense counsel

19   don't have the same ability to understand the hearing officer,

20   to make arguments, to sharpen their arguments.  And even if

21   it's nonprecedential, at least it helps us in terms of how

22   we're looking at things for the next case down the road and

23   that's totally unfair; right?

24             MR. ROFFMAN:  We also don't know, frankly, if there

25   are any negative ones.

1          THE COURT:  Well, I mean -- okay.  That is a fair

2     point.  So I -- so I don't -- I don't really care how many

3     disciplinary proceedings there's been since August 30, 2004.

4     I don't see how that's relevant.  And the state the number of

5     nonpublic orders, I don't think they have to go and tell you

6     the numbers but if it's more than zero, I think, in fairness,

7     he is entitled to know that, Ms. Anders.

8          MS. ANDERS:  We've already told him that there are a

9     number of --

10          THE COURT:  Oh, well, there you go.

11          MR. ROFFMAN:  Well, so but they -- I think what

12     they're including in the nonpublic orders are all the

13     noninterlocutory ones.  The reason No. 15 is important is

14     because it will allow us to compare the public results, final

15     decisions, with a number of actions that have been instituted.

16     So that will actually tell us --

17          THE COURT:  But that's -- I mean, that's -- I mean,

18     look, that -- that's not going to tell me anything, because

19     I'd have to look at every single one and determine whether or

20     not some were right or some were wrong.  I mean, what you're

21     going to say is -- I don't even know what you're going to say,

22     but you're going to say almost none of them go in favor of the

23     defense.  It's such a small percentage, 2 or 3 percent, that

24     we're not actually getting a fair shake.  Is that kind of what

25     you want to do?

1    MR. ROFFMAN:  Well, it depends on what the answer

2    is, frankly.  We don't know what the answer is.  So we don't

3    know if the answer is 50/50.  We don't know the answer there's

4    been zero or one in 20 years where the defense is one.

5         THE COURT:  Well, she -- Ms. Anders just said that

6    they have had some.

7         I'm sorry.  Ms. Anders, have there been some, or do

8    you know, that are final orders, as opposed to interlocutory

9    orders?

10        MS. ANDERS:  I believe --

11        THE COURT:  Okay.  If she confirms that, will

12    that -- if the number is greater than zero and then --

13        MS. ANDERS:  Yes.

14        THE COURT:  Look, if I -- if I get down the road and

15   I think it would actually matter to me how many more than zero

16   there are, then I'll give you the discovery.  But I don't

17   think it's -- I'm not going to be swayed by X number versus

18   Y number.

19        MR. ROFFMAN:  Yeah, I mean, I -- obviously, we think

20   we're entitled to all of it, but we'll take what we can get.

21   I mean, if the PCAOB is willing to tell us, look, over the

22   20 years, there have been, you know, a range or a certain

23   number of final decisions in favor of the respondent, that

24   would get us part of the way there, yes.

25        THE COURT:  All right.  Okay.

1          MR. ROFFMAN:  Thank you.

2          THE COURT:  Ms. Anders.  So knowing that I'm going

3     to not make you answer interrogatory 15, and that I'm not

4     going to make you answer the number of nonpublic orders since

5     2004, is there something that you can do or talk to your

6     client about that's something that the number is greater than

7     zero?

8          MS. ANDERS:  I imagine there is.  This is a

9     statutory requirement that these procedures remain

10     confidential, so Congress contemplated that they would.  They

11     exist, and so we may be able to come to an interrogatory that

12     says there are -- there is a number greater than zero.  But

13     yes, we think the actual number itself is completely

14     irrelevant and will be prejudicial to us for exactly the

15     reason Your Honor identified.

16          THE COURT:  All right.  Well, what I want is for you

17     guys to come to an interrogatory where you tell them whether

18     there are any final nonpublic orders by the chief hearing

19     officer that are in favor of the respondent.  Is that --

20     that's what I would like.

21          MS. ANDERS:  We'll take that back, yes.

22          THE COURT:  Okay.  So I think that gets us through

23     everything except the ones we're saving for the merits issue;

24     right?

25          MS. ANDERS:  I believe so.

1              THE COURT:  Is that right?

2              MR. ROFFMAN:  Yes, Your Honor.

3              THE COURT:  Okay.  Great.

4         So let's talk about how to do this.  If -- I mean,

5    are we basically at a position that once you get whatever

6    information that we've talked about today, which I imagine

7    won't take very long, that you guys would be prepared to, I

8    imagine, cross-brief motions for summary judgment, and then if

9    on the one merits issue I decide for you afterwards, then I'll

10   let you have the discovery?

11             MR. ROFFMAN:  I think that's right, with one

12   wrinkle, which is -- so we have, in -- for John Doe

13   Corporation, we currently have a answer or otherwise respond

14   deadline of June 18th.  There has not yet been an answer in

15   the other two cases.

16             THE COURT:  Well, how come the corporation one isn't

17   stayed?

