**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE,<br><br>      *Plaintiff*,<br><br>      v.<br><br>PUBLIC COMPANY ACCOUNTING<br>OVERSIGHT BOARD,<br><br>      *Defendant*. | Civil Action No. 1:24-cv-780-ACR |
| JOHN DOE,<br><br>      *Plaintiff*,<br><br>      v.<br><br>PUBLIC COMPANY ACCOUNTING<br>OVERSIGHT BOARD,<br><br>      *Defendant*. | Civil Action No. 1:25-cv-186-ACR<br>(consolidated with No. 1:24-cv-780 (lead)) |

**<u>DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT AND MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................1

STATEMENT OF THE CASE.............................................................................................4

    A.    Legal Background.................................................................................4

    B.    Factual Background and Procedural History ........................................5

LEGAL STANDARD...........................................................................................................5

ARGUMENT .......................................................................................................................5

I.    Plaintiffs' Jury-Trial Claims Fail on Jurisdictional Grounds and on the Merits...................5

    A.    This Court Lacks Subject-Matter Jurisdiction over Plaintiffs' Jury-Trial Claims.................................................................................6

    B.    Plaintiffs' Jury-Trial Claims Fail on the Merits....................................10

II.    Plaintiffs' Due-Process Claims Fail ..................................................21

    A.    The Board's Limited Combination of Prosecutorial and Adjudicatory Functions Does Not Violate Due Process ...........................21

    B.    This Court Lacks Jurisdiction over Plaintiffs' Confidentiality Claim, and in Any Event, Board Confidentiality Procedures Do Not Violate Due Process ......................................................28

        1.    The Court Lacks Subject-Matter Jurisdiction over Plaintiffs' Non-Structural Due-Process Claims .................................................28

        2.    The Board's Confidentiality Procedures Do Not Violate Due Process ...................................................................................30

III.    Plaintiffs' Appointments Clause and Article II Claims Are Meritless .............................32

    A.    Hearing Officers Are Lawfully Appointed by the Commission...........................32

    B.    Hearing Officers Do Not Enjoy Unconstitutional Removal Protections..............36

    C.    Even if Plaintiffs' Article II Challenges Had Merit, Plaintiffs Would Not Be Entitled to Injunctive Relief ..............................................39

IV.    Plaintiffs' Private Nondelegation Claims Fail ..................................40

    A.    The Board and Its Employees Are Part of the Government for Purposes of Assessing Plaintiffs' Private Nondelegation Claim ..................................40

    B.    Even if the Board Were a Private Entity, the SEC's Supervision Is Constitutionally Sufficient .......................................................42

V.    The Board's Funding Scheme Is Constitutional ...............................46

VI.    Plaintiffs Are Not Entitled to a Permanent Injunction......................49

CONCLUSION.................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abramowitz v. Lake*,
    2025 WL 2480354 (D.D.C. Aug. 28, 2025) ........................................................... 39

*Alpine Sec. Corp. v. FINRA*,
    121 F.4th 1314 (D.C. Cir. 2024) ............................................................... 3, 43, 44

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*,
    64 F.4th 1354 (D.C. Cir. 2023) ........................................................................... 50

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*,
    430 U.S. 442 (1977) ............................................................................... 11, 16, 17

*Axalta Coating Sys. v. FAA*,
    144 F.4th 467 (3d Cir. 2025) ................................................................................ 21

*Axon Enters., Inc. v. FTC*,
    598 U.S. 175 (2023) .................................................................. 1, 6, 7, 8, 9, 10, 29

*Blankenship v. FINRA*,
    2024 WL 4043442 (E.D. Pa. Sept. 4, 2024) .......................................................... 8

*Blinder, Robinson & Co. v. SEC*,
    837 F.2d 1099 (D.C. Cir. 1988) ...................................................................... 2, 22

*CFPB v. Cmty. Fin. Servs. Ass'n*,
    601 U.S. 416 (2024) ........................................................................... 3, 46, 47

*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*,
    494 U.S. 558 (1990) ............................................................................................. 19

*Chem. Waste Mgmt., Inc. v. EPA*,
    873 F.2d 1477 (D.C. Cir. 1989) .................................................................... 22, 27

*Crowell v. Benson*,
    285 U.S. 22 (1932) ............................................................................................... 11

*Dawson v. Contractors Transp.*,
    467 F.2d 727 (D.C. Cir. 1972) ............................................................................ 21

*Dep't of Transp. v. Ass'n of Am. R.R.*,
    575 U.S. 43 (2015) .................................................................................... 40, 41, 42

*Doe v. Exxon Mobil Corp.*,
    2022 WL 3043219 (D.D.C. Aug. 2, 2022) ........................................................... 33

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006)................................................................................................50

*Edmond v. United States*,
    520 U.S. 651 (1997)................................................................................................36

*Ehrman v. United States*,
    429 F. Supp. 2d 61 (D.D.C. 2006) .........................................................................5

*Elgin v. Dep't of Treasury*,
    567 U.S. 1 (2012)..........................................................................................6, 9, 45

*Ex parte Bakelite Corp.*,
    279 U.S. 438 (1929)................................................................................................11

*FCC v. Consumers' Rsch.*,
    606 U.S. 656 (2025)...........................................................3, 42, 43, 44, 45, 47, 48

*First State Bank v. Daniel & Assocs.*,
    519 F. Supp. 2d 1157 (D. Kan. 2007) ...................................................................18

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010)...............................3, 9, 17, 29, 30, 33, 37, 38, 39, 40, 41, 42, 44, 49, 50

*FTC v. Cement Inst.*,
    333 U.S. 683 (1948)..........................................................................22, 25, 26, 28

*Gallier v. Woodbury Fin. Servs.*,
    171 F. Supp. 3d 552 (S.D. Tex. 2016) ...................................................................18

*Gottlieb v. Pena*,
    41 F.3d 730 (D.C. Cir. 1994) ...........................................................................26, 27

*Graceba Total Commc'ns v. FCC*,
    115 F.3d 1038 (D.C. Cir. 1997) .............................................................................30

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989)..............................................................................................8, 11

*Helvering v. Mitchell*,
    303 U.S. 391 (1938)................................................................................................11

*Herron v. Fannie Mae*,
    861 F.3d 160 (D.C. Cir. 2017) ...............................................................................41

*Hill v. NTSB*,
    886 F.2d 1275 (10th Cir. 1989) .............................................................................13

*Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*,
    426 U.S. 482 (1976)...................................................................................22

*Hudson v. United States*,
    522 U.S. 93 (1997).......................................................................................6

*Huff & Puffers v. FDA*,
    2025 WL 1092696 (C.D. Cal. Feb. 27, 2025)....................................7, 8

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935)..................................................................................38

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) ..............................................................8, 39

*Jonal Corp. v. Dist. of Columbia*,
    533 F.2d 1192 (D.C. Cir. 1976)..............................................................27

*Kelley v. Shapiro*,
    417 F.2d 1338 (2d Cir. 1969) .................................................................30

*Kennedy v. Braidwood Mgmt., Inc.*,
    145 S. Ct. 2427 (2025)............................3, 27, 33, 34, 35, 36, 39, 40, 46

*Kim v. FINRA*,
    698 F. Supp. 3d 147 (D.D.C. 2023) ........................................................50

*King v. Briggs*,
    83 F.3d 1384 (Fed. Cir. 1996)................................................................30

*LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*,
    784 F. Supp. 3d 1 (D.D.C. 2025) ............................................................49

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995)......................................................................40, 41, 42

*Lehman v. State Bd. of Pub. Acct.*,
    263 U.S. 394 (1923)..................................................................................14

*Lemelson v. SEC*,
    2025 WL 1503815 (D.D.C. May 27, 2025).............................7, 9, 10, 24

*Lindke v. Freed*,
    601 U.S. 187 (2024)..................................................................................42

*Liu v. SEC*,
    591 U.S. 71 (2020).....................................................................................8

*Lucia v. SEC*,
    585 U.S. 237 (2018)............................................................................................39

*Marcello v. Bonds*,
    349 U.S. 302 (1955)............................................................................................27

*Marrie v. SEC*,
    374 F.3d 1196 (D.C. Cir. 2004) .........................................................................20

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)..............................................................................29, 31, 32

*Meta Platforms, Inc. v. FTC*,
    2024 WL 1549732 (D.C. Cir. Mar. 29, 2024) ..............................................23, 27

*Meta Platforms, Inc. v. FTC*,
    723 F. Supp. 3d 64 (D.D.C. 2024) ...............................................................25, 27

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)......................................................................................49, 50

*Morgan v. United States*,
    298 U.S. 468 (1936)............................................................................................27

*In re Murchison*,
    349 U.S. 133 (1955)............................................................................................25

*Murray's Lessee v. Hoboken Land & Improvement*,
    59 U.S. (18 How.) 272 (1855) ...........................................................................10

*Nat'l Sav. Bank of D.C. v. Ward*,
    100 U.S. 195 (1879)............................................................................................19

*Navistar Int'l v. Deloitte & Touche*,
    837 F. Supp. 2d 926 (N.D. Ill. 2011) .................................................................17

*Nebraska Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*,
    435 F.3d 326 (D.C. Cir. 2006)............................................................................49

*Nexstar Media, Inc. Grp. v. NLRB*,
    2024 WL 4127090 (N.D. Ohio Aug. 26, 2024)...................................................8

*NLRB v. Jones & Laughlin Steel Corp.*,
    301 U.S. 1 (1937)...............................................................................................11

*NLRB v. N. Mountain Foothills Apartments*,
    — F.4th —, 2025 WL 3009338 (9th Cir. Oct. 28, 2025) ....................................8

*Oceanic Steam Navigation Co. v. Stranahan*,
   214 U.S. 320 (1909)................................................................11

*Oil States Energy Servs. v. Greene's Energy Grp.*,
   584 U.S. 325 (2018)................................................................10

*Ortega v. OCC*,
   155 F.4th 394 (5th Cir. 2025) ................................13, 17, 18

*Passavant v. United States*,
   148 U.S. 214 (1893)................................................................11

*Pennsylvania v. U.S. Dep't of Health & Hum. Servs.*,
   80 F.3d 796 (3d Cir. 1996)....................................................36

*Riggins v. Goodman*,
   572 F.3d 1101 (10th Cir. 2009) ............................................22

*In re Sealed Case*,
   829 F.2d 50 (D.C. Cir. 1987)................................................36

*SEC v. First Pac. Bancorp*,
   142 F.3d 1186 (9th Cir. 1998) ................................................8

*SEC v. Jarkesy*,
   603 U.S. 109 (2024)..............1, 8, 9, 10, 11, 12, 13, 17, 18, 21

*SEC v. Posner*,
   16 F.3d 520 (2d Cir. 1994)......................................................8

*Seila Law v. CFPB*,
   591 U.S. 197 (2020)........................................................40, 49

*Simpson v. Off. of Thrift Supervision*,
   29 F.3d 1418 (9th Cir. 1994) ................................................22

*Sunshine Anthracite Coal Co. v. Adkins*,
   310 U.S. 381 (1940)........................................................42, 43

*Sw. Airlines Co. v. TSA*,
   554 F.3d 1065 (D.C. Cir. 2009)......................................22, 26

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994)..........................................6, 9, 29, 45

*United States ex rel. Bernardin v. Duell*,
   172 U.S. 576 (1899)................................................................11

*United States v. Arthrex, Inc.*,
   594 U.S. 1 (2021) .................................................................................................3

*United States v. Hartwell*,
   73 U.S. 385 (1867) ..........................................................................................3, 33

*United States v. Perholtz*,
   622 F. Supp. 1253 (D.D.C. 1985) ....................................................................49

*Vape Cent. Grp. v. FDA*,
   2025 WL 637416 (D.D.C. Feb. 27, 2025) .......................................................7, 9

*VHS Acquisition Subsidiary No. 7 v. NLRB*,
   2024 WL 4817175 (D.D.C. Nov. 17, 2024) ......................................................8

*VHS Acquisition Subsidiary No. 7 v. NLRB*,
   759 F. Supp. 3d 88 (D.D.C. 2024) ...................................................................39

*Wash. Post Co. v. Keogh*,
   365 F.2d 965 (D.C. Cir. 1966) ..........................................................................5

*West v. Atkins*,
   487 U.S. 42 (1988) ...........................................................................................42

*Wildberger v. Am. Fed'n of Gov't Emps.*,
   86 F.3d 1188 (D.C. Cir. 1996) ........................................................................23

*Williams v. Pennsylvania*,
   579 U.S. 1 (2016) .............................................................................................25

*Willy v. Admin. Review Bd.*,
   423 F.3d 483 (5th Cir. 2005) ...........................................................................36

*Withrow v. Larkin*,
   421 U.S. 35 (1975) .........................................................2, 22, 23, 24, 25, 26, 27, 31

*Yapp USA Auto. Sys. v. NLRB*,
   748 F. Supp. 3d 497(E.D. Mich. 2024) .........................................................8, 10

**STATE CASES**

*Landell v. Lybrand*,
   107 A. 783 (Pa. 1919) ......................................................................................19

*In re Smith*,
   10 Wend. 449 (N.Y. Sup. Ct. 1833) ...............................................................16

*State Bd. of Health v. Roy*,
   48 A. 802 (R.I. 1901) .......................................................................................16

*State Bd. of Med. Exam'rs v. Macy*,
    159 P. 801 (Wash. 1916)..................................................................16

*Ultramares Corp. v. Touche*,
    174 N.E. 441 (N.Y. 1931)................................................................19

**FOREIGN CASES**

*Leeds Estate Bldg. & Inv. Co. v. Shepherd*,
    36 Ch 787 (1887) ............................................................................14

**FEDERAL STATUTES**

5 U.S.C. § 554(d)(2)(C)........................................................................22

5 U.S.C. § 4802......................................................................................36

15 U.S.C. § 78s(c).............................................................................38, 43

15 U.S.C. § 78s(d)....................................................................................5

15 U.S.C. § 78s(d)(2)...........................................................................7, 45

15 U.S.C. § 78s(e)..............................................................................5, 44

15 U.S.C. § 78s(e)(1)...............................................................................7

15 U.S.C. § 78y.......................................................................................17

15 U.S.C. § 78y(a)..............................................................................5, 7

15 U.S.C. § 7201(9)................................................................................21

15 U.S.C. § 7211................................................................................35, 36

15 U.S.C. § 7211(a).........................................................................1, 4, 41

15 U.S.C. § 7211(b)......................................................................4, 40, 41

15 U.S.C. § 7211(c)............................................................................4, 47

15 U.S.C. § 7211(c)(4)..................................................................32, 34, 39

15 U.S.C. § 7211(e)(4)....................................................................4, 41, 43

15 U.S.C. § 7211(f)................................................................................35

15 U.S.C. § 7211(f)(4)....................................................................34, 35, 36

15 U.S.C. § 7211(g) ...................................................................................................34

15 U.S.C. § 7211(g)(2) ............................................................................4, 27, 34, 36

15 U.S.C. § 7212 .........................................................................................................47

15 U.S.C. § 7212(a) ......................................................................................................4

15 U.S.C. § 7213(a) ....................................................................................................12

15 U.S.C. § 7213(a)(1) ...........................................................................................4, 20

15 U.S.C. § 7213(a)(2) ...............................................................................................41

15 U.S.C. § 7213(a)(2)(A)(i) .....................................................................................13

15 U.S.C. § 7213(a)(2)(B)(1) .....................................................................................13

15 U.S.C. § 7215(a) ...............................................................................................4, 32

15 U.S.C. § 7215(b) ......................................................................................................4

