# EXHIBIT F



1666 K Street NW
Washington, DC 20006

Office: 202-207-9100
Fax: 202-862-8430

www.pcaobus.org

| **Order Instituting Disciplinary Proceedings, Making Findings, and Imposing Sanctions** | PCAOB Release No. 105-2022-034 |
|---|---|
| *In the Matter of KPMG S.A.S.,* | December 6, 2022 |
| Respondent. | |

By this Order Instituting Disciplinary Proceedings, Making Findings, and Imposing Sanctions ("Order"), the Public Company Accounting Oversight Board ("Board" or "PCAOB") is imposing sanctions on KPMG S.A.S. ("KPMG Colombia," the "Firm," or "Respondent"). The Board is:

(1) censuring the Firm;

(2) imposing a $4,000,000 civil money penalty on the Firm;

(3) requiring the Firm to undertake certain remedial actions as described in Section IV of this Order; and

(4) requiring the Firm to engage an independent consultant as specified in Section IV of this Order.

The Board is imposing these sanctions on the basis of its findings that KPMG Colombia (1) violated PCAOB rules and standards by failing to cooperate with the Board's 2016 inspection of the Firm by, among other actions, providing PCAOB inspectors with improperly altered work papers involving two issuers; and (2) violated PCAOB rules and quality controls standards over several years in connection with (a) the Firm's audit and quality control documentation, and (b) the Firm's internal training program.

I.

The Board deems it necessary and appropriate, for the protection of investors and to further the public interest in the preparation of informative, accurate, and independent audit reports, that disciplinary proceedings be, and hereby are, instituted against Respondent

pursuant to Section 105(c) of the Sarbanes-Oxley Act of 2002, as amended ("Act"), and PCAOB Rule 5200(a)(1).

## II.

In anticipation of the institution of these proceedings, and pursuant to PCAOB Rule 5205, Respondent has submitted an Offer of Settlement (the "Offer") that the Board has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Board or in which the Board is a party, and without admitting or denying the findings contained in the Order, except as to the Board's jurisdiction over Respondent and the subject matter of these proceedings (which is admitted) and the facts, findings, and violations in paragraphs 1-8, 19-28, 30-32, 37-39, 41-44, 49-55, and 57-62 (which are admitted), Respondent consents to the entry of this Order as set forth below.[1]

## III.

On the basis of Respondent's Offer, the Board finds that:[2]

## A.    Respondent

1.      **KPMG Colombia** is a simplified stock company headquartered in Bogotá, Republic of Colombia. KPMG Colombia is a member of the KPMG international network of firms ("KPMG Global"). The Firm registered with the Board on April 27, 2010, and is a registered public accounting firm as that term is defined in Section 2(a)(12) of the Act and PCAOB Rule 1001(r)(i). During the period relevant to this matter, the Firm performed referred audit work on Colombian components of "Issuer A" and "Issuer B," which were audited principally by other member firms of KPMG Global.

## B.    Issuers and Other Relevant Individuals

2.      **Issuer A** was, at all relevant times, an issuer within the meaning of Section 2(a)(7) of the Act and PCAOB Rule 1001(i)(iii).

---

[1]      The findings herein are made pursuant to Respondent's Offer and are not binding on any other person or entity in this or any other proceeding.

[2]      The Board finds that Respondent's conduct described in this Order meets the condition set out in Section 105(c)(5)(A) of the Act, 15 U.S.C. § 7215(c)(5)(A), which provides that certain sanctions may be imposed in the event of intentional or knowing conduct, including reckless conduct, that results in a violation of the applicable statutory, regulatory, or professional standard.

3.        **Issuer B** was, at all relevant times, an issuer within the meaning of Section 2(a)(7) of the Act and PCAOB Rule 1001(i)(iii).

4.        The "**Lead Partner**" was formerly a partner of KPMG Colombia. He served as the lead partner for the Firm's audit work on the Colombian components of Issuer A (the "Issuer A Component Audit").[3]

5.        "**Manager A**" was formerly an employee of KPMG Colombia. He served as the manager for the Issuer A Component Audit.[4]

6.        The "**Senior**" was formerly an employee of KPMG Colombia. He served as the senior for the Issuer A Component Audit.[5]

7.        The "**Managing Director**" was formerly an employee of KPMG Colombia. He served as the managing director for the Firm's audit work on the Colombian component of Issuer B (the "Issuer B Component Audit").

8.        "**Manager B**" was formerly an employee of KPMG Colombia. He served as the manager for the Issuer B Component Audit.

## C.    Summary

9.        During the period covered by this Order, KPMG Colombia engaged in two courses of misconduct that violated PCAOB rules and standards, including quality control standards, and that resulted in additional violations by the Firm's personnel.

10.       *First*, KPMG Colombia failed to cooperate with the Board's 2016 inspection of the Firm. After learning that the Board's Division of Registration and Inspections ("DRI") would be inspecting the Firm's audit work for the Issuer A Component Audit and Issuer B Component Audit, KPMG Colombia personnel improperly modified work papers and backdated those work papers to conceal from DRI that they had been modified. As a result, and as further described

---

[3]        *See José Daniel Meléndez Giménez*, PCAOB Rel. No. 105-2022-035 (Dec. 6, 2022).

[4]        *See Edgar Mauricio Ramírez Rueda*, PCAOB Rel. No. 105-2022-036 (Dec. 6, 2022).

[5]        *See Marco Alexander Rodríguez Ramírez*, PCAOB Rel. No. 105-2022-037 (Dec. 6, 2022).

