# EXHIBIT G



1666 K Street NW
Washington, DC 20006

Office: 202-207-9100
Fax: 202-862-8430

www.pcaobus.org

**Order Instituting Disciplinary Proceedings, Making Findings, and Imposing Sanctions**

*In the Matter of BDO USA, P.C., Kevin Olvera, CPA, and Michael Musick, CPA,*

Respondents.

PCAOB Release No. 105-2023-024

September 26, 2023

By this Order Instituting Disciplinary Proceedings, Making Findings, and Imposing Sanctions ("Order"), the Public Company Accounting Oversight Board ("Board" or "PCAOB") is:

(1) Censuring BDO USA, P.C. ("BDO" or the "Firm"), Kevin Olvera, CPA ("Olvera"), and Michael Musick, CPA ("Musick");

(2) Imposing civil money penalties in the amounts of $2,000,000 upon BDO, $35,000 on Olvera, and $25,000 on Musick;

(3) Limiting Olvera's activities in connection with any "audit," as that term is defined in Section 110(1) of the Sarbanes-Oxley Act of 2002, as amended (the "Act"), for a period of one year following the date of this Order, as described in Section IV hereto; and

(4) Requiring that Olvera and Musick complete twenty hours of continuing professional education ("CPE"), in addition to any CPE required in connection with any professional license.

The Board is imposing these sanctions on the basis of its findings that BDO, Olvera, and Musick (collectively, "Respondents") violated PCAOB rules and standards in connection with BDO's audit of the fiscal year 2017 financial statements of AAC Holdings, Inc. (the "Audit").

I.

The Board deems it necessary and appropriate, for the protection of investors and to further the public interest in the preparation of informative, accurate, and independent audit

reports, that disciplinary proceedings be, and hereby are, instituted pursuant to Section 105(c) of the Act and PCAOB Rule 5200(a)(1) against Respondents.

II.

In anticipation of the institution of these proceedings, and pursuant to PCAOB Rule 5205, Respondents have each submitted an Offer of Settlement (collectively, "Offers") that the Board has determined to accept. Solely for purposes of these proceedings and any other proceedings brought by or on behalf of the Board, or to which the Board is a party, and without admitting or denying the findings herein, except as to the Board's jurisdiction over Respondents and the subject matter of these proceedings, which is admitted, Respondents consent to the entry of this Order as set forth below.[1]

III.

On the basis of Respondents' Offers, the Board finds that:[2]

## A.    Respondents

1.      **BDO USA, P.C.**, a Virginia professional corporation, is a public accounting firm headquartered in Chicago, Illinois, and registered with the Board pursuant to Section 102 of the Act and PCAOB rules. The Firm has offices throughout the U.S. and is licensed in multiple jurisdictions, including under the name BDO USA LLP in Illinois (license no. 066003607). BDO served as the auditor of AAC Holdings, Inc. ("AAC") from 2011 until at least June 2019.[3] On February 23, 2018, BDO issued an audit report in connection with the Audit that contained the

---

[1]      The findings herein are made pursuant to Respondents' Offers and are not binding on any other person or entity in this or any other proceeding.

[2]      The Board finds that Respondents' conduct described in this Order meets the conditions set out in Section 105(c)(5) of the Act, 15 U.S.C. § 7215(c)(5), which provides that certain sanctions may be imposed in the event of: (1) intentional or knowing conduct, including reckless conduct, that results in a violation of the applicable statutory, regulatory, or professional standard; or (2) repeated instances of negligent conduct, each resulting in a violation of the applicable statutory, regulatory, or professional standard.

[3]      At all times relevant to this matter, BDO USA, LLP served as the auditor of AAC. However, effective July 1, 2023, the Firm converted from BDO USA, LLP, a limited liability partnership organized under the laws of the state of Delaware, to BDO USA, P.A., a professional service corporation organized under the laws of the state of Delaware. Subsequently, on August 30, 2023, the Firm converted from BDO USA, P.A. to BDO USA, P.C., a professional corporation organized under the laws of the state of Virginia.

Firm's unqualified opinion that AAC's 2017 financial statements presented fairly, in all material respects, AAC's financial position, results of operations, and cash flows in conformity with U.S. Generally Accepted Accounting Principles. Many of the BDO auditors working on the 2017 Audit of AAC worked out of BDO's Nashville, Tennessee office.

2.    **Kevin Olvera** is a certified public accountant licensed by the state of Texas (license no. 111136). He is a partner in BDO's Dallas, Texas office, and an associated person of a registered public accounting firm as that term is defined in Section 2(a)(9) of the Act and PCAOB Rule 1001(p)(i). Olvera served as an assisting partner for BDO's audit of AAC's 2016 financial statements. BDO then assigned him to serve as a Focused Consulting Reviewer ("FCR") on the 2017 Audit and on BDO's audit of AAC's 2018 financial statements. As the FCR on the Audit, Olvera was assigned to provide technical expertise to the engagement team on areas related to revenue and accounts receivable, and to review the engagement team's Audit work to determine whether certain risks relating to those audit areas (which are the subject of this Order) were adequately addressed.

3.    **Michael Musick** is a certified public accountant licensed by the state of Tennessee (license no. 19300). He is a partner in BDO's Nashville, Tennessee office, and an associated person of a registered public accounting firm as that term is defined in Section 2(a)(9) of the Act and PCAOB Rule 1001(p)(i). Musick was the Engagement Quality Review ("EQR") partner on the 2017 Audit.

## B.    Relevant Entity

4.    **AAC** was, at all relevant times, a Nevada corporation headquartered in Brentwood, Tennessee. The company provided healthcare services to clients with drug and alcohol addiction, including testing, diagnostic, behavioral and treatment services. At all relevant times, AAC's common stock was registered under Section 12(b) of the Securities Exchange Act of 1934. At all relevant times, AAC was an issuer as that term is defined in Section 2(a)(7) of the Act and PCAOB Rule 1001(i)(iii). AAC was delisted from the New York Stock Exchange and filed for bankruptcy protection by June 2020.

## C.    Summary

5.    This matter concerns Respondents' violations of PCAOB rules and auditing standards in connection with BDO's Audit of the financial statements of AAC for fiscal year ended December 31, 2017. Respondents failed to fulfill their respective roles in evaluating significant accounting estimates that AAC used to value substantially all of its client-related revenue and related accounts receivable ("AR") for 2017. In April 2019, AAC restated its 2017

**3**

annual financial statements and its prior-year annual financial statements (the "Restatement"), reducing reported AR by 32% and 47%, respectively. AAC filed for bankruptcy 14 months later.

6.       At all times relevant to this matter, AAC provided healthcare services to clients suffering from substance addiction and behavioral health problems. AAC derived over 90% of its 2017 client-related revenue based on claims it billed to insurance companies and other third-party payors ("insurers") for reimbursement of services that AAC had provided to clients.

