# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE,<br><br>*Plaintiff*,<br><br>v.<br><br>PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD,<br><br>*Defendant*. | Case No. 1:24-cv-780-ACR |
| JOHN DOE,<br><br>*Plaintiff*,<br><br>v.<br><br>PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, *et al.*<br><br>*Defendants*. | Case No. 1:25-cv-186-ACR (consolidated with No. 1:24-cv-780 (lead)) |

## BRIEF OF THE UNITED STATES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 3

I.    Statutory and Regulatory Background ............................................................... 3

II.    This Litigation ................................................................................................... 7

LEGAL STANDARD .................................................................................................. 8

ARGUMENT .............................................................................................................. 8

I.    There Is No Jurisdiction to Consider Plaintiffs' Fifth Amendment and Seventh Amendment Challenges. ................................................................................... 8

II.    Even if There Were Jurisdiction, the Board's Proceedings Do Not Deprive Plaintiffs of Any Rights Under Article III, the Seventh Amendment, or the Fifth Amendment. ......... 15

    A.    There Is No Violation of Article III or the Seventh Amendment. ........................ 15

        1.    *Jarkesy* Does Not Cover Any Remedies Other than Civil Penalties, and It Is Unclear Whether Any Penalties Will Be Sought Against Plaintiffs. ..... 15

        2.    The Causes of Action Against Plaintiffs Have No Common-Law Analogue. ................................................................................................. 17

        3.    In Any Event, Plaintiffs' Proceedings Concern Only Public Rights. ....... 18

    B.    There Is No Due Process Clause Violation ............................................................ 21

        1.    The Board's Practices Comport with the Due Process Clause Under Longstanding Supreme Court Precedent. ................................................. 22

        2.    The Board's Procedural Protections Meant to Protect the Identity of Subjects Being Investigated Do Not Violate the Due Process Clause ...... 25

III.    The Board's Appointment of Its Hearing Officers and Its Ability to Remove Them at Will Comply with the Appointments Clause and Article II. ........................................... 27

    A.    The Board's Hearing Officer Is Lawfully Appointed. ........................................... 28

    B.    At Most One Tenure Protection Exists Between the Board's Hearing Officers and the President ................................................................................................. 30

    C.    There Is No Basis to Enjoin the Board Based on Alleged Appointments Clause Violations. ....................................................................................................... 32

i

IV.   The Board's Exercise of Its Investigative and Adjudicatory Powers Comports with the Private Nondelegation Doctrine...................................................................................... 33

     A.   The Board Is a Governmental Entity. ................................................................. 34

     B.   The Board Functions Subordinately to the Commission. .................................... 36

V.   The Board's Funding Complies with the Appropriations Clause and the Taxing Clause............................................................................................................................. 37

VI.   No Permanent Injunction Is Warranted. ......................................................................... 40

CONCLUSION ........................................................................................................................... 41

# TABLE OF AUTHORITIES

## Cases

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
  121 F.4th 1314 (D.C. Cir. 2024).................................................................. 36, 41

*Alpine Sec. Corp. v. Nat'l Sec. Clearing Corp.*,
  No. 23-cv-782, 2025 WL 901847 (D. Utah Mar. 25, 2024).................................. 12

*Axon Enter., Inc. v. FTC*,
  598 U.S. 175 (2023)........................................................................... *passim*

*Axon Enter., Inc. v. FTC*,
  986 F.3d 1173 (9th Cir. 2021) .................................................................. 8, 14

*Bennett v. SEC*,
  844 F.3d 174 (4th Cir. 2016) .................................................................... 9, 11

*Blankenshipv. FINRA*,
  No.24-cv-3003, 2024 WL 4043442 (E.D. Pa. Sept. 4, 2024)................................ 12

*Cincinnati Soap Co. v. United States*,
  301 U.S. 308 (1937).................................................................................. 37

*City of Rochester v. Bond*,
  603 F.2d 927 (D.C. Cir. 1979)....................................................................... 9

*Cmty. Fin. Servs. Ass'n of Am.* v. *CFPB*,
  51 F.4th 616 (5th Cir. 2022) ........................................................................ 38

*Cobb v. Yeutter*,
  889 F.2d 724 (6th Cir. 1989) ........................................................................ 22

*Cochran v. SEC*,
  20 F.4th 194 (5th Cir. 2021) ........................................................................ 11

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
  601 U.S. 416 (2024)......................................................................... 3, 37, 38

*Crowell v. Benson*,
  285 U.S, 22 (1932).............................................................................. 18, 22

*Den ex dem. Murray v. Hoboken Land & Imp. Co.*,
  59 U.S. 272 (1855)................................................................................... 19

*Dep't of Transp. v. Ass'n of Am. R.R.*,
  575 U.S. 43 (2015)........................................................................... 33, 34, 35

*Desiderio v. Nat'l Ass'n of Securities Dealers*,
  191 F.3d 198 (2d Cir. 1999).......................................................................... 35

*Doe v. Hill*,
  141 F.4th 291 (D.C. Cir. 2025)...................................................................... 25

*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012)..................................................................................... 14

*Express Scripts, Inc. v. FTC*,
  No. 24-cv-01549, 2025 WL 521812 (E.D. Mo. Feb. 18, 2025) ............................................ 12

*\*FCC v. Consumers' Research*,
  606 U.S. 656 (2025) ....................................................................................................... *passim*

*\*Free Enterprise Fund v. PCAOB*,
  561 U.S. 477 (2010) ....................................................................................................... *passim*

*FTC v. Cement Inst.*,
  333 U.S. 683 (1948) .................................................................................................................. 25

*Harline v. DEA*,
  148 F.3d 1199 (10th Cir. 1998) .............................................................................................. 22

*Huff and Puffers, LLC v. FDA*,
  No. 8:24-cv-02110-JVS-JDE, 2025 WL 1092696 (C.D. Cal. Feb. 27, 2025) ...................... 12

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935) .................................................................................................................. 31

*Jarkesy v. SEC*,
  48 F. Supp. 3d 32 (D.D.C. 2014) ............................................................................................ 10

*Jarkesy v. SEC*,
  803 F.3d 9 (D.C. Cir. 2015) .......................................................................................... 9, 10, 11

*Jarkesy v. SEC*,
  34 F.4th 446 (5th Cir. 2022) ............................................................................................ 32, 33

*Kennedy v. Braidwood Mgmt., Inc.*,
  606 U.S. 748 (2025) ....................................................................................................... *passim*

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
  103 F.4th 748 (10th Cir. 2024) .............................................................................................. 41

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
  145 S. Ct. 1047 (2025) ............................................................................................................ 41

*LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*,
  784 F. Supp. 3d 1 (D.D.C. 2025) ........................................................................................... 32

*Lebron* v. *National Railroad Passenger Corp.*,
  513 U.S. 374 (1995) .................................................................................................................. 34

*Lemelson v. SEC*,
  793 F. Supp. 3d 1 (D.D.C. 2025) ........................................................................................... 12

*Lindke v. Freed*,
  601 U.S. 187 (2024) .................................................................................................................. 35

*Lucia v. SEC*,
  585 U.S. 237 (2018) .................................................................................................................... 5

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) .......................................................................................................... 21, 22

iv

*Meta Platforms, Inc. v. FTC*,
No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024) ................................. 23

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ................................................................................ 40, 41

*Mori v. Dep't of the Navy*,
731 F. Supp. 2d 43 (D.D.C. 2010) ......................................................................... 8

*Morrissey v. Brewer*,
408 U.S. 471 (1972) .......................................................................................... 21

*Mugler v. Kansas*,
123 U.S. 623 (1887) .......................................................................................... 16

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
53 F.4th 869 (5th Cir. 2022) ..................................................................... *passim*

*Nat'l Union Fire Ins. Co. v. Allfirst Bank*,
282 F. Supp. 2d 339 (D. Md. 2003) ...................................................................... 26

*NCRNC, LLC v. Kennedy*,
No. 1:25-cv-607, 2025 WL 1549048 (N.D.N.Y. May 30, 2025) ........................... 12

*Nexstar Media, Inc. Grp. v. NLRB*,
746 F. Supp. 3d 464 (N.D. Ohio 2024) ................................................................. 12

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
584 U.S. 325 (2018) .......................................................................................... 18

*Pro-Football, Inc. v. Harjo*,
284 F. Supp. 2d 96 (D.D.C. 2003) .......................................................................... 8

*\*SEC v. Jarkesy*,
603 U.S. 109 (2024) ................................................................................. *passim*

*SEC v. Posner*,
16 F.3d 520 (2d Cir. 1994) ................................................................................. 17

*SEC v. Wills*,
25 Fed. R. Serv. 2d 1317 (D.D.C. 1978) .............................................................. 17

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ........................................................................................ 1, 33

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
540 F. Supp. 3d 45 (D.D.C. 2021) ....................................................................... 40

*Stern v. Marshall*,
564 U.S. 462 (2011) .......................................................................................... 21

*Sun Valley Orchards, LLC v. U.S. Department of Labor*,
148 F. 4th 121 (3d Cir. 2025) ............................................................................. 15

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940) ..................................................................................... 33, 36

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ..................................................................................... *passim*

*Tull v. United States,*
    481 U.S. 412 (1987) ............................................................................................ 17

*United States v. Armstrong,*
    517 U.S. 456 (1996) ............................................................................................ 26

*United States v. Arthrex, Inc.,*
    594 U.S. 1 (2021) ................................................................................................ 25

*United States v. Hartwell,*
    73 U.S. 385 (1868) .............................................................................................. 28

*United States v. Stone,*
    394 F. Supp. 3d 1 (D.D.C. 2019) ........................................................................ 26

*Vape Cent. Grp., LLC v. FDA,*
    No. 24-3354, 2025 WL 637416 (D.D.C. Feb. 27, 2025) ..................................... 12

*VHS Acquisition Subsidiary No. 7 v. NLRB,*
    759 F. Supp. 3d 88 (D.D.C. 2024) ........................................................... 30, 32, 33

*VHS Acquisition Subsidiary No. 7 v. NLRB,*
    --- F. Supp. 3d ---, 2024 WL 4817175 (D.D.C. Nov. 17, 2024) ............................ 12

*Waffle House, Inc. v. NLRB,*
    No. 3:24-6751-MGL, 2025 WL 602744 (D.S.C. Feb. 10, 2025) ........................... 12

*Wedel v. United States,*
    2 F.2d 462 (9th Cir. 1924) .................................................................................. 16

*Withrow v. Larkin,*
    421 U.S. 35 (1975) ...................................................................................... *passim*

*YAPP USA Auto. Sys., Inc. v. NLRB,*
    748 F. Supp. 3d 497 (E.D. Mich. Sept. 9, 2024) ................................................. 12

**Statutes**

15 U.S.C. § 78y ................................................................................ 7, 10, 11, 25

15 U.S.C. § 7202 ............................................................................................. 36

15 U.S.C. § 7211 ..................................................................................... *passim*

15 U.S.C. § 7215 ..................................................................................... *passim*

15 U.S.C. § 7217 ..................................................................................... *passim*

15 U.S.C. § 7219 ......................................................................................... 37, 39

28 U.S.C. § 1331 ............................................................................................... 9

**Rules**

Federal Rule of Civil Procedure 56(a) .............................................................. 8