18             MR. ROFFMAN:  No, I'm sorry, in this -- in the

19   corporation one in this case.

20             THE COURT:  Oh, oh, in front of me.  Oh.

21             MR. ROFFMAN:  Yeah, in front of you.

22             THE COURT:  Okay.

23             MR. ROFFMAN:  In front of you.  And so I think we

24   sort of have to figure out is the board going to file answers,

25   are they not going to file answers.

```
 1                THE COURT:  Ms. Anders, do you know what you're
 2      going to do yet?
 3                MS. ANDERS:  I'm sure we can work it out.
 4                THE COURT:  Okay.  Why don't you guys just work it
 5      out, but I would like to get the case moving.
 6                MS. ANDERS:  So would we.
 7                THE COURT:  Yeah.  Understood.
 8                How ready -- assuming you figure out the answer
 9      thing, like let's just set something.  Are you all envisioning
10      cross-motions?
11                MS. ANDERS:  So yes, what we proposed at the moment
12      is I think we'd like to brief -- speaking for the board, we'd
13      like to brief all three cases together, because the issues are
14      heavily overlapping.
15                THE COURT:  Yes.
16                MS. ANDERS:  We would propose a four-brief schedule.
17      Out initial proposal is that plaintiff go first, because they
18      bear the burden, and this case is going to be resolved on
19      motions.
20                THE COURT:  Well, why can't we just -- I mean, you
21      guys are really super smart.  I mean, can't we do
22      cross-motions and that four we can --
23                MS. ANDERS:  It would be like a three-briefing
24      parallel schedule, or six-brief, rather.
25                THE COURT:  Yeah, so you guys file summary judgment,
```

1    you file your oppositions and then you file your replies.  I

2    know you're not happy with that because you don't get the

3    final word on surreply but, rest assured, I will not have

4    recency bias.

5              MS. ANDERS:  I think -- I think when we've done

6    things like that in other cases, we've found there's a lot of

7    redundancy and a lot of sort of talking past each other.

8              THE COURT:  That's true.  Okay.

9              MS. ANDERS:  So I think we would rather talk about

10   who goes first in a four-brief schedule than do the six-brief

11   schedule, because it is a little frustrating that way.

12             THE COURT:  That is a fair point.

13             Unfortunately, she did catch me at redundancy.

14   There is a lot of redundancy when we do it that way.  Can we

15   just do the one, one, one, one?  If you want a sur-surreply,

16   I'll give you like five pages or something.

17             MR. ROFFMAN:  That's -- I think if we get that

18   surreply, that's fine.

19             THE COURT:  Yeah, I had a feeling.

20             Okay.  When can you get your brief in, do you think?

21   How much time do you need?

22             MR. ROFFMAN:  So I did not see, this morning, the

23   board's email yet, so I don't know what they're proposing.

24             MS. ANDERS:  So we proposed 60 days from today, like

25   a 60, 60, 21, 21.

1          MR. ROFFMAN:  That's fine with us, Your Honor.

2          THE COURT:  Okay.  So the --

3          MR. ROFFMAN:  Although, actually, could I -- if we

4    could do 60 days rather than from today but from June 18th, if

5    we're going to get an answer then?

6          THE COURT:  Fine.

7          MR. ROFFMAN:  Especially if we go first.

8          THE COURT:  Great.  Perfect.

9          All right.  Answer by June 18th.  You guys just put

10   out a proposed schedule that's 60 days from their 60 days, 30,

11   30.  I don't know what that does with respect to the holidays.

12   If that puts someone in Thanksgiving or something, I don't

13   want to ruin the holidays.

14         MS. ANDERS:  Yeah, I think we were thinking 21, 21,

15   but we can figure it out.

16         MR. ROFFMAN:  We'll figure it out.

17         THE COURT:  Okay.  You guys figure it out.  And then

18   I will -- then I'm going to give you a very short three --

19   five-page surreply, but you're going to get like five or ten

20   days to do it.  Then what I want you all to do is once you

21   figure out that schedule and get it to me this week, is work

22   with Ms. White to get a hearing calendar -- a hearing on the

23   calendar, let's say, two to three weeks after the final

24   surreply.  I do want to get this done this year, if possible.

25   And I think we should set aside a day for the hearing.  I

don't know that we'll actually need a day, but I have a sense

this might go a while.  So it's just easier to block the time.

So whenever you set the hearing, set the hearing for 10:30.

THE CLERK:  Yes, Your Honor.

MS. ANDERS:  There's just one other issue, which is

discovery in other cases.  I think that was something --

THE COURT:  I thought you were going to say whatever

happened here was going to happen in your other cases?

MR. ROFFMAN:  That's right, Your Honor.  The only

ones in which it applies, frankly, goes to the question you

asked at the very beginning of this hearing.  So we had

certain requests that related to the docket numbers and

that -- the underlying docket numbers in this case.

THE COURT:  Okay.