15 U.S.C. § 7215(b)(1) .................................................................................................4

15 U.S.C. § 7215(b)(3)(B) ...........................................................................................4

15 U.S.C. § 7215(b)(5)(A) ............................................................................28, 29, 32

15 U.S.C. § 7215(c) ................................................................................................4, 7

15 U.S.C. § 7215(c)(1) ...............................................................................................31

15 U.S.C. § 7215(c)(1)(A) ..........................................................................................10

15 U.S.C. § 7215(c)(2) ...............................................................................................29

15 U.S.C. § 7215(c)(4) ...................................................................................8, 10, 21

15 U.S.C. § 7215(c)(7)(B) ..........................................................................................21

15 U.S.C. § 7215(d) .............................................................................................4, 43

15 U.S.C. § 7215(d)(1)(C) ..........................................................................................28

15 U.S.C. § 7215(d)(2) ...............................................................................................28

15 U.S.C. § 7215(e) .........................................................................................4, 5, 23

15 U.S.C. § 7215(e)(1)...........................................................................................41, 44

15 U.S.C. § 7217 ............................................................................................34, 35, 36

15 U.S.C. § 7217(a) ...............................................................................................34, 44

15 U.S.C. § 7217(b) ...............................................................................................34, 44

15 U.S.C. § 7217(b)(2) ......................................................................................4, 41, 43

15 U.S.C. § 7217(b)(5) ......................................................................................4, 38, 43

15 U.S.C. § 7217(c) ..................................................................................................7, 44

15 U.S.C. § 7217(c)(2) ......................................................................................5, 44, 45

15 U.S.C. § 7217(c)(3) ..................................................................................................5

15 U.S.C. § 7217(c)(3)(B) ..........................................................................................31

15 U.S.C. § 7217(d) ....................................................................................................43

15 U.S.C. § 7219 ...........................................................................................................4

15 U.S.C. § 7219(b) .......................................................................................41, 43, 46

15 U.S.C. § 7219(d)(1) ...........................................................................41. 43, 46, 47

15 U.S.C. § 7219(f) .............................................................................................46, 47

**FEDERAL REGULATIONS**

17 C.F.R. § 202.150 ................................................................................33, 34, 37, 38

**STATE STATUTES**

Conn. Gen. Stat. § 20-280 ...........................................................................................15

Conn. Gen. Stat. § 20-280b .........................................................................................15

Conn. Gen. Stat. § 20-280c .........................................................................................15

Conn. Gen. Stat. § 20-281a .........................................................................................15

Ohio Rev. Code § 4701.03 ...........................................................................................15

Ohio Rev. Code § 4701.16 ...........................................................................................15

Ohio Rev. Code § 4701.29 ...........................................................................................15

**FOREIGN STATUTES**

Joint Stock Companies Act 1844
    7 & 8 Vict., c. 110 (U.K) ..............................................................................14

**FEDERAL RULES**

Fed. R. Civ. P. 56(c)(1)(A) ..............................................................................33

**PCAOB RULES AND STANDARDS**

PCAOB Auditing Standard 1015 ..............................................................................20

PCAOB Auditing Standard 1206 ..............................................................................12

PCAOB Auditing Standard 1215 ..............................................................................12, 17

PCAOB Auditing Standard 1305 ..............................................................................17

PCAOB Auditing Standard 2201 ..............................................................................13

PCAOB Auditing Standard 2305 ..............................................................................12

PCAOB Auditing Standard 2315 ..............................................................................12

PCAOB Auditing Standard 2501 ..............................................................................13

PCAOB Auditing Standard 2805 ..............................................................................12

PCAOB Auditing Standard 3101 ..............................................................................12

PCAOB Rule 3100 ..............................................................................12, 20

PCAOB Rule 3200 ..............................................................................12

PCAOB Rule 3500T ..............................................................................12

PCAOB Rule 4006 ..............................................................................12, 13

PCAOB Rule 5101(a)(1) ..............................................................................23, 42

PCAOB Rule 5109(d) ..............................................................................26

PCAOB Rule 5110 ..............................................................................12

PCAOB Rule 5110(a) ..............................................................................42

PCAOB Rule 5200(a) ..............................................................................23, 42

PCAOB Rule 5200(b) ..............................................................................4, 39

PCAOB Rule 5200(d) ......................................................................................24, 27, 28

PCAOB Rule 5201(d) .......................................................................................................9

PCAOB Rule 5206 ........................................................................................................23

PCAOB Rule 5403 ....................................................................................................25, 31

PCAOB Rule 5403(b) ...................................................................................................24

PCAOB Rule 5408 ........................................................................................................29

PCAOB Rule 5460 ....................................................................................................4, 23

CONSTITUTIONAL PROVISIONS

U.S. Const. Amendment VII ...............................................1, 5, 10, 16, 17, 18, 19

U.S. Const. Amendment VI ...........................................................................................6

U.S. Const. Article II, § 2, cl. 2 .................................................................................33

OTHER AUTHORITIES

148 Cong. Rec. S7351
    (statement of Sen. Paul Sarbanes) .........................................................................15

148 Cong. Rec. S7355
    (statement of Sen. Mike Enzi) ..............................................................................15

A.C. Littleton, *Accounting Evolution to 1900* (1st ed. 1933) ..............................13, 14

A.P. Richardson, *American Institute of Accountants: Report of the Secretary*, 42
    J. Accountancy 349, 353 (1926) ...........................................................................15

*Accounting Reform and Investor Protection: Hearings Before the S. Comm. on
    Banking, Housing, and Urban Affairs*, 107th Cong. (2002)
    (statement of SEC Chairman Arthur Levitt) ...........................................................15
    (statement of Paul Volcker) ...................................................................................15
    (statement of Lynn Turner) ....................................................................................15

C.S. Potts, *Trial by Jury in Disbarment Proceedings*, 11 Tex. L. Rev. 28 (1932) ........15

George Unwin, *The Gilds and Companies of London* (1908) ......................................16

Ivan Waddington, *The Movement Toward the Professionalisation of Medicine*,
    301 British Med. J. 688 (1990) .............................................................................16

James Edwards, *History of Public Accounting in the United States* (1960) .................14

Jay M. Feinman, *Liability of Accountants for Negligent Auditing:  Doctrine, Policy, and Ideology*, 31 Fla. St. U. L. Rev. 17 (2003) ........................................................18

John Leubsdorf, *Legal Ethics Falls Apart*, 57 Buff. L. Rev. 959 (2009) ....................................15

PCAOB 2024 Annual Report ...............................................................................................50

PCAOB Office of Hearing Officers Charter .........................................23, 24, 27, 33, 37

PCAOB Ethics Code 3(b)(3) ...............................................................................................24

PCAOB Ethics Code 3(b)(4) ...............................................................................................24

Presidential Statement on Signing the Sarbanes-Oxley Act of 2002, 38 Weekly Comp. Pres. Doc. 1283 (July 30, 2002) .................................................17

Richard Brown, *A History of Accounting and Accountants* (1905)..............................................14

Robert F. Serio & Matthew S. Kahn, *Private Rights of Action and the Sarbanes-Oxley Act of 2002*, 38 Sec. Regul. & L. Rep. 668 (2006).........................................17

2 Ronald E. Mallen, *Legal Malpractice* (2025)..............................................................20

Samuel H. Gruenbaum & Marc I. Steinberg, *Accountants' Liability and Responsibility:  Securities, Criminal and Common Law*, 13 Loy. L.A. L. Rev. 247 (1980)..........................................................................................................14, 19

Saul Levy, *Accountants' Legal Responsibility* (1954)..............................................................14

Sean M. O'Connor, *Be Careful What You Wish For: How Accountants and Congress Created the Problem of Auditor Independence*, 45 B.C. L. Rev. 741 (2004)..........................................................................................................14

SEC, *Public Company Accounting Oversight Board; Notice of Filing of and Immediate Effectiveness of Proposed Bylaw and Rule Amendments*, 84 Fed. Reg. 4594 (Feb. 15, 2019) .......................................................................................34

Thomas Bourveau *et al.*, *Public Company Auditing Around the Securities Exchange Act* (Apr. 30, 2021) (Columbia Bus. Sch. Research Paper) ..................................14

3 William Blackstone, *Commentaries* .......................................................................................20

William Herbert, *The History of the Twelve Great Livery Companies of London* (1836)..........................................................................................................16

## INTRODUCTION

In response to a series of massive financial scandals in which undetected accounting fail-ures played a decisive role in misleading the public, Congress established the Public Company Accounting Oversight Board ("PCAOB" or "Board") in the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 ("Sarbanes-Oxley" or "Act"), to provide federal oversight of the audits of public companies. 15 U.S.C. § 7211(a). In these consolidated actions, two accountants who are respondents in Board disciplinary proceedings raise numerous constitutional challenges to the Board's authority to carry out its statutory responsibility to regulate public-company auditing. Their challenges fail as a matter of law.

As a threshold matter, this Court does not have subject-matter jurisdiction to consider plaintiffs' principal argument—that Article III and the Seventh Amendment entitle them to a jury trial because one remedy the Board might impose in a disciplinary proceeding is a civil monetary penalty. Congress has provided that parties wishing to pursue legal challenges to Board discipli-nary decisions must do so before the Board first, with review by the U.S. Securities and Exchange Commission ("SEC" or "Commission") and then, if necessary, a federal court of appeals. Because plaintiffs' jury-trial arguments are not structural claims that challenge the Board's authority to act, but merely target one possible remedy—civil monetary penalties—plaintiffs must pursue those claims in the manner that Congress prescribed. *See Axon Enters., Inc. v. FTC*, 598 U.S. 175 (2023).

In all events, plaintiffs have no constitutional entitlement to a jury trial. As the Supreme Court explained in *SEC v. Jarkesy*, 603 U.S. 109 (2024), Article III and the Seventh Amendment guarantee a jury trial for lawsuits "in the nature of an action at common law"—that is, lawsuits "made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Id.* at 128. To prevail on their claims, therefore, plaintiffs must show that the rules being enforced against them—rules that require cooperation with Board investigations and compliance

with technical accounting procedures—are equivalent to the kinds of common-law claims heard by the courts at Westminster in 1789. But that is impossible. Accounting generally, and corporate auditing in particular, were not even recognized professions in 1789, much less professions whose practitioners were subject to common-law suits seeking to enforce professional norms. The body of law regulating accounting and auditing did not emerge until a century later and was principally administered by state boards of accountancy and professional self-regulatory bodies, all without the involvement of juries. And the particular regulations being enforced against plaintiffs here are nothing like the kinds of common-law actions familiar to the courts at Westminster. The Board's disciplinary proceedings do not supplant common-law claims that would have triggered the jury-trial right, so there is no basis for finding a violation of that right.

Plaintiffs' remaining claims are also meritless. Decades of precedent foreclose their contention that the Board's dual role as initiator of investigations and disciplinary proceedings and as reviewer of final disciplinary decisions violates due process. *See Withrow v. Larkin*, 421 U.S. 35, 56 (1975); *Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099, 1104 (D.C. Cir. 1988). Congress and the Board have put in place procedural safeguards to ensure the fairness of Board disciplinary proceedings—proceedings that unquestionably afford to plaintiffs notice of the charges against them and a full opportunity to be heard—and the Due Process Clause requires nothing more.[1]

Plaintiffs' Appointments Clause and Article II challenges to Board hearing officers similarly lack merit. The Commission—which is indisputably the "Head of a Department" within the meaning of the Appointments Clause—has exercised its statutory authority to approve the Board's

---

[1] Plaintiffs also contend that Congress's decision to prohibit disclosure of Board decisions in which no sanctions are imposed violates due process. This Court lacks subject-matter jurisdiction over that claim as well because it does not challenge the Board's authority but merely one procedural rule—the nondisclosure of Board decisions—that applies to Board proceedings. The claim also lacks merit. Nonpublic Board decisions are not precedential in Board proceedings, so plaintiffs will not suffer any disadvantage even if such decisions remain confidential.

appointment of hearing officers.  So even if hearing officers are considered inferior officers, and not mere employees, for Appointments Clause purposes, the requirements of the Clause are fully satisfied.  *See Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2457 (2025); *United States v. Hartwell*, 73 U.S. 385, 393-94 (1867).  Nor are Board hearing officers unconstitutionally insulated from removal.  They are at-will employees who may be removed without cause, which is all that Article II requires.  *See Free Enter. Fund* v. *PCAOB*, 561 U.S. 477 (2010).

Plaintiffs' nondelegation challenge to Congress's decision to vest regulatory authority in the Board also falls flat.  The Board is indisputably part of the government for constitutional purposes; indeed, the Supreme Court deemed Board members inferior officers of the United States. *Free Enter. Fund*, 561 U.S. at 486.  In turn, the governing statutory scheme invests the Commission, as principal officer, with ample power to supervise the inferior-officer Board.  *See Braidwood*, 145 S. Ct. at 2446 (discussing *United States v. Arthrex, Inc.*, 594 U.S. 1 (2021)).  And even if the Board were considered a private entity for those constitutional purposes, those same statutes give the Commission more than enough control over the Board's activities to eliminate any private nondelegation concern.  *See Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1325 (D.C. Cir. 2024).

Finally, plaintiffs' challenge to the means by which the Board is funded (annual assessments paid by public companies and broker-dealers) is foreclosed by recent Supreme Court precedent.  As plaintiffs apparently recognize, their contention that this funding mechanism violates the Appropriations Clause is foreclosed by *CFPB v. Community Financial Services Association*, 601 U.S. 416 (2024).  And their contention that Congress unconstitutionally delegated its taxing power is foreclosed by *FCC v. Consumers' Research*, 606 U.S. 656 (2025), which rejected a closely analogous nondelegation challenge.

This Court therefore should dismiss for lack of subject-matter jurisdiction plaintiffs' jury-

trial claims and due-process challenge to the confidentiality of Board decisions (or grant summary judgment to the Board) and should grant summary judgment to the Board on all remaining claims.

## STATEMENT OF THE CASE

### A.    Legal Background

Congress established the Board in Sarbanes-Oxley to oversee audits of public companies subject to the securities laws. 15 U.S.C. § 7211(a); *see id.* § 7211(c) (statutory responsibilities). Organized as a nonprofit corporation, *see id.* § 7211(b), the Board carries out its functions under the supervision and oversight of the SEC, *see, e.g.*, 15 U.S.C. § 7211(e)(4) (SEC appoints Board's members); *id.* § 7217(b)(2), (5) (Board rules require SEC approval and may be modified by SEC at any time); *id.* § 7219 (SEC approves the Board's budget and "accounting support fee[s]").

The Act requires accounting firms that audit public companies and certain broker-dealers to register with the Board and to comply with auditing and other professional standards. 15 U.S.C. §§ 7212(a), 7213(a)(1). The Board, in turn, is authorized to investigate any act or omission by a registered firm or associated person that may violate the Act, Board rules, or securities-law provisions relating to preparation and issuance of audit reports. *Id.* § 7215(b)(1). The Board also may institute disciplinary proceedings and impose sanctions for violations. *Id.* § 7215(c).