Order
PCAOB Release No. 105-2022-034
December 6, 2022

below, the Firm violated PCAOB Rule 4006, *Duty to Cooperate with Inspectors*; AS 3, *Audit Documentation*; and ET § 102, *Integrity and Objectivity*.[6]

11.     These violations stemmed from deficiencies in the Firm's system of quality control related to, among other areas, audit documentation. At the time of the 2016 inspection, the Firm (a) did not have an effective system in place to provide reasonable assurance that a complete and final set of work papers were timely assembled for retention ("archived"),[7] and that, once archived, work papers were retained and protected against improper alteration;[8] (b) failed to maintain control over administrative passwords that could be used to backdate alterations to work papers; and (c) did not have an effective system in place to ensure that the Firm provided PCAOB inspectors with the appropriate versions of the Firm's audit work papers for purposes of the inspection (*i.e.*, an accurately dated set of work papers prepared and retained in accordance with AS 3 without improper alterations after the documentation completion date). As a result, the Firm violated QC § 20, *System of Quality Control for a CPA Firm's Accounting and Auditing Practice*, and QC § 30, *Monitoring a CPA Firm's Accounting and Auditing Practice*.

12.     Although the Firm took steps to address quality control deficiencies concerning the timely archiving and preservation of audit documentation prior to the Board's next inspection of the Firm in 2019, those steps did not adequately address the risks that modified audit documentation could be improperly backdated and provided to PCAOB inspectors. In 2019, KPMG Colombia's system of quality control still did not provide reasonable assurance that audit documentation modified or created after the audit report date and prior to archiving was accurately dated in the final archived audit documentation. Nor did it provide reasonable assurance that audit consultation memos residing in the files of its Department of Professional Practice, which were intended to document compliance with the Firm's quality control policies and procedures, were timely completed, appropriately dated, and protected against improper alteration. As a result, the Firm continued to violate QC § 20 through 2019.

13.     *Second*, from at least 2016 until 2020, KPMG Colombia violated PCAOB rules and quality control standards related to integrity and personnel management by failing to establish appropriate policies and procedures for administering and overseeing internal training tests, including tests designed to help the Firm's audit professionals satisfy the requirements for

---

[6]     All references to PCAOB rules and standards in this Order are to the versions of those rules and standards, and to their organization and numbering, in effect at the time of the audits discussed herein.

[7]     *See* AS 3 ¶ 15.

[8]     *See* AS 3 ¶¶ 14, 16.

maintaining their accounting certifications. Those quality control failures prevented the Firm from identifying cheating in connection with tests for mandatory training courses covering topics that were relevant to compliance with PCAOB rules and standards. As a result, the Firm violated QC § 20, QC § 30, and QC § 40, *The Personnel Management Element of a Firm's System of Quality Control—Competencies Required by a Practitioner-in-Charge of an Attest Engagement*.

14.    Although the Firm took steps since 2020 to improve its quality control policies and procedures related to its internal training program, the Firm subsequently identified instances where personnel have cheated on internal training exams. As a result, as set forth in the undertakings below, KPMG Colombia will conduct an investigation to identify and determine the extent of exam cheating by its associated persons since January 1, 2020, and will take such further employment actions and remedial steps as may be appropriate. The Firm will also engage an independent consultant to review and assess whether the Firm has taken appropriate employment actions or other remedial steps and whether the Firm has designed and implemented quality controls that reasonably assure compliance with all professional standards relating to ethics and integrity in connection with its training program.

## D.    KPMG Colombia Violated PCAOB Rules, Auditing Standards, and Ethics Standards in Connection with the PCAOB's 2016 Inspection

15.    PCAOB Rule 4006 requires that "[e]very registered public accounting firm, and every associated person of a registered public accounting firm . . . cooperate with the Board in the performance of any Board inspection."[9] "Implicit in this cooperation requirement is that auditors provide accurate and truthful information."[10]

16.    PCAOB rules also require registered public accounting firms to comply with applicable auditing and related professional practice standards.[11] Among other requirements,

---

[9]      PCAOB Rule 4006.

[10]     *Kabani & Co., Inc.*, Rel. No. 34-80201, 2017 WL 947229, at *12 (SEC Mar. 10, 2017) (citations omitted), *petition for review denied, Kabani & Co., Inc. v. SEC*, 733 F. App'x 918 (9th Cir. 2018); *see also*, PCAOB Staff Audit Practice Alert No. 14, at *3 (Apr. 21, 2016) ("This duty to cooperate includes an obligation not to provide improperly altered documents or misleading information in connection with the Board's inspection processes." (citations omitted)).

[11]     *See* PCAOB Rule 3100, *Compliance with Auditing and Related Professional Practice Standards*.

Order
PCAOB Release No. 105-2022-034
December 6, 2022

registered firms must comply with the auditing, ethics, and quality control standards adopted by the Board.[12]

17.     The Board's audit documentation standard states, in part: "A complete and final set of audit documentation should be assembled for retention as of a date not more than 45 days after the report release date (*documentation completion date*). . . . Audit documentation must not be deleted or discarded after the documentation completion date, however, information may be added. Any documentation added must indicate the date the information was added, the name of the person who prepared the additional documentation, and the reason for adding it."[13]

18.     PCAOB ethics standards provide, in part, that a registered firm "shall maintain objectivity and integrity" and "shall not knowingly misrepresent facts" in the performance of professional services.[14] A registered firm knowingly misrepresents facts in violation of ET § 102 when, for example, it knowingly: (i) makes, or permits or directs another to make, materially false and misleading entries in an entity's records; or (ii) signs, or permits or directs another to sign, a document containing materially false and misleading information.[15]

### i.     The Firm Improperly Modified the Audit Work Papers for Both the Issuer A Component Audit and Issuer B Component Audit After the Documentation Completion Date and in Anticipation of a PCAOB Inspection

#### a.   Issuer A Component Audit

19.     KPMG Colombia sent its interoffice report for its audit work on the Colombian component of Issuer A to the principal auditor by no later than February 25, 2016. The principal auditor released its audit report for the Issuer A audit by no later than February 26, 2016. As a result, the documentation completion date for all audit work performed for the Issuer A audit was no later than April 11, 2016.