7.       In its Form 10-K for fiscal year 2017, AAC publicly disclosed that it recognized its client service revenue and AR by estimating the amounts it expected to realize for the services it provided. Specifically, AAC management estimated: (a) the amounts that insurers would pay for covered services at "out-of-network" rates (which AAC referred to as the Estimated Insurance Value ("EIV")); (b) additional amounts insurers would pay as a result of AAC's appeals of claims  where the payment received from the insurer was abnormally low (claims that AAC referred to as "Short Pay" claims); and (c) an allowance for doubtful accounts for AR that could become uncollectible in the future (the "AR Allowance"). Despite identifying each of those three estimates as a "significant accounting estimate" during the 2017 Audit, the BDO engagement team failed to obtain sufficient appropriate audit evidence for any of them, and Olvera, in his role as FCR, failed to identify these deficiencies. As described below, those failures occurred despite Respondents encountering several red flags calling into question the reasonableness of the estimates.

8.       With respect to the EIV, for example, AAC publicly disclosed that this estimate was "based on [AAC's] historical collection experience," which included considering the type of services provided and collection histories on a per facility basis. During the Audit, however, Respondents knew that AAC was excluding its collection experience for Short Pay claims from the calculation of the EIV for six-to-twelve months, or more. Despite that knowledge, the engagement team failed to adequately evaluate the effect of those exclusions on the reasonableness of the EIV.

9.       With respect to Short Pay claims, Respondents were aware that the relevant estimate had arisen out of a recent policy change AAC management had adopted. Prior to the second half of 2016, AAC's practice was to close Short Pay claims when any partial reimbursement was received, writing off the disallowed portion. However, under the new policy, AAC began keeping Short Pay claims open and estimating that it would recover through an appeals process approximately 50% of the disallowed portion of the insurance reimbursement it had initially expected (the "50% success rate"). During the 2017 Audit, the engagement team failed to obtain sufficient audit evidence supporting AAC's 50% success rate estimate, despite knowing of certain data indicating that AAC may be falling significantly short of achieving that projection.

Order
PCAOB Release No. 105-2023-024
September 26, 2023

10.    With respect to AAC's AR Allowance, Respondents were aware that PCAOB inspectors had identified the Firm's failure to sufficiently test the AR Allowance during BDO's audit of AAC's 2015 financial statements. Nevertheless, when the engagement team conducted the Audit for 2017, it also failed to perform sufficient procedures to evaluate AAC's AR Allowance. The engagement team and Olvera, as the FCR, failed to obtain a sufficient understanding of how AAC management developed the AR Allowance estimate and its key assumptions – *e.g.*, loss rates. The engagement team also failed to adequately test AAC's process for developing the estimate and related assumptions, despite having planned to do so. Instead, the engagement team and Olvera concluded that the 2017 AR Allowance was a reasonable estimate based primarily on their reliance on a flawed "hindsight analysis" that had been developed by AAC and which inappropriately compared gross and net numbers.

11.    In sum, the engagement team and Olvera failed to appropriately evaluate three separate significant accounting estimates. As a result, BDO and Olvera violated numerous PCAOB standards, as described below.

12.    In addition, in the 2017 Audit, Musick failed to perform his EQR with due professional care in violation of AS 1220, *Engagement Quality Review*.

## D.    Background

13.    AAC was primarily an "out-of-network" healthcare provider, which is a provider that does not have contractual agreements dictating agreed rates to be paid by insurers. As such, AAC assumed some risk by providing services to clients and then billing insurers without having agreed-upon contractual reimbursement rates for services. For 2017, more than 92% of AAC's reported client-related revenues were from insurers, and approximately 79% were paid by insurers at out-of-network rates.

14.    For 2017, AAC disclosed in its Form 10-K that it accounted for its client service revenue and AR by estimating net realizable value.[4] Specifically, AAC disclosed that it recorded client service revenue at its established billing rates less an adjustment to reflect the amount it expected to be reimbursed by an insurer based on historic adjustments for out-of-network services not under contract. AAC referred to that adjusted amount as the Estimated Insurance Value, EIV. AAC updated its EIV percentage as of the end of each reporting period. AAC's average EIV rate was 45% at year-end 2016 and 36% at year-end 2017.

---

[4]    *See* Accounting Standards Codification ("ASC") 954-310-30-1, -35-1, -45-1; ASC 954-605-25-4, -605-45-2, -605-45-4.

15.	A portion of AAC's AR related to Short Pay claims, those for which insurers had determined an allowable charge that was less than half of AAC's gross charges for services provided at its facilities.[5] For each Short Pay claim, AAC applied a 50% success rate against the portion of the claim's current-period EIV that the insurer had not paid, thus continuing to recognize half of the unpaid current-period EIV as AR ("Short Pay AR"). AAC disclosed in its 2017 Form 10-K that it was continuing to pursue collection of the Short Pay AR.

16.	AAC also disclosed that it recorded AR for amounts due from insurers net of the EIV and net of the AR Allowance. The AR Allowance for doubtful accounts reflected management's estimate of AR that could become uncollectible in the future. The recorded value of a particular receivable, however, could vary from period to period because AAC applied its updated EIV rate to outstanding AR at the end of each period.

## E.	BDO and Olvera Violated PCAOB Rules and Auditing Standards During the 2017 Audit

### i.	Relevant PCAOB Auditing Standards

17.	In connection with the preparation or issuance of an audit report, PCAOB rules require that a registered public accounting firm and its associated persons comply with the PCAOB's auditing and related professional standards.[6] An auditor is in a position to express an unqualified opinion on an issuer's financial statements when the auditor has conducted an audit in accordance with PCAOB standards and concludes that the financial statements, taken as a whole, are presented fairly, in all material respects, in conformity with the applicable financial reporting framework.[7]

---

[5]	For services provided at AAC's labs, the company generally defined a Short Pay claim as one reimbursed at less than 10% of gross charges for services provided.

[6]	*See* PCAOB Rule 3100, *Compliance with Auditing and Related Professional Practice Standards*; PCAOB Rule 3200, *Auditing Standards*. All references to PCAOB rules and standards in this Order are to the versions of those rules and standards, and to their organization and numbering, in effect at the time of the 2017 Audit.

[7]	*See* AS 3101.02, *The Auditor's Report on an Audit of Financial Statements When the Auditor Expresses an Unqualified Opinion*; *see also* AS 2810.30-.31, *Evaluating Audit Results* (requiring auditors to evaluate whether the financial statements are presented fairly, in all material respects, in conformity with the applicable financial reporting framework, including whether the financial statements contain the information essential for a fair presentation).