**Regulations**

17 C.F.R. § 210.2-01 ................................................................................................... 19

17 C.F.R. § 201.1001 ...................................................................................................... 6

17 C.F.R. § 201.440 ...................................................................................................... 15

17 C.F.R. § 202.150 ............................................................................................... *passim*

17 C.F.R. § 240.19d-2 .................................................................................................... 7

**Other Authorities**

PCAOB, Bylaw and Rule Amendments to Provide that the PCAOB's Appointment and Removal of its Hearing Officers Are Subject to Commission Approval, PCAOB Release No. 2019-001 (Jan. 29, 2019), https://perma.cc/4G26-G8BB ........................................................... 5

PCAOB, Marc B. Dorfman Sworn In As the PCAOB's Chief Hearing Officer (Apr. 8, 2019), https://pcaobus.org/news-events/news-releases/news-release-detail/marc-b-dorfman-sworn-in-as-the-pcaob-s-chief-hearing-officer_699 .................................................................. 5

PCAOB, Office of Hearing Officers, Charter (Mar. 25, 2021), https://assets.pcaobus.org/pcaob-dev/docs/default-source/enforcement/documents/oho-charter-final.pdf?sfvrsn=f23c6871_4 ............................................................................ 23

PCAOB, PCAOB Rules, Section 3. Auditing and Related Professional Practice Standards, https://pcaobus.org/about/rules-rulemaking/rules/section-3-auditing-and-related-professional-practice-standards----rule-3500t .............................................................. 19

PCAOB, PCAOB Rules, Section 5. Investigations and Adjudications, https://pcaobus.org/about/rules-rulemaking/rules/section_5 ........................................... *passim*

SEC, Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission, (Jan. 15, 2025), https://www.sec.gov/enforce/civil-penalties-inflation-adjustment ................................................................................................... 6

**INTRODUCTION**

Plaintiffs—two accountants who are respondents in Board disciplinary proceedings—raise a litany of constitutional claims relating to the structure and operations of the Public Company Accounting Oversight Board ("PCAOB" or "Board"), most of which are in direct contradiction to Supreme Court precedent.  Throughout this litigation, they have repeatedly modified their theories for the explicit purpose of permanently enjoining the Board's disciplinary proceedings against them for allegedly violating the Board's rules.  The Court should deny their motion in its entirety and grant summary judgment in favor of the Board because none of Plaintiffs' claims have merit.

To start, the Court does not have jurisdiction over Plaintiffs' Seventh Amendment or Fifth Amendment Due Process Clause claim related to the alleged "secrecy" of the Board because those claims are not "structural" claims that present a "here-and-now injury," *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (quoting *Seila Law LLC* v. *CFPB*, 591 U.S. 197, 212 (2020)), and are instead about the agency's individualized merits determinations.  They are thus subsumed by the statutory scheme created by Congress, requiring those claims to first be decided by the Board, then reviewed by the Securities and Exchange Commission ("SEC" or "Commission"), and then finally reviewed by a federal circuit court.

Even if the Court did address the merits of those claims, none has merit.  Regarding the Seventh Amendment, the causes of action and remedies sought by the Board make clear that no cause of action against either Plaintiff is rooted in the common law and thus the Board's claims against Plaintiffs "bring no common law soil with them."  *SEC v. Jarkesy*, 603 U.S. 109, 137 (2024).  Further, Plaintiffs' proceedings concern only public rights, meaning "no involvement by an Article III court in the initial adjudication is necessary."  *Id.* at 128.

Plaintiffs' Due Process Clause claims similarly fail.  Plaintiffs first claim that the Board inherently violates due process because the hearing officer is an employee of the Board and because it acts as both prosecutor and adjudicator, but the Supreme Court foreclosed those types of claims long ago.  *See Withrow v. Larkin*, 421 U.S. 35 (1975).  Plaintiffs' second claim is that the "secrecy" of the Board's proceedings violates due process; Plaintiffs supply no precedent for this novel proposition, and it lacks merit because no such due process requirement exists.

Plaintiffs' Appointments Clause claims fare no better.  Plaintiffs first argue that the Board's hearing officers are not constitutionally appointed because they are appointed by the Board rather than the Commission directly, but the Supreme Court recently stated that an inferior officer can lawfully appoint another inferior officer when the head of department has ultimate authority over the inferior officer.  *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 785 (2025).  Plaintiffs then argue that hearing officers enjoy two layers of removal protection, contrary to the Supreme Court's decision in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010).  But that's wrong because, at most, one for-cause removal protection exists between the President and the hearing officer.

Switching course from alleging that the Board violates the Constitution itself, Plaintiffs argue that the Board is a private entity rather than a governmental one that impermissibly wields federal power in contradiction to the private nondelegation doctrine.  But Plaintiffs are incorrect because, as the Supreme Court stated in *Free Enterprise Fund*, the Board is a public entity, and even if it weren't, the Board functions subordinately to the Commission and thus does not contradict the private nondelegation doctrine.

Finally, Plaintiffs contend that the Board is unconstitutionally funded without fully explaining why.  But they are wrong, as the Board's funding complies with both the Appropriations Clause and the Taxing Clause as made clear by the Supreme Court's recent cases in *CFPB v.*

*Community Financial Services Association of America, Ltd.*, 601 U.S. 416 (2024) ("*CFSA*"), and

*FCC v. Consumers' Research*, 606 U.S. 656 (2025).

None of Plaintiffs' claims have merit, so the Court should deny their motion in totality and

grant summary judgment in favor of the Board.

## STATEMENT OF FACTS

**I.    Statutory and Regulatory Background**

Congress enacted the Sarbanes–Oxley Act of 2002, 116 Stat. 745, 15 U.S.C. § 7211, *et*

*seq.*, "[a]fter a series of celebrated accounting debacles."  *Free Enter. Fund*, 561 U.S. at 484.

Among other measures, the Act introduced tighter regulation of the accounting industry under the

Board, modeled after private self-regulatory organizations in the securities industry that investigate

and discipline their members and that operate under the oversight of the Commission.  The Board

consists of five members, who are both appointed and removable by the Commission. 15 U.S.C.

§§ 7211(e)(1), (4), (6), 7217(c)(3); *see Free Enter. Fund*, 561 U.S. at 509.  The Board has the

power to hire "employees, accountants, attorneys, and other agents" to assist it in its duties.  15

U.S.C. § 7211(f)(4).  The Commission has broad authority over the Board in addition to

appointment and removal.  Those powers include control over the Board's budget, *id.* §§

7219(d)(1), 7219(b), and the ability to amend Board sanctions or enforce the Board's rules on its

own.  *Id.* §§ 7202(b)(1), (c), 7217(c).  The Commission also has authority to amend the Board's

rules and standards, *id.* § 7217(b)(5), and may, by rule, "relieve the Board of any responsibility to

enforce compliance with any provision of [the Sarbanes–Oxley] Act, the securities laws, the rules

of the Board, or professional standards."  *Id.* § 7217(d)(1).

The Board is authorized to investigate possible violations of any provision of the Sarbanes–

Oxley Act or the provisions of securities laws that relate "to the preparation and issuance of audit

reports and the obligations and liabilities of accountants with respect thereto" as well as violations

of the Board's rules. *Id.* § 7215(b)(1).  In the event that a formal investigation is necessary—which occurs "when it appears that an act or practice, or omission to act, by a registered public accounting firm or any person associated with a registered public accounting firm may violate" one of those laws, *see* PCAOB Rule 5101(a)(1)—the Board "may designate members, or groups of members, of the Board's staff" to assist with various aspects of the investigation.  PCAOB Rule 5101(a)(2); *see also* 15 U.S.C. § 7211(f)(4); PCAOB Rule 5100, *et seq.*  Those aspects include requiring testimony of any registered public accounting firm and any person associated with a registered public accounting firm, PCAOB Rule 5102(a); issuing accounting board demands for audit work papers and other related documents "in the possession of a registered public accounting firm or any associated person," PCAOB Rule 5103(a); examining books and records to assist with the investigation, PCAOB Rule 5104; requesting testimony of any other person relevant or material to the investigation, PCAOB Rule 5105(a); and requesting the Commission to issue subpoenas to aid in the investigation.  PCAOB Rule 5111(a).  If the Board uses enforcement staff during an investigation, that staff "may not participate or advise in the decision, or in Board review of the decision."  PCAOB Rule 5200(d).

After investigation, the Board can institute disciplinary proceedings with specific charges as long as it notifies the subject, provides an opportunity to defend against those charges, and keeps a record of the proceedings.  15 U.S.C. § 7215(c)(1); PCAOB Rule 5200, *et seq.*  The Board's organic statute permits it to pass rules "subject to the approval of the Commission" that allow "an individual member or employee of the Board" to conduct the initial hearing and determination of a proceeding, 15 U.S.C. § 7211(g)(2), and the Board's rules provide that those hearings may be "presided over by the Board or, if the Board orders, by a hearing officer."  PCAOB Rule 5200(b).

After the Supreme Court's decision in *Lucia v. SEC*, 585 U.S. 237 (2018)—that SEC ALJs are "Officers" within the meaning of the Appointments Clause, *id.* at 251—the Board adopted amendments to its bylaws and rules. *See* PCAOB, Bylaw and Rule Amendments to Provide that the PCAOB's Appointment and Removal of its Hearing Officers Are Subject to Commission Approval, PCAOB Release No. 2019-001 ("PCAOB Press Release") (Jan. 29, 2019), https://perma.cc/4G26-G8BB.  Under those bylaws, Hearing officers are appointed and removed by the Board with the Board's decision reviewable by the Commission.  *See* PCAOB Bylaws § 6.3 ("[T]he appointment or removal of any hearing officer shall be made by the Governing Board and shall be subject to the approval of the Securities and Exchange Commission.").   And regulations make clear that no hearing officer can be appointed without the Commission's approval.  17 C.F.R. § 202.150 ("No action by the Board proposing to appoint . . . a hearing officer shall be final absent Commission approval.").  Hearing officers are separate from enforcement staff and "may not be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for the Board." PCAOB Rule 5200(d).  The Board does not have a hearing officer currently as that position is currently vacant, Pls.' Statement of Undisputed Material Facts, ECF No. 108 ("Pls.' SMF") ¶ 22, but the prior hearing officer who was overseeing Plaintiffs' disciplinary proceedings was appointed by the Board on April 8, 2019 with the Commission's approval.  PCAOB, Marc B. Dorfman Sworn In As the PCAOB's Chief Hearing Officer (Apr. 8, 2019), https://pcaobus.org/news-events/news-releases/news-release-detail/marc-b-dorfman-sworn-in-as-the-pcaob-s-chief-hearing-officer_699.