MR. ROFFMAN:  We were simply going to swap out the

numbers in those other --

THE COURT:  All right.  So you're not -- so don't

bother doing it because I'm not going to grant it.  Then if we

get you discovery, you're going to get it in general, not with

respect to each proceeding.

MR. ROFFMAN:  I think that resolves it.  There was

one -- was there one outstanding discovery request in John Doe

Two, I think, that was different?

THE COURT:  Oh, we were so close to you all making

your flights.

1          MR. RYAN:  Yes.

2          I think there's one request in the John Doe Two that

3     does not overlap.

4          THE COURT:  Okay.

5          MR. RYAN:  And that is a request -- I haven't looked

6     at it in a while, but it's -- it relates to the board's budget

7     and funding and the way it collects its revenue.  And the

8     claim is that the board raises its revenue without any

9     involvement from Congress, and that's a violation of the

10    Taxing Clause.

11         THE COURT:  Okay.

12         MR. RYAN:  So, but I think we can --

13         THE COURT:  All right.  I don't want to spring this

14    on you.  Do you know what he's talking about?  Do you have a

15    response?

16         MS. ANDERS:  Yeah, I have a response to that.

17         THE COURT:  Okay.

18         MS. ANDERS:  So, yeah, this is a request from last

19    fall that requests all documents concerning or reflecting

20    involvement or oversight by any member or committee of

21    Congress with respect to the board's budget, the board's

22    calculation of accounting support fees, the PCAOB scholars

23    program, or the board's other financial affairs.

24         THE COURT:  I'm going to take a flyer that the PCAOB

25    scholars program no longer exists.

1          MS. ANDERS:  That could well be, I don't know, but I
2     think that was actually venue related in Tennessee.  But I
3     think this request is not relevant to any claim remaining in
4     the case.  And, in fact, in the Doe One case, the plaintiff
5     agreed that there was no discovery necessary for the taxing
6     claim.  So that's where we stand on Doe One.

7          This is coming back from Doe Two, after -- after
8     months and months, but we just think the question whether this
9     is a tax is a question of legal characterization.  And then
10    the question whether Congress -- whether, if it is a tax,
11    Congress provided sufficient guardrails, is a question of the
12    statute.  So from our perspective, this is not relevant, and
13    we just don't think it's something that the plaintiffs need or
14    that we want to answer.

15         THE COURT:  All right.  I'm inclined to agree.  I
16    don't think this is the time or place to get into how they're
17    dealing with their budgets.  But if as you're -- if they raise
18    anything in their summary judgment motion or in their
19    opposition to your summary judgment motion where you say no,
20    they've actually put this in play in a way I can show you,
21    contact chambers.  We can have a quick chat about it.  You
22    know, I just don't see it right now but if you get to briefing
23    and I can't brief facts without knowing this, or they say Y
24    and therefore, now they've put it into play, I'm certainly
25    happy to revisit.  Does that sound fair?

1          MR. RYAN:  Very well.

2          THE COURT:  Okay.

3          All right.  Anything else from anybody else?

4          MR. HARTLIEB:  Your Honor, I just wanted to confirm

5     with respect to the briefing schedule where you envision the

6     United States being able to file a brief within that

7     sequence.

8          THE COURT:  That's an excellent question.

9          MR. HARTLIEB:  And if I may offer, I think what may

10    make sense in the cross-motions is after I -- both parties

11    have filed their opening briefs, the United States weigh in

12    once at that time, as opposed to having multiple opening and

13    reply briefs.

14         THE COURT:  Totally great with me.  Do it on the

15    same day that the replies are due.  Well, actually, do it --

16    maybe do it -- you're going to be a little bit tight on time,

17    but you will have had plenty of notice as to what's being

18    argued.  Do it 15 days before the first sets of replies are

19    due so that it will be fair -- before plaintiff's reply is due

20    at least, so that way it will be fair to the plaintiffs, so

21    they can respond to it, because I imagine you're just going to

22    agree with Ms. Anders.  Does that make sense?

23         MR. HARTLIEB:  That makes sense.  Thank you, Your

24    Honor.

25         THE COURT:  Okay.  And also, I don't know that we're

1    going to have people wanting to weigh in with amicus briefs,

2    but can you put someplace in your proposed order that any

3    amicus briefs have to come in at the same time as the

4    government brief for either side.  And they don't need a

5    motion.  I mean, unless there's someone that you wildly object

6    to, if you guys agree, they can just make it a consent motion.

7    Does that make sense to everybody?

8                MR. ROFFMAN:  Yes, Your Honor.

9                THE COURT:  Yup.  All right.

10               Thank you, everyone.  Have a great week.  And please

11   give me the proposed order this week.

12               (The proceedings were concluded at 4:34 p.m.)

13

14               I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
15   record of proceedings in the above-entitled matter.

16               _____/s/_____
                     Christine T. Asif
17                   Official Court Reporter

18

19

20

21

22

23

24

25