Procedures for conducting disciplinary proceedings are set by statute and implementing rules. *See id.* § 7215(b)-(e); PCAOB Rules § 5. The Act requires the Board to "establish, by rule, … fair procedures" for investigations and proceedings, 15 U.S.C. § 7215(a), and it authorizes the Board to delegate its hearing function to any employee, *id.* § 7211(g)(2). Board rules, in turn, provide that disciplinary proceedings may be "presided over" by a "hearing officer" whose decisions are subject to de novo review by the Board. PCAOB Rules 5200(b), 5460. Any Board sanctions are subject to review by the SEC and are automatically stayed during the period in which SEC review may be sought or until the SEC orders otherwise. 15 U.S.C. §§ 7215(b)(3)(B),

7215(e), 7217(c)(2) (citing *id.* § 78s(d)-(e)).  The SEC can cancel or modify any sanctions it deems "excessive, oppressive, inadequate, or otherwise not appropriate."  *Id.* § 7217(c)(3).  And any "person aggrieved" by the SEC's order may "obtain review" in a court of appeals.  *Id.* § 78y(a).

### B.     Factual Background and Procedural History

These consolidated cases arise out of separate disciplinary proceedings: one against plaintiff "Doe 1" based on his alleged failure to cooperate with a Board inspection and investigation, SMF ¶ 39, and one against plaintiff "Doe 2" based on his audit work, SMF ¶ 41.[2]  The Board's Chief Hearing Officer ("CHO") was assigned to preside over both hearings.[3]  In 2023 and 2024, plaintiffs filed these suits seeking declaratory and injunctive relief.  ECF 64 in No. 24-cv-780 (D.D.C. Mar. 18, 2024), ECF 52 in No. 25-cv-186 (D.D.C. Jan. 22, 2025).[4]

## LEGAL STANDARD

"A motion for summary judgment should be granted where it is shown that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."  *Wash. Post Co. v. Keogh*, 365 F.2d 965, 967 (D.C. Cir. 1966).  When "both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard."  *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006).

## ARGUMENT

### I.     Plaintiffs' Jury-Trial Claims Fail on Jurisdictional Grounds and on the Merits

This Court lacks subject-matter jurisdiction over plaintiffs' Article III and Seventh Amendment challenges to the Board's disciplinary proceedings because Congress has channeled such

---

[2] Both proceedings have been stayed pending resolution of this suit.

[3] CHO Dorfman retired in June 2025, SMF ¶ 21, and no replacement has yet been assigned.

[4] Both cases were transferred to this Court from other districts and later consolidated.  A third case, *John Doe Corporation v. PCAOB*, No. 25-cv-70 (D.D.C.), was dismissed with prejudice by stipulation.  *See* ECF 106.

claims into a statutory review scheme that precludes collateral attacks in this Court. Plaintiffs' claims also fail on the merits because the Board's disciplinary proceedings do not involve the sort of traditional common-law claims that must be tried in court before a jury.[5]

### A.    This Court Lacks Subject-Matter Jurisdiction over Plaintiffs' Jury-Trial Claims

This Court lacks subject-matter jurisdiction over plaintiffs' jury-trial claims because Congress established an exclusive procedure for federal-court challenges to Board proceedings: review by a federal court of appeals once the Board's and the SEC's proceedings are complete. Plaintiffs are free to argue to the Board and to the SEC that the Board's proceedings violate their jury-trial rights, and then to seek review in a federal appellate court if necessary. But plaintiffs are not entitled to skirt that procedure by coming to this Court in the first instance.

1. As the Supreme Court recently explained in *Axon Enterprises, Inc. v. FTC*, 598 U.S. 175 (2023), Congress often "preclude[s] district courts from exercising jurisdiction over challenges to federal agency action" by "specifying a different method to resolve" those claims. *Id.* at 185. To determine whether such channeling has occurred, courts examine "whether Congress' intent to preclude district court jurisdiction" is "'fairly discernible in the statutory scheme,'" *Elgin v. Dep't of Treasury*, 567 U.S. 1, 9-10 (2012), and, if so, "whether the particular claims brought" are "'of the type Congress intended to be reviewed within this statutory structure,'" *Axon*, 598 U.S. at 186 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 208, 212 (1994)).

The statutory scheme at issue here follows the "typical[]" method of claim-channeling by providing for "review in a court of appeals following the agency's own review process." *Axon*,

---

[5] Doe 2's complaint mentions the Sixth Amendment, *see* Am. Compl. ¶¶ 86-88, *Doe v. PCAOB*, No. 25-cv-186 (D.D.C. Aug. 8, 2024), ECF 34, but does not appear to raise a Sixth Amendment claim. Any such claim would lack merit, as Board disciplinary proceedings are not criminal prosecutions. *See* U.S. Const. amend. VI; *Hudson v. United States*, 522 U.S. 93, 99 (1997).

598 U.S. at 185. The Board may institute disciplinary proceedings by "bring[ing] specific charges with respect to [a] firm or associated person" and "provid[ing]" an "opportunity to defend against[] such charges." 15 U.S.C. § 7215(c). "[A]ny final [Board] sanction" is subject to review by the Commission, which "may enhance, modify, cancel, reduce, or require the remission" of any sanction that is "not appropriate." *Id.* § 7217(c); *see id.* § 78s(d)(2), (e)(1). And, critically, any "person aggrieved by a final [Commission] order" may "obtain review" in a court of appeals. *Id.* § 78y(a).

That statutory scheme divests district courts of jurisdiction over claims challenging the Board's "substantive decision[s]" or the "procedures" used to make those decisions. *Axon*, 598 U.S. at 189. That principle is clear from *Axon*, which holds that a statute that channels claims to a federal court of appeals strips district courts of subject-matter jurisdiction over all claims other than *structural* constitutional claims. *See id.* at 188-89. The claims in *Axon* were structural because the plaintiffs there "challeng[ed] the [agencies'] power to proceed at all, rather than actions taken in the agency proceedings." *Id.* at 192. By contrast, the Supreme Court explained, if the claims had "address[ed] the sorts of procedural or evidentiary matters an agency often resolves on its way to a merits decision," the district court would have lacked jurisdiction. *Id.* at 193.

2. Plaintiffs' jury-trial claims are procedural under *Axon*, and the claim-channeling statute thus strips this Court of jurisdiction. Plaintiffs do not challenge the Board's structure or "power to proceed at all." *Axon*, 598 U.S. at 192. Rather, their jury-trial claims are contingent on the *way* the Board carries out its proceedings. As numerous courts have held, because such jury-trial claims turn on the remedies actually imposed, they are case-specific and must be pursued through the normal statutory review process. *See, e.g.*, *Lemelson v. SEC*, 2025 WL 1503815, at *4-6 (D.D.C. May 27, 2025), *appeal docketed*, No. 25-5208 (D.C. Cir. June 5, 2025); *Vape Cent. Grp. v. FDA*, 2025 WL 637416, at *5-9 (D.D.C. Feb. 27, 2025); *Huff & Puffers v. FDA*, 2025 WL 1092696, at

*4-6 (C.D. Cal. Feb. 27, 2025); *VHS Acquisition Subsidiary No. 7 v. NLRB*, 2024 WL 4817175, at

*3-4 (D.D.C. Nov. 17, 2024); *Yapp USA Auto. Sys. v. NLRB*, 748 F. Supp. 3d 497, 512-14 (E.D.

Mich. 2024); *Blankenship v. FINRA*, 2024 WL 4043442, at *2-3 (E.D. Pa. Sept. 4, 2024); *Nexstar*

*Media, Inc. Grp. v. NLRB*, 2024 WL 4127090, at *2-5 (N.D. Ohio Aug. 26, 2024).

Plaintiffs contend that "common law remed[ies]" "trigger the jury-trial right."  Br.10.  But

equitable remedies do not, *see Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989), and the

Board can decide to impose only equitable remedies, or even no remedies at all.  For instance, the

Board might choose to impose only an injunction-like ban on certain auditing activities relating to

public companies.  *See* 15 U.S.C. § 7215(c)(4) (permitting Board to impose revocation of regis-

tration, limitation or suspension of certain activities, censure, or mandatory education).  Such rem-

edies are indisputably equitable.  *See Jarkesy v. SEC*, 34 F.4th 446, 454 (5th Cir. 2022) ("ban"

from "participation in securities industry activities" is "equitable"); *SEC* v. *First Pac. Bancorp*,

142 F.3d 1186, 1193 (9th Cir. 1998) (bar from serving as officer or director is within court's "broad

equitable powers"); *SEC v. Posner*, 16 F.3d 520, 521-22 (2d Cir. 1994) (same).[6]

Even apart from the range of possible remedies, a jury trial is required only for claims that

"implicate private rather than public rights."  Br.14.  Plaintiffs' claims do not address the Board's

structure or power to proceed at all, but rather whether a disciplinary proceeding involves a claim

"made of the stuff of the traditional actions at common law tried by the courts at Westminster in

1789."  *Jarkesy*, 603 U.S. at 128.  If the Board does not press such a claim, there is no right to a

jury trial.  Thus, unlike the claims in *Axon*, plaintiffs' claims depend on what the Board "would

---

[6] Plaintiffs are incorrect (Br.12 n.13) that only Article III courts may grant equitable relief.  *See Liu v. SEC*, 591 U.S. 71, 86 (2020) (Congress may grant "equitable powers" "for use in administrative proceedings"); *cf. NLRB v. N. Mountain Foothills Apartments*, — F.4th —, 2025 WL 3009338, at *7 (9th Cir. Oct. 28, 2025) ("[T]he Seventh Amendment is not implicated" by equitable remedies imposed by agencies).  Nor do plaintiffs cite any authority for the untenable proposition that the Board's nonmonetary sanctions are legal rather than equitable.

adjudicate in assessing the charges against" them. 598 U.S. at 193. And here, as explained below, plaintiffs' proceedings implicate only public rights. *See* pp. 10-21, *infra*. But even if that were debatable, plaintiffs' claims still would not challenge the Board's structure or authority to proceed at all, but rather only the particular claims the Board may pursue.[7]

Thus, unlike the petitioners in *Axon*, who would have had "the same claim" even if they had "*won* before the agency," 598 U.S. at 191, plaintiffs would have no jury-trial claim if the Board imposed only equitable remedies or no remedy, or pursued only claims involving public rights. Accordingly, district courts have consistently held—after *Axon* and *Jarkesy*—that they lack juris-diction to adjudicate jury-trial challenges to proceedings at an agency or self-regulatory organiza-tion like the Board. *See* pp. 7-8, *supra* (collecting cases).

3. The so-called "*Thunder Basin* factors" that the Supreme Court examined in *Axon* con-firm that result. First, there is "meaningful judicial review" under the statutory scheme. *Axon*, 598 U.S. at 190. If necessary, plaintiffs can raise their jury-trial claims in the court of appeals, which can invalidate any sanction and "thereby redress[] any harm before it occurs." *Vape*, 2025 WL 637416, at *5; *see Lemelson*, 2025 WL 1503815, at *5 (citing a "chorus of post-*Jarkesy* dis-trict court opinions" holding that "statutory procedures for challenging final administrative orders" give "sufficient opportunity for 'meaningful review' of" jury-trial claims).[8]

Second, plaintiffs' jury-trial claims are not "collateral to any decisions the [Board] could

---

[7] Moreover, just as the Board may choose not to impose legal remedies, the Board may choose not to press a particular claim. *See* PCAOB Rule 5201(d) (allowing "either a hearing officer or the Board" to "amend" the charges against a respondent "prior to" the adjudication of the charge).

[8] That analysis does not change because plaintiffs would prefer judicial review without risking disciplinary sanctions. The *Thunder Basin* petitioner made the same argument, and the Supreme Court rejected it. *See* 510 U.S. at 205, 215; *accord Elgin*, 567 U.S. at 17 n.6; *Axon*, 598 U.S. at 190 n.2. Nor is this case like *Free Enterprise Fund* insofar as plaintiffs here attack their specific disciplinary proceedings, and any sanctions that might be imposed by the Board and affirmed by the Commission would be "encapsulated in a final Commission order" subject to judicial review. *Free Enter. Fund*, 561 U.S. at 490.

make in individual enforcement proceedings." *Axon*, 598 U.S. at 195-96. As discussed above, "this is not a case in which the asserted injury exists separate and apart from the specifics of the adjudicatory process," *Lemelson*, 2025 WL 1503815, at *5-6, including remedies (if any).

Third, plaintiffs' claims are not outside of the Board's expertise. *See Axon*, 598 U.S. at 194. Indeed, by challenging how the Board brings charges and "fashion[s] remedies," those claims are in a "core area" of that "expertise," *Yapp*, 748 F. Supp. 3d at 513-14 (discussing NLRB). Congress gave the Board discretionary authority to "bring specific charges" and "impose" "disciplinary or remedial sanctions" it "determines appropriate." 15 U.S.C. §§ 7215(c)(1)(A), (c)(4). There is no basis for short-circuiting those determinations—particularly where various outcomes "would obviate any need to address the constitutional issue." *Yapp*, 748 F. Supp. 3d at 513-14.

## B.    Plaintiffs' Jury-Trial Claims Fail on the Merits

Even if this Court had jurisdiction over the Article III and Seventh Amendment claims, those claims would fail on the merits. The disciplinary proceedings against plaintiffs do not resemble any eighteenth-century common-law claim; they involve only adjudication of public rights. Thus, no jury-trial right attaches, regardless of what remedy the Board may ultimately order.

1. The "public-rights doctrine applies to matters arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it." *Oil States Energy Servs. v. Greene's Energy Grp.*, 584 U.S. 325, 334 (2018). In such cases, if "Congress properly assigns a matter to adjudication in a non-Article III tribunal," neither the Seventh Amendment nor Article III poses any "independent bar to the adjudication of that action by a nonjury factfinder." *Id.* at 345.

Many government adjudications involve public rights and therefore may be conducted outside of Article III courts. *See Jarkesy*, 603 U.S. at 128-31; *e.g.*, *Murray's Lessee* v. *Hoboken Land*

*& Improvement*, 59 U.S. (18 How.) 272 (1855) (revenue collection); *United States ex rel. Bernardin v. Duell*, 172 U.S. 576 (1899) (patents); *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320 (1909) (immigration); *Ex parte Bakelite Corp.*, 279 U.S. 438 (1929) (tariffs); *Crowell v. Benson*, 285 U.S. 22 (1932) (public lands). The Supreme Court has upheld agency adjudications under the public-rights exception even when the agency imposed monetary sanctions. *See, e.g.*, *Passavant v. United States*, 148 U.S. 214, 221-22 (1893) (tariffs); *Oceanic Steam Navigation*, 214 U.S. at 338, 342 (immigration); *Helvering v. Mitchell*, 303 U.S. 391, 402 (1938) (tax laws); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 48 (1937) (labor laws); *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 449-61 (1977) (workplace safety).

A government proceeding implicates private rights only if the government's claim is "in the nature of an action at common law"—that is, if it is "made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Jarkesy*, 603 U.S. at 128. Only then is "adjudication by an Article III court" required. *Id.*

*Jarkesy* illustrates that distinction. *See* 603 U.S. at 127-32. There the Supreme Court held that an SEC enforcement action "involve[d] a 'matter[] of private rather than public right'" because the SEC's claims under antifraud securities-law provisions sounded in fraud—a quintessential common-law cause of action. *Id.* at 134 (quoting *Granfinanciera*, 492 U.S. at 56). Thus, the government essentially stepped into the shoes of a private litigant to enforce claims for monetary relief that a private citizen could have enforced under the common law. The Court distinguished nearly all of the cases cited above on the ground that, unlike *Jarkesy*, they concerned "actions" that were not "suit[s] at common law or in the nature of" such "suit[s]." *Id.* at 137-38.

Plaintiffs contend (Br.14-15) that *Jarkesy* "strictly limited" the public-rights exception "to its historical applications" and criticized it as misconceived. But plaintiffs' reading goes too far.

The Court declined to set the doctrine's boundaries "definitively," and it made clear that the doctrine "derive[s] … from background legal principles," has been applied in a variety of contexts, and remains fully viable. *Jarkesy*, 603 U.S. at 131; *see id.* at 127-32.