---

[12]     *See* PCAOB Rule 3200T, *Interim Auditing Standards*; PCAOB Rule 3400T, *Interim Quality Control Standards*; Rule 3500T, *Interim Ethics and Independence Standards*.

[13]     AS 3 ¶¶ 15-16 (italics in original).

[14]     *See* ET § 102.01.

[15]     *See* ET §§ 102.02(a), (c).

20.     On September 7, 2016, DRI informed KPMG Colombia that it would inspect the Firm's work on the Issuer A Component Audit. DRI identified (a) net sales and accounts receivable, and (b) property, plant, and equipment as the focus areas for the inspection.

21.     After learning that DRI would inspect the Firm's work on the Issuer A Component Audit, the Lead Partner for the Firm's work on the Issuer A Component Audit instructed Manager A and the Senior to perform a review of the audit documentation for that engagement, with assistance from the other members of the engagement team. The Lead Partner further instructed Manager A and the Senior to provide him with comments from that review.

22.     After receiving the engagement team's initial review comments, the Lead Partner informed Manager A and the Senior that the engagement team needed to revise the audit work papers ahead of the inspection. Manager A and the Senior, together with other members of the engagement team and Firm staff, then began making changes to the work papers to address the comments that had been provided to the Lead Partner.

23.     After the engagement team began making changes, the Lead Partner personally performed a review of the audit work papers, including a review of some of the changes that the engagement team had already made pursuant to his instructions. The Lead Partner also enlisted the help of multiple other Firm audit professionals to review specific areas of the audit work papers. From September 21 to October 2, 2016, the Lead Partner sent Manager A and the Senior a series of emails providing detailed comments from his review for the engagement team to address through further revisions to the work papers. The other professionals whom the Lead Partner enlisted to help with the review also provided comments to the engagement team.

24.     In some of the emails, the Lead Partner noted that it was possible to see in the revised version of the work papers that some of the changes had been made in September 2016, and he instructed Manager A and the Senior to alter those dates. When providing that instruction, the Lead Partner intended to hide the fact that alterations were being made to the work papers after the documentation completion date. At least one other Firm professional also noted to the engagement team that some of the work papers she reviewed included dates reflecting that changes had been made in September 2016, which the engagement team addressed through additional backdating.

25.     Pursuant to the Lead Partner's instructions, the engagement team altered and backdated multiple work papers between September 7, 2016, and the start of DRI's inspection of the Firm's work on the Issuer A Component Audit. In making those changes, the engagement team did not indicate the date they made the changes, who made the changes, or the reasons

Order
PCAOB Release No. 105-2022-034
December 6, 2022

why the changes were made. To the contrary, the engagement team backdated the changes to dates before the documentation completion date, and concealed the actual revision dates, by improperly changing the date on a computer clock using an administrative passcode.

26.     KPMG Colombia, through its personnel, improperly altered and backdated work papers for the Issuer A Component Audit so the improperly modified and backdated work papers appeared to constitute the complete and final set of timely archived audit documentation. Numerous individuals at KPMG Colombia, including but not limited to the Lead Partner and the other members of the engagement team involved in the modifications and backdating, knew or were reckless in not knowing that KPMG Colombia provided improperly modified and backdated work papers for the Issuer A Component Audit to DRI during the inspection fieldwork, which took place from October 10 to October 21, 2016.

27.     During the PCAOB inspection, KPMG Colombia personnel did not inform DRI or anyone else at the PCAOB that the Issuer A Component Audit work papers provided to DRI had been improperly modified and backdated, or provide DRI with information about the actual dates the work papers were modified and the reasons they were modified after the documentation completion date. KPMG Colombia also never provided DRI with copies of the work papers as they actually appeared on the documentation completion date.

28.     As a result of the above-described conduct, KPMG Colombia violated PCAOB Rule 4006 and AS 3 in connection with the Board's 2016 inspection of the Firm and DRI's review of the Firm's work on the Issuer A Component Audit.

29.     As a result of the above-described conduct, KPMG Colombia also violated ET § 102 in connection with the Board's 2016 inspection of the Firm and DRI's review of the Firm's work on the Issuer A Component Audit.

### b.   Issuer B Component Audit

30.     KPMG Colombia sent its interoffice report for its audit work on the Colombian component of Issuer B to the principal auditor by no later than April 15, 2016. The principal auditor released its audit report for the Issuer B audit by no later than April 22, 2016. As a result, the documentation completion date for all audit work performed for the Issuer B audit was no later than June 6, 2016.

31.     On September 7, 2016, DRI informed KPMG Colombia that it would also inspect the Firm's work on the Issuer B Component Audit. DRI identified (a) net sales and accounts receivable, and (b) property, machinery, and equipment as the focus areas for the inspection.

32.     On September 8, 2016, the lead partner for the Firm's work on the Issuer B Component Audit informed the Managing Director and Manager B of the impending inspection. The Managing Director and Manager B thereafter assembled a team to prepare for the inspection; the team included both individuals who had worked on the audit and others who had not.

33.     The Managing Director and Manager B instructed the team to review the work papers for the Issuer B Component Audit to determine if there were any deficiencies.