18.    PCAOB standards require that an auditor exercise due professional care in planning and performing an audit and in the preparation of the report.[8] Due professional care requires that the auditor exercise professional skepticism, which is an attitude that includes a questioning mind and a critical assessment of audit evidence.[9] Professional skepticism requires "an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred."[10]

19.    Auditors are required to plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis for the opinion expressed in the auditor's report, including obtaining reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.[11] PCAOB standards provide that management representations "are part of the evidential matter the independent auditor obtains, but they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit."[12] Inquiry of company personnel, by itself, does not provide sufficient audit evidence to reduce audit risk to an appropriately low level for a relevant assertion.[13]

20.    PCAOB standards provide that an auditor should identify and assess the risks of material misstatement at the financial statement level and assertion level; in doing so, the auditor should identify significant accounts and disclosures and their relevant assertions.[14] PCAOB standards also require an auditor to design and implement audit responses that address the identified and assessed risks of material misstatement for each relevant assertion of each significant account and disclosure.[15] PCAOB standards require an auditor to design and perform

---

[8]      *See* AS 1015.01, *Due Professional Care in the Performance of Work*.

[9]      *See id*. at .07; AS 2301.07, *The Auditor's Responses to the Risks of Material Misstatement*; AS 2401.13, *Consideration of Fraud in a Financial Statement Audit*.

[10]     AS 2401.13.

[11]     *See* AS 1105.04, *Audit Evidence*; AS 2401.01, .12.

[12]     AS 2805.02, *Management Representations*.

[13]     *See* AS 1105.17, Note.

[14]     AS 2110.59, *Identifying and Assessing Risks of Material Misstatement*.

[15]     *See* AS 2301.08.

audit procedures, including substantive procedures and tests of details, that are specifically responsive to the assessed significant risks and fraud risks.[16]

21.     PCAOB standards require an auditor to document "the procedures performed, evidence obtained, and conclusions reached with respect to relevant financial statement assertions."[17] "Audit documentation must clearly demonstrate that the work was in fact performed."[18]

22.     The auditor is responsible for evaluating the reasonableness of management's accounting estimates in the context of the financial statements taken as a whole.[19] The auditor's objective when evaluating accounting estimates includes obtaining sufficient appropriate evidential matter to provide reasonable assurance that all accounting estimates that could be material to the financial statements are reasonable in the circumstances, are presented in conformity with applicable accounting principles, and are properly disclosed.[20] In evaluating the reasonableness of an estimate, the auditor normally concentrates on key factors and assumptions that are significant to the estimate.[21]

23.     When evaluating the reasonableness of an estimate, the auditor should obtain an understanding of how management developed the estimate, and should use one or a combination of three approaches: (1) reviewing and testing the company's process to develop the accounting estimate; (2) developing an independent expectation of the estimate to corroborate the reasonableness of management's estimate; and (3) reviewing subsequent events and transactions occurring prior to the date of the auditor's report.[22]

24.     As described below, the Firm and Olvera violated these and other standards in performing the 2017 Audit.

---

[16]     *See id*. at .11, .13.

[17]     AS 1215.06, *Audit Documentation*.

[18]     *Id.*

[19]     AS 2501.04, *Auditing Accounting Estimates*.

[20]     *Id*. at .07.

[21]     *Id*. at .09.

[22]     *Id*. at .10.

### ii.    The Materiality and Risk Assessments for the 2017 Audit

25.    For 2017, AAC reported total revenue of $318 million, $309 million of which was client-related, and a net loss of $25.1 million. AAC also reported, as of year-end 2017, AR net of the AR Allowance of $94 million, which represented approximately 22% of AAC's total reported assets. For the Audit, the engagement team set a materiality level of $3 million. Musick, the EQR partner, concurred with that materiality level.

26.    During the Audit, the engagement team identified AAC's EIV, Short Pay claims, and the AR Allowance as significant accounting estimates. The team also assessed there to be a significant risk of material misstatement related to revenue recognition, Short Pay claims, and the AR Allowance.

27.    The engagement team identified revenue recognition as posing a significant risk of material misstatement and a fraud risk because it was "an area of judgment / estimates." In particular, the engagement team identified a risk that management would "manipulate" the raw data utilized in recording the quarterly EIV adjustments. Part of the reason for the engagement team's identification of the fraud risk was due to the complexity of AAC's process to organize its data to record revenue and the fact that much of the process was manual.

28.    The engagement team also identified a significant risk of material misstatement related to Short Pay claims because those claims involved estimates and "the application of subsequent collection information."

29.    Finally, the engagement team identified AAC's AR Allowance as having a significant risk of material misstatement because the AR Allowance was judgmental in nature and required use of estimates by management.

30.    During the 2017 Audit, the engagement team and Olvera were each aware of these significant risks associated with AAC's EIV, Short Pay claims, and AR Allowance. They were also aware that the estimates had a significant effect on AAC's revenue and AR. In response, the engagement team planned to assess the reasonableness of the EIV, Short Pay, and AR Allowance estimates primarily through substantively testing the process used by management to develop the estimates.[23]

31.    However, the engagement team failed to design and perform sufficient substantive procedures that (a) specifically responded to the above risks, and (b) adequately

---

[23]    *See id.* at 10(a), .11.

Order
PCAOB Release No. 105-2023-024
September 26, 2023

tested management's process for developing the above estimates. Similarly, Olvera failed to identify these deficiencies when performing his focused consulting review.

### iii.    BDO and Olvera Failed to Appropriately Evaluate the EIV

32.    As noted above, AAC recorded the majority of its client service revenue and AR by estimating, through the EIV, the amount insurers would pay for AAC's services at out-of-network rates. During the 2017 Audit, the engagement team failed to obtain sufficient appropriate audit evidence for AAC's EIV, and thus for AAC's reported revenue and AR, and Olvera failed to identify these deficiencies in his focused consulting review. They failed to do so, despite being aware of information indicating that revenue and AR may have been overstated due to an inappropriately high EIV.

33.    Each quarter, AAC determined the EIV by analyzing, on a facility-by-facility basis, claims that it had (a) billed to insurers, (b) received some payment for, and (c) closed in either the prior six or twelve months. Using that information, AAC calculated an EIV rate for each facility and applied that rate to all unsettled/open client service claims from the related facility. AAC then used the current EIV rate to adjust its recorded revenue and AR.

34.    For the 2017 Audit, the BDO engagement team performed certain testing on AAC's EIV estimate, but that testing did not address an issue that the team and Olvera knew affected the EIV: AAC's change in approach to Short Pay claims, which created a risk that the EIV, and thus AAC's revenue and AR, could be materially inflated.