When there is a hearing officer, the officer may, among other functions, administer oaths, issue accounting board demands, receive evidence, regulate the course of proceedings, consider

procedural and other motions, and prepare initial decisions.  PCAOB Rule 5200(c).  A hearing record is made during the disciplinary proceeding, PCAOB Rule 5202, and the hearing officer writes an initial decision that is reviewable by the Board either on its own initiative or upon a petition for review.  PCAOB Rules 5204, 5460(a)-(b).  The Board reviews the hearing officer's decision de novo and "may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, an initial decision by a hearing officer and may make any findings or conclusions that in its judgment are proper based on the record."  PCAOB Rule 5460(c).  The Board can also allow additional evidence not presented to the hearing officer.  PCAOB Rule 5464.  Though any hearings are generally not public, they can be made public "with the consent of the parties to such hearing" if "ordered by the Board for good cause shown."  15 U.S.C. § 7215(c)(2); PCAOB Rule 5203.

The Board can implement a variety of sanctions if it determines that the subject violated the Act, the rules of the Board, or the securities laws within the Board's jurisdiction, whether through action or omission.  15 U.S.C. § 7215(c)(4).  Those sanctions include: (1) temporary suspension or permanent revocation of registration with the Board or from further associating with a registered public accounting firm; (2) temporary or permanent limitation on the activities, functions, or operations of that person; (3) monetary penalties of up to approximately $174,000 for negligent violations and $1.3M for intentional violations for natural persons;[1] (4) censure; (5) required additional professional education or training; and (6) "any other appropriate sanction provided for in the rules of the Board."  *Id.* § 7215(c)(4)(A)-(G), (c)(5).  If the Board imposes a final sanction, it must "promptly file notice with the Commission," which can review, modify,

---

[1] The monetary fines listed in the statute have been adjusted pursuant to the Inflation Adjustment Act, *see* 17 C.F.R. § 201.1001, and the inflation adjustments can be found on the SEC's website at https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.

enhance, cancel, reduce, or require remission of any sanction imposed by the Board.  *See id.*

§ 7217(c)(1)-(3).  The person aggrieved by the Board's order may also file a written motion for a

stay with the Commission while the Commission considers whether to modify the sanction.  *See*

PCAOB Rule 5206(b); 17 C.F.R. § 240.19d-2.  The Commission's final order regarding the

proceeding is then reviewable in federal circuit court—a person aggrieved may obtain review by

filing a written petition in a court of appeals requesting the order be modified or set aside as long

as the person urged the issue for review before the Commission or had reasonable grounds for

failing to do so.  15 U.S.C. § 78y(a)(1), (c)(1).

## II.    This Litigation

Plaintiffs Doe 1 and Doe 2 are two auditors who formerly worked at Board-registered

public accounting firms and are the subjects of disciplinary proceedings before the Board for

violations of the Board's rules.  *See* Pls.' Mot. for Summ. J. at 8, ECF No. 108 ("Pls' MSJ") at 8

(citing Pls' SMF ¶¶ 1-2, 38-39, 40-42).  Both proceedings are stayed, *see* Pls' MSJ at 8, and the

Board has not imposed any of the range of sanctions available to it—monetary or otherwise—

against either auditor.  *See id.* at 10 (stating the disciplinary proceedings "threaten harsh

sanctions").

Doe 1 brought an action in the Northern District of Texas challenging various aspects of

the Board's operations and its disciplinary process in January 2023.  *See generally* Compl., No.

1:24-cv-780, ECF No. 1.  The United States intervened in that case on March 16, 2023.  Notice of

Intervention, No. 1:24-cv-780, ECF No. 39.  The Northern District of Texas transferred the case

on March 18, 2024.  Transfer Order, No. 1:24-cv-780, ECF No. 64.

Doe 2's case began in the Middle District of Tennessee, making similar challenges to Doe

1.  *See generally* Compl., No. 1:25-cv-186, ECF No. 1.  The United States intervened in that case

on July 24, 2024, Notice of Intervention, No. 1:25-cv-186, ECF No. 33, and the case was transferred to this Court on January 22, 2025.  Transfer Order, No. 1:25-cv-186, ECF No. 52.

Under the briefing schedule set by the Court, Plaintiffs moved for summary judgment on September 26, 2025, Pls' MSJ, and Defendants cross-moved on November 25.  Def. Pub. Co. Acct. Oversight Bd.'s Mot. for Summ. J., ECF No. 110 ("PCAOB's MSJ").

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment."  *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 112 (D.D.C. 2003) (citation omitted).  Rather, the dispute must regard a question of fact that is material, meaning that it is "capable of affecting the substantive outcome of the litigation."  *Id.* That is determined by "look[ing] to the substantive law on which each claim rests."  *Mori v. Dep't of the Navy*, 731 F. Supp. 2d 43, 45 (D.D.C. 2010) (citation omitted).  The dispute must also be genuine, meaning that it is "supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the nonmoving party."  *Pro-Football*, 284 F. Supp. 2d at 112.

## ARGUMENT

### I.   There Is No Jurisdiction to Consider Plaintiffs' Fifth Amendment and Seventh Amendment Challenges.

The Court should dismiss Plaintiffs' non-structural claims under the Fifth and Seventh Amendments and grant the Board's motion for summary judgment on those claims because the Court does not have jurisdiction over claims "about the agency's individualized merits determination."  *Axon Enter., Inc. v. FTC*, 986 F.3d 1173, 1196 (9th Cir. 2021) (Bumatay, J.,

concurring in part and dissenting in part), *rev'd and remanded,* 598 U.S. 175 (2023). Plaintiffs'
Seventh Amendment claims depend on the Board's instituting civil penalties against them to fall
within the scope of *Jarkesy*. *See* Pls' MSJ at 9-15. And their Fifth Amendment claim regarding
the alleged "secrecy" of the Board's procedures, *see id.* at 24-27, is a procedural challenge
attendant to disciplinary proceedings and depends on an unfavorable decision against Plaintiffs.
Because the PCAOB's processes have not yet been completed, and because the PCAOB has not
yet imposed any sanction against Plaintiffs, this Court has no jurisdiction to examine the propriety
of any hypothetical denial of process or hypothetical penalty.

Although federal district courts ordinarily have original jurisdiction over "all civil actions
arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, those
courts "possess only the power authorized by the Constitution and by statute." *Jarkesy v. SEC*,
803 F.3d 9, 15 (D.C. Cir. 2015). Congress may divest district courts of jurisdiction over certain
claims—either expressly or impliedly—"by creating a statutory scheme of administrative
adjudication and delayed judicial review in a particular court." *Bennett v. SEC*, 844 F.3d 174, 178
(4th Cir. 2016) (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)). When
Congress has created such "a special statutory review scheme . . . , 'it is ordinarily supposed that
Congress intended that procedure to be the exclusive means of obtaining judicial review in those
cases to which it applies.'" *Jarkesy*, 803 F.3d at 15 (quoting *City of Rochester v. Bond*, 603 F.2d
927, 931 (D.C. Cir. 1979)); *see also Axon*, 598 U.S. at 185 (Congress frequently "preclude[s]
district courts from exercising jurisdiction over challenges to federal agency action" by "specifying
a different method to resolve" those claims.).

To determine whether a comprehensive review process is the exclusive means of obtaining
judicial review, courts ask "whether the particular claims brought were 'of the type Congress

intended to be reviewed within this statutory structure.'" *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 208, 212). The Supreme Court has identified three considerations to assist that inquiry: (1) whether precluding district court jurisdiction will "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral" to the statute's review provisions; and (3) whether the claim is outside the agency's expertise. *Id.* (citing *Thunder Basin*, 510 U.S. at 212-13). But "[t]he ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id.*

1. The best reading of this Court's precedent and the Supreme Court's recent decisions in *Axon* and *Jarkesy* is that claims relating to an agency's structure and operations in totality—such as a claim that an officer was unconstitutionally appointed under the Appointments Clause—may be brought at any time during the agency's investigation or enforcement of alleged violations, but there is no jurisdiction over claims that require an examination of the individualized determinations made by the agency in the individual enforcement proceedings.

In the first *Jarkesy* litigation—brought in this Court in 2014—the plaintiffs sued to enjoin an ongoing administrative proceeding brought by the SEC because of alleged violations of the Fifth Amendment and Seventh Amendment, among others, before the SEC issued a final order. *See Jarkesy*, 803 F.3d at 14. Judge Howell held that this Court had no jurisdiction because 15 U.S.C. § 78y(a)(1) "established such a comprehensive scheme for review of agency enforcement proceedings" so that federal court review was available only in federal appeals courts after entry of a final order by the SEC, and because the plaintiffs' claims were not "wholly collateral" to the statute's review provisions. *Jarkesy v. SEC*, 48 F. Supp. 3d 32, 38 (D.D.C. 2014) (citing *Thunder Basin*, 510 U.S. at 212-13, 215-16), *aff'd sub nom. Jarkesy*, 803 F.3d 9. Instead, the plaintiffs' claims "entirely related to [plaintiffs'] own actions" and could be reviewed by an appeals court at

the end of the litigation, meaning there was no jurisdiction. *Id.* at 38-39. The D.C. Circuit affirmed, holding that—except for one claim not properly raised on appeal—"the remainder of [plaintiffs'] claims concern . . . substantive or procedural deficiencies in the Commission's enforcement of the securities laws against him to this point." *Jarkesy*, 803 F.3d at 22. Thus, the claims were not "wholly collateral" to the proceeding. *Id.* The Supreme Court didn't hear the plaintiffs' challenge in *Jarkesy* until several years later after a final order was issued, which "levied a civil penalty of $300,000," ordered disgorgement, and prohibited the plaintiff "from participating in the securities industry and in offerings of penny stocks." *Jarkesy*, 603 U.S. at 119.

Even though certain parts of the D.C. Circuit's decision in *Jarkesy* may no longer be operative after *Axon*, its holding about procedural challenges pertaining to the individualized merits of an enforcement proceeding remains untouched, so the Court has no jurisdiction over those claims until the end of the proceeding. Before the Supreme Court's decision in *Axon*, circuit courts had previously differed regarding whether 15 U.S.C. § 78y and similar statutory provisions entirely prevented collateral attacks against agency proceedings in federal district court during an ongoing SEC enforcement proceeding. *Compare, e.g.*, *Bennett*, 844 F.3d at 176 (finding that the district court had no jurisdiction to hear a case challenging the constitutionality of an administrative enforcement proceeding), *with Cochran v. SEC*, 20 F.4th 194, 198, 206-07 (5th Cir. 2021) ("[a]ssuming arguendo that Congress intended § 78y to have a jurisdiction-stripping effect as to some securities-law claims," but holding that the plaintiff's removal power claim was not precluded because it was "wholly collateral" to the proceeding and was a "structural constitutional claim[]"), *aff'd and remanded sub nom. Axon*, 598 U.S. 175. *Axon* clarified that those statutes did not preclude claims that were "fundamental, even existential" and "collateral to the subject of th[e] proceeding," and that asserted that "the agencies, as currently structured, are unconstitutional

11

in much of their work." 598 U.S. at 180, 188. But the same is not true for claims that relate to the individualized decisions the Commission "could make in individual enforcement proceedings," which *Axon* left untouched. *See id.* at 195-96.