2.  The proceedings at issue involve only public rights, which forecloses plaintiffs' jury-trial claims.  Indeed, the Board's oversight of public-company auditing fits neatly within the Supreme Court's definition of a public right.  The Board enforces rules and standards that are closely analogous to (if not the same as) rules of conduct that state regulators and professional self-regulatory bodies enforced against accounting firms for more than a century without any involvement of juries—rules that simply did not exist at common law.

While offering few details regarding their alleged misconduct, plaintiffs indicate that the Board accused Doe 1 of failing to cooperate with a Board investigation and misleading Board inspectors, and accused Doe 2 of failing to adequately evaluate certain accounting estimates used by a client.  *See* SMF ¶¶ 39, 41.  The Board rules at issue are Rules 3100 and 3200, requiring compliance with Board auditing standards; Rule 3500T, requiring compliance with ethics and independence standards; Rules 4006 and 5110, requiring cooperation with inspections and investigations; and auditing standards requiring that auditors prepare and retain certain documentation (Auditing Standard ("AS") 1215), obtain certain representations from management (AS 2805), and include certain content in written reports expressing unqualified opinions (AS 3101).  *See id.*

Those provisions are part of a highly specialized and detailed regulatory code designed to protect the public interest in the integrity of the public auditing function.  *See* 15 U.S.C. § 7213(a). The Board's Auditing Standards, for example, regulate how auditors should divide responsibility for an audit with another firm, perform statistical and nonstatistical sampling, and evaluate financial information using substantive analytical procedures.  AS 1206, 2305, 2315.  One auditing

standard that Doe 2 is accused of violating describes at length how an auditor should evaluate a client's accounting estimates, including the proper procedures for evaluating fair-value measurements obtained from a variety of different third parties.  AS 2501.

An allegation that an auditor violated those rules is a far cry from "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789."  *Jarkesy*, 603 U.S. at 128.  The rules do not "target the same basic conduct," "employ the same terms of art," or "operate pursuant to the same legal principles" as any common-law claim.  *Id.* at 134.  They are not intended to, and do not operate to, redress private injuries.  The Board enforces its rules to protect the investing public's interest in the integrity and reliability of the audit process—an interest of paramount importance to the reliability of securities markets and public confidence in the economy.  And the requirements the Board enforces have little or nothing to do with the kinds of common-law claims an injured party might bring against an accountant for redress of private injuries.

The regulations enforced by the Board have no "common law counterparts."  *Jarkesy*, 603 U.S. at 138; *see Ortega v. OCC*, 155 F.4th 394, 403-07 (5th Cir. 2025).  There is no common-law cause of action requiring auditors (for example) to maintain work papers for seven years, monitor professional ethics, obtain written representations from management, or cooperate with a Board investigation.  *See* 15 U.S.C. §§ 7213(a)(2)(A)(i), (B)(1); PCAOB Rule 4006; AS 2201.75; *cf. Hill v. NTSB*, 886 F.2d 1275, 1282 (10th Cir. 1989) ("[a]dministrative proceedings" on suspending "pilot certificate" involve FAA's "special expertise" and are not "suits at common law").

Indeed, there is no "common law soil" for the Board's rules to transpose, *Jarkesy*, 603 U.S. at 137, as there is *no common-law history at all of legal claims* against corporate auditors in the eighteenth century or earlier.  Accounting and auditing did not even exist as professions in England "up to the beginning of the nineteenth century."  A.C. Littleton, *Accounting Evolution to 1900*, at

268 (1st ed. 1933); *see* Richard Brown, *A History of Accounting and Accountants* 271, 314 (1905) (tracing "history of the profession" to 1885 in the United States and to 1855 elsewhere); *see generally* Sean M. O'Connor, *Be Careful What You Wish For: How Accountants and Congress Created the Problem of Auditor Independence*, 45 B.C. L. Rev. 741, 745-56 (2004).  Parliament first required company directors to maintain account books and appoint auditors in 1844.  *See* Littleton, *supra*, at 288-89 (citing Joint Stock Companies Act 1844, 7 & 8 Vict., c. 110 (U.K)).  The "first important English court case on the duties of an auditor" was not decided until the 1880s.  James Edwards, *History of Public Accounting in the United States* 9 (1960) (citing *Leeds Estate Bldg. & Inv. Co. v. Shepherd*, 36 Ch 787 (1887)).  And it was not until the twentieth century that accounting "turned from an unstructured, fringe activity into a widely adopted, standardized, and regulated activity."  Thomas Bourveau *et al.*, *Public Company Auditing Around the Securities Exchange Act* 1-2 (Apr. 30, 2021) (Columbia Bus. Sch. Research Paper), https://ssrn.com/abstract=3837593.

Even in the twentieth century, when accountants could be held liable in court for fraud (which, again, is not at issue here), responsibility for disciplining accountants rested principally with state boards of accountancy, which possessed considerable disciplinary authority (including the power to impose monetary sanctions), and with professional self-regulatory societies, which retained authority to expel or suspend members without any involvement of juries.  *See Lehman v. State Bd. of Pub. Acct.*, 263 U.S. 394, 395 (1923) (rejecting constitutional challenges to state accounting board with power to revoke certification upon finding "unprofessional conduct"); Saul Levy, *Accountants' Legal Responsibility* 51-52 (1954) (describing professional societies and state-constituted boards that could punish accountants for misconduct); Samuel H. Gruenbaum & Marc I. Steinberg, *Accountants' Liability and Responsibility:  Securities, Criminal and Common Law*, 13 Loy. L.A. L. Rev. 247, 248 (1980) ("[T]he practice of the accounting profession [historically]

was controlled largely by the profession itself."); *see also, e.g.*, Ohio Rev. Code §§ 4701.03, 4701.16, 4701.29 (Ohio accountancy board prescribes rules, investigates alleged violations, and imposes discipline, including monetary penalties, without a jury); Conn. Gen. Stat. §§ 20-280, 20-280b, 20-280c, 20-281a (same for Connecticut Board of Accountancy).  The American Institute of Accountants first adopted a professional ethics code in 1917, and its governing council thereafter sat "as a trial board" to resolve complaints and impose sanctions.  A.P. Richardson, *American Institute of Accountants:  Report of the Secretary*, 42 J. Accountancy 349, 353 (1926).

Congress ultimately created the PCAOB to rectify the deficiencies of that pre-existing regulatory system.  It is that system—not a common-law tradition—from which the Board emerged. *See* 148 Cong. Rec. S7351 (statement of Sen. Paul Sarbanes); *id.* at S7355 (statement of Sen. Mike Enzi); *see also Accounting Reform and Investor Protection:  Hearings Before the S. Comm. on Banking, Housing, and Urban Affairs*, 107th Cong. 15-16 (2002) (statement of SEC Chairman Arthur Levitt); *id.* at 106 (statement of Paul Volcker); *id.* at 245-46 (statement of Lynn Turner).

Thus, to the extent that Board disciplinary proceedings have any historical analogy, it is to traditional state regulation of professionals and to professionals' self-regulation.  When courts sat at Westminster in 1789, professionals routinely meted out self-discipline without judicial—much less jury—involvement.  For example, eighteenth-century barristers established their own disciplinary systems, *see* John Leubsdorf, *Legal Ethics Falls Apart*, 57 Buff. L. Rev. 959, 963-64 (2009), and "no Englishman ever thought of extending trial by jury to disbarment cases," C.S. Potts, *Trial by Jury in Disbarment Proceedings*, 11 Tex. L. Rev. 28, 36-37 (1932).  The British General Medical Council, established in 1858 and consisting mostly of doctors, had the "formal power to discipline practitioners and, as a final resort, to remove from the Medical Register any

practitioner who was judged by the council to have been guilty of 'infamous conduct in any professional respect.'" Ivan Waddington, *The Movement Toward the Professionalisation of Medicine*, 301 British Med. J. 688, 688-90 (1990); *see State Bd. of Med. Exam'rs v. Macy*, 159 P. 801, 803 (Wash. 1916) (explaining that proceedings to revoke medical licenses did not exist "at common law").[9] And in the fifteenth and sixteenth centuries, British livery companies were governed by "Court[s] of Assistants" consisting of senior members of particular trades responsible for establishing rules and "punish[ing] of rebellious or misdoers against the rules." George Unwin, *The Gilds and Companies of London* 218-22 (1908) (citation modified); *see also, e.g.*, William Herbert, *The History of the Twelve Great Livery Companies of London* 120 (1836) (quoting the 14th-century charter of the Fishmongers, who elected members "to well and loyally rule and govern … , and to cause due punishment on those in whom defaults shall be found").

3. Because the Board rules being enforced against plaintiffs have no eighteenth-century counterpart in any common-law claim, only public rights are at issue here—and this Court need go no further than that historical record to resolve plaintiffs' Article III and Seventh Amendment claims. But more recent precedent confirms the point, as the relevant rules constitute a detailed auditing "code" much like the "detailed building code" at issue in *Atlas Roofing Company v. Occupational Safety and Health Review Commission*, 430 U.S. 442 (1977).

In *Atlas Roofing*, the Supreme Court addressed a statute authorizing government employees to conduct workplace health and safety inspections. *See* 430 U.S. at 445-56. If an inspector found a violation, he could impose a "civil penalty"; if the employer objected, the matter would

---

[9] For that reason, plaintiffs' malpractice analogy is ahistorical. *See In re Smith*, 10 Wend. 449, 454-55 (N.Y. Sup. Ct. 1833) (law providing for expulsion of physician from medical society for gross negligence did not trigger jury-trial right, as it was not analogous to common-law civil trial but rather a proceeding to "purge of an unworthy member a profession in which purity of conduct and character are all important"); *State Bd. of Health v. Roy*, 48 A. 802, 804 (R.I. 1901) (similar).

16

proceed to an administrative hearing. *Id.* at 446. The Court rejected a jury-right challenge to that scheme, explaining that the agency's adjudication, based on a cause of action "unknown to the common law," involved only public rights. *Id.* at 455, 461; *see Jarkesy*, 603 U.S. at 138 (describing *Atlas Roofing* as involving claims "unknown to the common law").

Here, too, Congress designed a novel regulatory scheme not to "enable the Federal Government to bring or adjudicate claims that trace[] their ancestry to the common law," but to solve newly pressing regulatory issues with "innovative methods, techniques, and approaches" designed to advance the public interest in the integrity and reliability of the public accounting function. *Jarkesy*, 603 U.S. at 137. In Sarbanes-Oxley, Congress responded to failures of the existing regulatory regime, replacing a scattered and ineffective system of state- and self-regulation with a new system of standards enforced by a single entity and backstopped by judicial review. *See Free Enter. Fund*, 561 U.S. at 484; S. Rep. No. 107-205, at 5-6 (2002) (describing failures of self-regulation); Presidential Statement on Signing the Sarbanes-Oxley Act of 2002, 38 Weekly Comp. Pres. Doc. 1283, 1285 (July 30, 2002) ("For the first time, the accounting profession will be regulated by an independent board" that "will set clear standards to uphold the integrity of public audits"). The Board promulgated detailed technical standards that bear no resemblance to any common-law claim. *See, e.g.*, AS 1215.15 (elaborate timing requirements for assembling audit documentation); AS 1305 (detailed requirements for communicating control deficiencies).[10]

This case is thus much like *Ortega v. OCC*, in which the Fifth Circuit rejected a Seventh

---

[10] In addition, as in *Atlas Roofing*, Congress chose not to give the Board the option to bring claims in court—unlike the SEC in *Jarkesy*, which could choose to bring claims either "in-house" or "in federal court." *Jarkesy*, 603 U.S. at 118; *see* 15 U.S.C. § 78y. Nor are the Board's rules subject to private enforcement, as was at least one of the causes of action at issue in *Jarkesy*. *See* 603 U.S. at 116 (citing Section 10(b) of the Securities Exchange Act); *Navistar Int'l v. Deloitte & Touche*, 837 F. Supp. 2d 926, 931 (N.D. Ill. 2011) (Sarbanes-Oxley did "not create a private right of action to enforce PCAOB audit standards"); Robert F. Serio & Matthew S. Kahn, *Private Rights of Action and the Sarbanes-Oxley Act of 2002*, 38 Sec. Regul. & L. Rep. 668, 668-69 (2006).

Amendment challenge to the authority of the Office of the Comptroller of the Currency ("OCC") to bring administrative enforcement actions against banks. 155 F.4th at 403-09. Such actions, the court explained, are "not meant to regulate private transactions" like Jarkesy's "fraud," but are instead meant to protect the "banking ecosystem at large" and "ensure proper stewardship of public funds in the federal deposit insurance program"—"prerogatives [that] have been, historically and exclusively, the domain of the non-Article III branches." *Id.* at 404. Here, as in *Ortega*, Congress deemed "court adjudication of a particular problem" to be "inadequat[e]," "created new remedies to target that particular problem, and assigned their adjudication to" a congressionally created body. *Id.* at 408.

4. Plaintiffs are incorrect (Br.12-13) that the rules they are accused of violating "have their roots in common law negligence and malpractice." First, those rules are wholly unlike negligence or malpractice actions cognizable at common law for the straightforward reason that such actions against accountants *did not exist* at common law. Rather, as plaintiffs appear to concede, parties first began to bring such claims against accountants in the early twentieth century, well over 100 years after the courts of Westminster sat in 1789. *See* Jay M. Feinman, *Liability of Accountants for Negligent Auditing: Doctrine, Policy, and Ideology*, 31 Fla. St. U. L. Rev. 17, 22 (2003) (suits against accountants virtually unavailable through 1950s); Br.13. Thus, there was no eighteenth-century common-law accounting-related claim that Congress could have "incorporated."[11] *Jarkesy*, 603 U.S. at 125; *see Ortega*, 155 F.4th at 406 ("no federally chartered banks" existed "until Congress authorized them," so no "regulatory causes of action" existed "against such banks in the 18th century such that the Seventh Amendment could 'preserve' such suits").

---

[11] Although plaintiffs suggest (Br.13) that the "common law recognized a cause of action for accounting malpractice," the cases they cite merely distinguish *modern* malpractice claims against accountants from statutory claims, *see First State Bank v. Daniel & Assocs.*, 519 F. Supp. 2d 1157, 1161 (D. Kan. 2007); *Gallier v. Woodbury Fin. Servs.*, 171 F. Supp. 3d 552, 565 (S.D. Tex. 2016).

Second, even if those twentieth-century claims against accountants had any relevance (and they do not), the Board's proceedings against plaintiffs differ meaningfully from those claims. To start, neither Doe 1's alleged failure to cooperate with a Board investigation nor Doe 2's alleged failure to properly evaluate a client's flawed accounting estimates sounds in malpractice or negligence. Refusing to cooperate with an investigation has nothing to do with malpractice or negligence, and no client could prevail against an accountant for negligence or malpractice where the client suffered no injury as a result of the accounting work. *See Nat'l Sav. Bank of D.C. v. Ward*, 100 U.S. 195, 198-200 (1879) (legal malpractice or negligence).