34.     At the instruction of the Managing Director and Manager B, the work papers were then modified to address certain deficiencies and inconsistencies identified by the reviewers and backdated to a date during the audit.

35.     As a result of this review, KPMG Colombia personnel modified numerous work papers, including, but not limited to, documents related to (a) net sales and accounts receivable, and (b) property, machinery, and equipment, *i.e.*, the focus areas for the inspection. In each case, the modified work paper did not reflect the date the document was modified, the person who modified it, or the reason it was modified.

36.     On occasion, rather than modifying existing work papers, a reviewer created new work papers that did not exist as of the documentation completion date. Where the new work papers were created by a reviewer who had not been a member of the engagement team during the audit, the new work papers nevertheless falsely reflected that they were prepared by someone who had served on the Issuer B Component Audit engagement team, rather than by the reviewer. Additionally, the reviewer dated the newly created work papers with a date during the audit, rather than the date the work papers were actually created.

37.     KPMG Colombia, through its personnel, improperly altered and backdated work papers for the Issuer B Component Audit so the improperly modified and backdated work papers appeared to constitute the complete and final set of timely archived audit documentation. The Firm then provided those improperly altered and backdated work papers to the PCAOB's inspectors during inspection fieldwork.

38.     During the PCAOB inspection, KPMG Colombia personnel did not inform DRI or anyone else at the PCAOB that the Issuer B Component Audit work papers provided to DRI had been improperly modified and backdated, or provide DRI with information about the actual dates the work papers were modified and the reasons they were modified after the documentation completion date. KPMG Colombia also never provided DRI with copies of the work papers as they actually appeared on the documentation completion date.

Order
PCAOB Release No. 105-2022-034
December 6, 2022

39.     As a result of the above-described conduct, KPMG Colombia violated PCAOB Rule 4006 and AS 3 in connection with the Board's 2016 inspection of the Firm and DRI's review of the Firm's work on the Issuer B audit.

40.     As a result of the above-described conduct, KPMG Colombia also violated ET § 102 in connection with the Board's 2016 inspection of the Firm and DRI's review of the Firm's work on the Issuer B audit.

### ii.    KPMG Colombia Violated PCAOB Rule 4006 and ET § 102 by Providing Materially False and Misleading Certifications to DRI

41.     In connection with the 2016 inspection, KPMG Colombia, through its personnel, made materially false and misleading statements to DRI. Specifically, the Firm represented that no modifications had been made to the audit documentation for either the Issuer A Component Audit or the Issuer B Component Audit after the documentation completion date.

42.     In connection with the 2016 inspection, the Firm completed and submitted to DRI separate "engagement profiles" for its work on the Issuer A and Issuer B component audits. Both engagement profiles inaccurately represented that no changes had been made to the audit documentation after the documentation completion date. Specifically, on the engagement profile for both components, the Firm answered "No" to the question: "Have there been any changes to the audit documentation subsequent to the documentation completion date?"

43.     However, before submitting the final engagement profiles to DRI, multiple Firm personnel knew improper changes had been made to the audit documentation for both component audits after the respective documentation completion dates and in anticipation of the inspection. At no time did anyone at KPMG Colombia inform DRI that either of those engagement profile responses was false.

44.     Through these actions, KPMG Colombia committed additional violations of PCAOB Rule 4006.

45.     Through these actions, KPMG Colombia also committed additional violations of ET § 102.

### E.    KPMG Colombia Violated PCAOB Rules and Quality Control Standards Concerning Integrity, Audit and Quality Control Documentation, and Complying with Regulatory Requirements

46.    PCAOB rules require that a registered public accounting firm comply with the Board's quality control standards,[16] which provide that a registered firm "shall have a system of quality control for its accounting and auditing practice."[17]

47.    Pursuant to PCAOB quality control standards, firms should establish policies and procedures to provide reasonable assurance that, among other things: (a) "personnel . . . perform all professional responsibilities with integrity;"[18] (b) "the work performed by engagement personnel meets applicable professional standards, regulatory requirements, and the firm's standards of quality," including with respect to "planning, performing, supervising, reviewing, documenting, and communicating the results of each engagement;"[19] and (c) the firm's quality control policies and procedures "are suitably designed and are being effectively applied."[20]

48.    A firm should communicate its quality control policies and procedures to its personnel in a manner that provides reasonable assurance that those policies and procedures are understood and complied with.[21] A firm should also prepare appropriate documentation to demonstrate compliance with its policies and procedures for the quality control system, and should retain that documentation for a period of time sufficient to enable those performing monitoring procedures to evaluate the extent of the firm's compliance with its quality control policies and procedures.[22]

---

[16]    *See* PCAOB Rule 3400T.

[17]    QC § 20.01.

[18]    *See* QC § 20.09.

[19]    *See* QC §§ 20.17, .18.

[20]    *See* QC §§ 20.20; 30.02.

[21]    *See* QC § 20.23.

[22]    *See* QC § 20.25.

    **i.**    **Quality Control Deficiencies Related to Audit Documentation and the Firm's Non-cooperation with the 2016 Inspection**

49.    The Firm's non-cooperation with the 2016 inspection resulted in large part from deficiencies in its system of quality control relating to audit documentation and compliance with regulatory requirements.

50.    At the time of the 2016 inspection, KPMG Colombia permitted engagement teams to archive electronic audit documentation on an engagement team member's local computer hard drive, which rendered the audit documentation susceptible to both premature destruction and improper alteration.