35.    Specifically, the engagement team and Olvera knew that, prior to late 2016, AAC's policy was to close a short-paid claim when the company received any reimbursement from the insurer. In late 2016, however, AAC changed that policy, retroactive to mid-2016, and began to keep Short Pay claims open. AAC kept those claims open while it appealed to the insurers for reimbursement of the disallowed amounts. The engagement team and Olvera were aware that the appeal process could take six-to-twelve months from the payment date, or longer.

36.    Because AAC calculated its EIV rate based only on closed claims, the policy change to keep open Short Pay claims, which by definition involved initially low reimbursement by insurers, had a material effect on AAC's revenue and AR. Indeed, in a BDO work paper that Olvera reviewed, AAC management calculated that the exclusion of open Short Pay claims from the EIV rate calculation for the last two quarters in 2016 resulted in a $15 million increase to 2016 revenue, and an $11 million increase to year-end 2016 AR, net of the AR Allowance, and before applying a success rate reduction.

Order
PCAOB Release No. 105-2023-024
September 26, 2023

37.    The engagement team and Olvera also knew that AAC identified approximately 65% more gross AR for Short Pay claims[24] in 2017 than in 2016, and thus the impact of excluding open Short Pay claim histories in the EIV rate calculation had an even greater impact on revenue and AR in 2017 than in 2016. Yet, during the 2017 Audit, the engagement team and Olvera, in his role as FCR, failed to appropriately consider the effects of AAC's continuing to exclude open Short Pay claims when evaluating the reasonableness of AAC's EIV.

38.    *First*, the engagement team failed to obtain an understanding of the magnitude of the effect that AAC's new Short Pay approach had on the 2017 EIV rate and thus on AAC's 2017 revenue and AR.

39.    *Second*, despite planning to do so, the engagement team also failed to adequately test whether AAC had been successful in obtaining additional reimbursements on Short Pay claims since the change in policy at the end of 2016. For example, during Audit planning, to address the significant risks presented by the Short Pay estimate, the engagement team documented that "[a]s this issue only arose in the 4th quarter of the prior year, the Company has not had significant collection data available. BDO will begin to evaluate [Short Pay historical collection data] in the 3rd quarter of 2017 and will continue to analyze the collection information as it becomes available to evaluate management's estimate of short pays." During the Audit, though, the engagement team concluded that there was still not sufficient collection data on the 2016 Short Pay claims to reliably indicate AAC's future success in seeking additional reimbursements on Short Pay claims. But the engagement team relied on management representations about the sufficiency of the collection data; it failed to perform adequate procedures to evaluate whether AAC was succeeding or failing in collecting additional reimbursements on Short Pay claims.

40.    *Third*, as discussed further below, the engagement team and Olvera failed to address the fact that one of the assumptions that management made in adopting its new approach to Short Pay claims—that AAC would have a 50% success rate in pursuing additional reimbursement on those claims—itself demonstrated that AAC's EIV was improperly inflated. That 50% success rate reflected management's assumption that, when resubmitting or appealing a Short Pay claim, the expected reimbursement would be at a much lower level than on an original claim. That expectation of lower reimbursements on certain claims, however, was not captured in the EIV until AAC closed the claim after engaging in the lengthy resubmission/appeals process.

---

[24]    Gross AR for a Short Pay claim reflected AAC's original billing reduced by the initial payment by the insurer, but not reduced by the EIV, the 50% success rate, or the AR Allowance.

41.     Because the engagement team and Olvera, as the FCR, did not identify or address the material effects that AAC's revised approach to Short Pay claims had on the EIV for 2017, they failed to appropriately evaluate the reasonableness of that significant estimate. Accordingly, BDO and Olvera violated PCAOB standards.[25]

### iv.    BDO and Olvera Failed to Appropriately Evaluate AAC's 50% Success Rate Estimate on Short Pay Claims

42.     AAC's change in approach to Short Pay claims not only affected the EIV rate applied to value revenue and AR, the change also directly increased AAC's AR balance by including an entire category of AR previously excluded from the balance—Short Pay AR. Specifically, because AAC started delaying its closing of Short Pay claims, it also delayed writing off the portion of the claim's EIV that the insurer had not paid.

43.     As noted above, however, AAC recognized that it was unlikely to receive reimbursement on Short Pay claims at the same rate as on original claims. For each Short Pay claim, therefore, AAC calculated the difference between what it had initially expected to receive from the insurer and what it actually received; then it applied an estimated success rate of around 50% to that difference (*i.e.*, Short Pay AR). In its 2017 Form 10-K, AAC reported Short Pay AR of $14.6 million, net of the AR Allowance, which was more than four times the materiality level BDO's engagement team had established for the Audit. Despite the significance of the 50% success rate estimate, the engagement team failed to obtain sufficient evidence to support it.

44.     AAC first adopted the 50% success rate estimate in late 2016 in consultation with its external legal counsel ("External Counsel"), who stated that he had significant experience representing out-of-network providers in appeals of underpayments of healthcare receivables. In an email exchange during the 2016 audit among the External Counsel, AAC management, and BDO's 2016 engagement partner, the External Counsel stated that a success rate of 50% to 65% was reasonable. During the 2016 audit, members of the BDO engagement team held a telephone call with the External Counsel about Short Pay claims, but they did not obtain any data or other evidence from him supporting the 50% success rate estimate, nor did they obtain a reasonable understanding of any data, methods, or assumptions used by the External Counsel. In fact, when the 2016 engagement partner consulted internally at BDO about "industry statistics related to success by providers in resubmissions/reconsiderations/appeals," he was informed that "such data is not published and is often difficult to correlate from one entity to another entity." These communications with the External Counsel, and the internal

---

[25]     *See* AS 2501.04, .10.

Order
PCAOB Release No. 105-2023-024
September 26, 2023

consultation, were documented in BDO's work papers for the 2016 audit of AAC. Going into the 2017 Audit, Olvera had reviewed the 2016 work papers relating to Short Pay claims.

45.     As noted above, during the 2017 Audit, the Audit engagement team planned to analyze AAC's success in seeking further collections on Short Pay claims. In fact, doing so was required under PCAOB standards because the engagement team had specifically identified "the application of subsequent collection information" as creating a significant risk of material misstatement for Short Pay claims. Having identified that risk as significant, the team needed to perform tests of details responsive to it.[26]

46.     Yet the engagement team performed no such tests during the 2017 Audit, nor did Olvera, in his role as FCR, question the lack of such testing. The engagement team did not test how much Short Pay AR AAC had collected during 2017, how many Short Pay claims AAC had closed, or how many re-bills/appeals of Short Pay claims AAC was pursuing.

47.     Moreover, although Olvera had a follow-up call with the External Counsel during the 2017 Audit, the External Counsel merely stated that he still maintained the positions he had advanced during the 2016 audit, without providing any further support.