Since *Jarkesy* and *Axon* were decided, courts have regularly held that similar claims should be channeled pursuant to special review scheme, "[u]nlike the challenge in *Axon*." *See, e.g.*, *Lemelson v. SEC*, 793 F. Supp. 3d 1, 9-10 (D.D.C. 2025) ("[T]he Court joins the chorus of post-*Jarkesy* district court opinions holding that the relevant statutory procedures for challenging final administrative orders provides a sufficient opportunity for meaningful review of any Seventh Amendment defense." (citation modified)); *Vape Cent. Grp., LLC v. FDA*, No. 24-3354, 2025 WL 637416, at *6 (D.D.C. Feb. 27, 2025) (Seventh Amendment).[2]

Under those authorities, there is no jurisdiction over Plaintiffs' Fifth Amendment and Seventh Amendment claims relating to possible sanctions by the Board and possible procedural violations due to the Board's alleged "secrecy," *see* Pls' MSJ at 9-15, 24-27, because those claims require an examination of whatever decision the Board makes based on the individual enforcement proceedings against Plaintiffs. For example, if no disciplinary sanctions or sanctions that are only equitable in nature are ultimately imposed, the Seventh Amendment would not be implicated at

---

[2] *See also, e.g.*, *NCRNC, LLC v. Kennedy*, No. 1:25-cv-607, 2025 WL 1549048, at *7-*8 (N.D.N.Y. May 30, 2025) (Seventh Amendment); *Blankenship v. FINRA*, No. 24-cv-3003, 2024 WL 4043442, at *3 n.3 ) (E.D. Pa. Sept. 4, 2024) (same), *appeal docketed*, No. 24-2860 (3d Cir. Oct. 4, 2024; *Huff and Puffers, LLC v. FDA*, No. 8:24-cv-02110-JVS-JDE, 2025 WL 1092696, at *6 (C.D. Cal. Feb. 27, 2025) (same); *Waffle House, Inc. v. NLRB*, No. 3:24-6751-MGL, 2025 WL 602744, at *9 (D.S.C. Feb. 10, 2025) (same); *VHS Acquisition Subsidiary No. 7 v. NLRB*, --- F. Supp. 3d ---, 2024 WL 4817175, at *3-4 (D.D.C. Nov. 17, 2024) (same); *YAPP USA Auto. Sys., Inc. v. NLRB*, 748 F. Supp. 3d 497, 513 & n.6 (E.D. Mich. Sept. 9, 2024) (same); *Nexstar Media, Inc. Grp. v. NLRB*, 746 F. Supp. 3d 464, 472 (N.D. Ohio 2024) (same); *Alpine Sec. Corp. v. Nat'l Sec. Clearing Corp.*, No. 23-cv-782, 2025 WL 901847, at*5 (D. Utah Mar. 25, 2024) (due process); *Express Scripts, Inc. v. FTC*, No. 24-cv-01549, 2025 WL 521812, at *7 (E.D. Mo. Feb. 18, 2025) (due process)

all. *See Jarkesy*, 603 U.S. at 122 (the amendment "embraces all suits which are not of equity or admiralty jurisdiction" (citation modified)).  No such injury has occurred yet; no sanctions have been imposed, and no orders have been implemented that harm Plaintiffs.  Plaintiffs' motion recognizes that no injury has occurred, as it repeatedly discusses the "threats" posed by the enforcement proceedings, such as "threaten[ing] harsh sanctions" or "threaten[ing] to deprive plaintiffs of liberty and property interests."  Pls' MSJ at 10, 15; *see also id.* at 11, 16-17.  The Court thus has no jurisdiction over those claims because they relate to possible results of the enforcement proceeding rather than arguing that "the agencies, as currently structured, are unconstitutional in much of their work."  *Axon*, 598 U.S. at 180.

2.  That conclusion is reinforced by the *Thunder Basin* factors.  For the first factor— "whether preclusion of district court jurisdiction 'could foreclose all meaningful judicial review,'" *Axon*, 598 U.S. at 190 (quoting *Thunder Basin*, 510 U.S. at 212-13)—Plaintiffs will have the opportunity to have meaningful judicial review regarding the Board's procedures and the scope of any sanctions imposed by the Board later.  The Supreme Court has made clear "that adequate judicial review does not usually demand a district court's involvement" as "[r]eview of agency action in a court of appeals can alone meaningfully address a party's claims."  *Id.* (citation modified).  Here, circuit court review is available once the Board has decided whether to implement any sanctions, 15 U.S.C. § 7215(c)(4)(A)-(G), (c)(5), and the Commission has decided whether to review, modify, cancel, reduce, or require remission of any sanction.  *See id.* § 7217(c)(1)-(3).  Plaintiffs will be able to have their claims meaningfully addressed then through an appeal from any adverse agency action in the court of appeals.  *Cf. Axon*, 598 U.S. at 191.

The second factor—whether the claims are "wholly collateral" to the enforcement proceeding—similarly points to no judicial review being available because, unlike in *Axon*,

Plaintiffs' concern is "about how [the Board's] power [is] wielded" and "the subject of the enforcement actions" rather than an "object[ion] to the [Board's] power generally." *Id.* at 193. That is so because Plaintiffs' claims are "about the agency's individualized merits determination" and depend on the issuance of "an unfavorable order." *See Axon*, 986 F.3d at 1196-97 (Bumatay, J., concurring in part and dissenting in part). Although Plaintiffs bring a constitutional claim, the relief they request from the Board is to have their disciplinary proceedings in front of the Board dismissed or permanently enjoined and to not have any sanctions implemented against them. *Cf. Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012) ("[P]etitioners' constitutional claims are the vehicle by which they seek to reverse the removal decisions, to return to federal employment, and to receive the compensation they would have earned but for the adverse employment action"). Those claims are thus not "wholly collateral" to § 78y's review provisions.

Finally, the third factor—whether the constitutional claims are outside the agency's expertise—is not dispositive when the other two factors support a finding of no jurisdiction. Twice, the Supreme Court has stated that whether agencies can declare a statute unconstitutional does not matter when judicial review is available after the agency has made a decision. In *Thunder Basin*, the Court held that "[e]ven if" an agency could not address constitutional questions, those claims could be "meaningfully addressed in the Court of Appeals." 510 U.S. at 215. And in *Elgin*, the Court similarly held that the availability of judicial review by the Federal Circuit was sufficient for the plaintiff's constitutional claim. 567 U.S. at 21.

3. To be sure, the Supreme Court said in *Free Enterprise Fund* and reiterated in *Axon* that some Board actions may never go before to the Commission and expressed concern that some claims may never have judicial recourse. *See Free Enter. Fund*, 561 U.S. at 490; *Axon*, 598 U.S. at 190. But those concerns do not exist for Plaintiffs' claims if they choose to petition the Board

regarding the initial decision for de novo review, PCAOB Rule 5460(a), (c), and then if necessary, seek Commission review.  17 C.F.R. § 201.440.  Any final decision by the Commission upholding a Board sanction would then be subject to judicial review under § 78y.  Plaintiffs also may file an application for Commission review, which "operate[s] as a stay" of a PCAOB disciplinary sanction "unless and until the Commission orders . . . that no such stay shall continue to operate."  15 U.S.C. § 7215(e).

## II.    Even if There Were Jurisdiction, the Board's Proceedings Do Not Deprive Plaintiffs of Any Rights Under Article III, the Seventh Amendment, or the Fifth Amendment.

### A.    There Is No Violation of Article III or the Seventh Amendment.

Plaintiffs have not demonstrated that there is any violation of Article III or the Seventh Amendment by being subjected to an enforcement proceeding by the Board.

To start, Plaintiffs invoke Article III and the Third Circuit's recent decision in *Sun Valley Orchards, LLC v. U.S. Department of Labor*, 148 F. 4th 121 (3d Cir. 2025), without explaining how Article III would be violated here.  Pls' MSJ at 9.  That claim, however, is merely a repackaged Seventh Amendment claim under the Supreme Court's decision in *Jarkesy*, as the Third Circuit explained that it was deciding the claim under Article III rather than the Seventh Amendment because the plaintiff's "complaint did not allege a violation of the Seventh Amendment."  *Sun Valley Orchards*, 148 F.4th at 128 n.3.  So the invocation of Article III should not change the Court's analysis here.

### 1.    *Jarkesy* Does Not Cover Any Remedies Other than Civil Penalties, and It Is Unclear Whether Any Penalties Will Be Sought Against Plaintiffs.

Turning to *Jarkesy*, Plaintiffs argue that this Court should expand its holding to remedies well beyond civil penalties even though the Supreme Court chose not to do so.  In *Jarkesy*, the agency issued an order for civil penalties along with several other sanctions, namely the SEC's direction to the plaintiffs "to cease and desist committing or causing violations of the antifraud

provisions," its ordered disgorgement, and its prohibition of the plaintiff "from participating in the securities industry and in offerings of penny stocks." 603 U.S. at 119. The Supreme Court held only that when an agency sought civil penalties designed to punish and deter, not to compensate, those penalties were within the scope of the Seventh Amendment and entitled to a jury trial. *Id.* at 125. It said nothing about the other ordered sanctions. *See generally id.*

Despite that, Plaintiffs argue that this Court should find that *all* possible sanctions available in the Board's enforcement proceedings—including "debarment from the public auditing profession[] and public censure"—"trigger the jury-trial right." Pls.' MSJ at 10. They aver that "censuring them and barring or suspending them from their profession" necessarily are "designed to punish and deter" because neither sanction "has any impact on those allegedly affected by Plaintiffs' conduct, or any purpose apart from punishing Plaintiffs' alleged misdeeds and deterring other regulated individuals and entities." *Id.* at 11-12.

But that contention is wrong both factually and legally. Factually, if Plaintiffs are censured and/or banned from participating in the industry, then the public will be protected. Censuring Plaintiffs would inform the public about any proven violations, enabling members of the public to decide whether to work with them. And an injunction preventing Plaintiffs from participating in the industry would protect the public from Plaintiffs if they are determined to not be able to operate according to the standards required by their industry. Legally, it has long been recognized that "courts of equity [can] protect the public against injury" while courts of law "can only reach existing [torts], leaving future acts to be the subject of new prosecutions or proceedings." *Wedel v. United States*, 2 F.2d 462, 463 (9th Cir. 1924) (quoting *Mugler v. Kansas*, 123 U.S. 623, 672 (1887)). And courts faced with agencies' pursuit of similar sanctions have concluded that injunctions meant to protect the public from future violations of the law, to bar respondents from

participating in their chosen industry, and to disgorge ill-gotten gains are equitable actions without any entitlement to a jury trial. *See, e.g.*, *SEC v. Posner*, 16 F.3d 520, 521 (2d Cir. 1994) (officer and director bar was within the court's "'general equitable powers' to fashion appropriate relief for violations of the federal securities laws"); *SEC v. Wills*, 25 Fed. R. Serv. 2d 1317 (D.D.C. 1978) (finding the "equity duty [] clear" to proceed with an equitable action seeking to enjoin defendants from future violations of the law and to disgorge them of profits).