Moreover, early accounting-related claims were cognizable only if a contractual relationship existed between the auditor and the plaintiff. *See, e.g.*, *Ultramares Corp. v. Touche*, 174 N.E. 441, 444-48 (N.Y. 1931) (Cardozo, J.); *Landell v. Lybrand*, 107 A. 783, 783 (Pa. 1919) (per curiam); *see also Nat'l Sav. Bank of D.C.*, 100 U.S. at 203 (legal malpractice claims required either fraud or privity of contract); *see* Gruenbaum & Steinberg, *supra*, at 310 (liability only later expanded to plaintiffs who foreseeably relied on an accountant's work). Here, the Board's claims that Doe 1 failed to cooperate with a Board investigation and that Doe 2 failed to properly evaluate accounting estimates do not depend on any relationship between the auditor and the Board—or, indeed, between the auditor and *anyone*. The Board has no contractual relationship or other privity with the auditors subject to its disciplinary proceedings, and no privity is required for the Board's disciplinary scheme to apply. *Cf. Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 568 (1990) ("The nature of an action is in large part controlled by the nature of the underlying relationship between the parties.").[12]

---

[12] For much the same reasons, even assuming that "*legal* malpractice was 'historically an action at law,'" Br.12-13 (citing dicta in *Chauffeurs*, 494 U.S. at 568), that analogy is "inadequate" in the "context of the Seventh Amendment inquiry" here—as it was in *Chauffeurs*—because it "does not capture the relationship" between the parties. 494 U.S. at 568.

In addition, although negligence and malpractice claims against accountants in the early twentieth century would have required a showing of damages, *see, e.g.*, 2 Ronald E. Mallen, *Legal Malpractice* § 21:1 (2025), the claims here do not depend on harm to the Board or to any other party. The Board's rules and standards are directed not at the harms an auditor may cause his clients or at any injury to the Board, but rather at "protecting the integrity" of accountancy and "the confidence of the investing public"—the quintessential goals of government action involving *public* rights. *Marrie v. SEC*, 374 F.3d 1196, 1200 (D.C. Cir. 2004); *see* 15 U.S.C. § 7213(a)(1) (Board rules and standards must promote "public interest" or "protection of investors").

Finally, plaintiffs' effort to analogize the Board's claims to negligence or malpractice claims against professionals *other* than accountants is meritless. To establish common-law negligence or malpractice in the eighteenth century, a plaintiff would have had to make a showing not only of damages, *see* 3 William Blackstone, *Commentaries* *125 ("where there is no injury, the law gives no remedy"), but also a lack of general care or reasonableness, *see id.* at *122 & n.3 (malpractice requires "negligence or unskillful treatment"); *id.* at *197 n.15 ("A physician is liable to a civil action for damages for want of reasonable care and skill."). The Board's standards are different. The Board rules and auditing standards at issue are not directed at what a reasonable person would do, but rather reflect specialized auditor and accounting codes of conduct that were adopted as those professions matured in the early part of the twentieth century. Indeed, the rules that plaintiffs emphasize in their brief (Br.13-14) depend on compliance with the Board's highly detailed auditing requirements. *See* PCAOB Rule 3100 (requiring compliance with "all applicable auditing and related professional practice standards"); AS 1015.10 (2023) (requiring "an audit conducted in accordance with the standards of the [Board]"). Thus, even assuming that a failure to follow Board rules involved "the *fact* of negligence" or some other lack of care, the Board

20

proceedings at issue here still would not resemble any common-law "legal cause of action in tort." *Dawson v. Contractors Transp.*, 467 F.2d 727, 732 (D.C. Cir. 1972); *see Axalta Coating Sys. v. FAA*, 144 F.4th 467, 473-77 & n.3 (3d Cir. 2025) (applying public-rights exception to administrative action for civil penalties because regulatory "standards" "descend[ed] in no way from the common law," including common-law negligence, and instead constituted "technical prescriptions for engaging in the regulated activity" (quoting *Jarkesy*, 603 U.S. at 137)).

## II.  Plaintiffs' Due-Process Claims Fail

Plaintiffs raise two due process challenges: first, that the Board impermissibly combines prosecutorial and adjudicatory functions in a single entity; and second, that proceedings are unfair because decisions in which the Board does not impose sanctions remain confidential.  Br.19-27.[13] This Court lacks subject-matter jurisdiction over claims based on the second theory, and both claims fail on the merits.

### A.  The Board's Limited Combination of Prosecutorial and Adjudicatory Functions Does Not Violate Due Process

Plaintiffs argue (Br.20-24) that Sarbanes-Oxley violates due process insofar as it authorizes the Board both to initiate investigations and disciplinary proceedings and to review the resulting disciplinary orders.  The Supreme Court and the D.C. Circuit have long rejected such arguments, and the same result is warranted here.

1.  It is settled—as plaintiffs implicitly concede (Br.20)—that government agencies may,

---

[13] The Board does not dispute that its sanctions implicate regulated parties' property interests and therefore the Due Process Clause.  Br.15-17.  Plaintiffs' description of the consequences of those sanctions, however, is overstated and inaccurate.  The Board cannot require approval before taking "any job whatsoever" with an issuer, broker, or dealer, Br.17; rather, the requirement extends only to certain types of positions.  *See* 15 U.S.C. § 7215(c)(7)(B).  And Board sanctions do not include "prohibit[ing] accountants from working for any Board-registered accounting firm," Br.6; rather, a recipient of an industry bar may work at any Board-registered accounting firm and *may perform accounting and auditing activities*—but simply may not do so with respect to public companies (or share in compensation from audits of public companies).  15 U.S.C. §§ 7215(c)(4), 7201(9).

consistent with due process, combine investigative and adjudicative functions.  The Administrative Procedure Act ("APA") expressly provides that the "members of the body comprising the agency" may be involved in both agency adjudications and investigative functions—and that provision has been understood to be constitutional since its enactment in 1946.  5 U.S.C. § 554(d)(2)(C); *Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099, 1104 (D.C. Cir. 1988).  The Supreme Court has definitively held that "it does not violate due process of law" for "members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings."  *Withrow v. Larkin*, 421 U.S. 35, 56 (1975).  Accordingly, involvement by agency heads in both investigative and adjudicative functions has long been ubiquitous.  Courts have repeatedly upheld such structures.  *See, e.g.*, *Sw. Airlines Co. v. TSA*, 554 F.3d 1065, 1074-75 (D.C. Cir. 2009); *Chem. Waste Mgmt., Inc. v. EPA*, 873 F.2d 1477, 1484 (D.C. Cir. 1989); *Simpson v. Off. of Thrift Supervision*, 29 F.3d 1418, 1424 (9th Cir. 1994); *FTC v. Cement Inst.*, 333 U.S. 683, 700 (1948); *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976) (school board); *Riggins v. Goodman*, 572 F.3d 1101, 1112 (10th Cir. 2009) (state and municipal agency employees wear "multiple hats" by necessity, and "case law generally rejects the idea" that combining "adjudicatory and investigatory functions is a denial of due process").

That ubiquitous federal, state, and local practice is premised on the recognition that members of an agency may "investigate the facts, [and] institute proceedings" without prejudging "the necessary adjudications."  *Withrow*, 421 U.S. at 54.  At the investigation and institution stages, the agency investigates *whether* particular conduct may have occurred, and whether violations *might* have been committed.  *Id*.  And because the subject of the investigation has the opportunity to present evidence at the adjudication, "[t]he mere exposure to evidence presented in nonadversary

22

investigative procedures is insufficient in itself to impugn the fairness of the board members at a later adversary hearing." *Id*. at 55. Of course, a court may determine "from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high." *Id*. at 58; *see Wildberger v. Am. Fed'n of Gov't Emps.*, 86 F.3d 1188, 1196 (D.C. Cir. 1996). But absent evidence of "bias in a particular case," the default rule is that agencies may "constitutionally undertake both investigative and adjudicative functions." *Meta Platforms, Inc. v. FTC*, 2024 WL 1549732, at *1 (D.C. Cir. Mar. 29, 2024) (per curiam).

2. The Board follows the typical model approved in *Withrow*, while maintaining strict separation between investigative and adjudicative functions at the staff level. The Board may authorize an investigation at the recommendation of the Director of the Division of Enforcement and Investigations ("Enforcement Division"), or on its own initiative, "when it appears that an act or practice … may violate" Sarbanes-Oxley or certain rules, standards, or statutory provisions. PCAOB Rule 5101(a)(1). The Board may authorize a disciplinary proceeding when "it appears to the Board, as the result of an investigation or otherwise, that a hearing is warranted to determine whether" an accounting firm "has engaged in any act or practice, or omitted to act, in violation of the Act" or other rules. PCAOB Rule 5200(a). The disciplinary hearing is "adversarial" and "conducted on the record" before a hearing officer, with respondents afforded a "right to counsel," PCAOB, Office of Hearing Officers Charter at 1 (Mar. 25, 2021) ("OHO Charter").[14] The hearing officer issues an "initial decision," which becomes the Board's final decision absent Board review. PCAOB Rule 5460. A dissatisfied party may seek Board review, *id.*, and the Board's decision is automatically stayed until the Commission dissolves the stay or the period for seeking review expires. PCAOB Rule 5206; *see* 15 U.S.C. § 7215(e).

---

[14] Available at https://assets.pcaobus.org/pcaob-dev/docs/default-source/enforcement/documents/oho-charter-final.pdf?sfvrsn=f23c6871_4.

The Board's rules establish extensive guardrails to protect against actual or perceived conflicts of interest and bias.  As with agencies subject to the APA, only the individual Board members (and their personal staffs) may be involved both in instituting proceedings and in reviewing the hearing officer's decision; no other staff members may perform both investigative and adjudicative functions.  The hearing officer "shall not be responsible to, or subject to the supervision or direction of, an employee or agent of the Board engaged in the performance of investigative or prosecuting functions for the PCAOB."  OHO Charter at 2.  Board staff who perform "prosecutorial" functions" in connection with a disciplinary proceeding, including Enforcement Division employees, are prohibited from "participat[ing] or advis[ing] in the [hearing officer's] decision, or in Board review of the decision, except as a witness or counsel in the proceeding."  PCAOB Rule 5200(d); *see* OHO Charter at 2. And Board staff are forbidden from engaging in ex parte communications with the hearing officer or with any Board member regarding any facts in issue in a disciplinary proceeding.  *See* PCAOB Rule 5403(b); OHO Charter at 2.[15]

3.  Plaintiffs nonetheless assert (Br.22-23) that the Board cannot reach a fair decision on appellate review of the hearing officer's decision because the Board initially authorized the investigation and disciplinary proceeding.  But that argument flies in the face of decades of unbroken Supreme Court precedent.  "[T]here is no incompatibility between the agency filing a complaint based on probable cause and a subsequent decision, when all the evidence is in, that there has been no violation of the statute."  *Withrow*, 421 U.S. at 57; *see Lemelson*, 2025 WL 1503815, at *7-8 (rejecting similar challenge to SEC proceedings).  Nothing about the fact that the decision to institute a disciplinary proceeding might be termed "prosecutorial," and the ultimate decision "adjudicative," suggests that "the minds of [Board] members [are] irrevocably closed" to a respondent's

---

[15] In addition, Board members and staff are subject to the Board's Ethics Code, which bars conduct that, e.g., might create an appearance of partiality.  *See* PCAOB Ethics Code 3(b)(3)-(4).

subsequent evidence and arguments. *Cement Inst.*, 333 U.S. at 701. *Withrow* squarely and repeatedly rejected exactly the argument plaintiffs make here—that a structure like the Board's creates an intolerable "risk of unfairness." *Withrow*, 421 U.S. at 58.

Moreover, plaintiffs' broadside attack on the Board's structure, built largely on separate opinions authored by one Supreme Court justice, *see* Br.19-24, would apply equally to innumerable federal, state, and municipal administrative proceedings. Plaintiffs cannot be correct that commonplace administrative structures, used for decades, are so inherently unfair as to violate due process.[16] Perhaps recognizing as much, plaintiffs attempt to end-run *Withrow* by arguing that the Board's procedures present particular risks of bias. Br.23. Those assertions are baseless.

Plaintiffs first complain that the Board, when considering whether to authorize an investigation or disciplinary proceeding, may be briefed by Enforcement Division staff about the law and facts outside of the putative respondent's presence. Br.20-21; Ex. A (Cox Decl.) ¶ 4. But such briefings create no risk of bias, much less a due process violation. For one thing, once a disciplinary proceeding has been instituted, Board rules prohibit any communication between any staff involved in the proceeding and the Board (or the hearing officer). PCAOB Rule 5403. Before that point, any communications are not "ex parte" because there is not yet a proceeding or a respondent. Rather, such communications are part of the process by which the Board decides

---

[16] Notably, plaintiffs' argument relies almost exclusively on inapposite criminal cases. Br.15-24 (citing, *e.g.*, *Williams v. Pennsylvania*, 579 U.S. 1 (2016), and *In re Murchison*, 349 U.S. 133 (1955)). In *Williams*, the Supreme Court held that a judge's significant, personal involvement in deciding, as a prosecutor, to seek the death penalty against the defendant provided the specific indication of bias that *Withrow* held was not present when an agency authorizes a complaint and later adjudicates the matter. And in *Murchison*, the judge previously served as a "one-man" grand juror, charged the defendant with contempt, and adjudicated the offense and convicted him based in part on his own impression of the defendant's conduct before him as grand juror. 349 U.S. at 138. Neither of those criminal cases alters *Withrow*'s general rule for administrative agencies, nor suggests that any comparable risk of bias is present here. *See Meta Platforms, Inc. v. FTC*, 723 F. Supp. 3d 64, 89 n.4 (D.D.C. 2024) (distinguishing *Williams* and *Murchison* from FTC's involvement in institution and adjudication).

*whether to authorize* an investigation or proceeding—the sort of agency deliberative activity that is ubiquitous throughout the government.  It is thus well established that "mere exposure to evidence presented" in "nonadversary investigative procedures is insufficient in itself to impugn the fairness of … board members at a later adversary hearing."  *Withrow*, 421 U.S. at 55; *accord Sw. Airlines Co.*, 554 F.3d at 1074-75 (no due-process problem based on contacts between initial and final decision-makers); *Gottlieb v. Pena*, 41 F.3d 730, 737 (D.C. Cir. 1994) (similar).

Plaintiffs' arguments are particularly unpersuasive in light of the extensive opportunity that respondents are afforded to present their arguments and positions.  Plaintiffs assert that respondents are denied "any opportunity to rebut or contextualize evidence" during the investigative and charging decisions.  Br.21.  But that is just wrong.  Subjects of investigations have a right to "submit a written statement to the Board setting forth their interests and positions in regard to the subject matter of the investigation," and the Board takes those statements into consideration in deciding whether to institute a disciplinary proceeding.  PCAOB Rule 5109(d).  If a proceeding is instituted, then the respondent has a full opportunity to present its case to the hearing officer, offering its own evidence and "contextualizing" the staff's case.  On any review by the Board, *that* evidence would constitute the record.  *See Cement Inst.*, 333 U.S. at 701.  Whatever preliminary information the Board receives at the early stages of the investigative proceedings is thus superseded by the adversarial creation of the hearing record, and the Board's ultimate decision may be upheld only if it is supported by substantial evidence in *that* record as a whole.

Plaintiffs next claim (Br.23) that the Board is "bias[ed]" in favor of affirming the hearing officer's decisions because the Board has a role in appointing the officer.  Once again, that argument would, if accepted, prevent any agency from delegating the task of rendering initial decisions—a practice that the Supreme Court has approvingly described as the "almost-universal

26

model" of agency adjudication.  *Braidwood*, 145 S. Ct. at 2450.  In all events, plaintiffs' imputation of bias from mere participation in hiring decisions comes nowhere close to carrying the "difficult burden" to "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47; *accord Chem. Waste Mgmt.*, 873 F.2d at 1484.  Plaintiffs' sole purported evidence of bias—that "the public record reveals no instance in which the Board overruled a CHO decision in favor of enforcement staff," Br.23—does not "establish a due process violation," *Meta Platforms*, 723 F. Supp. 3d at 90, as "a 'raw statistic cannot of itself show bias in a particular case,'" *Meta Platforms, Inc.*, 2024 WL 1549732, at *1.