51.    During the 2015/2016 time period, audit engagement teams typically stored electronic work papers on engagement team members' laptops while the audit was performed. After an engagement was completed and the team's documentation was supposed to be finalized, Firm policy dictated that the engagement team run a program that would produce an archived version of the electronic documentation for the engagement. Once the electronic audit documentation was archived, Firm policy required the engagement team to store that archived documentation on a particular server that the Firm maintained.

52.    During the 2015/2016 timeframe, however, the Firm did not take steps to monitor whether engagement teams were appropriately archiving electronic audit documentation on or before an engagement's documentation completion date, or whether archived documentation was being stored on the designated server. As a result, archiving of electronic work papers during the 2015/2016 timeframe sometimes occurred after the relevant documentation completion date, or not at all. Further, archived electronic documentation was sometimes not stored on the designated server, so the location of the documentation for an engagement was not always known.

53.    Additionally, because electronic work papers were locally maintained and archived by engagement teams during the 2015/2016 timeframe, engagement teams could create multiple, different versions of the electronic work paper files for the same engagement.

54.    As a result of the foregoing deficiencies in its system for archiving electronic work papers, KPMG Colombia had to rely on the individual engagement teams to identify and provide the correct copy of the electronic work papers for the PCAOB inspection in 2016. However, KPMG Colombia lacked sufficient quality control policies and procedures to provide reasonable assurance that the engagement teams acted with integrity and provided DRI with the appropriate work papers for an engagement (*i.e.*, an accurately dated set of work papers

prepared and retained in accordance with AS 3 without improper alterations after the documentation completion date).

55.     Moreover, other deficiencies in KPMG Colombia's system of quality control in 2016 increased the risk that engagement teams could provide improperly altered and backdated work papers to PCAOB inspectors.

56.     Prior to and through at least the 2016 PCAOB inspection period, KPMG Colombia did not allocate enough time for engagement teams to complete documentation at the time of the audits. As a result, Firm personnel responded by developing methods to complete and backdate work papers well after the documentation completion date if an audit was selected for inspection.

57.     Specifically, during the 2015/2016 time period, it was common practice for KPMG Colombia audit personnel to insert and sign off as preparers and reviewers on blank work papers in the electronic audit files. This allowed audit personnel to later substitute new work papers in place of the blank ones, while maintaining the original sign-off dates on the work papers. Although the Firm was aware of this practice, it did not take appropriate or timely steps to prevent it.

58.     KPMG Colombia also did not maintain appropriate control over IT administrative passwords during the 2015/2016 timeframe. Certain engagement team staff gained access to those passwords, which allowed them to reset clocks on their computers to prior dates and times. Engagement teams used the administrative passwords to modify and backdate copies of audit work papers, including for the 2016 PCAOB inspection.

### ii.     Continuing Quality Control Deficiencies Related to Documentation at the Time of the 2019 Inspection

59.     In the period between the PCAOB's 2016 and 2019 inspections of the Firm, KPMG Colombia took steps to improve its system of quality control surrounding audit documentation, including steps to monitor whether engagement teams were timely archiving work papers and appropriately storing the archived work papers on the designated server. However, certain other deficiencies in its system of quality control persisted through 2019.

60.     In 2019, it was still possible for engagement teams both to create new audit documentation in KPMG Colombia's electronic work papers and to substantially alter existing audit documentation between the time the Firm released its audit report and the documentation completion date for an engagement, in a manner that was inconsistent with AS 3. Specifically, engagement teams could create or modify work papers while making it appear

that the audit documentation was completed and reviewed before the audit report was issued—including by signing off on blank work papers and later substituting them with modified work papers. KPMG Colombia was aware, by 2019, of its personnel's practice of inserting and signing off on blank work papers and later substituting other work papers in their place. However, the Firm did not take adequate steps to prevent the practice or effectively communicate to its personnel that it was improper and should be stopped.

61.    Although KPMG Colombia had taken steps to ensure the timely archiving and preservation of electronic audit work papers, it did not implement sufficient quality controls around files within its Department of Professional Practice ("DPP"), which were also subject to inspection by the PCAOB, peer review, and other monitoring procedures. Specifically, the Firm's system of quality control did not provide reasonable assurance that its documentation of consultations between engagement teams and the Firm's DPP professionals was timely prepared and protected from improper alteration. As a result, at least one consultation with DPP that was the subject of review by PCAOB inspectors was not formally documented by DPP, and could only be substantiated during the 2019 inspection through a search of Firm emails. Additionally, two consultation memos in DPP's files were revised during the inspection and did not receive final sign-off until several months after the documentation completion date for the relevant audit. Yet those two revised memos in DPP's files continued to be dated as though they were completed before the audit report was issued.[23]

\* \* \* \* \*

62.    As a result of the deficiencies described in paragraphs 49 to 61, above, from at least 2015 through 2019, KPMG Colombia violated QC § 20 and QC § 30 because its quality control policies and procedures did not provide reasonable assurance that: (a) its personnel performed all professional responsibilities with integrity; (b) the work performed by engagement personnel met applicable professional standards, regulatory requirements, and the Firm's standards of quality; and (c) the quality control policies and procedures established by the Firm were suitably designed and being effectively applied.[24] The Firm also violated QC § 20 by failing to communicate its quality control policies and procedures to its personnel in a manner that provided reasonable assurance that those policies and procedures were

---

[23]    The revised memos in DPP's files were not shown to PCAOB inspectors during the 2019 inspection.