48.     The engagement team and Olvera continued to point to the discussions with the External Counsel to support the 50% success rate estimate during the 2017 Audit, using that information as audit evidence. Notably, the engagement team did not follow the requirements under PCAOB standards for using the External Counsel's work as that of a specialist's.[27] To do so, the team would have had to obtain an understanding of the methods or assumptions the External Counsel had used in arriving at his 50% success rate conclusion and make appropriate tests of data that AAC provided him.[28] The engagement team and Olvera, as the FCR, did not take any of those steps. Indeed, as reflected in the Audit work papers, the engagement team obtained only a general understanding of the External Counsel's qualifications and experience in pursuing additional reimbursement on Short Pay claims.

49.     The evidence that the engagement team and Olvera reviewed during the 2017 Audit concerning AAC's success in pursuing Short Pay claims actually contradicted the 50% success rate assumption. Specifically, during the 2017 Audit, management represented to the engagement team and Olvera that AAC had obtained only about $2.1 million in additional

---

[26]     *See* AS 2301.11.

[27]     *See* AS 1210, *Using the Work of a Specialist*.

[28]     *See id.* at .09, .12.

reimbursements on Short Pay AR as of year-end 2017, well below the $10.4 million in Short Pay AR (net of the AR Allowance) that AAC had reported at the end of 2016. During the Audit, the engagement team did not test management's representation about the $2.1 million in additional reimbursements, but even assuming the accuracy of the representation, it raised questions as to whether AAC had significantly overestimated expected reimbursements of Short Pay AR. Olvera, in his role as FCR, did not identify these issues.

50.     In short, despite identifying a significant risk associated with collections on Short Pay claims, the engagement team failed to obtain sufficient evidence to support the reasonableness of AAC's 50% success rate estimate during the 2017 Audit, and Olvera failed to identify this deficiency when performing his focused consulting review. Therefore, BDO and Olvera violated PCAOB standards.

### v.     BDO and Olvera Failed to Appropriately Evaluate AAC's AR Allowance

51.     The engagement team also failed to appropriately evaluate the reasonableness of AAC's AR Allowance during the 2017 Audit. That failure occurred despite the PCAOB identifying deficiencies in BDO's work in evaluating AAC's 2015 AR Allowance less than two years earlier.

52.     In 2017 and earlier years, AAC calculated its AR Allowance by applying pre-determined loss rates against its AR. The loss rates increased as the age of the AR increased and made collection more doubtful. For AR aged 0-180 days, the loss rates typically were under 1%; for AR aged 181-240 days, the loss rate was 25%; for AR aged 241-300 days, the loss rate was 50%; for AR aged 301-360 days, the loss rate was 75%; and for AR aged more than 360 days, the loss rate was approximately 98%. AAC applied the reserve loss rates against all AR, regardless of the type of claim.

53.     During the PCAOB's 2016 inspection of BDO, PCAOB inspectors reviewed the Firm's work on the 2015 AAC audit. In September 2016, the Firm received a PCAOB inspection comment form explaining that the Firm "failed to perform sufficient procedures to test the valuation of AR in accordance with AU Section 342, *Auditing Accounting Estimates*." In its response to the comment form, the Firm accepted the PCAOB inspectors' conclusion.

54.     Thereafter, BDO's engagement teams performed additional procedures to attempt to address the deficiencies the PCAOB inspectors had identified in the Firm's evaluation of AAC's loss rates. In developing those remediation procedures, the engagement partner for BDO's 2015 and 2016 audits of AAC consulted with a partner in BDO's national office. The Firm's national office approved the remediation procedures on February 28, 2017, approximately a week before AAC's 2016 Form 10-K was filed in March 2017.

55.     In the 2017 Audit, the engagement team and Olvera continued to use a version of one of the remediation procedures developed in response to the PCAOB's 2016 inspection when they evaluated the loss rates that AAC used to establish its AR Allowance for 2017. As explained below, that procedure, which consisted of analyzing a "hindsight analysis" developed by AAC, was insufficient under PCAOB standards and did not support the reasonableness of AAC's AR Allowance.

> a.     BDO's and Olvera's Evaluation of AAC's AR Allowance

56.     As required by PCAOB standards, the 2017 engagement team planned to obtain an understanding of how AAC developed its 2017 AR Allowance.[29] The team also planned to perform procedures to test the process used by management to develop that estimate, which is one of the three approaches that PCAOB standards provide for evaluating the reasonableness of an accounting estimate.[30] However, the engagement team failed to obtain a sufficient understanding of how management developed the 2017 AR Allowance, and failed to appropriately test management's process. Olvera, in his role as FCR, did not identify those failures.

57.     The engagement team identified the above-described loss rates as key assumptions management used in developing the 2017 AR Allowance. But the engagement team's and Olvera's evaluation of the reasonableness of the AR Allowance did not concentrate on those assumptions.[31] In fact, other than documenting that the loss rates used in 2017 were determined by AAC in 2014 based on a "qualitative" "lookback analyses [*sic*] of collection trends," and that BDO last "audited" management's analysis in 2014, the engagement team and Olvera, in his role as FCR, failed to obtain any understanding of AAC's process for developing the loss rates. They also failed to obtain an understanding of what method AAC used for the 2014 qualitative analysis, the type and range of collection experience used in that analysis, and any testing that BDO personnel may have performed on those loss rates in 2014. They also

---

[29]     *See* AS 2501.10.

[30]     *See id.* During the 2017 Audit, the engagement team did not plan to use or, in fact, use either of the other two approaches PCAOB standards identify for evaluating the reasonableness of an estimate: developing an independent expectation of the estimate to corroborate the reasonableness of management's estimate, or reviewing subsequent events or transactions occurring prior to the date of the auditor's report.

[31]     As noted above, PCAOB standards provide that, in evaluating the reasonableness of an accounting estimate, the auditor "normally concentrates on key factors and assumptions" that are significant to the accounting estimate. *See* AS 2501.09.

failed to obtain an adequate understanding of any testing that BDO personnel may have performed on those loss rates after 2014.

58.    Moreover, any reliance that the engagement team and Olvera placed in the 2017 Audit on management's 2014 qualitative lookback analysis was particularly inappropriate given their awareness that the composition of, and collectability risks surrounding, AAC's AR had changed since 2014.

59.    For example, setting aside Short Pay AR, AAC's gross AR aged over one year grew from about $42 million to $100 million during 2017, and grew from 20% of total gross AR to 30% of total gross AR during 2017.[32] Such significant growth in highly aged AR was a red flag that AAC's AR population was becoming less collectable. Despite these circumstances, the engagement team concluded that there were no significant or unusual items indicating that a change in the loss rates was warranted, but that conclusion was unsupportable.