Additionally, despite offering a few facts about their investigations and formal disciplinary proceedings, *see* Pls' SMF ¶¶ 38-42, Plaintiffs say nothing about whether any monetary penalties are being sought or will be sought against them. Instead, all that is in the record is that enforcement proceedings are underway against both, but have been stayed pending the outcome of this lawsuit. Thus, at this point, there is nothing in the record demonstrating whether the Board even seeks monetary penalties, so there is no basis to find that Plaintiffs are entitled to a jury trial.

### 2. The Causes of Action Against Plaintiffs Have No Common-Law Analogue.

Likewise, there is no basis to find that the cause of action against Plaintiffs for any violations of the Sarbanes–Oxley Act, the Board's rules, or other legal requirements somehow converts an action seeking equitable remedies into an action based in law. The relevant inquiry is not whether "the nature of the cause of action" is based in common law, as Plaintiffs argue. *See* Pls' MSJ at 10 (arguing "an action must proceed before a jury if *either* the claim *or* the remedy so necessitates"). Instead, the Court must "search [] for a single historical analog, taking into consideration the nature of the cause of action and the remedy as two important factors." *Tull v. United States*, 481 U.S. 412, 421 n.6 (1987). Of those two factors, "the remedy [is] the 'more important' consideration" because "some causes of action sound in both law and equity." *Jarkesy*, 603 U.S. at 123.

17

The specific causes of action here are not entirely clear based on Plaintiffs' motion because they do not provide complete details of the violations of which they have been accused. But from the limited details available, Doe 1 is accused of failing to cooperate with a Board investigation and misleading Board inspectors, while Doe 2 allegedly failed to adequately evaluate certain accounting estimates used by a client. *See* Pls' SMF ¶¶ 39, 41. Neither is alleged to have generally committed "[a]ccounting negligence and malpractice," as Plaintiffs argue. *See* Pls' MSJ at 12-13. Instead, those allegations relate to the Board's rules, including detailed technical evaluations for how Plaintiffs should have evaluated a client's accounting estimates as an auditor and a requirement to cooperate with a Board investigation. *See* PCAOB's MSJ at 12-13; *see also id.* at 17-21 (detailing how Plaintiffs' claims are unconnected from the common law). "These standards bring no common law soil with them" because they do not "reiterate common law terms of art." *See Jarkesy*, 603 U.S. at 137.

### 3. In Any Event, Plaintiffs' Proceedings Concern Only Public Rights.

Even if the Seventh Amendment is implicated for any of the remedies sought—monetary or otherwise—the adjudication of the alleged violations of the Board's rules involve public rights and thus "no involvement by an Article III court in the initial adjudication is necessary." *Jarkesy*, 603 U.S. at 128.

1. "[T]he public-rights doctrine applies to matters 'arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it.'" *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018) (quoting *Crowell v. Benson*, 285 U.S. 22, 50 (1932)). If a class of cases involves public rights, the executive and legislative departments can carry out the subject without judicial determination, "even when [it is] 'presented in such form that the judicial power [is] capable of acting on them.'" *Jarkesy*,

603 U.S. at 128 (quoting *Den ex dem. Murray v. Hoboken Land & Imp. Co.*, 59 U.S. 272, 284 (1855)).

The subject of Plaintiffs' claims relates to public rights. To start, the requirements imposed on Plaintiffs relate to their unique position as associated persons of firms registered with the PCAOB; that association bestows on them certain responsibilities to the public. The Board's authority to investigate and conduct disciplinary proceedings applies only to "registered public accounting firm[s]" and "associated person[s]." *See* 15 U.S.C. § 7215(b)(1) (authorizing the Board to investigate acts, practices, or omissions "by a registered public accounting firm, any associated person of such firm, or both"), *id.* § 7215(c)(1) (authorizing the Board to conduct proceedings "to determine whether a registered public accounting firm, or an associated person thereof, should be disciplined"). That is so because the PCAOB was created solely for "tighter regulation of the accounting industry" modeled after "private self-regulatory organizations in the securities industry." *Free Enter. Fund*, 561 U.S. at 484. The rights at issue, therefore, do not relate to "penaliz[ing] and deter[ring] alleged wrongdoing," Pls' MSJ at 15, but to ensuring that the public is protected from accounting misconduct that caused grave harm before the passage of the Sarbanes–Oxley Act.

Further, the Board's rules that Plaintiffs allegedly violated relate to compliance with a highly specialized regulatory code, including requirements to comply with Board auditing and related standards, PCAOB Rules 3100 and 3200; compliance with ethics and independence standards set by the American Institute of Certified Public Accountants and the Commission's auditor independence rules, PCAOB Rule 3500T (citing 17 C.F.R. § 210.2-01); cooperation with inspections and investigations by the Board into alleged violations of the laws and rules within the Board's jurisdiction, PCAOB Rules 4006 and 5110; and compliance with certain auditing

standards relating to a range of conduct.  *See* Pls' SMF ¶¶ 39, 41.  Those are not "the stuff" of any common-law cause of action.  *See Jarkesy*, 603 U.S. at 128.

2.  Cases involving private rights are those in which the government's claim "is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789."  *Id.* at 127-28 (citation omitted).  The Court must examine whether "the action resembles a traditional legal claim" and "borrow[s] its cause of action from the common law," which the Court does, in part, by examining whether the modern cause of action "target[s] the same basic conduct," "employ[s] the same terms of art," and "operate[s] pursuant to similar legal principles" as the common-law analogue.  *Id.* at 134-37.

Here, Plaintiffs' alleged violations are not based on traditional actions at common law but instead relate to the Board's enforcement of rules and standards like those that state regulators and professional self-regulatory bodies have long enforced against accounting firms.  As explained by the Board, none of the causes of action against Plaintiffs has a common-law counterpart, because they relate to violations of the Board's rules that do not invoke any language used at common law for alleged professional negligence.  *See* PCAOB's MSJ at 13-14.  Instead, there has been longstanding regulation of the accounting industry by non-judicial bodies since public accounting became a profession and the subject of public importance.  *See id.* at 14-15.  And those non-judicial bodies' closest common-law analogues are to older professions—such as to the discipline of eighteenth-century barristers—where professional organizations self-disciplined without judicial involvement.  *See id.* at 15-16.  "These standards bring no common law soil with them" and do not "reiterate common law terms of art," *see Jarkesy*, 603 U.S. at 137, meaning they involve public rights rather than private ones.

3.    Plaintiffs' reliance on *Jarkesy* is misplaced because that case involved an SEC enforcement action under antifraud securities law provisions, and the Supreme Court said that fraud was a quintessential common law cause of action.  *Id.* at 134.  Plaintiffs argue that in *Jarkesy*, the Supreme Court "left little doubt that . . . the [public-rights] exception is strictly limited to its historical applications," Pls' MSJ at 15, but *Jarkesy* did no such thing.  Instead, the relevant test is to determine whether the "suit concerns private rights" by examining whether it is like "traditional actions at common law."  *Jarkesy*, 603 U.S. at 127-28 (quoting *Stern v. Marshall*, 564 U.S. 462, 484 (2011)).  If there is no common-law analogue, then the case may concern "public rights" if the function was historically within the province of the executive and legislative branches, demonstrated by the political branches exercising that power.  *Id.* at 128-30.  Nothing indicates that *Jarkesy* that precedent, so the Court's analysis instead should be whether the alleged violations of the Board's rules is "the stuff" of the common law.  As discussed above, they are not.

**B.    There Is No Due Process Clause Violation.**

Plaintiffs argue that the Board's proceedings violate the Due Process Clause in two ways.  *First*, they argue that the Board's disciplinary proceedings violate the Due Process Clause because "Plaintiffs face a single institution" during the Board's investigation of misconduct, the initial hearing before the Board's hearing officer, and appeal of any initial decision to the Board.  *See* Pls' MSJ at 18-24.  *Second*, they argue that the "secrecy of the Board's disciplinary process" violates due process.  Neither argument has merit.[3]

The Due Process Clause "is flexible and calls for such procedural protections as the particular situation demands."  *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey*

---

[3] The government assumes for purposes of Plaintiffs' Due Process Clause claim that their property interests are implicated, but as argued by the Board, Plaintiffs have overstated how those interests could be affected by those disciplinary proceedings.  *See* PCAOB's MSJ at 21 n.13.

*v. Brewer*, 408 U.S. 471, 481 (1972)).  The "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Id.* at 333 (citation modified).  That requirement is satisfied here.

### 1. The Board's Practices Comport with the Due Process Clause Under Longstanding Supreme Court Precedent.

Plaintiffs first argue that the disciplinary proceedings violate the Due Process Clause because the hearing officer is an employee of the Board and because the Board acts as both "prosecutor[] and adjudicator[]."  Pls' MSJ at 19-20.  That argument is foreclosed by Supreme Court precedent.

In *Withrow*, the Supreme Court stated that "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation."  421 U.S. at 58.  The Court observed that it is "very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings," and noted that "[v]ery similar[] claims have been squarely rejected in prior decisions of this Court."  *Id.* at 47, 56.  The Court stated that this "mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law."  *Id.* at 56.  Federal appeals courts have held the same.  *See, e.g.*, *Harline v. DEA*, 148 F.3d 1199, 1203-06 (10th Cir. 1998) (rejecting due process challenge to ALJs on ground that they were employed by agency bringing enforcement proceedings); *Cobb v. Yeutter*, 889 F.2d 724, 730-31 (6th Cir. 1989) (holding that fact that "same agency will necessarily serve both as prosecutor and as judge . . . in and of itself, is not enough to make out a due process violation").  That result is magnified here because the Board's rules prevent enforcement staff that participated in an investigation from "participat[ing] or advis[ing] in the decision, or in Board review of the decision."  PCAOB Rule 5200(d).  Similarly, the hearing officer "shall not be

responsible to, or subject to the supervision or direction of, an employee or agent of the Board engaged in the performance of investigative or prosecuting functions for the PCAOB." PCAOB, Office of Hearing Officers, Charter at 2 (Mar. 25, 2021) ("OHO Charter").[4]  Likewise, Board staff cannot engage in ex parte communications with the hearing officer or with any Board member regarding any facts in issue in a disciplinary proceeding. *See* PCAOB Rule 5403(b); OHO Charter at 2.

Plaintiffs cite the Supreme Court's decision in *Withrow* but miss its import.  The Court stated that it is a "difficult burden" to demonstrate that "the combination of investigative and adjudicative functions *necessarily* creates an unconstitutional risk of bias in administrative adjudication."  421 U.S. at 47 (emphasis added).  Under that standard, Plaintiffs must "overcome a presumption of honesty and integrity in those serving as adjudicators" by convincing a court that "under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden."  *Id.*  Plaintiffs come nowhere close to that high bar—instead, all Plaintiffs have presented is "no more evidence of bias or the risk of bias or prejudgment than inhered in the very fact that the Board had investigated and would now adjudicate."  *Id.* at 54.  Absent any evidence of "bias in a particular case," the default rule is that agencies may "constitutionally undertake both investigative and adjudicative functions."  *Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at *1 (D.C. Cir. Mar. 29, 2024) (per curiam).