Relatedly, plaintiffs claim (Br.19-20) that the hearing officer can *never* be neutral because he is employed by the "institution bringing … charges."  That argument is flatly inconsistent with longstanding precedent—and with the existence of administrative law judges throughout agencies. *See, e.g.*, *Marcello v. Bonds*, 349 U.S. 302, 311 (1955) (immigration officers); *Jonal Corp. v. Dist. of Columbia*, 533 F.2d 1192, 1197 (D.C. Cir. 1976) (members of Contract Appeals Board).  Given that the individual Board members may adjudicate cases consistent with due process, there is no reason why they cannot delegate initial determinations to an employee, as Sarbanes-Oxley expressly authorizes.  15 U.S.C. § 7211(g)(2); *see Gottlieb*, 41 F.3d at 737 (recognizing legitimacy of delegation to agency head's staff); *Morgan v. United States*, 298 U.S. 468, 481 (1936).  Moreover, the Board maintains numerous procedural safeguards designed to ensure hearing officers' impartiality.  For instance, a hearing officer "may not be responsible to or subject to the supervision or direction of" anyone engaged in investigative or prosecutorial functions, PCAOB Rule 5200(d); the "[o]utcomes of proceedings" cannot be considered in evaluating the performance or compensation of hearing officers; OHO Charter at 3; and "[n]o Board member or staff shall attempt to improperly influence, … a hearing officer's decision," *id.*

27

Finally, plaintiffs speculate (Br.23-24) that the Board may be influenced by its findings in settlements with plaintiffs' former employers. But plaintiffs do not suggest that any such findings would be preclusive in their disciplinary proceedings. Nor could they; the Board's settled orders as to plaintiffs' former firms expressly state (as do all settled disciplinary orders) that findings "are not binding on any other person or entity in this or any other proceeding." SMF ¶ 42. Moreover, Article III "judges frequently try the same case more than once and decide identical issues each time" without raising bias concerns. *Cement Inst.*, 333 U.S. at 703. The Board "cannot possibly be under stronger constitutional compulsions in this respect than a court." *Id.*

**B.     This Court Lacks Jurisdiction over Plaintiffs' Confidentiality Claim, and in Any Event, Board Confidentiality Procedures Do Not Violate Due Process**

Plaintiffs next argue that laws requiring the confidentiality of certain Board and hearing officer decisions unconstitutionally deprive plaintiffs of the opportunity to cite potentially favorable decisions in their proceedings. Sarbanes-Oxley prohibits public disclosure of decisions in which the Board does not impose sanctions. In those circumstances, "documents and information prepared or received by or specifically for the Board" in connection with an investigation are generally "confidential and privileged as an evidentiary matter (and shall not be subject to civil discovery or other legal process)" "unless and until presented in connection with a public proceeding." 15 U.S.C. § 7215(b)(5)(A); *see* SMF ¶ 37. By contrast, when the Board imposes a sanction, the Board must "report the sanction" and the "basis for its imposition" to "the public" once "any stay on the imposition of such sanction has been lifted." 15 U.S.C. §§ 7215(d)(1)(C), (d)(2).

This Court lacks subject matter jurisdiction over plaintiffs' due process challenge to that framework, and in any event, plaintiffs' claim is meritless.

**1.     The Court Lacks Subject-Matter Jurisdiction over Plaintiffs' Non-Structural Due-Process Claims**

Plaintiffs contend that it is unfair to force them to litigate their disciplinary proceedings

28

without access to confidential Board decisions—that is, they challenge the *procedures* attendant to disciplinary proceedings. That claim does not challenge the Board's "structure," much less its "very existence." *Axon*, 598 U.S. at 189. Plaintiffs' claim therefore can—and must—be evaluated in the course of statutory review of the Board's rulings in plaintiffs' cases. *Id.*

The *Thunder Basin* factors confirm that Congress has divested this Court of jurisdiction over plaintiffs' procedural claims. First, the Sarbanes-Oxley review scheme provides "meaningful judicial review" of plaintiffs' procedural challenges. *Id.* at 190. Plaintiffs are free to move for access to confidential Board decisions, *see* PCAOB Rule 5408, and, if they are unsuccessful, to raise their due-process arguments in their disciplinary proceedings. Any Board denial of access to confidential decisions would be based in the first instance on the Board's interpretation of 15 U.S.C. § 7215(b)(5)(A) and (c)(2). That interpretation, as well as any due-process challenge to it, can be reviewed de novo through the statutory review scheme. *Axon*, 598 U.S. at 190 n.2.

Second, plaintiffs' procedural claims are not "collateral to any decisions the Commission[] could make in individual enforcement proceedings." *Axon*, 598 U.S. at 195-96. To the contrary, plaintiffs' claims are inextricably intertwined with their specific disciplinary proceedings.

Third, plaintiffs' claims fall firmly within the SEC's "competence and expertise." *Free Enter. Fund*, 561 U.S. at 491. With respect to whether Sarbanes-Oxley permits disclosure, the Board's and SEC's views, based on experience applying the statute, would be helpful to a court of appeals on review. Moreover, section 7215 confers discretion to disclose information in certain circumstances, and the Board and SEC would apply their expertise to that question. And with respect to plaintiffs' due-process claim, determining whether administrative procedures are con-stitutionally sufficient typically requires "analysis of the governmental and private interests that are affected." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976); *see* pp. 31-32, *infra*. The Board

and the SEC are well positioned to consider those fact-bound questions in the first instance. *See Free Enter. Fund*, 561 U.S. at 491 (agency consideration appropriate for "fact-bound inquiries that, even if 'formulated in constitutional terms,'" involve "understanding of the [regulated] industry"); *Graceba Total Commc'ns v. FCC*, 115 F.3d 1038, 1042 (D.C. Cir. 1997); *cf. King v. Briggs*, 83 F.3d 1384, 1389 (Fed. Cir. 1996) (rejecting challenge to agency's decision not to publish a prior merits order, despite noting that "the requirement to issue a published decision might represent better public policy," where "nothing" in agency's organic statute "require[d] that [it] publish its decision in a given case or class of cases").

### 2. The Board's Confidentiality Procedures Do Not Violate Due Process

Plaintiffs' challenge also fails on the merits. As plaintiffs acknowledge, Sarbanes-Oxley's confidentiality requirement protects regulated parties' interests by preventing publication of unproven charges. Pl.'s Reply re Pseudonymity Mot. 11, *Doe v. PCAOB*, No. 24-cv-78 (D.D.C. June 28, 2024), ECF 74. The Board implements that protection by keeping such decisions confidential.

Plaintiffs cite no decision of any court holding that a procedure like the Board's violates due process—much less where Congress has mandated confidentiality to protect the interests of plaintiffs and other regulated parties. Nor do plaintiffs contend that they lack notice of the rules the Board will apply, or that they will be denied an opportunity to be heard. Those failures are fatal to their claim. *See, e.g.*, *Kelley v. Shapiro*, 417 F.2d 1338 (2d Cir. 1969) (per curiam) (affirming decision rejecting similar due-process argument where the plaintiff identified no relevant authority and received notice and an opportunity to be heard).

Plaintiffs' due-process claims rest on the contention (Br.24-26) that they are unconstitutionally "deprive[d]" of access to "precedent." But the Board's nonpublic decisions are not precedent: "neither the Board nor PCAOB hearing officers have a practice of citing such decisions" in

proceedings involving different respondents, and Enforcement Division staff do not have a prac-
tice of citing such decisions in their briefing in proceedings involving different respondents. SMF
¶¶ 33-34. Unlike courts, the Board does not treat prior, nonpublic decisions as dictating—or even
as providing persuasive authority for—the proper disposition of any subsequent proceeding. That
leaves plaintiffs to speculate baselessly (Br.25) that confidentiality allows for "winks and nods
among those in the know." But respondents and their counsel have a right to participate in disci-
plinary proceedings, 15 U.S.C. § 7215(c)(1), and ex parte communications between Enforcement
Division staff and the hearing officer or the Board are strictly prohibited, PCAOB Rule 5403. In
plaintiffs' disciplinary hearings, they will be "permitted to be present throughout," they will
"kn[o]w the facts presented to the Board," and they will know all the legal arguments that the
Enforcement Division makes. *Withrow*, 421 U.S. at 55. Ad hominems aside, Br.26, there is no
"secret" portion of the proceedings, and any Board decision will be upheld only if adequately
supported by the facts and law on which the Board has expressly based its decision. *See* 15 U.S.C.
§ 7217(c)(3)(B) (SEC reviews the "basis on which the sanction was imposed").

The *Mathews v. Eldridge* factors confirm that plaintiffs' claim lacks merit. 424 U.S. at
335. The "private interest that will be affected by the official action" is negligible: plaintiffs are
not disadvantaged by the existence of confidential decisions that neither side invokes. *Id*. The
"risk of an erroneous deprivation of such interest through the procedures used" is also negligible.
*Id*. Again, plaintiffs' proceedings will be decided based on the facts and law applicable to those
proceedings, and plaintiffs will be aware of, and able to counter, every argument that the Enforce-
ment Division makes to the adjudicators. The "probable value, if any, of additional or substitute
procedural safeguards" is also low. *Id*. Access to decisions that neither side may use might give
plaintiffs ideas about additional legal arguments, but presumably plaintiffs are fully capable of

31

developing those arguments themselves.  Finally, "the Government's interest, including the func-tion involved and the fiscal and administrative burdens" of additional process, is substantial.  *Id.*  Confidentiality is required by statute and serves important fairness interests for other respondents.

As a last resort, plaintiffs propose redaction (Br.26-27), but they do not explain how such disclosure would comply with the statutory direction that "all documents and information prepared or received by or specifically for the Board" remain "confidential."  15 U.S.C. § 7215(b)(5)(A).  Instead, plaintiffs offer only a brief, unanchored cost-benefit analysis.  Br.27.  But the Supreme Court requires more than "ad hoc weighing."  *Mathews*, 424 U.S. at 348.  "[S]ubstantial weight must be given to the good-faith judgments of the individuals charged by Congress with the admin-istration of [the relevant scheme] that the procedures they have provided assure fair consideration."  *Id.* at 349.  And critically, plaintiffs will have "a meaningful opportunity to present their case" at the hearing and in "subsequent judicial review."  *Id.*  Nothing more is required.[17]

### III.    Plaintiffs' Appointments Clause and Article II Claims Are Meritless

#### A.    Hearing Officers Are Lawfully Appointed by the Commission

PCAOB hearing officers are appointed by the Board with the approval of the Commission, a method that fully complies with the Appointments Clause's requirements for inferior officers.  The Board is therefore entitled to summary judgment on this challenge.[18]

1. The appointment of Board hearing officers is valid under the Appointments Clause.  The Clause permits inferior officers to be appointed by "Heads of Departments."  U.S. Const. art. II,

---

[17] Plaintiffs appear to have abandoned Doe 2's claim that Board disciplinary proceedings also violate Sarbanes-Oxley § 105, which directs the Board to adopt "fair procedures."  Doe 2 Compl. ¶ 92.  That claim fails, as it rests on the premise that Congress would have considered unfair the very procedures it enacted.  *See* 15 U.S.C. §§ 7211(c)(4), 7215(a), (b)(5)(A).
[18] For the purpose of adjudicating plaintiffs' Appointments Clause claim, this Court may proceed on the assumption that Board hearing officers are "inferior officers" for constitutional purposes.

§ 2, cl. 2. As plaintiffs acknowledge (Br.31), the Commission is the "'Hea[d]' of a 'Department[t]'" for Appointments Clause purposes. *Free Enter. Fund*, 561 U.S. at 510-12. And the Supreme Court has made clear in cases spanning over 150 years that a Head of Department's *approval* of an appointment pursuant to statutory authority satisfies the Appointments Clause. *See id.* at 512 n.13 (inferior officers appointed by individual member of Commission, "subject to the approval of the [full] Commission," "satisfies the Appointments Clause"); *Braidwood*, 145 S. Ct. at 2457 (*Free Enterprise Fund* "affirmed" the "validity" of appointments-by-approval); *id.* at 2453 ("statutory authorization for the Secretary" to appoint is sufficient); *Hartwell*, 73 U.S. at 393-94 (upholding appointment made with Treasury Secretary's "approbation").

Board hearing officer appointments are plainly lawful under this precedent. Those officers are appointed by the Board with the approval of the Commission. *See* 17 C.F.R. § 202.150 ("No action by the Board proposing to appoint … a hearing officer shall be final absent Commission approval."); PCAOB Bylaws Art. 6.3(d); OHO Charter at 2. Consistent with that procedure, the Board appointed the most recent hearing officer on February 5, 2019, and the Commission approved that appointment on March 27, 2019.[19] *See* SMF ¶¶ 18, 19, 44.

2. Plaintiffs' challenge to Board hearing officers' appointments rests on their assertion that the SEC lacks statutory authority to approve the appointments. Br.31. That assertion is wrong.

Sarbanes-Oxley gives the Commission authority to oversee the Board's enforcement activities, including its appointment of hearing officers. The Board has the authority to "appoint such … agents as may be necessary or appropriate" to carry out the Board's duties, 15 U.S.C.

---

[19] Plaintiffs are wrong (Br.30) that the Board produced "no official documents" memorializing the Board's appointment and the Commission's approval. *See* Ex. E. The Board also provided an interrogatory response on the subject, *see* Ex. D, Rog. 1, which plaintiffs have offered no evidence to dispute, *see* Fed. R. Civ. P. 56(c)(1)(A); *Doe v. Exxon Mobil Corp.*, 2022 WL 3043219, at *28 n.30 (D.D.C. Aug. 2, 2022).

§ 7211(f)(4), which include "conduct[ing] … disciplinary proceedings," *id*. § 7211(c)(4).  Congress made that authority "subject to section 7217 of this title," which provides that the "Commission shall have oversight and enforcement authority over the Board."  15 U.S.C. § 7217(a).  Congress thus granted to the SEC the power to require its approval for any or all Board appointments. The SEC invoked that authority in 2019, when it ordered that "the Commission, acting as head of a department, must approve … the appointment … of any PCAOB hearing officer before any such action may take effect."  SEC, *PCAOB Hearing Officers*, 84 Fed. Reg. 12,907, 12,907 (Apr. 3, 2019) (codified at 17 C.F.R. § 202.150) (relying on section 7217(a)).[20]

Section 7211(g) confirms that conclusion.  That provision permits the Board to delegate "any of its functions to an individual member or employee of the Board, or to a division of the Board, including functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any matter"—but only "subject to the approval of the Commission." 15 U.S.C. § 7211(g)(2).  Congress thus plainly contemplated that the Board would use hearing officers and that the Commission would have authority to supervise that use, including by requiring approval of individual hearing officers' appointments.