[24]    *See* QC §§ 20.09, .17-.18, .20; QC § 30.

understood and complied with, and by failing to prepare and retain appropriate documentation to demonstrate compliance with its policies and procedures for the quality control system.[25]

## F.    KPMG Colombia Violated PCAOB Rules and Standards in Connection with Its Internal Training

### i.    Applicable PCAOB Quality Control Standards

63.    In addition to the areas described above, PCAOB quality control standards address personnel management and state that "policies and procedures should be established to provide the firm with reasonable assurance that . . . [w]ork is assigned to personnel having the degree of technical training and proficiency required in the circumstances."[26] Moreover, "policies and procedures should be established to provide the firm with reasonable assurance that . . . [p]ersonnel participate in general and industry-specific continuing professional education and other professional development activities that enable them to fulfill responsibilities assigned, and satisfy applicable continuing professional education requirements of . . . regulatory agencies."[27]

64.    PCAOB quality control standards recognize that "[t]he elements of quality control are interrelated,"[28] and that, as explained above, monitoring procedures are necessary.[29] Under PCAOB standards, monitoring involves an ongoing consideration and evaluation of, among other things, the effectiveness of professional development activities and compliance with the firm's policies and procedures.[30]

### ii.    Training Requirements for KPMG Colombia Personnel

65.    As part of KPMG Colombia's personnel management system, the Firm administers an internal training program for all of its professionals. The Firm has designed its training program to serve multiple purposes, including to provide Firm personnel with technical instruction, to further their professional development, and to satisfy some of the continuing professional education requirements imposed by authorities that licensed some of the Firm's

---

[25]    *See* QC §§ 20.23, .25.

[26]    QC § 20.13.b; QC § 40.02.b.

[27]    QC § 20.13.c; QC § 40.02.c.

[28]    QC § 20.08.

[29]    *See id.*; QC § 30.02; *see also* QC § 20.20.

[30]    *See* QC § 20. 20.c-.d; QC § 30.02.c-.d.

auditors. The Firm's training requirements vary by each professional's position, role, and industry practice area, and are intended to be relevant to, among other things, the independence of its personnel, the audit work they perform, and the integrity with which they carry out their professional responsibilities. The Firm's internal training often includes a testing component.

66.    Since at least 2016, the Firm required audit personnel to take certain online training courses that are relevant to compliance with PCAOB rules and standards. The particular courses the Firm's auditors must take vary based on their experience levels. These audit-related courses include a testing component and are mandatory for audit personnel.

### iii.    Failures by KPMG Colombia to Establish Adequate Quality Control Policies and Procedures Related to Integrity and Personnel Management

67.    Between 2016 and 2020, KPMG Colombia had in place certain quality control policies and procedures intended to address integrity and personnel management. Those policies and procedures, however, did not provide reasonable assurance that Firm personnel acted with integrity when taking internal training tests. Among other things, the monitoring procedures were not designed to effectively detect, deter, or prevent cheating through answer sharing.

### iv.    Sharing of Answers to Training Tests at KPMG Colombia

68.    Between 2016 and 2020, KPMG Colombia personnel were involved in improper answer sharing. That conduct included sharing answers by sending emails with answers to training test questions, by providing screenshots of training questions and answers, or by discussing answers when taking tests in the presence of others.

69.    A preliminary internal investigation by the Firm revealed that the misconduct included improper answer sharing in connection with tests that were a part of the Firm's mandatory assurance training, including among individuals who performed work on audits governed by PCAOB standards.

70.    As illustrated by the misconduct described above, from at least 2016 until 2020, KPMG Colombia, failed to establish policies and procedures, including monitoring procedures, to provide the Firm with reasonable assurance that (1) Firm personnel performed all professional responsibilities with integrity; (2) personnel to whom work was assigned had the degree of technical training and proficiency required in the circumstances; and (3) personnel participated in general and industry-specific continuing professional education that enabled them to fulfill responsibilities assigned and satisfy applicable continuing professional education

requirements of regulatory agencies. Accordingly, the Firm violated PCAOB quality control standards related to integrity and personnel management.[31]

## IV.

In view of the foregoing, and to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports, the Board determines it appropriate to impose the sanctions agreed to in Respondent's Offer.

In ordering sanctions, the Board took into account the Firm's extraordinary cooperation in one part of this matter, specifically its response to discovering improper answer sharing on internal trainings. During the PCAOB staff's investigation into audit documentation and non-cooperation issues, the Firm voluntarily and timely self-reported to PCAOB staff the answer sharing misconduct it had discovered. The Firm then provided substantial assistance to the PCAOB's investigation by conducting, and providing to the PCAOB the results of, a preliminary internal investigation, including evidence relating to the Firm's interviews of personnel it suspected of engaging in improper answer sharing. Absent this extraordinary cooperation, the civil money penalty imposed would have been significantly larger, and the Board may have imposed additional sanctions.

Additionally, since both the audit documentation and answer sharing misconduct occurred, the Firm has implemented remedial measures aimed at preventing future similar violations. Those remedial efforts include, but are not limited to: (1) changes to the Firm's audit documentation systems and archiving policies and procedures that are intended to provide reasonable assurance that (a) audit procedures are completed and audit documentation is prepared and reviewed prior to the release of the audit report; (b) the Firm detects and reviews significant or unexpected changes to audit documentation between the date of the audit report and the archiving of the audit documentation; (c) audit documentation is timely archived, appropriately retained, and protected from improper alteration; (d) PCAOB inspectors are provided the timely archived audit documentation during inspections; and (e) DPP files are timely prepared and maintained with integrity; (2) changes to Firm training and other personnel management policies and procedures to promote professional integrity, especially as it relates to audit documentation and training examinations; (3) employment actions and other disciplinary actions with respect to certain individuals that engaged in the misconduct described in this Order; and (4) changes to Firm leadership.