60.    In sum, because the engagement team and Olvera, in his role as FCR, failed to obtain an understanding of how AAC developed its 2017 AR Allowance estimate and failed to appropriately use any of the three authorized approaches for evaluating the reasonableness of that estimate, BDO and Olvera violated PCAOB standards.[33] Those failures were aggravated by the engagement team's and Olvera's awareness that the same deficiency had been identified during the PCAOB's 2016 inspection.

           b.    The "Hindsight Analysis" Was Not a Proper Means for Evaluating the
                 Reasonableness of the AR Allowance

61.    Instead of appropriately performing any of the three approaches that PCAOB standards provide for evaluating the reasonableness of an accounting estimate,[34] the engagement team purported to assess the reasonableness of AAC's 2017 AR Allowance by relying on a modified version of the hindsight analysis that AAC had developed and BDO had analyzed as part of its remediation of deficiencies identified during the 2016 PCAOB inspection.

62.    Under PCAOB standards, however, a hindsight analysis or retrospective review is not one of the methods that PCAOB standards recognize for evaluating the reasonableness of,

---

[32]    Because Short Pay AR was not recognized by AAC from 2014 through the second quarter of 2016, and AAC did not recognize in 2016 any Short Pay AR aged over one year, this comparison excludes Short Pay AR from the analysis.

[33]    *See* AS 2501.10; AS 1015.01, .07.

[34]    *See* AS 2501.10.

and obtaining sufficient appropriate audit evidence to support, significant accounting estimates.[35] Rather, a hindsight analysis or retrospective review is a procedure that is designed to provide the auditor "*additional* information about whether there may be a possible bias on the part of management in making the current-year estimates."[36]

63.    In fact, with a hindsight analysis or retrospective review, an auditor does not directly evaluate a company's current-year estimates. Instead, the auditor assesses "significant accounting estimates reflected in the financial statements *of the prior year* to determine whether management judgments and assumptions relating to the estimates indicate a possible bias on the part of management."[37]

64.    As described in detail below, that was precisely the nature of the hindsight analysis on which the engagement team relied when evaluating the reasonableness of AAC's 2017 AR Allowance, and on which Olvera relied when performing his focused consulting review. Specifically, the hindsight analysis developed by AAC assessed, in retrospect, whether AAC's AR allowance as of year-end 2016 still appeared to provide adequate loss coverage. The analysis then assumed similar coverage in 2017 to draw conclusions about the sufficiency of AAC's 2017 AR Allowance. Under PCAOB standards, the engagement team and Olvera could not satisfy their obligation to evaluate the reasonableness of AAC's AR Allowance by reviewing the company-developed hindsight analysis.

          c.    The Hindsight Analysis Was Flawed

65.    BDO's and Olvera's reliance on the particular hindsight analysis used in the 2017 Audit was also inappropriate because the analysis was fatally flawed.

66.    In general, the 2017 hindsight analysis began by considering the adequacy of AAC's AR Allowance at year-end 2016 ("2016 AR Allowance"). Specifically, the analysis compared the 2016 AR Allowance to the sum of (a) the 2016 AR that AAC had actually written off as uncollectible bad debt during 2017 ("2016 AR Actual Write-Offs") and (b) "assumed bad debt write offs" on AR from year-end 2016 that still remained on AAC's books at year-end 2017. The hindsight analysis then rolled certain aspects of the calculations forward to 2017. Ultimately, AAC concluded that the AR Allowance coverage of AR was sufficiently similar between the two years, and because of that, the 2017 "hindsight analysis . . . supported

---

[35]    *See id.* at .01, .07, .10.

[36]    AS 2401.64 (emphasis added).

[37]    *Id.* (emphasis added).

Order
PCAOB Release No. 105-2023-024
September 26, 2023

management's estimation process of establishing the allowance for doubtful accounts at December 31, 2017."

67.     During the 2017 Audit, the engagement team and Olvera reviewed AAC's 2017 hindsight analysis and agreed with management's conclusion that the analysis supported the 2017 AR Allowance estimate. As they should have recognized, however, the company's analysis used a mixture of gross and net numbers that rendered it unreliable.

68.     As reflected in BDO's 2017 work papers, AAC determined that it should perform the hindsight analysis on a "gross" basis. That is, although AAC reported its revenue and AR net of EIV adjustments—to reflect the estimated reimbursements from insurers at out-of-network rates—it concluded that, in the hindsight analysis, it should remove the effect of those adjustments because they varied from period to period.

69.     Accordingly, in the 2017 hindsight analysis, AAC began by taking the 2016 AR Allowance that it reported in its Form 10-K and grossed that amount up to $61.9 million, to remove the effects of the EIV adjustment. It also grossed up the AR from year-end 2016 that still remained on AAC's books at year-end 2017 ("Remaining 2016 AR") and the 2016 AR Actual Write-Offs. As grossed up to remove the effects of the EIV, 2016 AR Actual Write-Offs totaled $13.1 million and the Remaining 2016 AR (which under AAC's AR Allowance loss rates had been reserved for at about 98%) totaled $141 million. A comparison of these figures shows that AAC's grossed-up $61.9 million 2016 AR Allowance was clearly insufficient to absorb the $154.1 million sum of the 2016 AR Actual Write-Offs plus the Remaining 2016 AR.[38]

70.     The engagement team and Olvera reviewed all of those grossed-up figures that appeared in AAC's hindsight analysis, yet ignored their obvious implications. Instead, they accepted AAC's position that a further adjustment was required in the hindsight analysis. Specifically, AAC took one of the figures that had been grossed up to remove the effects of the EIV—the $141 million in Remaining 2016 AR—and then re-applied the most current EIV rate to it (*i.e.*, adjusting the $141 million to be *net* of EIV). Doing so reduced the figure for Remaining 2016 AR to a net amount of $51 million. Having made that inappropriate adjustment, AAC decided that the 2016 AR Allowance was sufficient.

---

[38]     As noted above, AAC had recently changed its policy and began pursuing appeals of Short Pay claims. Of the $141 million in Remaining 2016 AR, $41 million was related to Short Pay AR. Even if this $41 million were deducted from the $141 million, the $61.9 million 2016 AR Allowance would not have come close to covering the $113 million of 2016 AR Actual Write-Offs plus non-Short Pay Remaining 2016 AR.

71.    The hindsight analysis's mixture of gross and net numbers actually raised red flags about the reasonableness of AAC's AR Allowance, rather than supporting it. Having grossed up all of the relevant balances in the hindsight analysis to remove the effects of the EIV, there was no basis for AAC to net one of the balances back down to selectively reintroduce the effects of the EIV. Nonetheless, the engagement team and Olvera accepted the analysis as support for the reasonableness of AAC's 2017 AR Allowance.