---

[4] Available at https://assets.pcaobus.org/pcaob-dev/docs/default-source/enforcement/documents/oho-charter-final.pdf?sfvrsn=f23c6871_4.

Plaintiffs' insinuation that communications between enforcement staff and the Board *before* an investigation or disciplinary communication to obtain approval from the Board to either initiate a formal investigation or a disciplinary proceeding, *see* Pls' MSJ at 21, similarly does not violate due process. Those communications allow the Board to decide whether to authorize an investigation or disciplinary proceeding in the first place, and there is little risk that those communications would create any bias on the PCAOB's part, especially because the Board's rules prohibit any communication between staff involved in disciplinary proceedings and the Board (or the hearing officer). PCAOB Rule 5403; *cf. Withrow*, 421 U.S. at 55 ("The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the Board members at a later adversary hearing."). In any event, subjects of investigations are given plenty of opportunity to rebut any allegations made against them, PCAOB Rule 5109(d), belying any concerns that their due process rights are violated.

Plaintiffs also argue that their due process rights are violated by the Board reviewing the hearing officer's decision because "the appellate decisionmaker cannot be the same decisionmaker who made the decision to prosecute the case." Pls' MSJ at 22. That is incorrect. The Board is not acting as an appellate decisionmaker because a hearing officer's decision is merely an initial decision that is reviewable by the Board. PCAOB Rules 5204, 5460(a)-(b). The Board then can choose whether to "affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, an initial decision by a hearing officer and may make any findings or conclusions that in its judgment are proper based on the record." PCAOB Rule 5460(c). After any final sanction is made by the Board, the Commission then has the opportunity to review, modify, cancel, reduce, or require remission of any sanction imposed by the Board. *See* 15 U.S.C. § 7217(c)(1)-(3). This practice comports with the "almost-universal model of adjudication in the Executive Branch"

where "principal officers [] have the capacity to review decisions made by inferior adjudicative officers." *Braidwood*, 606 U.S. at 774-75 (quoting *United States v. Arthrex, Inc.*, 594 U.S. 1, 20 (2021)). And after that, a federal circuit court can review the Commission's decision if a person aggrieved files a written petition in a court of appeals requesting the order be modified or set aside. 15 U.S.C. § 78y(a)(1), (c)(1).

Finally, with no law for support, Plaintiffs argue that the Board's enforcement proceedings against them are unlawful because Plaintiffs' former employers have been the subjects of public orders issued by the Board. Pls' MSJ at 23. But it is unclear why those prior settlements would require the Board to discipline Plaintiffs, as one Plaintiff's alleged violations relate primarily to conduct during an investigation by the Board rather than any substantive violations by his employer, *see* Pls' SMF ¶ 39, and the other Plaintiff's investigation relates to his own conduct in evaluating certain accounting estimates used by a client, *see id.* ¶ 41. Thus, it is entirely speculative to assume that any violation of due process will occur at this juncture. No such due process violation would exist if the proceeding involved Article III judges. *See FTC v. Cement Inst.*, 333 U.S. 683, 703 (1948) ("[J]udges frequently try the same case more than once and decide identical issues each time, although these issues involve questions both of law and fact.").

### 2. The Board's Procedural Protections Meant to Protect the Identity of Subjects Being Investigated Do Not Violate the Due Process Clause.

Plaintiffs next argue that the disciplinary proceedings violate the Due Process Clause because they are within a "statutory shroud of secrecy" that removes Plaintiffs' "presumptive right to transparent judicial proceedings in cases of far-reaching public consequence." Pls' MSJ at 24 (quoting *Doe v. Hill*, 141 F.4th 291, 300 (D.C. Cir. 2025)). The relevant statute provides that disciplinary hearings "shall not be public, unless otherwise ordered by the Board for good cause shown, with the consent of the parties to such hearing." 15 U.S.C. § 7215(c)(2); *see* PCAOB Rule

5203 (same).  Plaintiffs' claim—raised for the first time in their motion for summary judgment—
is meritless.

Plaintiffs' arguments have no basis in the law.  *First*, Plaintiffs argue that they are "robbed"
of "critical means" of combatting their disciplinary proceedings because the Board alone knows
the result of what happened in other proceedings.  Pls' MSJ at 24-25.  But that is no different from
what occurs with state and federal prosecutors' offices that know which cases the prosecutors
chose to charge and which they did not.  Except in rare circumstances—such as when a criminal
defendant has produced "'some evidence tending to show the existence of the essential elements'
of a selective prosecution claim," *United States v. Stone*, 394 F. Supp. 3d 1, 30-31 (D.D.C. 2019)
(quoting *United States v. Armstrong*, 517 U.S. 456, 470 (1996))—information about charging
decisions is not discoverable, much less publicly available.

*Second*, Plaintiffs argue that they are "depriv[ed] [] of access to potentially favorable
precedent" and thus "deprived [] of one of the founding cornerstones of the American judicial
process."  Pls' MSJ at 25.  But that too is wrong both factually and legally.  Factually, the Board
does not treat prior nonpublic decisions as precedential.  *See* PCAOB's Statement of Material Facts
Not in Dispute and Counter-Statement of Disputed Facts, ECF No. 110-2 ("PCAOB's SMF")
¶¶ 33-34.  And legally, there is no general right for every decision to be treated as "precedent."
District court judges are not required to follow the rulings of other district court judges, even when
they reside in the same district.  *See, e.g.*, *Nat'l Union Fire Ins. Co. v. Allfirst Bank*, 282 F. Supp.
2d 339, 351 (D. Md. 2003).  And federal circuit courts regularly issue unpublished decisions with
different circuits having different rules regarding those decisions' precedential value.  *Compare*
Ninth Circuit Local Rule 36-3(a) (stating that all "[u]npublished dispositions and orders . . . are
not precedent" except in regard to the doctrine of law of the case or rules regarding claim or issue

preclusion), *with* D.C. Circuit Local Rule 32.1 (allowing parties to argue that some "unpublished orders or judgments . . . may be cited as precedent").  Regardless, there is no general right to have prior court decisions be treated as precedential, much less any authority suggesting that agency decisions that can eventually be reviewed by a federal court must be treated as precedential.

*Third*, Plaintiffs argue that the Board should be required to provide prior decisions with the names anonymized and identifying information redacted.  Pls' MSJ at 26-27.  Where that right comes from is unclear, as no statute governing the Board requires it and Plaintiffs point to no judicial decision saying that due process requires agencies to go through the time-consuming, burdensome process of collecting documents and redacting information.  This novel request to change the Board's policy is better suited as a request to Congress than one to this Court.

### III. The Board's Appointment of Its Hearing Officers and Its Ability to Remove Them at Will Comply with the Appointments Clause and Article II.

Plaintiffs argue that (1) the Board's hearing officers (when there is one appointed) are not constitutionally appointed because the hearing officer is appointed by the Board rather than the Commission directly, and (2) hearing officers are unconstitutionally protected from removal because the Board has the direct power to remove the hearing officer instead of the Commission.  Plaintiffs are wrong.  Under binding (and recent) Supreme Court precedent, an inferior officer can be lawfully appointed by another inferior officer with the approval of the "Head[] of Department[]"—here, the Commission.[5]  Similarly, there is no unconstitutional protection of the hearing officer because there is only one "for cause" barrier between the hearing officer and the President—that between the President and the Commission.  Thus, there is no Appointments Clause violation.

---

[5] Like the PCAOB, the United States assumes without conceding, for purposes of the Appointments Clause analysis, that the hearing officer is an "inferior officer."  *See* PCAOB's MSJ at 32 n.18.

A.      **The Board's Hearing Officer Is Lawfully Appointed.**

The Appointments Clause states that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. art. II, § 2, cl. 2.  In *Free Enterprise Fund*, the Supreme Court held that Board members are properly considered inferior officers under the direction of the Commission and that even though the Commission is a multimember body, it is "Head[] of Department[]" for Appointments Clause purposes.  *See* 561 U.S. at 512-13.  Plaintiffs do not contend that the Board members were unconstitutionally appointed in any way.

Instead, Plaintiffs contend that because the Board itself is not a "Head[] of Department[]," hearing officers are not constitutionally appointed.  Pls' MSJ at 30-31.  In Plaintiffs' view, the power to appoint inferior officers belongs to the Commission only, and because no statute specifically authorizes the Commission to appoint hearing officers, no hearing officers can be appointed.  *Id.* at 31-32.

But Plaintiffs are mistaken.  There can be no question that the Board's appointment of the hearing officer subject to the Commission's approval, 17 C.F.R. § 202.150, complies with the Appointments Clause.  The Supreme Court has explicitly held that an inferior officer may appoint another inferior officer as long as the department head has final approval over the appointment.  Most recently, in *Braidwood*, the Supreme Court cited with approval a 157-year-old decision in which the Court held that the appointment of "a specified number of clerks" (a type of inferior officer) by an assistant treasurer (another type of inferior officer) was constitutional when the Secretary of Treasury had to approve the assistant treasurer's decision.  *See* 606 U.S. at 785 (quoting *United States v. Hartwell*, 73 U.S. 385, 393-94 (1868)).  That was true even though "the Secretary could only approve or disapprove appointments proposed and carried out by the assistant

28

treasurer," meaning "the assistant treasurer could frustrate the Secretary's ability to appoint clerks of his choosing simply by refusing to propose their appointment." *Id.* at 786.

Based on this authority and the Court's decision in *Free Enterprise Fund*, the Court stated that "the department head's approval of an inferior officer's appointment of another inferior officer satisfies the Appointments Clause." *Id.* (internal quotation marks omitted) (quoting *Free Enter. Fund*, 561 U.S. at 512 n.13). The same is true here where the Board (an inferior officer) appoints hearing officers (another type of inferior officer) with approval by the Commission. *See* PCAOB Bylaws § 6.3 ("[T]he appointment or removal of any hearing officer shall be made by the Governing Board and shall be subject to the approval of the Securities and Exchange Commission."); 17 C.F.R. § 202.150 ("No action by the Board proposing to appoint . . . a hearing officer shall be final absent Commission approval."). The hearing officer's appointment is therefore constitutional.