The Supreme Court's recent *Braidwood* decision confirms the lawfulness of that arrangement.  There, Congress had enacted a 1999 statute vesting a Public Health Service agency director (who was not a Head of Department) with the authority to "convene" a task force; at the time, the task force's members lacked sufficient authority to count as constitutional officers.  Subsequent enactments gave the task force members more authority, necessitating that their appointment be

---

[20] The Commission also published and allowed to go into effect the Board's own rule change providing for Commission approval of hearing officer appointments, invoking its statutory oversight authority under Sarbanes-Oxley.  *See* SEC, *Public Company Accounting Oversight Board; Notice of Filing of and Immediate Effectiveness of Proposed Bylaw and Rule Amendments*, 84 Fed. Reg. 4594 (Feb. 15, 2019) (citing 15 U.S.C. § 7217(b)).

vested by Congress in a Head of Department.  The Court held that the Secretary of HHS had the necessary authority because a 1966 "reorganization plan" ratified by Congress in 1984 had "transferred" to the Secretary of Health, Education, and Welfare (which later became HHS) "all functions of all agencies of or in the Public Health Service," including the agency director's authority to convene the task force.  145 S. Ct. at 2454-57.  The Court acknowledged that "Congress could have vested the Secretary with appointment authority in more direct ways," but made clear that "Congress need not use magic words to confer appointment authority."  *Id.* at 2454, 2456.

*Braidwood* forecloses plaintiffs' suggestion that "Congress has not vested in the SEC the authority to … approve the Board's selection" merely because no statute expressly requires Commission approval of Board appointments in every case.  Br.31.  No statute in *Braidwood* required the Secretary of HHS to appoint task force members.  Rather, it was sufficient that the relevant enactments, construed together, gave the Secretary authority that was capacious enough to *encompass* those appointments.  *Braidwood*, 145 S. Ct. at 2453.  The same is true here: the Commission's broad authority to oversee the Board's appointment process unquestionably includes the authority to approve or disapprove the Board's appointment of hearing officers.

Plaintiffs' remaining arguments also lack merit.  Plaintiffs assume (Br.31) that section 7211's grant of authority to *the Board* "to appoint such employees, accountants, attorneys, and other agents as may be necessary or appropriate," 15 U.S.C. § 7211(f)(4), is exclusive, implying that *the Commission* lacks authority to approve the appointments.  But that assumption is belied by section 7211(f)'s text, which expressly makes the Board's appointment authority "subject to" Commission oversight in section 7217.  That is plainly the best reading of the statute.  But even if it were not, the Supreme Court has instructed that appointment statutes must be construed consistent with the Appointments Clause if possible.  *Braidwood*, 145 S. Ct. at 2460-61 (it "is at a

minimum 'reasonable' to read" the statutes so that they "together vest the Secretary with authority to appoint"); *Edmond v. United States*, 520 U.S. 651, 657-58 (1997) (declining to construe a statute to in manner that would violate Appointments Clause where alternative construction was available). The Board's construction of sections 7211 and 7217 is indisputably reasonable.

Finally, plaintiffs argue in passing (Br.31) that the office of Board hearing officer is not created by statute. But Sarbanes-Oxley unambiguously authorizes the Board to delegate authority to subordinates (including with respect to hearings) and grants to the SEC broad powers to supervise that authority, including by requiring approval of appointments. 15 U.S.C. § 7211(f)(4), (g)(2). That arrangement is sufficient to satisfy the Appointments Clause, whether or not the statute spells out the names or roles of particular subordinates. *See Braidwood*, 606 U.S. at 780-83; *In re Sealed Case*, 829 F.2d 50, 55 & nn.29-30 (D.C. Cir. 1987); *Willy v. Admin. Review Bd.*, 423 F.3d 483, 491 (5th Cir. 2005) (no Appointments Clause violation "[e]ven though … no specific federal statute create[d]" the subordinate's position; Congress used "broad language" that "vest[ed]" the principal officer with "ample authority to create" the position); *see also Pennsylvania v. U.S. Dep't of Health & Hum. Servs.*, 80 F.3d 796, 805 (3d Cir. 1996) ("[R]equiring Congress to identify the [specific position] by name in its statutory grant of authority would be legislatively unworkable and defeat the purpose of the relaxed requirements for 'inferior officer' appointments.").[21]

## B.    Hearing Officers Do Not Enjoy Unconstitutional Removal Protections

The Board is entitled to summary judgment on plaintiffs' removal claims because hearing

---

[21] Plaintiffs also make various arguments (Br.32) about 5 U.S.C. § 4802, which grants to the Commission the authority to "appoint and fix the compensation of such officers … as may be necessary for carrying out its functions under the securities laws." But any limits on the Commission's authority under section 4802 are irrelevant. The Commission's authority to approve the Board's appointments of hearing officers arises under sections 7211 and 7217.

officers serve at will, meaning that there is at most only one level of for-cause protection between them and the President.

1. In *Free Enterprise Fund*, the Supreme Court made clear that Article II permits Congress to interpose one layer of for-cause removal protection between inferior officers and the President. 561 U.S. 509. As originally enacted, Sarbanes-Oxley provided Board members with two layers of for-cause protection: Board members were removable by the Commission only for specified causes, and Commissioners were understood to be removable by the President only for inefficiency, neglect, or malfeasance. *Id*. at 487. Upon concluding that Board members were unconstitutionally insulated from presidential control, the Court severed the Board members' for-cause protection. That remedy complied with Article II, the Court explained, because it "leaves the Board removable by the Commission at will, and leaves the President separated from Board members by only a single level of good-cause tenure. The Commission is then fully responsible for the Board's actions, which are no less subject than the Commission's own functions to Presidential oversight." *Id*. at 509. In other words, the President had adequate ability under Article II to control the Board members' actions where the Board members were removable by the Commission at will and the Commissioners could be removed for cause by the President.

*Free Enterprise Fund* establishes that the rules governing removal of Board hearing officers are entirely consistent with Article II. Under the Commission's regulations and the Board's bylaws, hearing officers are removable at will by a majority of the Board, subject to Commission approval.[22] *See* 17 C.F.R. § 202.150; PCAOB Bylaws Arts. 4.3, 4.4, 6.3(d); SMF ¶¶ 23, 43; OHO Charter at 2. And the Board's offer letter to the CHO stated expressly that, "[l]ike other employees

---

[22] Plaintiffs incorrectly assert (Br.36) that the hearing officer has "statutory … protection" from removal. Such removal is governed by regulation and bylaw, which permit at-will removal.

of the PCAOB, you are employed on an at-will basis, which means that … the PCAOB may ter-

minate your employment at any time for any lawful reason, or for no reason."  SMF ¶ 43.  Board

members, in turn, are removable at will by the Commission, and Commissioners are understood

to be removable by the President for cause.  *See Free Enter. Fund*, 561 U.S. at 509.  Thus, there is

at most one layer of for-cause protection between Board hearing officers and the President.  As in

*Free Enterprise Fund*, the Commission is fully responsible for the Board hearing officers' actions,

and the President may supervise the Commission's oversight of hearing officers just as he super-

vises the Commission's other work.  *Id.*[23]

2.  Implicitly conceding that one layer of for-cause protection is constitutionally permissi-

ble, plaintiffs strain to argue that the hearing officer in fact enjoys "multiple levels of removal

protection."  Br.34.  But plaintiffs point only to the fact that at-will removal of a hearing officer

requires the Board to act and the SEC to approve.  17 C.F.R. § 202.150; PCAOB Bylaws Art.

6.3(d).  That simply means that both bodies must agree to remove the hearing officer, not that the

hearing officer's actions are insulated from accountability.  Contrary to plaintiffs' argument, the

SEC is at all times "fully responsible" for the hearing officer's actions.  Br.34.  If, for instance, the

SEC wished to remove the hearing officer but the Board did not, the SEC could simply remove

the recalcitrant Board members.  *See Free Enter. Fund*, 561 U.S. at 509.  And if the SEC wanted

to eliminate the Board's role in the removal process entirely, it could simply change the Board's

rules on its own initiative.  *See* 15 U.S.C. § 7217(b)(5); 15 U.S.C. § 78s(c).

Plaintiffs are therefore left to complain that too many "procedural barriers" (Br.34) inhere

in removing a hearing officer—in other words, that the Commission and Board might find reaching

_____

[23] The Supreme Court has granted review in *Trump v. Slaughter*, No. 25-332, to determine whether
to overrule *Humphrey's Executor v. United States*, 295 U.S. 602 (1935).  Depending on the
outcome, Board hearing officers may be subject to zero levels of for-cause removal protection.
For now, this Court should assume that Commissioners are removable only for cause.

38

agreement on removal cumbersome. But Article II is not concerned with logistical hurdles, and plaintiffs have not identified *any* case so suggesting. *See Abramowitz v. Lake*, 2025 WL 2480354, at *11 (D.D.C. Aug. 28, 2025) ("[T]he inconvenience[] of replacing supervisors in the course of firing an inferior officer does not violate the separation of powers."), *appeal docketed*, No. 25-5314 (D.C. Cir. Sept. 3, 2025); *cf. Braidwood*, 145 S. Ct. at 2457 (appointment methods requiring cooperation of an inferior officer, subject to principal officer's ability to fire the inferior officer, comply with Appointments Clause).[24]

### C.    Even if Plaintiffs' Article II Challenges Had Merit, Plaintiffs Would Not Be Entitled to Injunctive Relief

Even if plaintiffs prevailed on their appointment and/or removal claims, they would not be entitled to an injunction blocking entirely the Board's disciplinary proceedings.

First, even if this Court were to determine that the Board's hearing officer was not lawfully appointed, plaintiffs' remedy at most would be a declaration that hearing officers may not preside over plaintiffs' disciplinary proceedings. Plaintiffs do not seek retrospective relief. Br.35-36. As for prospective relief, because disciplinary proceedings may "be presided over by the Board," PCAOB Rule 5200(b); 15 U.S.C. § 7211(c)(4), and because the Board "members have been validly appointed by the full Commission," *Free Enter. Fund*, 561 U.S. at 513, the Board cannot be enjoined from conducting *any* disciplinary proceedings against plaintiffs. *See Lucia v. SEC*, 585 U.S. 237, 251 (2018) ("appropriate remedy" is a "'hearing before a properly appointed' official").

Second, even if plaintiffs were correct that the removal framework violated Article II, plaintiffs would not be entitled to any injunction against the disciplinary proceedings. When a

---

[24] The cases on which plaintiffs rely are inapposite because they concern administrative law judges at independent agencies, who—unlike Board hearing officers—*were* removable only for good cause and thus enjoyed two layers of for-cause protection. *VHS Acquisition Subsidiary No. 7 v. NLRB*, 759 F. Supp. 3d 88, 91 (D.D.C. 2024); *Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022).

removal restriction is invalid, "the appropriate remedy" is not to enjoin the agency from acting, but instead simply to invalidate the offending removal protection. *Seila Law v. CFPB*, 591 U.S. 197, 232-38 (2020) (severing "the offending tenure restriction"); *Free Enter. Fund*, 561 U.S. at 513 ("petitioners are not entitled to broad injunctive relief against the Board's continued operations"). Here, the sole purported removal protection that plaintiffs identify (Br.34) derives from the Commission's regulations and the Board's bylaws. This Court could hold those provisions invalid, leaving the Commission free to remove the hearing officer unilaterally at will. *Cf. Braidwood*, 145 S. Ct. at 2444, 2448 (absent "very clear and explicit [statutory] language," "the default presumption" is that an inferior officer "holds his position 'at the will and discretion of the head of the department'" (citation omitted)). No additional relief would be necessary or appropriate.

## IV.    Plaintiffs' Private Nondelegation Claims Fail

Plaintiffs' claim that the Board is a private entity exercising unlawfully delegated governmental power fails on multiple grounds. The Board is part of the government for constitutional purposes. But even if that were not so, the Commission's significant oversight of the Board's operations eliminates any basis for claiming a violation of the private nondelegation doctrine.

### A.    The Board and Its Employees Are Part of the Government for Purposes of Assessing Plaintiffs' Private Nondelegation Claim

Plaintiffs concede that the Board is "part of the government" (Br.36) for purposes of what they call their "individual constitutional rights" claims. The same is true for purposes of plaintiffs' private nondelegation claim, notwithstanding Sarbanes-Oxley's statement that "[t]he Board shall not be an agency or establishment of the United States Government." 15 U.S.C. § 7211(b).

1. In *Free Enterprise Fund*, the parties agreed, and the Supreme Court accepted, that the Board is "'part of the Government' for constitutional purposes." 561 U.S. at 486 (citing *Lebron*

*v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995)). *Lebron* and a subsequent case, *Department of Transportation v. Association of American Railroads*, 575 U.S. 43 (2015), held that Amtrak is a governmental entity for purposes of the Constitution, even though Amtrak's organic statute—like the Board's—disclaimed its governmental status. Under those decisions, an entity is "part of the government" for constitutional purposes—including in evaluating a private nondelegation challenge—when "[1] the Government creates [the] corporation by special law, [2] for the furtherance of governmental objectives, and [3] retains for itself permanent authority to appoint a majority of the directors of that corporation." *Lebron*, 513 U.S. at 399; *see Am. R.R.*, 575 U.S. at 55; *Herron v. Fannie Mae*, 861 F.3d 160, 167 (D.C. Cir. 2017).

The Board meets that test. The Board is a creature of statute: Congress "established" the Board and provided that it "shall … have succession until dissolved by an Act of Congress." 15 U.S.C. § 7211(a). Congress created the Board to further governmental objectives, including to "oversee the audit of companies that are subject to the securities laws" and to "protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports." 15 U.S.C. § 7211(a). And Board members are inferior officers appointed (and removable at will) by the SEC. *Id.* § 7211(e)(4); *see Free Enter. Fund*, 561 U.S. at 492.

Indeed, the Commission's control over the Board extends even further, cementing the conclusion that the Board has governmental status for purposes of plaintiffs' claims. *See Am. R.R.*, 575 U.S. at 52-53. By statute, the Board's rules are subject to "prior approval" by the SEC, 15 U.S.C. §§ 7217(b)(2), 7213(a)(2); no Board disciplinary sanction goes into effect without an opportunity for *de novo* review by the SEC, *see* 15 U.S.C. § 7215(e)(1); and the Board's budget and funding are subject to SEC review, *see* 15 U.S.C. § 7219(b), (d)(1).

2. Plaintiffs contend that, even if the Board is part of the government for constitutional

purposes, its "individual Board members" and employees are not.  Br.36 (citing 15 U.S.C. § 7211(b)).  That argument changes nothing.

First, the Supreme Court has made clear that a statutory *declaration* of governmental or nongovernmental status does not control.  As the Court explained, if Congress could "make the final determination" of "status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions," *Lebron*, 513 U.S. at 392, the government could "evade the most solemn obligations imposed in the constitution by simply resorting to the corporate form," *Am. R.R.*, 575 U.S. at 54 (quoting *Lebron*, 513 U.S. at 397); *see Free Enter. Fund*, 561 U.S. at 485-86 (treating the Board as governmental "[d]espite the provisions specifying that Board members are not Government officials for statutory purposes").  That is equally true whether the statutory declaration relates to the entity or the entity's personnel.

Second, it makes no sense to differentiate between the Board and its employees when assessing whether the Board, which is the only defendant, should be treated as the government.  By definition, employees acting within the scope of their employment act for their employer.  If the institutions those employees serve are governmental bodies for constitutional purposes, then those employees act on behalf of a governmental body for those same purposes.  *Cf. Lindke v. Freed*, 601 U.S. 187, 198 (2024); *West v. Atkins*, 487 U.S. 42, 54 (1988).  And in all events, plaintiffs' purported injuries stem from actions that only the Board (not staff) can take.  *See* PCAOB Rule 5101(a)(1) (formal investigations); PCAOB Rules 5110(a) and 5200(a) (disciplinary proceedings).

## B.    Even if the Board Were a Private Entity, the SEC's Supervision Is Constitutionally Sufficient

Even if the Board were considered a private entity, there would be no private nondelegation problem.  Where a private entity "function[s] subordinately to" a government agency and is subject to its "authority and surveillance," the delegation of power to the entity is "unquestionably valid."