Accordingly, it is hereby ORDERED that:

---

[31]     *See* QC § 20.09, .13.b-.c, .20; QC § 30.02; and QC § 40.02.b-.c.

A.    Pursuant to Section 105(c)(4)(E) of the Act and PCAOB Rule 5300(a)(5), KPMG S.A.S. is hereby censured.

B.    Pursuant to Section 105(c)(4)(D) of the Act and PCAOB Rule 5300(a)(4), a civil money penalty in the amount of $4,000,000 is imposed on KPMG S.A.S.

1.    All funds collected by the PCAOB as a result of the assessment of this civil money penalty will be used in accordance with Section 109(c)(2) of the Act.

2.    Respondent shall pay the civil money penalty within ten days of the issuance of this Order by (a) wire transfer in accordance with instructions furnished by PCAOB staff; or (b) United States Postal Service money order, bank money order, certified check, or bank cashier's check (i) made payable to the Public Company Accounting Oversight Board, (ii) delivered to the Office of Finance, Public Company Accounting Oversight Board, 1666 K Street, N.W., Washington D.C. 20006, and (iii) submitted under a cover letter, which identifies KPMG S.A.S. as a respondent in these proceedings, sets forth the title and PCAOB release number of these proceedings, and states that payment is made pursuant to this Order, a copy of which cover letter and money order or check shall be sent to Office of the Secretary, Attention: Phoebe W. Brown, Secretary, Public Company Accounting Oversight Board, 1666 K Street, N.W., Washington, D.C. 20006.

3.    If timely payment is not made, additional interest shall accrue at the federal debt collection rate set for the current quarter pursuant to 31 U.S.C. § 3717. Payments shall be applied first to post-Order interest.

4.    Respondent understands that failure to pay the civil money penalty described above may result in summary suspension of Respondent's registration, pursuant to PCAOB Rule 5304(a), following written notice to Respondent at the address on file with the PCAOB at the time of the issuance of this Order.

C.    *Undertakings related to improper audit documentation violations*—Pursuant to Section 105(c)(4)(G) of the Act and PCAOB Rule 5300(a)(9), KPMG S.A.S. shall complete the following undertakings:

1. Initial Undertakings—Within 90 days from the issuance of this Order, the Firm shall establish, revise, or supplement, as necessary, policies and procedures, including monitoring procedures, to provide the Firm with reasonable assurance that (a) personnel perform all professional responsibilities with integrity; (b) personnel prepare, archive, and maintain audit documentation in a manner that meets applicable professional standards, regulatory requirements, and the Firm's standards of quality; (c) personnel comply with applicable professional standards, regulatory requirements, and the Firm's standards of quality concerning cooperation with PCAOB inspections and investigations; (d) the foregoing policies and procedures are suitably designed and are being effectively applied; and (e) the foregoing policies and procedures are communicated in a manner that provides reasonable assurance that those policies and procedures are understood and complied with (including, but not limited to, all relevant policies and procedures being made available and communicated in Spanish).

2. Certification—Within 150 days of the issuance of this Order, the Firm shall provide a certification, signed by its Country Senior Partner, to the Director of the PCAOB's Division of Enforcement and Investigations ("DEI"), stating that the Firm has complied with paragraph IV.C.1, above. The certification shall identify the actions undertaken to satisfy the conditions specified above (including any remedial actions taken prior to the issuance of this Order), provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. KPMG S.A.S. shall also submit such additional evidence of, and information concerning, compliance as the staff of the Division of Enforcement and Investigations may reasonably request.

3. Additional Firm Undertakings—

   a. For two years from the issuance of this Order, the Firm will promptly report to the PCAOB Director of DEI any allegation of improper document alterations in connection with (i) any audit subject to the PCAOB's jurisdiction, or (ii) any PCAOB inspection or investigation.

   b. For six years from the issuance of this Order, within one week after being notified that the Firm will be inspected, the Firm shall notify personnel of the inspection and shall specifically instruct personnel of their obligation to cooperate with Board inspections, including by not altering audit documentation subject to PCAOB inspection or otherwise preparing or

**19**

making available to the Board's inspectors documents containing misleading information.

c.   No later than thirty days after the issuance of this Order, the Firm shall provide an electronic or paper copy of this Order to all of its associated persons.

D.   *Undertakings related to improper answer sharing violations*—Pursuant to Section 105(c)(4)(G) of the Act and PCAOB Rule 5300(a)(9), KPMG S.A.S. shall complete the following undertakings:

1.   Within 360 days of the issuance of this Order, a committee composed of KPMG S.A.S. or KPMG Advisory, Tax & Legal S.A.S. professionals acceptable to the DEI staff (the "Special Committee") shall complete the steps reasonably necessary to: (i) determine the extent to which audit professionals violated ethics and integrity requirements in connection with training examinations since January 1, 2020, (ii) identify the professionals who committed or were otherwise responsible for such violations, and (iii) recommend any employment actions or other remedial steps, to KPMG S.A.S.'s Disciplinary Committee that the Special Committee deems appropriate ("Special Committee Investigation").

2.   Within 90 days of completing the Special Committee Investigation, the Special Committee shall deliver to KPMG S.A.S.'s Executive Committee and Country Senior Partner a detailed report ("Special Committee Report of Investigation") summarizing the investigative steps it has taken, and any employment actions or other remedial steps it recommends be taken.