72.    BDO's work papers contained the following explanation for the use of two gross figures and one net figure in the hindsight analysis:

> Note that all [Remaining 2016 AR] . . . will not result in write-offs to bad debt. A portion of these will be written off as revenue adjustments which is factored into the EIV and thus is reserved for within net revenue. Company policy for writeoffs is that only those associated with paid to patient receivables and denial of service are included in bad debt (other writeoffs are to revenue and are contemplated in the EIV % calculation). As such, it is necessary to allocate the balance between portions to be recognized in revenue and those to be recognized in bad debt. Management applied the EIV % to the gross accounts > 360 in order to properly recalculate the expected writeoffs against the allowance for doubtful accounts.[39]

But that explanation—that AAC's AR Allowance was designed to cover only a portion of uncollectible receivables—was inconsistent with both AAC's practice when calculating the AR Allowance, and AAC's public disclosures about the nature of its AR Allowance.

73.    Specifically, AAC's 2017 Form 10-K disclosed that its AR Allowance was the company's best estimate of "accounts receivable that could become uncollectible in the future" (*i.e.*, future write-offs). That disclosure made no mention of being limited to a particular type of write-off of AR, such as write-offs to bad debt versus write-offs via revenue adjustment. Similarly, AAC's practice in calculating its AR Allowance was consistent with this disclosure, in that it did not distinguish between purportedly different types of write-offs. The engagement team and Olvera failed to identify these inconsistencies between the hindsight analysis and AAC's practice and public disclosures concerning the AR Allowance.

---

[39]    A paid-to-patient claim was one where an insurer would send payment to the patient, for forwarding to AAC, rather than paying AAC directly. A denial-of-service claim was one where the insurer denied reimbursement of the claim for lack of insurance coverage or other reasons.

Order
PCAOB Release No. 105-2023-024
September 26, 2023

74.     Moreover, even if AAC had a basis for concluding that less than the full amount of the Remaining 2016 AR would result in bad debt write-offs, BDO's work papers provided no logical basis for why AAC should have used the EIV rate to estimate what that lesser amount would be.

75.     Notably, had AAC performed the hindsight analysis on a purely net basis with respect to the AR, AR Allowance, and write-off figures, the analysis would have shown that AAC was under-reserved by roughly $42 million as of December 31, 2016, about the same amount by which AAC wrote down its 2017 AR in the 2018 Restatement.

### vi.    BDO and Olvera Failed to Respond to Red Flags

76.     As described above, BDO and Olvera, as the FCR, violated PCAOB standards during the 2017 Audit by failing to appropriately evaluate three separate significant accounting estimates that they had identified as presenting significant risks of material misstatement.[40] In each instance, those violations were exacerbated by BDO's and Olvera's failure to respond to red flags indicating the need to obtain additional evidence or perform further evaluation. In assessing the EIV estimate, for example, they failed to address the material effects that AAC's revised approach to Short Pay claims had on that estimate. With respect to Short Pay claims and AAC's 50% success rate estimate, they relied on the anecdotal statements of external counsel and failed to consider indications that AAC was not achieving its projected success rate. Finally, for the AR Allowance, despite having been put on notice by PCAOB inspectors of the need to evaluate the reasonableness of the particular loss rates AAC used to derive its AR Allowance, the engagement team failed to obtain direct evidence supporting the reasonableness of AAC's loss rates and instead elected to rely on a company-prepared hindsight analysis that was inconsistent with AAC's calculation of, and public disclosures about, the AR Allowance. Olvera failed to identify these deficiencies when performing his focused consulting review.

77.     Given those and other red flags they encountered, PCAOB standards called for the engagement team to obtain more persuasive evidence commensurate with the higher risk of material misstatement.[41] The team repeatedly failed to do so, however, and Olvera repeatedly failed to identify the deficiencies in the engagement team's Audit work. Accordingly, BDO and Olvera violated multiple PCAOB standards.[42]

---

[40]     *See* AS 2501.10.

[41]     *See* AS 2301.09, .11.

[42]     *See, e.g.,* AS 1015, AS 1105, AS 2301, AS 2501, and AS 2810.

### vii.    2018 Restatement

78.    During the third quarter of 2018, AAC identified that it had collected far less on AR than expected and determined that it needed to restate its 2016 and 2017 financial statements. In the 2018 Restatement, audited by BDO with Olvera serving as the FCR, AAC corrected errors related to its estimate of AR, net of the allowance for doubtful accounts. The Restatement reduced AAC's reported AR by $41.3 million (or 47%) and $30.3 million (or 32%) as of year-end 2016 and 2017. These adjustments in AR reduced reported assets by 11% and 7% as of the same dates. The Restatement also resulted in an increase to net loss of $20.6 million for 2016, and a reduction to net loss of $7.7 million for 2017 (due primarily to a reduction in the provision for doubtful accounts).

79.    After the Restatement, the New York Stock Exchange delisted AAC's stock in October 2019, when the company failed to maintain adequate market capitalization over a consecutive 30-day trading period. In June 2020, AAC filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code.

## F.    Musick Violated PCAOB Rules and Auditing Standards During the 2017 Audit

80.    Musick violated applicable PCAOB rules and standards as a result of failures in his role as the engagement quality reviewer for the 2017 Audit.

81.    Those failures relate to his review of the three estimates described above: AAC's EIV; Short Pay claims and AAC's associated 50% success rate assumption; and AAC's AR Allowance.

82.    As noted above, PCAOB rules require that a registered public accounting firm and its associated persons comply with the PCAOB's auditing and related professional standards.[43]

83.    In an audit, the engagement quality reviewer is responsible for evaluating the significant judgments made by the engagement team and the related conclusions reached in forming the overall conclusion on the engagement and in preparing the engagement report.[44] Among other things, the engagement quality reviewer should evaluate the engagement team's assessment of, and audit responses to, significant risks identified by the engagement team,

---

[43]    *See* PCAOB Rule 3100; PCAOB Rule 3200.

[44]    *See* AS 1220.09.

including fraud risks.[45] The engagement quality reviewer should also evaluate whether the engagement documentation that he or she reviewed when performing the review indicates that the engagement team responded appropriately to significant risks and supports the conclusions reached by the engagement team with respect to the matters reviewed.[46]

84.    In an audit, the engagement quality reviewer may provide concurring approval of issuance of the audit opinion only if, after performing the EQR with due care, he or she is not aware of a significant engagement deficiency.[47] Among other things, a significant engagement deficiency in an audit exists when the engagement team failed to obtain sufficient appropriate evidence in accordance with the standards of the PCAOB.[48]

85.    During his EQR of the 2017 Audit, Musick knew that the engagement team identified valuation of AR, Short Pay AR, and the AR Allowance as significant accounting estimates and significant risks of material misstatement. He reviewed the team's work papers relating to the reasonableness of the 50% success rate and the amount of collections on Short Pay AR during 2017 that was inconsistent with that 50% reimbursement assumption. He also reviewed the work papers on the AR Allowance hindsight analysis, was aware of the PCAOB inspection finding that BDO had failed to appropriately evaluate the reasonableness of the AR Allowance during the 2015 audit, and was aware that there had been no direct audit testing of the loss rates AAC used for the AR Allowance since 2014.