The Sarbanes–Oxley Act, as well as the regulations and rules implemented to enforce it, provides an adequate mechanism for the Board and the Commission to appoint hearing officers within the bounds of the Appointments Clause. The Act allows the Board to appoint all "agents as may be necessary or appropriate" to carry out the Board's duties, 15 U.S.C. § 7211(f)(4), including conducting disciplinary proceedings. *Id*. § 7211(c)(4). It further allows the Board to delegate initial hearings and determinations "subject to the approval of the Commission. *Id.* § 7211(g)(2). The Commission also has final authority over both the appointment of any hearing officer and over any decisions made by the hearing officer. Any hearing officer must be appointed by the Board, but that decision is subject to the Commission's approval. *See* 17 C.F.R. § 202.150 ("No action by the Board proposing to appoint . . . a hearing officer shall be final absent Commission approval."); PCAOB Bylaws § 6.3 ("[T]he appointment or removal of any hearing

officer shall be made by the Governing Board and shall be subject to the approval of the Securities and Exchange Commission.").  And any decisions made by that hearing officer ultimately rest with the Commission because the Board can "affirm, reverse, modify, set aside or remand for further proceedings" any initial decision by a hearing officer, PCAOB Rule 5460(c), after which the Commission can review, modify, cancel, reduce, or require remission of any sanction imposed by the Board.  *See* 15 U.S.C. § 7217(c)(1)-(3).  Thus, "[t]aken together, [the] complementary review authorities ensure" that the Commission has discretion to review all decisions by the hearing officer, even if the Commission does not review each decision.  *Cf. Braidwood*, 606 U.S. at 767 (finding that members of a task force were inferior officers when their decisions were subject to the approval of the Secretary of Health and Human Services; thus, their appointment was constitutional for Appointments Clause purposes).

### B. At Most One Tenure Protection Exists Between the Board's Hearing Officers and the President

Plaintiffs next suggest that hearing officers are "impermissibly afford[ed] . . . multiple layers of protection from removal by the President," thereby meaning that they are insulated from the President in a manner that does not comply with Article II under the Supreme Court's decision in *Free Enterprise Fund*.  Pls' MSJ at 33.  But Plaintiffs make a key omission: the *Free Enterprise Fund* rule applies only when there are "stacked layers of tenure protection" that make it impossible for the President to have full control over an inferior officer.  *See VHS Acquisition Subsidiary No. 7 v. NLRB*, 759 F. Supp. 3d 88, 95 (D.D.C. 2024).  No such multi-layer tenure protection exists here.

1.  In *Free Enterprise Fund*, the Court decided whether having more than one layer of for-cause limitations on removal complied with the Constitution's separation of powers.  Although no statutory provision expressly addresses the circumstances under which SEC Commissioners may

be removed, the Supreme Court decided *Free Enterprise Fund* "with th[e] understanding" that the Commissioners are removable only for cause. *See* 561 U.S. at 487. And the Commission could not remove Board members unless a formal Commission order was issued to remove a Board member for-cause. *See id.* at 487-88. The Court "h[eld] that the dual for-cause limitations on the removal of Board members contravene the Constitution's separation of powers." *Id.* at 492. That was so because the President could not "ensure that the laws are faithfully executed, nor be held responsible for Board member's breach of faith" since he had not ability to oversee the Board's conduct. *Id.* at 496; *see also id.* ("Neither the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, ha[d] full control over the Board."). The Court thus severed the Board members' for-cause protection so that they could be removable at will with "the President separated from Board members by only a single level of good-cause tenure," making "[t]he Commission [] then fully responsible for the Board's actions, which are no less subject than the Commission's own functions to Presidential oversight." *Id.* at 509.

Here, at most, only one for-cause protection exists between the President and the Board's hearing officers. The Supreme Court previously assumed that the President may remove Commissioners only for cause, *see id.* at 487,[6] and Board members are removable by the Commission at will, *see id.* at 509, while hearing officers are removable at will by the Board, subject to the Commission's approval. *See* 17 C.F.R. § 202.150; PCAOB Bylaws Arts. 4.3, 4.4,

---

[6] The Supreme Court heard argument in *Trump v. Slaughter* on December 8, 2025, in which one question presented is "[w]hether the statutory removal protections for members of the Federal Trade Commission violate the separation of powers and, if so, whether *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), should be overruled." *See* Br. of Petitioners, *Trump v. Slaughter*, No. 25-332 (Oct. 10, 2025).

6.3(d); Pls' SMF ¶¶ 23-24; PCAOB's SMF ¶¶ 23, 43.    That is enough to comply with *Free Enterprise Fund*'s rule against combining multiple layers of tenure protection.

2.  That result is not changed by one of the only cases cited by Plaintiffs: Judge McFadden's recent decision in *VHS Acquisition Subsidiary No. 7 v. NLRB*.  There, Judge McFadden found that, unlike the Board's hearing officers, the National Labor Relations Board's ALJs "are cloaked in at least two—and arguably three—levels of tenure protection" due to the statutory scheme that required both the NLRB and the Merit Systems Protection Board to determine that an ALJ should be removed.  759 F. Supp. 3d at 95.  Thus, "[l]ike the stacked tenure protections in *Free Enterprise Fund*," that structure vested the decision to remove the ALJs "in other tenured officers . . . none of whom is subject to the President's direct control."  *Id.* at 95-96 (quoting *Free Enter. Fund*, 561 U.S. at 495).[7]  The same goes for the Fifth Circuit's decision in *Jarkesy v. SEC*, in which the court found that "[t]wo layers of for-cause protection impede[d]" the President's control over the performance of the SEC's ALJs.  34 F.4th 446, 463-64 (5th Cir. 2022).  Because there are not multiple layers of for-cause protection at issue in this case, there is no constitutional infirmity.

**C.    There Is No Basis to Enjoin the Board Based on Alleged Appointments Clause Violations.**

There is no violation of *Free Enterprise Fund* or the Appointments Clause for the reasons stated above.  But even if there were, there is no basis for this Court to enjoin the Board from conducting any disciplinary proceedings, as Plaintiffs request.  *See* Pls' MSJ at 35-36.  It is Plaintiffs' responsibility to demonstrate that an injunction is required, *LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, 784 F. Supp. 3d 1, 35 (D.D.C. 2025), and they provide no support for the broad relief sought. Notably, Plaintiffs point to no Supreme Court case allowing for such a broad

---

[7] Judge McFadden's decision in *VHS Acquisition* is being held in abeyance by the D.C. Circuit pending the outcome of other cases involving similar issues.  *See* Order, *VHS Acquisition Subsidiary No. 7 v. NLRB*, No. 25-5006 (Sept. 30, 2025).

injunction.  *Free Enterprise Fund* does not support their position, as the Court there rejected that "petitioners [we]re entitled to broad injunctive relief against the Board's continued operations" and merely excised the tenure restrictions, stating that the Act otherwise "remains fully operative as a law."  561 U.S. at 509 (citation omitted); *see also Seila Law*, 591 U.S. at 232-38 (severing "the offending tenure restriction").  Nor does *VHS Acquisition*, in which Judge McFadden removed the for-cause removal provision so that the NLRB could remove the ALJs at will.  759 F. Supp. 3d at 100-01.  Nor does the Fifth Circuit's decision in *Jarkesy*, in which the court specifically said it was "not address[ing] whether vacating [the SEC's judgment] would be appropriate" based on the unconstitutionality of the statutory removal restrictions for the Commission's ALJs and otherwise did not discuss a remedy for the alleged Appointments Clause violation.  34 F.4th at 465-66.  Such an injunction is much too overbroad for any alleged Article II violation.

## IV.    The Board's Exercise of Its Investigative and Adjudicatory Powers Comports with the Private Nondelegation Doctrine.

Even though their prior claims depend on the Board's status as a governmental actor for constitutional purposes, Plaintiffs argue that the Board violates the "cardinal constitutional principle [] that federal power can be wielded only by the federal government."  Pls' MSJ at 36-37 (quoting *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872 (5th Cir. 2022) ("*NHBPA*")).  Although Plaintiffs do not use the term, courts have called this type of argument a "private nondelegation doctrine" challenge.  *See, e.g.*, *id.* at 880.  To prevail under that doctrine, a plaintiff must demonstrate that (1) the entity at issue is a "private" (as opposed to a governmental) entity, *see Dep't of Transp. v. Ass'n of Am. R.R. ("Amtrak")*, 575 U.S. 43, 51, (2015), and (2) the entity "does not function subordinately to [a] supervising agency," *NHBPA*, 53 F.4th at 881; *see also Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940)

(finding that Congress did not delegate legislative authority to a private entity when the members "function[ed] subordinately to the Commission").  Plaintiffs cannot make either showing.

### A.    The Board Is a Governmental Entity.

The Board is a public entity for constitutional purposes.  The Supreme Court implicitly held as much in *Free Enterprise Fund* by depending on the fact that the Board is a "Government-created, Government-appointed entity" that "the Board is part of the Government for constitutional purposes," 561 U.S. at 485-86 (citation modified), for its holding that "Board members are executive 'Officers' as that term is used in the Constitution."  *Id.* at 506.  And Supreme Court precedent regarding Amtrak dictates a similar result.  In *Lebron* v. *National Railroad Passenger Corp.*, 513 U.S. 374 (1995), the Supreme Court held that Amtrak was a governmental entity for Bill of Rights purposes because it was a government-created corporation established by Congress that operated similarly to independent regulatory agencies like the FCC and the SEC.  *Id.* at 397-99.  And in *Amtrak*, the Court held that Amtrak was a governmental entity for private nondelegation doctrine purposes as well based on "the practical reality of federal control and supervision" where "[t]he political branches created Amtrak, control its Board, define its mission, specify many of its day-to-day operations, have imposed substantial transparency and accountability mechanisms, and, for all practical purposes, set and supervise its annual budget." 575 U.S. at 55.

The same is true here.  Congress created the Board and provided that it "shall . . . have succession until dissolved by an Act of Congress."  15 U.S.C. § 7211(a).  Congress did so to further governmental objectives that arose "[a]fter a series of celebrated accounting debacles," *Free Enter. Fund*, 561 U.S. at 484, including "oversee[ing] the audit of companies that are subject to the securities laws," "protect[ing] the interests of investors," and "further[ing] the public interest in

34

the preparation of informative, accurate, and independent audit reports." 15 U.S.C. § 7211(a).  The political branches also imposed duties on the Board, which are "subject to action by the Commission."   *Id.* § 7211(c).   The Board is also subject to substantial supervision by the Commission, *see id.* § 7217, and the Commission has ultimate control over the Board's budget. *Id.* §§ 7219(d)(1), 7219(b); *cf. Desiderio v. Nat'l Ass'n of Securities Dealers*, 191 F.3d 198, 206-07 (2d Cir. 1999) (holding that an entity was not a government entity where government did not "appoint its members"); *NHBPA*, 53 F.4th at 873–74 (government did not appoint members of Horseracing Integrity and Safety Authority, a private entity).  All these factors make clear the Board is a governmental entity for constitutional purposes.

Plaintiffs resist this conclusion based on the Board's organic statute saying that individual Board members and employees are not government actors themselves.  Pls' MSJ at 36-37.  But as the Court stated in *Amtrak*, what Congress says about the Board is "not dispositive of [its] status as a governmental entity for purposes of separation of powers analysis under the Constitution." 575 U.S. at 51.  Instead, "the practical reality of federal control and supervision prevails over Congress' disclaimer of [an entity's] governmental status."   *Id.* at 55.  Because the Board is a governmental entity, the private-nondelegation doctrine does not apply to it. *See id.* at 50-51, 55 (holding that doctrine did not apply to Amtrak because it was a "governmental entity" for purposes of the doctrine, notwithstanding statute providing that Amtrak was "not a department, agency, or instrumentality of the United States Government."). And because the Board is a public entity, its employees are public employees as well.   *Cf. Lindke v. Freed*, 601 U.S. 187, 198 (2024) (employee's action is attributable to a governmental entity when "it is traceable to the [government's] power or authority).  None of the Board's members, officers, or employees would

have any power to act while operating as private persons, so the only delegated power that they could hold is attributable to the Board.