*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940); *see Consumers' Rsch.*, 606 U.S. at 692 (agency "retain[ing] decision-making power" may "enlist private parties" for "recommendations"). Here, the Board functions subordinately "to an accountable government agency"—the SEC—with "ultimate authority to 'approve[], disapprove[], or modif[y]'" Board "actions and decisions." *Alpine*, 121 F.4th at 1325 (quoting *Sunshine*, 310 U.S. at 388, 399).

1. Sarbanes-Oxley is structured to ensure that the Commission retains "ultimate authority" over the Board's "actions and decisions." *Alpine*, 121 F.4th at 1325. The Commission appoints the Board's members, 15 U.S.C. § 7211(e)(4); approves its budget, *id.* § 7219(b); and approves the accounting support fees it charges to maintain its operations, *id.* § 7219(d)(1).

The Commission also retains ultimate authority over the Board's substantive actions. By statute, "[n]o rule of the Board shall become effective without prior approval of the Commission," which may "abrogat[e], delet[e], or add[] to portions of the rules of the Board" as it "deems necessary or appropriate," just "as if the Board were" a self-regulatory organization ("SRO") like the New York Stock Exchange. 15 U.S.C. §§ 78s(c), 7217(b)(2), (5). The Commission may review any disciplinary action taken by the Board, and the action is automatically stayed pending that review. 15 U.S.C. §§ 7215(d), 7217(c). And the Commission "may relieve the Board of any responsibility to enforce compliance with any provision of this Act, the securities laws, the rules of the Board, or professional standards." 15 U.S.C. § 7217(d).

2. That extensive oversight eliminates any basis for a private nondelegation challenge. In *Consumers' Research*, for example, the Supreme Court rejected a private nondelegation challenge to the FCC's oversight of a private administrator regarding contributions to support the FCC's universal-service programs. *See* 606 U.S. at 692-95. The Court relied on the FCC's authority over the administrator's actions, including approval of administrative matters like budgets, as well as

the FCC's authority to revise the administrator's recommended actions before they took effect. *See id.* The Court concluded that, "[i]n every way that matters to the constitutional inquiry, the Commission, not the Administrator, is in control." *Id.* at 695.

In *Alpine*, the D.C. Circuit drew a similar conclusion as to the SEC's oversight of FINRA. *See* 121 F.4th at 1328. The SEC "'conduct[s] its own review'" of and "can approve, disapprove, or modify" FINRA "final decision[s] or sanction[s]." *Id.* at 1326. Those review provisions are particularly relevant because Congress borrowed heavily from them when granting the SEC oversight authority over the Board. *See* 15 U.S.C. § 7217(a)-(c); *Free Enter. Fund*, 561 U.S. at 484 (Board "modeled on private self-regulatory organizations in the securities industry … that investigate and discipline their own members subject to Commission oversight"). The court of appeals found no nondelegation problem given that level of supervision—except as to expedited "expulsions," which the SEC could *not* review before they took effect. *Alpine*, 121 F.4th at 1326-27.

By statute, the SEC has *more* authority over the Board than the authority that those decisions deem constitutionally sufficient. The Board cannot impose a fee, rule, or sanction without the SEC having the chance to review and overrule it. There are no expedited procedures under which a Board sanction goes into effect without a stay if a party seeks SEC review. 15 U.S.C. §§ 7215(e)(1), 7217(c)(2). And once the Commission undertakes its review, it does so under the same *de novo* standard that the D.C. Circuit deemed sufficient in *Alpine*. *See* 15 U.S.C. § 7217(c)(2) (citing 15 U.S.C. § 78s(e)); *Alpine*, 121 F.4th at 1326 (citing 15 U.S.C. § 78s(e)).

3. Plaintiffs' contrary arguments lack merit. Plaintiffs contend that the Board exercises too much power in its investigations and disciplinary proceedings because it decides who and what to investigate and how to pursue those investigations, whereas the SEC's review does not occur absent a sanction. *See* Br.38-40. But the same is true of FINRA, *see Alpine*, 121 F.4th at 1340

44

(Walker, J., concurring in part and dissenting in part), and the D.C. Circuit found no private non-delegation problem with those aspects of FINRA's scheme.  In any event, the Board is statutorily required to "notify" the SEC of "any" investigation and then, for certain purposes, to "coordinate" its investigative work with SEC enforcement staff.  15 U.S.C. § 7215(b)(4)(A).

Plaintiffs decry the SEC's review as "hypothetical," "after-the-fact," and something that "almost never happens," Br.40, but those arguments are irrelevant and wrong.  The "relevant legal question is not how often" the SEC "revises" the Board's actions; it is whether Board sanctions can take effect without the opportunity for SEC review.  *Consumers' Rsch.*, 606 U.S. at 695.  The answer to that question is no.  The lack of any nondelegation problem is especially clear given that the SEC's review is de novo and, as a matter of practice, has resulted in canceling Board sanctions.  *See, e.g.*, *In re Cynthia C. Reinhart*, 2019 WL 2297280 (SEC May 29, 2019).

Plaintiffs also contend that the Commission's review authority is essentially meaningless because the burdens of Board disciplinary proceedings force parties to settle well before the Commission can exercise that authority.  Br.40-41.  But the Commission is not limited to reviewing Board orders in litigated proceedings—it also can review and vacate orders arising from settlements.  *See* 15 U.S.C. § 78s(d)(2) (applicable via 15 U.S.C. § 7217(c)(2)).  Nor is review of disciplinary orders the only means by which the Commission controls the Board: if the Commission does not like the Board's conduct, it may remove the Board, rewrite its rules, or adjust its budget.  *See* pp. 41, 43-44, *supra*.  Regardless, courts have routinely endorsed statutory schemes in which judicial review is reserved for the end of the adjudicative process, even though a party may incur substantial litigation expense.  *See, e.g.*, *Elgin*, 567 U.S. at 9; *Thunder Basin*, 510 U.S. at 215.

Finally, plaintiffs contend that the Board refused to provide discovery concerning Commission oversight and that this Court should infer that no supervision occurred at all.  Br.41.  That

contention is wrong from start to finish.  It is the Commission's *authority* to supervise that matters for constitutional purposes, not its exercise of that authority in any given case.  *See Braidwood*, 145 S. Ct. at 2446 (Secretary "need not review every decision" and need only "'have the discretion to review decisions rendered by' the Task Force").  The Commission's oversight authority is set forth by statute.  For that reason, plaintiffs' supervision-related discovery requests were irrelevant, and this Court properly permitted the Board not to respond (while reserving a ruling on the Board's underlying legal position).  Pls.' Mot., Ex. C (Hr'g Tr. 14:7-15:18, 20:18-21:2).

## V.    The Board's Funding Scheme Is Constitutional

The Board is entitled to summary judgment on plaintiffs' challenges to the Board's funding mechanism: an annual accounting support fee that is subject to the Commission's approval and may not exceed the Commission-approved budget for the Board.  *See id*.  That mechanism fully comports with the Constitution, as recent Supreme Court precedent confirms.

The statutory framework for the Board's funding is straightforward.  Congress authorized the Board to "establish, with the approval of the Commission, a reasonable annual accounting support fee (or a formula for the computation thereof), as may be necessary or appropriate to es-tablish and maintain the Board."  15 U.S.C. § 7219(d)(1).  Congress also required the Board to "establish a budget for each fiscal year," "subject to" Commission "approval."  *Id*. § 7219(b), (c)(1).  That budget acts as a cap on the fees that may be collected each year, *id.* § 7219(f), and "shall be payable from annual accounting support fees," *id.* § 7219(c)(1).  Those fees (and other Board "receipts") "shall not be considered public monies of the United States."  *Id.* § 7219(c)(1).

1.  This Court should grant summary judgment to the Board on plaintiffs' Appropriations Clause claim.  Plaintiffs concede that they are "no longer pursuing" that claim.  Br.48.  Nor could they.  In *CFPB v. Community Financial Services Association of America*, 601 U.S. 416 (2024), the Supreme Court rejected an Appropriations Clause challenge to the CFPB's statutory funding

mechanism that is not distinguishable from plaintiffs' challenge here. *Id.* at 435.

2. Plaintiffs' claim that the Board's funding mechanism is an unconstitutional delegation of Congress's Taxing Clause power is foreclosed by the Supreme Court's recent decision in *FCC v. Consumers' Research*, 606 U.S. 656, 662 (2025).

There, the Court upheld a statutory grant of authority to the FCC to obtain "contribut[ions]" from regulated entities in an amount "sufficient" to support the agency's universal service pro-grams. The Court rejected the plaintiffs' Taxing Clause challenge and held that the delegation was permissible because the statute contains an "intelligible principle": the word "sufficient," which "sets a floor and a ceiling alike." *Id.* at 662. The Court rejected the proposition that a more onerous nondelegation test applies in the context of taxing authority. *See id.* at 673-80.

That ruling controls here. Congress authorized the Board to collect fees that are "reasona-ble," "necessary," and "appropriate to … maintain the Board," 15 U.S.C. § 7219(d)(1), which pro-vides at least as clear an intelligible principle as the word "sufficient" in the FCC's statute. *See Consumers' Rsch.*, 606 U.S. at 663, 681-82. Plaintiffs all but concede as much. Br.44.

Moreover, the purposes for which the Board's funds will be used are not "indeterminate." *Consumers' Rsch.*, 145 S. Ct. at 682-83. Congress mandated and provided detailed frameworks for Board "duties." 15 U.S.C. § 7211(c); *see id.* §§ 7212 (registration), 7213 (standard setting), 7214 (inspections), 7215 (enforcement). Congress also set a limit on the fees the Board may col-lect, which "shall not exceed" the Board's "recoverable budget expenses." *Id.* § 7219(f).

3. Plaintiffs attempt to distinguish *Consumers' Research* by contending that constitutional concerns relating to the Board's overall responsiveness to the President render the Board's other-wise constitutional funding mechanism unconstitutional. Br.46-47. Specifically, plaintiffs say that (1) the Board has private status; (2) Board members are selected by and subject to at-will

47

removal by the Commission rather than the President; (3) the Board is exempt from transparency-related federal statutes; and (4) Commissioners have protections from removal.  Br.45-48.

That argument is misconceived.  Plaintiffs do not directly challenge any of those features of the Board or the Commission or contend that any is unconstitutional in its own right.  Plaintiffs cannot smuggle into this case, in the guise of challenging a funding mechanism, claims about Board or Commission structure that they have never previously raised.  Whether a funding mechanism violates the nondelegation doctrine turns on whether it provides an "intelligible principle," and plaintiffs' unrelated complaints about the Board's structure or oversight do not make the statutory funding guidelines any more or less intelligible.

In addition, *Consumers' Research* forecloses the type of "combination theory" that plaintiffs advance.  606 U.S. at 696-98.  There, Congress delegated fundraising authority to the FCC, and the FCC enlisted a private company to provide administrative services.  In affirming that funding structure, the Court rejected the court of appeals' ruling that the *combination* of the two delegations was unconstitutional, even if neither was independently so.  *See id*.  The Court explained that because the two constitutional constraints "do not operate on the same axis," a "measure implicating (but not violating) one does not compound a measure implicating (but not violating) the other, in a way that pushes the combination over a constitutional line."  *Id*.

The same is true here.  Plaintiffs raise a private nondelegation argument and a public funding-based nondelegation argument, but neither is valid.  Plaintiffs make no showing that their various other asserted issues—including appointment and removal concerns—"operate on the same axis" as questions about the delegation of taxing power.  *Id*.  For the reasons above, Sarbanes-Oxley does not unconstitutionally delegate to the Board authority to *legislate* fees.  In exercising its bounded authority to set its fees, the Board acts as part of the government and is subject to SEC

oversight.  Finally, the Board's fee-setting actions are subject to adequate presidential supervision under *Free Enterprise Fund* because the Commission can remove Board members and the President can supervise the Commission.  On all axes, then, the Board's funding actions are subject to the oversight and accountability that the Constitution requires.

## VI.    Plaintiffs Are Not Entitled to a Permanent Injunction

The Board is entitled to summary judgment on all of plaintiffs' claims for the reasons stated above.  But even if this Court were to rule for plaintiffs on one or more claims, plaintiffs would not be entitled to "a permanent injunction enjoining the Board from continuing its disciplinary proceedings against them."  Br.49.  "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), and "must be narrowly tailored to remedy the specific harm shown," *Nebraska Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006).

That principle is particularly important in the context of separation-of-powers violations, where the Supreme Court has reiterated time and again that any remedy must fit the injury—and that the availability of remedies such as severance renders any injunction unnecessary and inappropriate.  *See, e.g.*, *Seila Law*, 591 U.S. at 232-38; *Free Enter. Fund*, 561 U.S. at 508 (similar); p. 39, *supra* (appointment remedy); pp. 39-40, *supra* (removal remedy).  Plaintiffs' due process claims also can be remedied without enjoining the disciplinary proceedings, such as by directing the Board to adopt alternative procedures that satisfy constitutional requirements.  *See, e.g.*, *United States v. Perholtz*, 622 F. Supp. 1253, 1258-59 (D.D.C. 1985).

Plaintiffs therefore cannot "carr[y] their burden [to] show[] that they are entitled to the permanent injunction they seek," *LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, 784 F. Supp. 3d 1, 35 (D.D.C. 2025), by arguing in summary fashion (Br.49) that they need an injunction to protect their "constitutional rights."  Instead, the appropriate remedy, the existence of irreparable harm,

and the remaining equitable factors, *see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006), will turn on the nature of any violation and its susceptibility to narrower remedies.  If this Court were to rule for plaintiffs on any claim, it should seek further briefing about the appropriate relief, if any.

That course is particularly appropriate because the balance of equities and the public interest—which in this case "merge," *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023)—counsel considerable hesitation before entering an injunction.  Established by Congress "[a]fter a series of celebrated accounting debacles," *Free Enter. Fund*, 561 U.S. at 484, the Board performs a vital role in protecting investors by conducting oversight that strengthens the accuracy, reliability, and transparency of financial reporting.  In 2024 alone, the Board conducted over 230 inspections and issued 51 public disciplinary orders.[25]  If the Court were considering an injunction, it would have to take into account the "ripple effect" across the PCAOB's enforcement efforts and its "regulatory mission."  *Kim v. FINRA*, 698 F. Supp. 3d 147, 170 (D.D.C. 2023).  And the Court would have to assess any hardship to plaintiffs, whose proceedings are currently stayed and many of whose claims are susceptible to narrower remedies.  Where "a less drastic remedy" is "sufficient," "no recourse to the additional and extraordinary relief of an injunction [is] warranted."  *Monsanto*, 561 U.S. at 165-66.

## CONCLUSION

The Court should grant defendant's motion for summary judgment on all of plaintiffs' claims and deny plaintiffs' motion for summary judgment on those claims.

---

[25] PCAOB, 2024 Annual Report 9, 13, available at https://pcaobus.org/about/annual-report.

Dated:  November 25, 2025

/s/ Donald B. Verrilli, Jr.
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Rachel G. Miller-Ziegler
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001
Telephone:  (202) 220-1100
Fax:  (202) 220-1100

Jeffrey A. Lamken (DC Bar # 440547)
Robert K. Kry (DC Bar # 490545)
MOLOLAMKEN LLP
600 New Hampshire Ave. NW, Suite 500
Washington, DC 20037
Telephone: (202) 556-2000

*Attorneys for Public Company Accounting Oversight Board*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 25, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.


DATED: November 25, 2025          */s/ Donald B. Verrilli, Jr.*
                                  Donald B. Verrilli, Jr.