E.   *Independent Consultant*—Pursuant to Section 105(c)(4)(G) of the Act and PCAOB Rule 5300(a)(8) and (9):

1.   Within 60 days of the issuance of this Order, KPMG S.A.S. shall retain an independent consultant ("Independent Consultant"), not unacceptable to the PCAOB DEI staff. The Independent Consultant shall have, at a minimum, the following qualifications: (i) demonstrated expertise conducting ethics and integrity investigations; (ii) experience designing or reviewing compliance policies, procedures, and controls relating to ethics and integrity; and (iii) knowledge concerning PCAOB quality control standards. The Firm may not retain as Independent Consultant any person who has been employed by or had a professional relationship with the Firm, any other KPMG Global

Order
PCAOB Release No. 105-2022-034
December 6, 2022

member or affiliate firm, or any audit client of the Firm in the previous two years; and the Firm shall require the Independent Consultant to agree not to enter into any employment or other professional relationship with the Firm, any other KPMG Global member or affiliate firm, or any audit client of the Firm for two years following the expiration of the consultancy.

2.  KPMG S.A.S. shall provide to the PCAOB DEI staff a copy of the engagement letter detailing the scope of the Independent Consultant's responsibilities. The Special Committee shall deliver to the Independent Consultant the Special Committee Report of Investigation at the same time as it provides such report to KPMG S.A.S.'s Executive Committee and Country Senior Partner as specified in paragraph IV.D.2., above. KPMG S.A.S. shall require that the Independent Consultant:

    a.  perform a review (the "IC Review of Quality Controls") of KPMG S.A.S.'s policies and procedures relating to training to determine whether they are designed and being implemented in a manner that provides reasonable assurance of compliance with all professional standards, including whether (i) the Firm's ethics and integrity training and guidance is adequate and sufficient; and (ii) the Firm is deploying proper resources and oversight for compliance with ethics and integrity requirements; and

    b.  review and assess (the "IC Review of Investigation") the Special Committee Investigation (including, without limitation, by reviewing the Special Committee Report of Investigation) and whether KPMG S.A.S. (i) has taken reasonable steps to identify, and to determine the extent to which, those audit professionals who engaged in improper exam sharing since January 1, 2020, and (ii) has followed the Special Committee's recommended employment actions or other remedial steps.

3.  To ensure the independence of the Independent Consultant, the Firm (i) shall not have the authority to terminate the Independent Consultant or substitute another independent consultant for the initial Independent Consultant, without the prior written approval of the PCAOB DEI staff; and (ii) shall compensate the Independent Consultant and persons engaged to assist the Independent Consultant for services rendered pursuant to this Order at their reasonable and customary rates.

4.  KPMG S.A.S. shall cooperate fully with the Independent Consultant and shall provide reasonable access to information and records as the Independent

Consultant may reasonably request, subject to KPMG S.A.S.'s right to withhold from disclosure any information or records protected by any applicable protection or privilege, such as the attorney-client privilege or the attorney work product doctrine. The Independent Consultant shall have the right to interview any partner, employee, agent, or consultant of KPMG S.A.S. concerning any matter within or relating to the IC Review of Quality Controls or the IC Review of Investigation.

5. After the IC Review of Quality Controls and the IC Review of Investigation are completed, but no later than 90 days after receiving the Special Committee Report of Investigation, the Independent Consultant shall issue a written report (the "IC Report") to KPMG S.A.S.: (i) summarizing its work; (ii) making recommendations, as the Independent Consultant deems appropriate, reasonably designed to ensure that KPMG S.A.S.'s policies and procedures relating to the topics discussed in paragraph IV.E.2.a., above, are adequate and sufficient to provide reasonable assurance of compliance with all relevant professional standards relating to training; (iii) describing its review of KPMG S.A.S.'s training and making additional recommendations, as the Independent Consultant deems appropriate, regarding ethics and integrity training; (iv) making recommendations, as the Independent Consultant deems appropriate, reasonably designed to ensure that the Special Committee has taken reasonable steps to identify, and to determine the extent to which, audit professionals who engaged in improper exam conduct since January 1, 2020, including recommending additional investigative steps for the Special Committee to take; and (v) making recommendations, as the Independent Consultant deems appropriate, reasonably designed to ensure that KPMG S.A.S. has taken appropriate employment actions or other remedial steps in light of the findings of the Special Committee Investigation.

6. After receiving the IC Report, the Firm shall implement any recommendations contained therein as soon as practicable, except that the Firm may notify the Independent Consultant within 30 days of receiving the IC Report of any recommendations that the Firm believes to be unnecessary, impractical, unduly burdensome, or outside the scope of this Order, and the bases of the Firm's objection(s). In connection with that notification, the Firm may propose alternative policies and procedures that it believes will achieve the objectives of the recommendations contained in the IC Report. The Firm and the Independent Consultant shall engage in good-faith negotiations concerning any objection raised by the Firm, but if the Firm and the

Order
PCAOB Release No. 105-2022-034
December 6, 2022

Independent Consultant are unable to come to agreement within 45 days, the Firm shall be required to adopt the Independent Consultant's recommendations to which it objects.

7.  At the conclusion of the negotiation process described in paragraph IV.E.6, above, KPMG S.A.S. shall require the Independent Consultant to provide a copy of the IC Report to the PCAOB DEI staff.

F.  For good cause shown, the PCAOB DEI staff may extend any of the deadlines contained in Sections IV.C., IV.D., and IV.E. of this Order. The time periods in Sections IV.C., IV.D., and IV.E. of this Order shall be determined in accordance with PCAOB Rule 1002, *Time Computation*.

G.  The Firm agrees that DEI may petition the Board to reopen this matter to determine whether additional sanctions or findings are appropriate if DEI believes that the Firm has not satisfied any provision in Section IV of this Order.

ISSUED BY THE BOARD.

/s/  Phoebe W. Brown

_____
Phoebe W. Brown
Secretary

December 6, 2022

23