86.    As described in connection with the Firm's and Olvera's failures above, the red flags and deficiencies relating to the EIV, 50% success rate, and AR Allowance were reflected on the face of the work papers relating to those significant risk areas. An EQR performed with due care, in compliance with AS 1220, should have detected, and resulted in the engagement team addressing, those deficiencies. Nevertheless, Musick improperly accepted the team's significant judgments and approved the issuance of the 2017 Audit report.

87.    As a result, Musick (a) failed to adequately evaluate the engagement team's audit responses to significant risks;[49] (b) failed to properly evaluate whether the engagement team's documentation indicated that the team responded appropriately to significant risks and

---

[45]    *See id.* at .10(b).

[46]    *See id.* at .11.

[47]    *See id*. at .12.

[48]    *See id*. at .12, Note.

[49]    *See id*. at .10(b).

supported the team's conclusions;[50] and (c) failed to perform his review with due professional care.[51] Because of his failure to exercise due professional care, he did not identify significant engagement deficiencies, such as the team failing to obtain sufficient appropriate evidence under PCAOB standards, and inappropriately provided his concurring approval of issuance of the Audit opinion, in violation of PCAOB rules and standards.[52]

# IV.

In view of the foregoing, and to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports, the Board determines it appropriate to impose the sanctions agreed to in Respondents' Offers. Accordingly, it is hereby ORDERED that:

A.  Pursuant to Section 105(c)(4)(E) of the Act and PCAOB Rule 5300(a)(5), BDO USA, P.C., Kevin Olvera, and Michael Musick are hereby censured;

B.  Pursuant to Section 105(c)(4)(C) of the Act and PCAOB Rule 5300(a)(3), for a period of one year from the date of this Order, Kevin Olvera's role in any "audit," as that term is defined in Section 110(1) of the Act and PCAOB Rule 1001(a)(v), shall be restricted as follows: Olvera shall not (1) serve, or supervise the work of another person serving, as an "engagement partner," as that term is used in AS 1201, *Supervision of the Audit Engagement*; (2) serve, or supervise the work of another person serving, as an "engagement quality reviewer," as that term is used in AS 1220, *Engagement Quality Review*; (3) serve, or supervise the work of another person serving, in any role that is equivalent to engagement partner or engagement quality reviewer, but differently denominated (such as "lead partner," "practitioner-in-charge," or "concurring partner"); (4) exercise authority, or supervise the work of another person exercising authority, to either sign a registered public accounting firm's name to an audit report, or to consent to the use of a previously issued audit report, for any issuer, broker, or dealer; (5) serve, or supervise the work of another person serving, as the "other auditor," or "another auditor," as those terms are used in AS 1205, *Part of the Audit Performed by Other Independent Auditors*; or (6) serve, or supervise the work of another person serving, as a "Focused Consulting Reviewer," as that

---

[50]  *See id.* at .11.

[51]  *See id.* at .12.

[52]  *See id.* at .12, Note; PCAOB Rule 3100; PCAOB Rule 3200.

term is used in BDO's policies and procedures, or in any role that is equivalent to a Focused Consulting Reviewer, but differently denominated.

C.      Pursuant to Section 105(c)(4)(F) of the Act and PCAOB Rule 5300(a)(6), Kevin Olvera and Michael Musick are each required to complete, within one year from the date of this Order, twenty hours of continuing professional education and training pertinent to accounting for, and auditing of, issuers operating in the healthcare industry (such hours shall be in addition to, and shall not be counted in, the CPE they are required to obtain in connection with any professional license); and

D.      Pursuant to Section 105(c)(4)(D) of the Act and PCAOB Rule 5300(a)(4): (i) a civil money penalty in the amount of $2,000,000 is imposed on BDO USA, P.C.; (ii) a civil money penalty in the amount of $35,000 is imposed on Kevin Olvera; and (iii) a civil money penalty in the amount of $25,000 is imposed on Michael Musick.

1.      All funds collected by the Board as a result of the assessment of these civil money penalties will be used in accordance with Section 109(c)(2) of the Act.

2.      Each Respondent shall pay their respective civil money penalty within ten days of the issuance of this Order by (1) wire transfer in accordance with instructions furnished by Board staff; or (2) United States Postal Service money order, bank money order, certified check, or bank cashier's check (a) made payable to the Public Company Accounting Oversight Board, (b) delivered to the Office of Finance, Public Company Accounting Oversight Board, 1666 K Street, N.W., Washington D.C. 20006, and (c) submitted under a cover letter, which identifies the person as a respondent in these proceedings, sets forth the title and PCAOB release number of these proceedings, and states that payment is made pursuant to this Order, a copy of which cover letter and money order or check shall be sent to Office of the Secretary, Attention: Phoebe W. Brown, Secretary, Public Company Accounting Oversight Board, 1666 K Street, N.W., Washington, D.C. 20006.

3.      With respect to any civil money penalty amounts that Respondents shall pay pursuant to this Order, Respondents shall not, directly or indirectly, (a) seek or accept reimbursement or indemnification from any source including, but not limited to, any current or former affiliated firm or professional or any payment made pursuant to any insurance policy; (b) claim, assert, or apply

Order
PCAOB Release No. 105-2023-024
September 26, 2023

for a tax deduction or tax credit in connection with any federal, state, local, or foreign tax; nor (c) seek or benefit by any offset or reduction of any award of compensatory damages, by the amount of any part of Respondents' payment of the civil money penalties pursuant to this Order, in any private action brought against Respondents based on substantially the same facts as set out in the findings in this Order.

4.  If timely payment is not made, additional interest shall accrue at the federal debt collection rate set for the current quarter pursuant to 31 U.S.C. § 3717. Payments shall be applied first to post-Order interest.

5.  Each of the Respondents understands that, with respect to each Respondent, failure to pay the applicable civil money penalty described above may result in (a) in the case of BDO USA, P.C., a summary suspension of the Firm's PCAOB registration pursuant to PCAOB Rule 5304(a), following written notice to BDO at the address on file with the PCAOB at the time of the issuance of this Order; or (b) in the case of Olvera and Musick, respectively, a summary suspension or bar of the respondent pursuant to PCAOB Rule 5304(b), following written notice to him at the address he last provided to the PCAOB's Division of Enforcement and Investigations in writing as of the time of the issuance of this Order.

ISSUED BY THE BOARD.

/s/  Phoebe W. Brown

_____

Phoebe W. Brown
Secretary

September 26, 2023

25