### B.    The Board Functions Subordinately to the Commission.

Even were the Board a private entity, it "function[s] subordinately to" the Commission and all final determinations regarding disciplinary sanctions are reviewable by the Commission; therefore, its operations do not violate the private nondelegation doctrine. *See NHBPA*, 53 F.4th at 881. Delegations to private entities are constitutional if "the private entity [] act[s] only 'as an aid' to an accountable government agency that retains the ultimate authority to 'approve, disapprove, or modify' the private entity's actions and decisions on delegated matters." *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1325 (D.C. Cir. 2024) (citing *Adkins*, 310 U.S. at 388, 399), *cert. denied,* 145 S. Ct. 2751 (2025).

Here, the Board functions subordinately to the Commission. All Board members are removable by the Commission at will. *Free Enter. Fund*, 561 U.S. at 509. The Commission may also relieve the Board of authority. 15 U.S.C. § 7217(d)(1). All the Board's rules must be approved by the Commission, who must judge whether the rule is "consistent with" the Sarbanes-Oxley Act or is otherwise "necessary or appropriate in the public interest or for the protection of investors." *Id.* § 7217(b)(2)-(4). The Commission also may "amend" rules of the Board and issue binding regulations. *See* 15 U.S.C. §§ 7202(a), 7217(b)(5). All the Board's disciplinary sanctions may be reviewed, modified, canceled, or reduced by the Commission. *Id.* § 7217(c)(1)-(3). Any Board sanction is automatically stayed on the filing of an application for Commission review or the institution of proceedings by the Commission, unless and until the Commission orders that a stay should not continue. *Id.* § 7215(e). And all the Board's budgets and funding decisions ultimately belong to the Commission. *Id.* § 7219(b), (d)(1).

Plaintiffs attempt to escape this conclusion by arguing that even if the Board is subordinate to the Commission for many purposes, the Commission does not oversee every action by the Board, meaning that the Board "plainly wield[s] core executive governmental power."  Pls' MSJ at 37.  For support, they cite *NHBPA*.  *See id.*  Even assuming that case was correctly decided, it is of no help to Plaintiffs because it involved a private entity that was not "subordinate" to any federal agency because the federal agency could not modify proposed rules on its own.  53 F.4th at 885-86.  In fact, the Court contrasted the FCC and private entity's relationship with the relationship between the Commission and FINRA, because the Commission has the power to "abrogate, add to, and delete from" FINRA rules "as the SEC deems necessary or appropriate," *id.* at 887, just as the Commission can do here.

## V.  The Board's Funding Complies with the Appropriations Clause and the Taxing Clause.

Plaintiffs argue that the Board is "unconstitutionally" funding its operations because its budget is payable from an annual accounting support fee determined by the Board subject to SEC approval, 15 U.S.C. § 7219(b), (d)(1), and because it assesses mandatory fees to issuers, brokers, and dealers, *id.* § 7219(d)(2); *id.* § 78m(b)(2)(C).  Plaintiffs never fully explain which provision of the Constitution these statutory provisions conflict with.  Their Complaint cites the Appropriations Clause and the Taxing Clause, *see* Compl., ECF No. 1, but the Board's funding does not conflict with either provision.

1.  The Appropriations Clause states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. Art. I, § 9, cl. 7.  Under that clause, "an appropriation is simply a law that authorizes expenditures from a specified source of public money for designated purposes."  *CFSA*, 601 U.S. at 424; *see also Cincinnati Soap Co. v.*

*United States*, 301 U.S. 308, 321 (1937) ("[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress.").

Plaintiffs argue that they are no longer pursuing an Appropriations Clause claim, *see* Pls' MSJ at 48, yet they shoehorn that argument into their brief by arguing that there is some constitutional problem with "the private Board [being able] to determine its own budget and spending, while reserving to the SEC the mere task of approving or disapproving" the budget. *Id.* at 46. Regardless, no Appropriations Clause challenge could stand after the Supreme Court's recent decision in *CFSA*, in which the Court upheld the CFPB's self-funding mechanism that was "double-insulated" since the CFPB receives funding from the Federal Reserve Board, which itself also decides its own funding. *See Cmty. Fin. Servs. Ass'n of Am.* v. *CFPB*, 51 F.4th 616, 638 (5th Cir. 2022). Nevertheless, the Supreme Court held that the CFPB's self-funding mechanism complied with the Appropriations Clause. *CFSA*, 601 U.S. at 441.

Here, the Board's funding is not "double-insulated" so the reasons for finding that its funding mechanism complies with the Appropriations Clause are even stronger, and the Court should grant summary judgment in the Board's favor.

2. Plaintiffs' argument that the Board's revenue-raising mechanism conflicts with the Taxing Clause is foreclosed by the Supreme Court's decision in *FCC v. Consumers' Research*, 606 U.S. 656 (2025). There, the plaintiffs argued that "required contributions" to the Commission for universal-service programs that raised revenue were "taxes" such that the statute "effect[ed] an unconstitutional delegation." *Id.* at 674. The Supreme Court held that the argument was "foreclose[d]" by Supreme Court precedent and that it simply did not matter "whether or not a tax is at issue" because the usual intelligible-principle test applied all the same. *Id.* at 675. The Supreme Court further listed several revenue-raising statutes—noting those are "endemic in the

sphere of financial regulation"—that were presumably constitutional including the Federal Reserve Board's levying of assessments on Federal Reserve Banks; the Office of the Comptroller of the Currency's ("OCC") collection of assessments from OCC-chartered banks; and the Federal Deposit Insurance Corporation's charges on banks. *Id.* at 675-76. The Court then rejected the suggested approach of drawing a line between taxes and fees, holding instead that Congress must instead comply with "the usual intelligible-principle test" to decide whether the contribution mechanism violated the Constitution's nondelegation rule. *Id.* at 680-81. The Court said it did not because Congress "imposed ascertainable and meaningful guideposts for the FCC to follow when carrying out its delegated function of collecting and spending contributions from carriers." *Id.* at 681.

Here, there is no meaningful difference between the funding mechanism at issue here and the one in *Consumers' Research* or the other revenue-raising statutes cited favorably by the Court. Congress provided an intelligible principle by authorizing the Board to collect fees that are "reasonable," "necessary," and "appropriate to . . . maintain the Board," 15 U.S.C. § 7219(d)(1), and it also provided detailed frameworks for Board "duties," *id.* § 7211(c); *see id.* §§ 7212 (registration), 7213 (standard setting), 7214 (inspections), 7215 (enforcement), while setting a limit on the fees the Board may collect, which "shall not exceed" the Board's "recoverable budget expenses." *Id.* § 7219(f).

Plaintiffs' attempts to distinguish *Consumers' Research* are unavailing. *First*, Plaintiffs repackage their Appointments Clause and nondelegation challenges by arguing that unlike the FCC, the Board is a private corporation whose leaders are removable at will by the SEC rather than the President. Pls' MSJ at 45. But Plaintiffs are wrong because the PCAOB is a governmental entity, *see supra* 34-36, and because the Supreme Court has cited the Federal Reserve Board—an

agency where the President may remove members only for cause—as one revenue-raising statute that presumably complied with the Constitution. *Consumers' Research*, 606 U.S. at 676. *Second*, Plaintiffs cite a statement by Justice Kavanaugh that delegations to independent agencies could "raise substantial questions under *Article II* of the Constitution." Pls' MSJ at 46 (quoting *Consumers' Research*, 606 U.S. at 699 (Kavanaugh, J., concurring)). But even assuming that view is correct, that statement has nothing to do with the Taxing Clause, which is located in Article I of the Constitution. Thus, the rule set out in *Consumers' Research* applies and forecloses Plaintiffs' argument.

## VI.    No Permanent Injunction Is Warranted.

Because the Court should deny Plaintiffs' motion for summary judgment in full and grant summary judgment to the Board on each claim, the court need not reach whether to issue a permanent injunction stopping the Board's disciplinary proceedings against Plaintiffs. Nevertheless, if the Court does reach that issue, it should deny Plaintiffs' request because Plaintiffs have not demonstrated that they are entitled to the "drastic and extraordinary remedy" of a permanent injunction. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F.Supp.3d 45 (D.D.C. 2021) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010)).

To start, Plaintiffs' request is foreclosed by *Free Enterprise Fund*, where the Court said that "petitioners are not entitled to broad injunctive relief against the Board's continued operations" for their Appointments Clause claim. 561 U.S. at 513. Instead, they were entitled only to "declaratory relief sufficient to ensure that . . . a constitutional agency accountable to the Executive" enforced the laws. *Id.* The same reasoning applies here because, for any of the alleged

constitutional violations over which the Court has jurisdiction, declaratory relief would sufficiently remedy Plaintiffs' alleged harm.

Further, Plaintiffs cannot demonstrate irreparable harm. The D.C. Circuit has said that "being investigated by, or participating in a proceeding before, an unconstitutionally appointed officer is not" an irreparable injury "without more." *See Alpine*, 121 F.4th at 1334; *see also Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 754 (10th Cir. 2024) ("[A] separation of powers violation, alone, [does] not constitute irreparable harm . . . ."), *cert. denied* 145 S. Ct. 1047 (2025). That result is magnified here because Plaintiffs no longer work for the employers for which they were investigated, and any delay in their disciplinary proceedings at this point are the result of their actions of bringing this collateral litigation against the Board rather than any delay on the Board's part.

The balance of the equities and public interest also disfavor entering a permanent injunction. Congress established the PCAOB "to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports," 15 U.S.C. § 7211(a), and it has done just that by conducting thousands of investigations and hundreds of public disciplinary orders since its inception. In contrast, Plaintiffs' harm here is minimal since their proceedings are already stayed and there are "less drastic remed[ies]" available were the Court to conclude that any constitutional defect exists. *See Monsanto*, 561 U.S. at 165-66.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary for judgment and grant Defendants' motion for summary judgment.

Dated: December 9, 2025                    Respectfully submitted,

                                           BRETT A. SHUMATE
                                           Assistant Attorney General
                                           Civil Division

                                           ERIC HAMILTON
                                           Deputy Assistant Attorney General
                                           Federal Programs Branch

                                           CHRISTOPHER R. HALL
                                           Assistant Branch Director

                                           */s/ J. Stephen Tagert*
                                           J. STEPHEN TAGERT
                                           Federal Programs Branch
                                           Civil Division, Department of Justice
                                           1100 L Street NW
                                           Washington, DC 20005
                                           Telephone: (202) 305-5486
                                           Stephen.Tagert@usdoj.gov

                                           *Counsel for Defendants*