IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, | |
| _Plaintiff_, | |
| v. | Civil Action No. 1:24-cv-780-ACR |
| PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, | |
| _Defendant_. | |
| JOHN DOE, | |
| _Plaintiff_, | |
| v. | Civil Action No. 1:25-cv-186-ACR (consolidated with No. 1:24-cv-780 (lead), 1:25-cv-70) |
| PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, et al., | |
| _Defendants_. | |

## <u>PLAINTIFFS' RESPONSE AND REPLY TO THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT</u>

Ian D. Roffman (_pro hac vice_)
Melanie V. Woodward (_pro hac vice_)
NUTTER, MCCLENNEN & FISH LLP
Seaport West, 155 Seaport Blvd.
Boston, MA 02210
Telephone: (617) 439-2421
Email: iroffman@nutter.com

_Attorneys for Plaintiff John Doe 1 (No. 24-cv-780)_

Russell G. Ryan (DC Bar # 414472)
Casey Norman (DC Bar # 90016178)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
Telephone: (202) 869-5210
Email: russ.ryan@ncla.legal

_Attorneys for Plaintiffs John Doe 1 (No. 24-cv-780) and John Doe 2 (No. 25-cv-186)_

Thomas K. Potter, III (_pro hac vice_)
BURR & FORMAN, LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
Telephone: (615) 724-3231
Email: tpotter@burr.com

_Attorney for Plaintiff John Doe 2 (No. 25-cv-186)_

### TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................ 5

I.    *Subject-Matter Jurisdiction*: THE DOE PLAINTIFFS  RAISE STRUCTURAL
      CONSTITUTIONAL CHALLENGES  TO THE BOARD'S DISCIPLINARY
      PROCEDURES ................................................................................................ 5

      A.    The Text of the Exchange Act Negates Any Jurisdiction-Stripping ..................... 6

      B.    *Free Enterprise Fund* and *Axon/Cochran* Are Controlling ................... 7

      C.    The *Thunder Basin* Factors Confirm Jurisdiction ................................. 15

      D.    The Court Has Supplemental Jurisdiction in Any Event ....................... 18

II.   *Right to a Jury Trial in an Article III Court*: THE BOARD'S CHARGED  LEGAL
      CLAIMS DO NOT COME WITHIN THE PUBLIC RIGHTS EXCEPTION TO THE
      FUNDAMENTAL RIGHT TO A JURY TRIAL ............................................... 20

III.  *Appointments Clause:* CONGRESS NEVER GRANTED THE SEC  AUTHORITY TO
      APPOINT A CHIEF HEARING OFFICER ....................................................... 26

IV.   *Removal Protection:* THE CHIEF HEARING OFFICER IS UNCONSTITUTIONALLY
      PROTECTED FROM REMOVAL BY MULTIPLE LAYERS OF PROTECTION,
      INCLUDING THE DC HUMAN RIGHTS ACT ........................................... 28

V.    *Non-Impartial Tribunal:* THE BOARD'S SO-CALLED "GUARDRAILS"  DO NOT
      PROTECT THE DOE PLAINTIFFS FROM A CONSTITUTIONALLY
      INTOLERABLE RISK OF BIAS, IN VIOLATION OF DUE PROCESS ..................... 29

      A.    Unlike in *Withrow*, the Doe Plaintiffs Are Excluded Entirely from the Board's
            Decisions to Initiate an Investigation or Institute Disciplinary Proceedings ........ 30

      B.    The Board Admits It Has Already Resolved the Same  Factual and Legal Issues
            Alleged Against the Doe Plaintiffs ....................................................... 35

VI.   *Secrecy:* THE UNLEVEL PLAYING FIELD CREATED  BY ONE-SIDED SECRECY
      VIOLATES DUE PROCESS ........................................................................ 37

VII.  *Delegation of Executive Powers:* THE BOARD OPERATES WITHOUT THE SEC'S
      PERVASIVE SURVEILLANCE OF ITS DISCIPLINARY PROCEDURES ................ 41

VIII. *Illegal Taxation:* THE BOARD'S TAXING POWER IS  INCONSISTENT WITH
      *CONSUMERS' RESEARCH* ........................................................................ 43

IX.    A PERMANENT INJUNCTION IS APPROPRIATE .................................................... 45

CONCLUSION................................................................................................................ 46

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Page(s)**

*Abramowitz v. Lake*,
    No. 1:25-cv-887-RCL, 2025 WL 2480354 (D.D.C. Aug. 28, 2025)......................................28

*AT&T, Inc. v. FCC*,
    149 F.4th 491 (5th Cir. 2025) .........................................................................................................26

*Axon Enterprise, Inc. v. Federal Trade Commission*,
    598 U.S. 175 (2023)......................................................................................................... *passim*

*Beacon Theatres, Inc. v. Westover*,
    359 U.S. 500 (1959)........................................................................................................................22

*Carr v. Saul*,
    593 U.S. 83 (2021)..........................................................................................................................18

*CFPB v. Community Financial Services Association*,
    601 U.S. 416 (2024)........................................................................................................................45

*Chem. Waste Mgmt., Inc. v. EPA*,
    873 F.2d 1477 (D.C. Cir. 1989) .....................................................................................................34

*Dairy Queen, Inc. v. Wood*,
    369 U.S. 469 (1962)........................................................................................................................22

*Dep't of Trans. v. Assoc. of Am. Railroads*,
    575 U.S. 43 (2015)..........................................................................................................................42

*Doe v. Hill*,
    141 F.4th 291 (D.C. Cir. 2025) ..............................................................................................4, 39, 41

*Free Enter. Fund LLP v. PCAOB*,
    537 F.3d 667 (D.C. Cir. 2008), *aff'd in part, rev'd in part, and remanded*, 561
    U.S. 477 (2010)........................................................................................................................14, 30

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010)..................................................................................................................7, 15

*FTC v. Cement Inst.*,
    333 U.S. 683 (1948)................................................................................................................35, 36

*Gabelli v. S.E.C.*,
    568 U.S. 442 (2013)........................................................................................................................18

*Granfinanciera, S. A. v. Nordberg*,
    492 U.S. 33 (1989)..........................................................................................................................23

*Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*,
426 U.S. 482 (1976)................................................................................................35

*Jarkesy v. Sec. & Exch. Comm'n*,
34 F.4th 446 (5th Cir. 2022), *aff'd on other grounds*, 603 U.S. 109 (2024) ...........................18

*Kabani v. SEC*,
733 F. App'x 918 (9th Cir. 2018), *cert. denied*, 587 U.S. 986 (2019)....................................17

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025).........................................................................................26, 27

*Kokesh v. SEC*,
581 U.S. 455 (2017)................................................................................................18

*Laccetti v. SEC*,
885 F.3d. 724 (2018)................................................................................................17

*Lebron v. National R.R. Passenger Corp.*,
513 U.S. 374 (1995)..........................................................................................29, 42

*Lee v. Public Company Accounting Oversight Board*,
No. 1:21-cv-01006-CKK (D.D.C.) (Docket Nos. 18 (Amended Complaint); 19
(Answer and Counterclaim))..............................................................................14, 29

*Liu v. S.E.C.*,
591 U.S. 71 (2020)................................................................................................18

*Lucia v SEC*,
585 U.S. 237 (2018)..........................................................................................3, 11

*Lucia v. SEC*,
585 U.S. 241-49 (2018) .............................................................................................18

*Manis v. Dep't of Agric.*,
796 F. Supp. 178 (M.D.N.C. 2025) ...........................................................................10

*Marcus v. Geithner*,
813 F. Supp. 2d 11 (D.D.C. 2011) ...........................................................................29

*Matthews v. Eldridge*,
424 U.S. 319 (1976)..........................................................................................39, 40

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
53 F.4th 869 (5th Cir. 2022) ..................................................................................43

*Ortega v. Off. of the Comptroller of the Currency*,
155 F.4th 394 (5th Cir. 2025) ..................................................................................25

*Riggins v. Goodman,*
    572 F.3d 1101 (10th Cir. 2009) ...................................................................................35, 36

*Royal Canin USA v. Wullschleger,*
    604 U.S. 22 (2025)........................................................................................................19

*SEC v. Arthur Andersen LLP,*
    No. 1:01-cv-01348 (D.D.C.), SEC Lit. Rel. No. 17039...............................................25

*SEC v. Dunlap,*
    No. 01-8437-CIV-DIMITROULEAS (S.D. Fla.), SEC Lit. Rel. No. 17001 .........................25

*SEC v. Ernst & Young,*
    775 F. Supp. 411 (D.D.C. 1991)..................................................................................25

*SEC v. Jarkesy,*
    603 U.S. 109 (2024)............................................................................................. *passim*

*Simpson v. Off. of Thrift Supervision,*
    29 F.3d 1418 (9th Cir. 1994) .......................................................................................34

*St. Paul Mercury Indem. Co.. v. Red Cab Co.,*
    303 U.S. 283 (1938)......................................................................................................14

*Sun Valley Orchards, LLC v. U.S. Dep't of Lab.,*
    148 F.4th 121 (3d Cir. 2025) ........................................................................................26

*Sw. Airlines Co. v. TSA,*
    554 F.3d 1065 (D.C. Cir. 2009) ...................................................................................35

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994)............................................................................................. *passim*

*Trump v. Slaughter,*
    No. 25-332 ....................................................................................................................28

*Tull v. United States,*
    481 U.S. 412 (1987)......................................................................................................22

*VHS Acquisition Subsidiary No. 7 v. NLRB,*
    759 F. Supp. 35 88, 98 (D.D.C. 2024).................................................................28, 29

*Wildberger v. American Fed. of Gov. Employees,*
    86 F.3d 1188 (D.C. Cir. 1996) .................................................................................3, 37

*Withrow v. Larkin,*
    421 U.S. 35 (1975)............................................................................................... *passim*

*Wulferic, LLC v. U.S. Food and Drug Admin.*,
   *793 F. Supp. 3d 830* (N.D. Tex. 2025) .................................................................9

**Federal Statutes**

15 U.S.C. § 78bb(a)(2) .....................................................................................................6

15 U.S.C. § 78d-1 .........................................................................................................11

15 U.S.C. § 78u(d) ........................................................................................................46

15 U.S.C. § 78y(a)(3) ......................................................................................................6

15 U.S.C. § 7215(a) .......................................................................................................27

15 U.S.C. § 7215(b)(5)(A) ........................................................................................38, 41

15 U.S.C. § 7215(c)(4) ...................................................................................................33

15 U.S.C. § 7215(c)(4)(D) .............................................................................................21

15 U.S.C. § 7215(c)(4)(D)(ii) ........................................................................................21

15 U.S.C. § 7215(c)(7)(A) .............................................................................................25

15 U.S.C. § 7215(c)(7)(B) .............................................................................................25

15 U.S.C. § 7217 ......................................................................................................25, 27

15 U.S.C. § 7219(c)(2) ...................................................................................................21

15 U.S.C. § 7219(e)(1) ...................................................................................................45

15 U.S.C. § 7243 ...........................................................................................................24

15 U.S.C. § 7261 ...........................................................................................................24

15 U.S.C. § 7262 ...........................................................................................................24

15 U.S.C. § 7263 ...........................................................................................................24

15 U.S.C. § 7264 ...........................................................................................................24

15 U.S.C. § 7265 ...........................................................................................................24

15 U.S.C. § 7266 ...........................................................................................................24

18 U.S.C. 1341 ..............................................................................................................24

18 U.S.C. 1519 ..............................................................................................................24

28 U.S.C. § 1331 ...........................................................................................5, 19

28 U.S.C. § 1346 ...............................................................................................5

28 U.S.C. § 1367 .........................................................................................2, 5, 19

**Federal Regulations**

17 C.F.R. § 201.1001 ........................................................................................33

**PCAOB Rules**

Rule 5102 .......................................................................................................33

Rule 5109(d) ...................................................................................................34

Rule 5200 .......................................................................................................33

Rule 5200(d) ...................................................................................................31

Rule 5403 .......................................................................................................31

Rule 5403(b)(2) ...............................................................................................31

Rule 5403(b)'s .................................................................................................31

Rule 5408 .......................................................................................................38

**Constitutional Provisions**

U.S. Const. Amendment I ...................................................................................42

U.S. Const. Amendment V ............................................................................9, 37, 39

U.S. Const. Amendment VII ......................................................................... *passim*

U.S. Const. Article III ................................................................................ *passim*

**Other Authorities**

148 Cong. Rec. S7350 .......................................................................................24

Alison Forman & Adam Karogeorge, *2024 Enforcement Activity Involving
    Auditors* (March 2025).................................................................................14

*Enforcement Activity: 2024 Year in Review*, at 10-11 ..............................................14

Erica Williams and Paquita Davis, *Keynote—Fireside Chat with PCAOB Chair
    Erica Y. Williams* ......................................................................................14

Rules on Investigations and Adjudications, PCAOB Rel. No. 2003-015 (Sept. 29, 2003), *available at* https://pcaobus.org/Enforcement/Documents/Release2003-015.pdf ..............................................................................................................31

Rules on Investigations and Adjudications, PCAOB Rel. No. 2003-015 (Sept. 29, 2003), *available at* https://pcaobus.org/Enforcement/Documents/Release2003-015.pdf ..............................................................................................................32

## PRELIMINARY STATEMENT

In 2002, Congress created something our founders would never have recognized: a private corporate entity authorized to hold secret bench trials in the name of the federal government that could result in millions in financial penalties and broad employment prohibitions. The Board[1] begins its defense with its origin story: that Congress created the Board in the wake of "massive financial scandals in which undetected accounting failures played a decisive role in misleading the public." Board Br. at 1. This framing is a red herring. The Doe Plaintiffs take no issue with a federal policy of curbing financial fraud in public companies. But good intentions do not excuse unconstitutional means. The constitutionality of a public policy solution is not judged by the importance of the problem Congress sought to address, but by its faithfulness to bedrock constitutional principles. Our Constitution, drafted in direct protest to the totalitarianism of kings, ensures that our liberties are safeguarded by rule of law protections—like the right to a jury, a fair trial by an impartial tribunal, and officials who are meaningfully accountable to elected officials— even in the face of financial scandals.

Congress went too far in empowering the Board, and the Board's disciplinary process fails to pass constitutional muster for multiple reasons described in the Doe Plaintiffs' opening brief. To save itself, the Board, supported at least in part by the United States, raises a potpourri of arguments. First, the Board attempts to avoid judicial scrutiny by claiming that this Court lacks subject matter jurisdiction over certain claims. But the Supreme Court has definitively held that federal courts have original jurisdiction to hear structural constitutional challenges to administrative action unless Congress expressly stripped away that jurisdiction. *Axon Enterprise, Inc. v. Federal Trade Commission*, 598 U.S. 175, 195 (2023) ("*Axon/Cochran*"). The Board

---

[1] Capitalized terms have been defined in the Parties' prior briefs.

contends that Section 25(a) of the Securities Exchange Act of 1934 ("Exchange Act") strips this Court of jurisdiction. But that position is not supported by the text of Section 25(a) or the cases interpreting it. By its terms, Section 25(a) grants jurisdiction to federal courts of appeals to review SEC final orders, but it says nothing about stripping the district court of original jurisdiction over constitutional claims. Alternatively, the Board argues that Plaintiffs' jury trial and due process claims are not "structural" claims. But these claims are structural in every sense: they raise infirmities that apply to all contested Board disciplinary proceedings and neither the Board nor its chief hearing officer ("CHO") can improvise any workarounds that would alter the impact of those infirmities on the Doe Plaintiffs. They present the same type of "here-and-now" constitutional injury that the Supreme Court in *Axon/Cochran* and *Free Enterprise Fund* affirmed this Court's power to address. And even if they were not structural, this Court has supplemental jurisdiction over those claims under 28 U.S.C. § 1367.

On the merits of the Doe Plaintiffs' claims, the Board's arguments fare no better. Faced with the Supreme Court's decision in *Jarkesy*—which was decided after the Board instituted disciplinary proceedings against the Doe Plaintiffs—the Board attempts in vain to find daylight between this case and that now-binding precedent. *SEC v. Jarkesy*, 603 U.S. 109 (2024). *Jarkesy* involved SEC charges and sanctions that are nearly indistinguishable from the ones here and that, importantly, were brought under exactly the same comprehensive scheme for the regulation of the securities markets as this case. As in *Jarkesy*, the Board here seeks legal sanctions (monetary penalties administered by the SEC) against the Doe Plaintiffs based on claims similar to common law claims (fraud and negligence). For this reason alone, the Doe Plaintiffs are entitled to an injunction barring the Board from proceeding with its administrative disciplinary proceedings.

As to the Doe Plaintiffs' complaints about the appointment and removal protection of the CHO, the Board again is faced with defending a structure that was created before binding Supreme Court precedent clarified its unconstitutional status. The Board acknowledges, as it must, that the CHO is an inferior officer of the United States who must be appointed by the Head of a Department, which here is the SEC. But perhaps because Sarbanes-Oxley was enacted 16 years before the Supreme Court clarified the status of administrative judges in *Lucia v SEC*, 585 U.S. 237 (2018), Congress never vested the SEC with the authority to appoint the CHO. The Board strains to find an implied grant of authority by linking the Board's authority to hire *employees* with the SEC's general "oversight" over the Board. But this argument goes far beyond the type of implied authority the Supreme Court has approved. And it would effectively turn the appointment of inferior officers on its head: placing that right in the hands of another inferior officer.

The Board faces a similar predicament with the layers of removal protection for its CHO. The combined effect of *Free Enterprise Fund* and *Lucia* is that the CHO cannot be protected from removal by more than one "for-cause" layer. That's exactly the case here, as the CHO's removal is shielded by too many layers of protection. His removal requires separate votes by both the SEC and the Board, and even with these dual votes, the CHO cannot be fired for his political affiliation or any of more than a dozen other traits that protect him under the DC Human Rights Act. These protections exceed what is constitutionally permissible for an inferior officer to be constitutionally accountable to a President and, ultimately, to the people.

As to the Doe Plaintiffs' due process concerns, the Board's proceedings are biased and unfair at every level. Before the Board institutes disciplinary proceedings, it receives a presentation of evidence from its Enforcement Staff behind the respondent's back. Again, established Supreme Court precedent forecloses the Board's arguments in defense of its practice. When the Supreme

3

Court, in *Withrow v. Larkin*, 421 U.S. 35 (1975), set out the "typical model" for agency proceedings, it had a key "procedural safeguard" that the Board does not: the opportunity for the respondent to hear and respond to the administrative agency's evidence *before* it institutes disciplinary proceedings. In addition, during the briefing and hearing before the CHO, the Board's prosecution staff has access to prior CHO and Board decisions that are hidden from respondents. This one-sided access to precedent flouts the Doe Plaintiffs' "presumptive right to transparent judicial proceedings." *Doe v. Hill*, 141 F.4th 291, 300 (D.C. Cir. 2025). And, to top it off, the same Board that authorized the disciplinary proceedings in the first place—and, in this case, has already decided identical factual and legal issues against the Doe Plaintiffs' former employers—sits as an appellate body. In short, the Board's disciplinary process sets up a tilted game that is simply incompatible with the Constitution's promise of a fair trial before a fair tribunal and the statutory requirement of fair procedures.

On the Doe Plaintiffs' private nondelegation claim, the Board does not dispute that, for the government to remain accountable to the people, it cannot delegate its authority to private actors absent pervasive surveillance and supervision by the government. The Board thus is forced to ask this Court to extend the fiction that it is part of the Government to its investigative and disciplinary functions. But those functions are largely exercised without any meaningful supervision by the SEC, which has no role in the Board's investigative decisions or settlements, the primary means by which the Board carries out its enforcement powers. And the Board employees who exercise those functions are not limited by any of the legislation designed to restrain government excess, such as the Administrative Procedure Act, the Federal Government in the Sunshine Act, the Freedom of Information Act, the Federal Advisory Committee Act, the Equal Access to Justice Act, or countless others.

4

Finally, the Supreme Court's recent decision in *FCC v. Consumers' Research* demonstrates why the Board's taxing power violates Article I. While the tax that was approved in *Consumers' Research* was constrained with limiting statutory language, the Board's powers are virtually unfettered.

For these reasons, as more fully described below, this Court should enter summary judgment on all counts for the Doe Plaintiffs and deny the Board's cross-motion for summary judgment.

## ARGUMENT

I.    ***Subject-Matter Jurisdiction*: THE DOE PLAINTIFFS RAISE STRUCTURAL CONSTITUTIONAL CHALLENGES TO THE BOARD'S DISCIPLINARY PROCEDURES**

The Board implicitly concedes, as it must, the Court's subject-matter jurisdiction to decide these consolidated cases. Both cases arise under the Constitution and laws of the United States, both cases involve a controversy to which "a part of the Government" of the United States is a party, and both cases are civil actions against the same "part of the Government." *See* U.S. Const. art. III, § 2, cl. 1; 28 U.S.C. §§ 1331, 1346, 1367. Indeed, the United States has intervened in both cases precisely because they are quintessential federal-question cases.

The Board does not expressly acknowledge any of the above-cited constitutional and statutory grants of subject-matter jurisdiction over these cases. Instead, the Board insists that even though the Court has indisputable jurisdiction over the cases, it should parse through each of the individual component claims asserted in the Doe Plaintiffs' complaints to determine which ones the Court might not have had jurisdiction over had they been pled as standalone claims. To that end, the Board argues that the Court cannot exercise jurisdiction over two of the Doe Plaintiffs' many claims because Congress purportedly stripped the Court's jurisdiction over those two claims (but not the others). That's not how subject-matter jurisdiction works, especially where *all* the

asserted claims present indisputably *federal* questions. More importantly, *Free Enterprise Fund* and *Axon/Cochran* squarely held that district courts have plenary federal-question jurisdiction over the very kinds of structural constitutional claims asserted in these cases, and the Board's hair-splitting efforts to distinguish those precedents fall flat.

### A.    The Text of the Exchange Act Negates Any Jurisdiction-Stripping

The Board contends that the statutory review scheme in Exchange Act Section 25(a), 15 U.S.C. § 78y(a), implicitly strips this Court of its presumptive subject matter jurisdiction to hear the Doe Plaintiffs' jury-trial and due process claims. But that contention is belied by the text of the Exchange Act. Section 25(a) allows a person "aggrieved by a final order of the [SEC]" to seek review of that final order in a federal appeals court. *Id.* Here, there is not yet even a final order of the Board, much less a final order of the SEC. *And there may never be any such final orders*. By its terms, therefore, the statutory review scheme of Section 25(a) is categorically inapplicable to the Doe Plaintiffs' complaints.

Moreover, Section 25(a) itself is explicitly permissive rather than mandatory, saying that a person aggrieved by a final order of the SEC "may" seek post-agency review in a court of appeals. *Id.* A nearby Exchange Act provision makes clear that "the rights and remedies provided by this chapter"—presumably including the right to seek judicial review in a court of appeals if aggrieved by a final SEC order—"shall be in addition to any and all other rights and remedies that may exist at law or in equity." 15 U.S.C. § 78bb(a)(2). And even when review is sought in a court of appeals, that court's jurisdiction becomes "exclusive" only after the SEC files its administrative record with the court. *See* 15 U.S.C. § 78y(a)(3). Here, no such SEC administrative record exists. Read together, these statutory provisions negate any reasonable inference that Congress intended to divest district courts of their presumptive jurisdiction to adjudicate colorable constitutional

challenges raised long before any final SEC order is issued, and especially in circumstances where, as here, a final SEC order might *never* be issued.

    **B.**    ***Free Enterprise Fund* and *Axon/Cochran* Are Controlling**

    It is indisputable that, absent an applicable jurisdiction-stripping statute to displace it, the Court has subject-matter jurisdiction over these cases. The Board urges the Court to infer such jurisdiction-stripping—albeit for only two of Plaintiffs' several claims—in Exchange Act Section 25(a), 15 U.S.C. § 78y(a). *See* Board Br. at 6-10. But the Supreme Court has already held—*twice*, including in one case against the Board itself—that this very statutory review scheme does *not* strip district courts of jurisdiction over pre-enforcement structural constitutional challenges like those asserted by the Doe Plaintiffs.

    The Court first did so in *Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010), a case in which a Board investigative target claimed the Board's leaders were unconstitutionally appointed and protected from presidential removal. Before reaching the merits of those claims, the Court addressed whether the district court had jurisdiction to consider the case notwithstanding the statutory review scheme set out in Section 25(a). *Id.* at 489-91. The Board argued, as it does here, that this statutory review scheme stripped the district court of jurisdiction under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), wherein the Court "fabricated" "a judge-made, multi-factor balancing test ... to ferret out whether the legislators who adopted [a statutory review scheme] harbored an implicit wish to oust district courts of jurisdiction in favor of agency proceedings." *Axon Enter., Inc. v. Fed Trade Comm'n,* 598 U.S. 175, 205 (2023) (Gorsuch, J., concurring) (cleaned up). The Court squarely rejected the Board's jurisdiction-stripping argument. It held that Section 25(a) "does *not* expressly limit the jurisdiction that other statutes confer on district courts. *Nor does it do so implicitly*." 561 U.S. at 489 (citations omitted; emphasis added).

The Court unanimously reiterated that holding in *Axon/Cochran*, wherein the plaintiffs challenged the tenure protections of SEC administrative law judges ("ALJs") and claimed that agency adjudicative proceedings were inherently biased and unfair in violation of due process. *Axon/Cochran,* 598 U.S. at 182-83. In the two companion cases decided in *Axon/Cochran*, district courts had held that, despite *Free Enterprise Fund*, the statutory review schemes of the Exchange Act and the Federal Trade Commission Act implicitly stripped district courts of jurisdiction to consider the plaintiffs' claims under the *Thunder Basin* test. *See Axon/Cochron,* 598 U.S. at 184. In both cases, however, the Supreme Court again squarely rejected the jurisdiction-stripping argument, concluding that "the review schemes set out in the Exchange Act and the FTC Act do *not* displace district court jurisdiction over Axon's and Cochran's far-reaching constitutional claims." *Id.* at 185 (emphasis added).

Notwithstanding this repeat Supreme Court holding that the statutory review scheme of Exchange Act Section 25(a) and *Thunder Basin* do *not* strip district courts of jurisdiction to consider structural constitutional challenges to the Board, the SEC, and their adjudicative enforcement processes, the Board insists that the very same review scheme *does* strip this Court of its jurisdiction over two of the Doe Plaintiffs' claims—specifically, their claims that those adjudicative enforcement processes violate their right to a jury trial in an Article III court and their right to due process of law. Board Br. at 6-10, 28-30. But the Board's efforts to distinguish *Free Enterprise Fund* and *Axon/Cochran* are unavailing.

To start, *Free Enterprise Fund* was decided against the Board itself, so there is zero daylight between that case and the instant cases in that regard. Ditto for the relevant statute to be interpreted; it is the exact same one here as in both *Free Enterprise Fund* and the *Cochran* component of *Axon/Cochran*. And *Axon/Cochran* involved nearly identical Article II removal-

protection challenges to ALJs and a nearly identical Fifth Amendment due process challenge as those asserted by the Doe Plaintiffs here, so there is no distinction there either.

The Board's attempt to evade the holdings of *Free Enterprise Fund* and *Axon/Cochran* largely hinges on its contention that the Doe Plaintiffs' jury-trial claims are not "structural" within the meaning of *Free Enterprise Fund* and *Axon/Cochran*, but rather "procedural" and "case-specific." Board Br. at 7. But that purported distinction evaporates upon even cursory scrutiny.

The claim that Board disciplinary hearings systematically deprive the Doe Plaintiffs—*and all other Board respondents charged in every contested disciplinary proceeding*—of their jury-trial rights is at least as "structural" as the ALJ removal-protection claims deemed structural in *Free Enterprise Fund* and *Axon/Cochran*. The Board's disciplinary enforcement process is purposefully structured to preclude jury trials in *all* cases. Indeed, the Board has no procedural rule, process, or device by which any respondent can even request a jury trial, much less demand one. Nor is the Board structurally capable of empaneling a jury or conducting a jury trial. In other words, there is no way for the Board to fix or avoid this structural defect absent (perhaps) an act of Congress.

Thus, just like in *Free Enterprise Fund* and *Axon/Cochran*, the Doe Plaintiffs allege that the Board "is wielding authority unconstitutionally" in "a broad swath of its work," and they challenge the Board's "power to proceed at all" against themselves and others similarly situated. *Axon/Cochran*, 598 U.S. at 189; *see also Wulferic, LLC v. U.S. Food and Drug Admin.*, 793 F. Supp. 3d 830, 842 (N.D. Tex. 2025) (district court had jurisdiction to consider Seventh Amendment jury-trial claim because it is "closely intertwined with Article III" and "necessarily presents a structural constitutional challenge, like those in *Axon* and *Free Enterprise Fund* that

attack how the agency is wielding its authority").[2] There is nothing "procedural," "case-specific," or merits-related about those challenges.

Moreover, just like the removal-protection claims in *Free Enterprise Fund* and *Axon/Cochran*, the Doe Plaintiffs' jury-trial claims seek to avoid the "here-and-now" injury of being subjected to "unconstitutional agency authority" in the form of "an illegitimate proceeding, led by an illegitimate decisionmaker," *Axon/Cochran*, 598 U.S. at 191 (quoting parties' briefs). In *Axon/Cochran*, the plaintiffs claimed that their agency proceedings and ALJs were constitutionally illegitimate because the ALJs were not sufficiently accountable to a President; likewise, the Doe Plaintiffs claim their proceedings and hearing officer are constitutionally illegitimate because the hearing officer is not a jury and the proceeding is not an Article III proceeding. With both types of constitutional claims, the "here-and-now" injury is being subjected to the illegitimate adjudicator and proceeding at all—irrespective of the outcome of the proceeding. *Id.* And with both types of claims, that injury becomes permanent and irremediable, if not prevented beforehand, because it would be "impossible to remedy once the proceeding is over, which is when appellate review kicks in." *Id.*; *accord Manis v. Dep't of Agric.*, 796 F. Supp. 178, 187 (M.D.N.C. 2025) (jury-trial and Article III claims challenge "the legitimacy of the agency proceeding itself," and statutory judicial review, "which would necessarily come after the conclusion of the agency proceeding, 'would come too late to be meaningful'" (quoting *Axon/Cochran*, 598 U.S. at 191)).

The Board contends that a jury-trial claim is not structural because a federal appeals court might later set aside any adverse SEC final decision that ultimately results from the non-jury Board proceeding. But that theoretical after-the-fact remedy was equally available for the removal-

---

[2] Before the D.C. Circuit, the Board has effectively conceded this point, insisting that if the Doe Plaintiffs prevail on their constitutional claims, this case will have "far-reaching consequences." Board Motion to Govern Further Proceedings, D.C. Circuit ECF Doc. No. 2128221, at 10 (quoting *Doe v. Hill*, 141 F.4th 291, 299 (D.C. Cir. 2025)).

protection claims in *Free Enterprise Fund* and *Axon/Cochran*. Had the plaintiffs in those cases been forced to exhaust the entire SEC administrative process (and then lost), and had they later convinced an appeals court they were right all along about unconstitutional ALJ tenure protections, that appeals court could have similarly set aside the resulting final SEC decision. Indeed, in the removal-protection context, the appeals court would also have had the less drastic alternative of remanding the case to the SEC with instructions to conduct a second hearing before a constitutionally tenured agency adjudicator, such as the Commission itself or any of its individual, presidentially appointed Commissioners. *See generally* 15 U.S.C. § 78d-1 (authorizing SEC to delegate "any of its functions to ... an individual Commissioner, ... including functions with respect to hearing, determining, ordering, … or otherwise acting as to any work, business, or matter"); *cf. Lucia v. Sec. & Exch. Comm'n,*, 585 U.S. 237, 251-52 (2018) (after holding that ALJ was not constitutionally appointed, remanding to SEC for new hearing before a properly appointed adjudicator); *Axon/Cochran*, 598 U.S. at 215 (Gorsuch, J., concurring) ("this is what a *win* looks like" (emphasis in original)). That less drastic alternative remedy would *not* be available if an appeals court someday finds a violation of the Doe Plaintiffs' jury-trial rights because the Board is *structurally incapable* of providing a jury trial to *any* respondent, such that a court order remanding the case for a new Board proceeding before a jury would be impossible to comply with.

The Doe Plaintiffs' due process claims are equally structural. Indeed, the Board does not dispute that this Court has jurisdiction over the Doe Plaintiffs' claim that Board disciplinary enforcement proceedings are inherently biased because of the Board's dual investigatory and prosecutorial hats and combined exercise of executive and pseudo-judicial powers in those proceedings. *See* Board Br. at 21. The Doe Plaintiffs' due process claims concerning the Board's concealment of adjudicatory precedent from Board-accused accountants are also plainly structural,

because this constitutional defect applies, by design, across the board in all proceedings against all respondents. There is nothing procedural or case-specific about this constitutional defect, and the Board can do nothing to fix or avoid it in any given case. Just like the ALJ removal-protection and due process claims that the Supreme Court held were structural in *Axon/Cochran*, and just like the jury-trial claims here, the Doe Plaintiffs' due process claims based on the Board's combination-of-functions and concealed precedent are as structural as it gets.

As intervenor, the United States bizarrely urges this Court to repeat the same error courts in this circuit made in *Jarkesy* a decade before that case finally reached the Supreme Court. U.S. Br. at 10-12 (citing *Jarkesy v. SEC*, 48 F. Supp. 3d 32, 38 (D.D.C. 2014), *aff'd*, 803, F.3d 9 (D.C. Cir. 2015)).[3] With considerable understatement, the Government acknowledges that "certain parts" of those in-circuit decisions "may no longer be operative" in light of the Supreme Court's intervening decision in *Axon/Cochran*. *Id.* at 11. More accurately, *Axon/Cochran* effectively abrogated those decisions, largely rejecting the core of this circuit's reasoning and conclusions, especially with respect to the *Thunder Basin* factors discussed below. Moreover, this circuit's refusal to exercise jurisdiction in *Jarkesy* should be "Exhibit A" in demonstrating why courts *must* exercise jurisdiction to prevent imminent or ongoing constitutional violations by governmental actors, notwithstanding theoretical after-the-fact judicial review. Had the courts exercised jurisdiction at the time, they could have spared Mr. Jarkesy, the SEC, and other courts another decade of costly and disruptive litigation—all ultimately rendered for naught when the Supreme Court ruled that Mr. Jarkesy was right all along.

---

[3] The Board, to its credit, does not likewise *explicitly* urge the Court to retrace this circuit's errant *Jarkesy* path, although it does so implicitly.

The Board and the Government also suggest a novel and dystopian "wait and see" approach to deciding whether the Doe Plaintiffs have a constitutional right to be prosecuted only in an Article III court with a jury. Under this approach, the Doe Plaintiffs would be forced to endure a full-blown nonjury trial in the Board's non-Article III forum, and then to exhaust all of their non-Article III internal appeals within the Board, and then to exhaust their non-Article III appeals to the SEC—all *before* learning for the first time whether the trial should have been in an Article III court with a jury all along. Then, after the administrative dust clears, an appeals court would evaluate with hindsight whether any of the sanctions ultimately imposed by the Board, and upheld by the SEC, were of a type that should have entitled the Doe Plaintiffs to a jury trial in an Article III court. And if the court identified any such remedies, everyone would go back to Square One, forfeiting the time and treasure already spent and starting the yearslong process all over again, this time before a jury in an Article III court.

The Board and the Government cannot seriously believe this is how these constitutional rights should be determined. The sanctions ultimately imposed at the *end* of the process are entirely irrelevant to that determination. What counts is what sanctions the Doe Plaintiffs are *threatened with* when they are first placed in jeopardy by the Board. Courts do not, for example, allow nonconsensual felony and misdemeanor bench trials just because the court might ultimately acquit the defendant, or impose a prison sentence of less than six years or only a non-custodial sentence. Courts likewise do not dismiss diversity-of-citizenship cases after trial just because the plaintiff ultimately recovered less than the $75,000 threshold for diversity cases or because an appeals court later reduced the judgment to an amount below the diversity threshold. *See generally St. Paul Mercury Indem. Co.. v. Red Cab Co.*, 303 U.S. 283, 288-90 (1938) (jurisdiction exists unless "it is apparent, to a legal certainty," that the plaintiff cannot recover the threshold dollar amount claimed,

13

and "[e]vents occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction").

In any event, the Board has never withdrawn its directive to the hearing officer to determine the amount of civil penalties to impose on the Doe Plaintiffs if liability is found, nor have the Board's staff prosecutors ever disavowed their intention to demand penalties against the Doe Plaintiffs. The charging documents in both Doe Plaintiffs' Board proceedings explicitly cite to the statutory provision authorizing the imposition of million-dollar penalties, and the Board has made no secret of its policy, practice and expectation, confirmed by its recent track record, that sanctions will routinely include significant monetary penalties. *See, e.g.*, Cornerstone Research, *Public Company Accounting Oversight Board (PCAOB) Enforcement Activity: 2024 Year in Review*, at 10-11 (reporting record monetary penalties in recent years, with penalties being imposed in more than 90 percent of the Board's enforcement cases); Alison Forman & Adam Karogeorge, *2024 Enforcement Activity Involving Auditors*, at 22-27 (March 2025) (similar, and noting that for the second consecutive year, Board penalties against auditors exceeded SEC penalties against auditors); Erica Williams and Paquita Davis, *Keynote—Fireside Chat with PCAOB Chair Erica Y. Williams*, CPA Journal, Aug. 2024 (the Board's then-Chair noting its record-breaking penalties, the importance of deterrence through these penalties, and specifically that "cases where audit paperwork has been altered improperly" and cases where "auditors haven't applied the appropriate professional skepticism or due professional care"—the very charges now alleged against the Doe Plaintiffs—are among the types of cases that "generate these larger penalties"). It is nonsensical to force a nonjury trial to proceed in a non-Article III venue based on nothing more than the hypothetical possibility that the Board may depart from its standard practice by imposing no monetary penalties.

14

### C.    The *Thunder Basin* Factors Confirm Jurisdiction

The so-called *Thunder Basin* factors also tip decidedly against jurisdiction-stripping in this case. The Board and the Government raised identical *Thunder Basin* arguments in *Free Enterprise Fund* and *Axon/Cochran*, but the Supreme Court soundly rejected them both times. *See Free Enterprise Fund*, 561 U.S. at 489-91; *Axon/Cochran*, 598 U.S. at 188-96. But since the Board and the Government have both trotted out these same arguments for a third time, we address the *Thunder Basin* factors below.

***Meaningful Judicial Review***. First, just as in *Free Enterprise Fund* and *Axon*, "preclusion of district court jurisdiction '*could* "foreclose all meaningful judicial review"'" of the Doe Plaintiffs' jury-trial and due process claims. *Axon/Cochran*, 598 U.S. at 190 (quoting *Thunder Basin*, 510 U.S. at 212-13).[4] As the Supreme Court recognized in both cases, "some Board actions never go to the SEC—and the statutory scheme [under Exchange Act § 25(a)], we explained, 'provides only for judicial review of Commission action.'" *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 490). Indeed, it is undisputed that of the Board's more than 500 publicly issued final sanctions orders since its creation in 2002, only eight have ever been subsequently appealed to, and decided on the merits by, the SEC. *See* Board Response to SOMF ¶ 31. And the last time it happened was more than six years ago. *Id.* This track record confirms that, absent district court jurisdiction, the Doe Plaintiffs (and most other Board respondents) "might never have ... judicial recourse." *Axon/Cochran*, 598 U.S. at 190 (distinguishing Board respondents from respondents in proceedings already pending before an agency (such as the SEC or FTC) whose orders are subject to direct review by federal courts).

---

[4] The Board flips the analysis of this first factor upside down by suggesting that jurisdiction-stripping should be inferred by default so long as an after-the-fact statutory appeal to a federal court might provide meaningful judicial review. Both *Thunder Basin* and *Axon/Cochran* make clear, however, that jurisdiction-stripping should not be inferred if there is any chance that doing so might foreclose meaningful judicial review.

Absent the exercise of district court jurisdiction now to stop the Board's ongoing constitutional violations, any number of plausible intervening causes might preclude *any* future judicial review of those violations. Among other possibilities, after requiring the Doe Plaintiffs to endure what they claim is a constitutionally illegitimate adjudication superintended by a constitutionally illegitimate adjudicator, the hearing officer might actually rule in favor of one or both of the Doe Plaintiffs and impose no sanctions. Or the Board might do so on internal appeal, or abandon the case altogether. Or the SEC might set aside any sanction imposed by the Board. Or the Board and the Doe Plaintiff's might reach a settlement at some point before the SEC issues any final order on appeal from any Board sanction.[5] Or, like many Board respondents, the Doe Plaintiffs might at some point find themselves sapped of the resources and fortitude to continue defending themselves over the many years it typically takes to ever get to a final SEC order. In any of these entirely plausible scenarios, the Doe Plaintiffs would be deprived of *any* judicial review of their constitutional claims against the Board. And, importantly, the interests of justice and the public would be ill-served by depriving the federal judiciary a timely opportunity to decide whether the Board is routinely and systematically violating the Constitution. Nor would any of the foregoing outcomes "moot" or "cure" the Doe Plaintiffs' constitutional injury, because by that point the *constitutional* injury would have already been inflicted and could not be undone. That injury would be exactly the same—and irremediable by any court of appeals—even if the Board or the SEC ruled completely in their favor on the merits of the Board's charges against them.

---

[5] It is troubling that the Board insists that the Doe Plaintiff's will invariably get the chance to "raise their jury-trial claims in the court of appeals," as this necessarily assumes that the Board will ultimately rule against the Doe Plaintiffs on the merits, because if it ruled in the Doe Plaintiffs' favor there would obviously be no appeal even to the SEC, much less to a court of appeals. That baseline premise that an appeal to the courts is inevitable raises serious concerns about whether the Board has prejudged the Doe Plaintiffs' case or, at a minimum, approaches its disciplinary proceedings with a starting presumption of guilt rather than innocence.

True, belated judicial review *could* eventually happen. It has so far happened only twice in the Board's 23-year history comprised of more than 500 final sanctions orders—both times in 2018[6]—but lightning could theoretically strike again. At that point, however, any judicial remedy for the Doe Plaintiffs' constitutional injuries would be meaning*less*, not meaning*ful*. The Doe Plaintiffs by then would have been subjected to many years of what they contend are constitutionally illegitimate proceedings conducted by a constitutionally illegitimate adjudicator. An appeals court could not undo that "here-and-now" injury after the fact. *Axon/Cochran*, 598 U.S. at 191 (quoting *Seila L. LLC v. Consumer Fin. Prot. Bureau,* 591 U.S. 197, 212 (2020)). As previously noted, that injury becomes permanent and irremediable if not prevented beforehand because it would be "impossible to remedy once the proceeding is over, which is when appellate review kicks in." *Id.* As the Court noted in *Axon/Cochran*, "the court of appeals can do nothing," and that is "the rub." *Id.*

**Collateralism**. Just as in *Free Enterprise Fund* and *Axon/Cochran*, the collateralism factor of *Thunder Basin* also supports jurisdiction here "for much the same reason." *Id.* at 192. The Doe Plaintiffs are not challenging any of the audit standards the Board has charged them with violating, nor how the Board might interpret and apply those standards in regulating accountants. Their jury-trial and due process claims "do not relate to the subject of the enforcement actions," *i.e.*, compliance with auditor standards. *Id.* at 193. Instead, they object to the structural constitutionality of the Board's disciplinary process generally, not to anything particular about how the process might play out in their individual cases. Thus, in deciding the Doe Plaintiffs' constitutional claims, this Court would have neither need nor reason to rule upon any aspect of the audit standards and

---

[6] *See Laccetti v. Sec. & Exch. Comm'n*, 885 F.3d. 724 (D.C. Cir. 2018); *Kabani & Co., Inc. v. Sec. & Exch. Comm'n*, 733 F. App'x 918 (9th Cir. 2018), *cert. denied*, 587 U.S. 986 (2019).

rules the Board has charged the Doe Plaintiffs with violating—the quintessence of a collateral issue.

*Lack of Agency Expertise and Competence*. Yet again, *Free Enterprise Fund* and *Axon/Cochran* "could hardly be clearer" in confirming that the Doe Plaintiffs' constitutional claims are beyond the Board's or the SEC's competence to decide. *Axon/Cochran*, 598 U.S. at 194. In both cases, the Court said in no uncertain terms that agencies have neither the expertise *nor even the competence* to decide standard questions of administrative and constitutional law. *Axon/Cochran*, 598 U.S. at 194-95 (quoting *Free Enter. Fund*, 561 U.S. at 491); *accord Carr v. Saul*, 593 U.S. 83, 92 (2021) ("this Court has often observed that agency adjudications are generally ill-suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise" (citing *Free Enter. Fund* and other cases)).[7] The Governent effectively concedes this point. U.S. Br. at 14.

### D.    The Court Has Supplemental Jurisdiction in Any Event

Article III of the Constitution vests in courts the judicial power to decide "cases" arising under the Constitution and laws of the United States, as well as "controversies" to which the United States is a party—not individual "claims" alleged within those cases and controversies. U.S. Const. art. III, § 2. The U.S. Code likewise grants courts original jurisdiction over all "civil actions" arising under the Constitution or laws of the United States—not over individual "claims" alleged

---

[7] The SEC's lack of expertise in deciding constitutional and other questions untethered to securities law should also be evident from its dismal track record in litigating such questions. In addition to getting the jury-trial question wrong in *Jarkesy* and the jurisdictional question wrong in *Axon/Cochran*, the SEC has flunked many other non-securities exams in the recent past, including about its applicable statute of limitations, *see Kokesh v. SEC*, 581 U.S. 455, 457, 461 (2017); *Gabelli v. S.E.C.*, 568 U.S. 442, 447-49 (2013), the equitable or punitive nature of disgorgement, *see Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71, 88 (2020); *Kokesh*, 581 U.S. at 464-65, the Appointments Clause of the Constitution, *see Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 241-49 (2018), and the constitutionality of the tenure protections enjoyed by its ALJs, *see Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446, 463-65 (5th Cir. 2022), *aff'd on other grounds*, 603 U.S. 109 (2024).

as component pieces of those civil actions. 28 U.S.C. § 1331. Nothing in any of these jurisdictional grants suggests that a court having indisputable jurisdiction over a case, controversy, or civil action should nevertheless sever certain component federal claims and decline to exercise jurisdiction over them even as they continue to exercise jurisdiction over the remainder of the case.

The federal supplemental jurisdiction statute, 28 U.S.C. § 1367, further confirms this jurisdictional point. That statute, which essentially codified longstanding principles of pendent jurisdiction, provides that where a district court has original jurisdiction over a "civil action," the court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Id.* § 1367(a). *See generally Royal Canin USA v. Wullschleger*, 604 U.S. 22, 26-27, 31 (2025) (discussing history and general application of supplemental jurisdiction). Here, this Court indisputably has jurisdiction over the Doe Plaintiffs consolidated civil actions, so it has supplemental jurisdiction over all closely related claims that form part of the same constitutional case or controversy. Indeed, under well-settled principles of supplemental jurisdiction, the Court could exercise jurisdiction over even closely related *state*-law claims even though *no* federal court would *ever* have jurisdiction to hear those claims if pled as standalone claims untethered to a related federal claim.

Nothing in *Axon/Cochran*, nor in principles of judicial economy, remotely suggests that district courts must parse out the specific component federal claims asserted within an all-federal complaint and then exercise jurisdiction over only some of them but not others that are factually related, thus forcing litigants to proceed on separate tracks in two different venues—obtaining immediate judicial review of some claims while having any theoretical judicial review of the others delayed, perhaps forever. The latter claims, being indisputably federal questions, deserve no less

19

respect and attention from federal courts than they would if they were purely state-law claims over which no federal court would ever have jurisdiction absent an anchor federal claim.

## II. *Right to a Jury Trial in an Article III Court*: THE BOARD'S CHARGED LEGAL CLAIMS DO NOT COME WITHIN THE PUBLIC RIGHTS EXCEPTION TO THE FUNDAMENTAL RIGHT TO A JURY TRIAL

The Board and United States make two arguments in support of their position that the Doe Plaintiffs are not entitled to an Article III forum with a jury. They argue that the right to a jury trial in an Article III court is limited "only" to claims that existed in 1789 and that the Board's claims fall within the "public rights" exception to Article III and the Seventh Amendment. Neither argument has merit.

First, the right to a jury trial in an Article III court is *not* limited to claims that existed in 1789. Article III says that "all Cases," in both "Law and Equity," belong in the courts. U.S. Const., art. 3, § 2. And it is well-settled that the Seventh Amendment's guarantee of a jury trial for "Suits at common law" speaks to the *nature* of the cause of action and the remedy sought: whether the suit is legal in nature, as opposed to equitable or a claim in admiralty. *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 122 (2024). In other words, the jury trial right is "not limited to the 'common-law forms of action recognized' when the Seventh Amendment was ratified." *Id.* (quoting *Curtis v. Loether*, 415 U.S. 189, 193 (1974)). For all of its discussion that the accounting profession, and thus professional liability claims, arose after 1789, the Board does not argue that its claims sound exclusively in equity or admiralty law. And for good reason: they do not.

*Jarkesy* made clear that claims for monetary penalties—like the ones here—are "prototypical" common law remedies. *Id.* at 123. Here, the Board's Order Instituting Proceedings against each Doe Plaintiff expressly directs the hearing officer to determine what, if any, sanctions would be appropriate under Sarbanes-Oxley Section 105(c)(4). SOMF ¶¶ 48, 50. Section 105(c)(4) includes civil money penalties as one of the few enumerated sanctions available to the hearing

20

officer. 15 U.S.C. § 7215(c)(4)(D). And the Board has made no secret of its intention and expectation, confirmed by its recent track record, that sanctions will routinely include significant monetary penalties. *See supra* Section I.B.

The sanctions the Doe Plaintiffs face here—industry debarment and more than $1.3 million[8]—are virtually identical to the ones imposed in *Jarkesy*. As in *Jarkesy*, a monetary penalty is not remedial, but rather punishment, serving "retributive or deterrent purposes." *Id.* at 123. And as in *Jarkesy*, the Board is not obligated to return any penalty money to putative victims, *id.*; indeed, unlike the SEC, it is statutorily forbidden to do so, *see* 15 U.S.C. § 7219(c)(2) (requiring the Board to use collected penalties to fund scholarships for college and graduate accounting students). These reasons alone are sufficient under *Jarkesy* to invoke the Seventh Amendment's right to a jury. *Jarkesy*, 603 U.S. at 123 ("the remedy is all but dispositive").[9]

In addition, as explained in the Doe Plaintiffs' opening brief, any other sanctions the Board might impose—such as public censures, industry bars, or suspensions—are also statutory *legal* sanctions, not "equitable" ones. Pls. Br. at 10-12. They are designed, at least in large part, "to punish or deter the wrongdoer" rather than "solely to restore the status quo." *Jarkesy*, 603 U.S. at 123. Moreover, even if they were remedies in equity, Article III of the Constitution would ensure that only an Article III court could impose them, because it vests exclusively in those courts the "judicial Power," which extends to "*all* cases in Law *and Equity*, arising under [the] Constitution [and] the Laws of the United States." U.S. Const., art. 3, §§ 1, 2 (emphasis added). Stated otherwise, any statutory sanction a private corporation like the Board is empowered to impose

---

[8] 15 U.S.C. § 7215(c)(4)(D)(ii); SEC Release Nos. 33-11350, 34-102134, IA-6808, IC-35442 (Jan. 7, 2025) (inflation adjustments).

[9] The penalties here are also considered to be "administered" by the SEC and adjusted for inflation alongside the penalties in *Jarkesy*. *See* SEC Release Nos. 33-11350; 34-102134; IA-6808; IC-35442, dated January 7, 2025 (effective Jan. 15, 2025).

cannot, by definition, be an "equitable" sanction, because the Board is not an Article III court, and thus it lacks any constitutional power to dispense equitable remedies—especially to itself. The Board's and the Government's citation to multiple *court* decisions that have imposed industry-ban injunctions merely confirms that such injunctions are indeed equitable remedies—precisely *because* they were imposed by Article III courts, even if without a jury trial. *See* Board Br. at 8; U.S. Br. at 16-17.[10]

What's more, Doe 1 is accused of altering documents (which he denies) and then lying when he denied that he altered documents.[11] SOMF ¶ 45. Such alleged conduct, which Doe 1 disputes, bears a "close relationship" to common-law fraud. *Jarkesy*, 603 U.S. at 125. Doe 2 is accused of failing to conduct an adequate audit. SOMF ¶ at 49. This alleged conduct, which Doe 2 disputes, bears a "close relationship" to the common law professional negligence. *Jarkesy*, 603 U.S. at 124; *see also* Pls. Br. at 12-16.

Once it is established that the Board directed the hearing officer to adjudicate a fundamentally legal sanction (monetary penalties) for claims that are legal (not equitable or in admiralty), the question is whether the Board can avoid a jury trial by arguing that its claims fall within the "public rights" exception to the Seventh Amendment. Board Br. at 10. They do not. In *Jarkesy*, the Court noted "the presumption is in favor of Article III courts" and that the "public rights exception is, after all, an *exception*" and should not "swallow the rule." *Jarkesy*, 603 U.S. at

---

[10] It is also well-settled that even if some of the Board's claims or sanctions could be deemed equitable, the Doe Plaintiffs' priority right to a jury trial on any legal claims would remain intact. *See Tull v. United States*, 481 U.S. 412, 425 (1987) (citing and quoting *Curtis v. Loether*, 415 U.S. 189, 196, n. 11 (1974)); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 470-73 (1962); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510–511 (1959).

[11] The Board attempts to couch its allegations in a series of technical rule violations that govern auditor conduct and "cooperation" with the PCAOB. But notably, the alleged "non-cooperation" does not involve any failure to participate in the Board's procedures; rather, the Board alleges that Doe 1 failed to cooperate *solely* because he denies doing what they accuse him of doing.

131-32 (emphasis in original). Thus, the Board bears the burden of showing that its claims fall within an accepted public rights exception.

The public rights exception has been applied sparingly and in situations with unique historical underpinnings. Examples include taxation (*Murray's Lessee*), federal power over foreign commerce (*Oceanic Stream Navigation Co.*), tariffs on goods imported through unfair competition (*Ex parte Bakelite*), and relations with Native American tribes (*Jicarilla Apache Nation*). *See Jarkesy*, 603 U.S. at 127-130. It has not been applied to securities law claims (*Jarkesy*), which closely resemble the claims here. The Board has not cited any known application of the public rights exception to Board claims, and the agency adjudications that the Board cites notably all predate *Jarkesy* significantly, some by more than a century. And none of them comes close to supporting the oxymoron that a *public* rights exception should apply to a *nonpublic* proceeding in which a *private* corporation and its *private* staff employees seek to punish a *private* individual.

The Board argues that the public rights exception should be extended to its claims because the Board was created "to rectify deficiencies" in pre-existing regulatory systems. Board Br. at 15. Even if true, this would not distinguish the claims here from the SEC's claims in *Jarkesy*, which the Court held required a jury trial in an Article III court. In *Jarkesy*, the Court rejected the SEC's similar argument that the public rights exception applied because Congress had created "new statutory obligations." 603 U.S. at 135. Rather, the Court reaffirmed its holding in *Granfinanciera*, that "[e]ven when an action 'originate[s] in a newly fashioned regulatory scheme,' what matters is the substance of the action, not where Congress has assigned it." *Id.* at 134 (*citing Granfinanciera, S. A. v. Nordberg*, 492 U.S. 33, 52 (1989)). Here, even if the claims arise out a "newly fashioned regulatory scheme," the sanctions to be adjudicated include civil penalties for allegedly fraudulent or negligent conduct. *Id.*

23

Moreover, the Board's characterization that it was created to remedy inadequate state licensure regulations does not find support in the historical record. Rather, the Board's creation was one piece of Sarbanes-Oxley, a statute intended to enhance the preexisting federal securities laws governing financial reporting by public companies, not to fill voids left by state accounting licensure boards. Thus, the Board must be understood in the context of the other provisions of Sarbanes-Oxley that were similarly intended to improve corporate accountability—such as enhanced financial disclosures by public companies, clawback of executive bonuses after financial restatements, and additional criminal accountability for corporate fraud. *See* 15 U.S.C. §§ 7243, 7261-66; 18 U.S.C. §§ 1519, 1341 et seq. The Congressional Record cited by the Board further underscores that the purpose of the Board was to improve public company financial reporting, not reform the accounting industry. *See, e.g.,* 148 Cong. Rec. S7350 (Sarbanes-Oxley Act of 2002 – Conference Report stating bill "to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws"); *id.* at S7350 (Statement of Sen. Paul Sarbanes: "[the legislation] applies exclusively to public companies—that is, to companies registered with the Securities and Exchange Commission. It is not applicable to private companies, who make up the vast majority of companies across the country."); *id.* at S7356 (Statement of Sen. Corzine: "[this legislation] really does, in my mind, fill a large gap that has been missing in our securities laws that were written 70 years ago."); *id.* at S7358 (Statement of Sen. Johnson: "[this legislation] gives this Nation strong securities legislation"). Sarbanes-Oxley places the Board squarely within the overall comprehensive federal regulatory scheme over the securities markets, not as a stand-alone supplement to state accounting regulation, as the Board now argues.[12] *See* 15 U.S.C. § 7217. It is unsurprising, therefore, that its putative overseer is the SEC.

---

[12] The Board's reliance on state law "disbarment" cases drastically minimizes the Board's actual claims, which seek potentially massive civil penalties and employment bars. The Board's sanctions far surpass any notion of disbarment.

The Fifth Circuit's analysis in *Ortega v. Office of the Comptroller of the Currency*, 155 F.4th 394 (5th Cir. 2025), further illustrates why the Doe Plaintiffs' complaints fall outside the public rights exception. In distinguishing administrative adjudication of banking laws from the securities laws at issue in *Jarkesy*, the Fifth Circuit noted that the SEC had a "long history of adjudication in Article III courts." *Id.* at 404. Indeed, the same is true of claims against auditors. Before creation of the Board in 2002, the SEC brought professional misconduct claims against auditors, and it often brought those claims in Article III courts. *See, e.g., SEC v. Arthur Andersen LLP*, No. 1:01-cv-01348 (D.D.C.), SEC Lit. Rel. No. 17039, AAER No. 1410, 2001 WL 687562 (June 19, 2001) (SEC action filed in Article III court against audit firm and three auditors alleging, among other things, false audit certifications and failure to satisfy generally accepted auditing standards); *SEC v. Dunlap*, No. 01-8437-CIV-DIMITROULEAS (S.D. Fla.), SEC Lit. Rel. No. 17001, AAER No. 1395, 2001 WL 583203 (May 15, 2001) (SEC action filed in Article III court against audit engagement partner alleging, among other things, false audit certifications and failure to satisfy generally accepted auditing standards); *SEC v. Ernst & Young*, 775 F. Supp. 411 (D.D.C. 1991) (SEC action filed in Article III court against audit firm alleging violation of auditor independence rules). Like the securities claims in *Jarkesy*, and unlike the banking regulatory claims in *Ortega*, the types of accounting misconduct claims asserted against the Doe Plaintiffs have never been the exclusive province of administrative hearings.

This case is virtually indistinguishable from *Jarkesy* in any meaningful respect. The claims are brought as part of the same comprehensive federal regulatory scheme over the financial markets, the Board seeks similar monetary penalty and industry bar sanctions, the claims are

---

In addition to civil money penalties, the Board can bar accountants from being "associated with" registered public accounting firms even in a non-accounting capacity, ban them from associating with any public company, broker, or dealer in any financial capacity, and even require them to obtain prior Board or SEC approval before taking any job whatsoever (professional or otherwise) with any public company, broker, or dealer. 15 U.S.C. § 7215(c)(7)(A), (B).

fundamentally legal claims (not equitable or admiralty claims), and the SEC could have filed comparable claims in federal court if it had chosen to do so. Just as the SEC could not deprive Mr. Jarkesy of a jury trial in an Article III court, the Board cannot strip the Doe Plaintiffs of their constitutional right to a jury trial in an Article III court. *See also AT&T, Inc. v. FCC*, 149 F.4th 491, 499 (5th Cir. 2025) (right to jury in FCC enforcement action); *Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*, 148 F.4th 121, 127 (3d Cir. 2025) (right to jury in DOL enforcement action).

## III.    *Appointments Clause:* CONGRESS NEVER GRANTED THE SEC AUTHORITY TO APPOINT A CHIEF HEARING OFFICER

The parties agree that the CHO is an inferior officer for Constitutional purposes, that the SEC is the relevant "Head of Department," that the CHO was appointed by the Board, and that his appointment was subsequently approved by the SEC. Board Br. at 32-33, n.18. Thus, the only disputed issue for this Court to decide is whether Congress has, "by Law," vested the SEC with authority to appoint the CHO. Pls. Br. at 30-32 (quoting U.S. Const., art. 2, § 2). It has not.

Acknowledging that Congress did not expressly vest the SEC with statutory authority to appoint the CHO, the Board cites *Kennedy v. Braidwood Mgmt., Inc.,* 606 U.S. 748 (2025) in suggesting that this Court read an implied grant of authority into Sarbanes-Oxley. But *Braidwood* does not support this position. In *Braidwood*, the Supreme Court held that express statutory authority to "convene" a Task Force "of individuals with appropriate expertise" was tantamount to the authority to "appoint" the Task Force. *Id.* at 780. Thus, even though the statute did not include the "magic word"—"appoint"—its meaning was clear enough. *Id.* The structure of the statute at issue in *Braidwood*, and the fact that Congress had previously used the word "convene" in a similar way, demonstrated that Congress intended "convene" to include assembling the Task Force and selecting its members. *Id.*

There is no comparable language in Sarbanes-Oxley that demonstrates Congress intended the SEC to appoint a CHO for the Board. Sarbanes-Oxley does not authorize the SEC to "convene" hearing officers but merely directs the Board, not the SEC, to establish rules for "fair procedures." 15 U.S.C. § 7215(a). Indeed, Congress was thoughtful about defining the SEC's role in connection with investigations and disciplinary hearings and, in fact, referred to the SEC 19 times in Section 7215. But not one of those references authorizes the SEC to appoint a CHO.

The Board argues the SEC's authority to appoint the CHO can be cobbled together in a convoluted theory that the Board's statutory authority to hire "employees, accountants, attorneys, and other agents" under Section 7211(f)(4) is "subject to" SEC oversight under Section 7217. Board Br. at 35. This interpretation fails under a plain reading of the statute. Section 7211(f)(4) says nothing about the SEC's authority. Section 7211(f) enumerates powers of the Board, not the SEC, and does not even refer to hearing officers. The words "employees" and "other agents" strongly imply that this provision authorizes the Board to hire mere employees, not constitutional inferior officers, which it would not have the authority to do in any event because it is not the Head of a Department.

The Board's reference to Section 7211(g)(2) is similarly unavailing. Board Br. at 36. Section 7211(g) authorizes the Board to promulgate rules, subject to SEC approval. The Board has not promulgated any rule that the CHO must be appointed or approved by the SEC. Moreover, this reading would turn Constitutional interpretation on its head by requiring the Court to find that Congressional authorization for a Head of Department (the SEC) to appoint an inferior officer originates from a rule or policy promulgated by an inferior officer (the Board). Similarly, the Board's reliance on 17 C.F.R. 202.150 would mean that a Head of Department can give itself authority that Congress never approved. The Board's logic is too circuitous. The more

straightforward reading is the better one: if Congress intended for the SEC to appoint a CHO, it would have said so.

## IV.    *Removal Protection:* THE CHIEF HEARING OFFICER IS UNCONSTITUTIONALLY PROTECTED FROM REMOVAL BY MULTIPLE LAYERS OF PROTECTION, INCLUDING THE DC HUMAN RIGHTS ACT

As with the Doe Plaintiffs' appointment claims, the parties largely agree on the relevant facts relating to the CHO's removal protections. The CHO is an inferior officer of the United States. He is nominally an at-will employee of the Board, but his removal requires separate votes by each of the SEC and the Board. The members of the Board are removable at will. *Free Enterprise Fund*, 561, U.S. at 509. SEC Commissioners are removable only for cause. *Id.* at 487.

In the past year, judges in this district have split on whether this structure passes constitutional muster. *Compare VHS Acquisition Subsidiary No. 7 v. NLRB*, 759 F. Supp. 3d 88, 98 (D.D.C. 2024) (multiple layers are unconstitutional), *with Abramowitz v. Lake*, No. 1:25-cv-887-RCL, 2025 WL 2480354, at *11 (D.D.C. Aug. 28, 2025) (multiple layers acceptable so long as each is removable at will). And as the Board and the United States have noted, the Supreme Court has already heard oral argument in *Trump v. Slaughter*, No. 25-332, in which a question of removal protections relating to independent agencies is presented.

But the CHO here presents an additional layer of unconstitutional removal protection not present in either *VHS Acquisition Subsidiary* or *Abramowitz*. As an employee of a private District of Columbia corporation, the CHO is entitled to the employment removal protections of the District of Columbia Human Rights Act ("DCHRA"). The DCHRA is a broad antidiscrimination statute that prohibits termination of employment for a host of reasons, including "political affiliation." DC Code § 2-1402.11(a).

The DCHRA did not apply to the inferior officers in *VHA Acquisition Subsidiary* or *Abromowitz*, because they were employees of the federal government, which enjoys sovereign

28

immunity to DCHRA claims. *Marcus v. Geithner*, 813 F. Supp. 2d 11, 17 (D.D.C. 2011) ("Sovereign immunity bars DCHRA claims against the federal government."). But the Board does not enjoy sovereign immunity and thus is subject to DCHRA claims.[13] While the Board argues that it is "part of the Government" for Constitutional purposes, it is not "part of the Government" for employment law purposes or sovereign immunity purposes.[14]

Thus, in addition to the multiple layers of removal protection afforded by the requirement of separate votes by each of the Board and the SEC, the CHO cannot be removed for political affiliation. As the Supreme Court wrote in *Free Enterprise Fund*, a President must be able to remove inferior officers through no more than one layer of good-cause protection, even if a President simply determines the officer disagrees politically. *Free Enterprise* Fund, 651 U.S. at 483-43. Here, the CHO would have three layers of removal protection: first, a President would have to instruct the SEC to remove him. Then, the SEC would have to instruct the Board to remove him. Finally, the CHO would be protected if the reason for removal was political (or any other protected status under DCHRA). This is exactly the type of "attenuation from accountability" that the Constitution forbids. *VHS Acquisition Subsidiary*, 759 F. Supp. at 96.

## V.    *Non-Impartial Tribunal:* THE BOARD'S SO-CALLED "GUARDRAILS" DO NOT PROTECT THE DOE PLAINTIFFS FROM A CONSTITUTIONALLY INTOLERABLE RISK OF BIAS, IN VIOLATION OF DUE PROCESS

The Board mischaracterizes the Doe Plaintiffs' argument as a "broadside attack" on "innumerable federal, state, and municipal administrative proceedings" that will result in courts

---

[13] At least one former Board employee has sued the Board in this district for violating the DCHRA prohibition on termination based on, among other things, political affiliation. While many of the documents in that case are under seal, the Board's Answer and Counterclaim does not assert sovereign immunity. *See Lee v. Public Company Accounting Oversight Board*, No. 1:21-cv-01006-CKK (D.D.C.) (ECF Nos. 18 (Amended Complaint); 19 (Answer and Counterclaim)).

[14] Amtrak, an entity to which the Board compares itself, Board Br. at 40-41, similarly does not enjoy sovereign immunity to suit. *See Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995) ("We have no doubt … that the statutory disavowal of Amtrak's agency status deprives Amtrak of sovereign immunity from suit.").

declaring "commonplace administrative structures, used for decades" to be "so inherently unfair as to violate due process." Board Br. at 25. This is a straw man because the Board is not commonplace: the unique structure of the Board—a non-governmental, private corporation that Justice Kavanaugh once described as an "unprecedented extra-constitutional stew"[15]—is what renders its disciplinary process "so inherently unfair as to violate due process." *Id*. When the Supreme Court, in *Withrow v. Larkin*, 421 U.S. 35 (1975), set out the "typical model," Board Br. at 23, for agencies combining investigatory and adjudicative functions in a way that comports with due process, the Board did not exist. Indeed, *Withrow* accounted for the fact that different administrative processes might compel a different due process conclusion: "[t]he incredible variety of administrative mechanisms in this country will not yield to any single organizing principle." *Withrow*, 421 U.S. at 52.

The Board insists that it "follows the typical model approved in *Withrow*, while maintaining strict separation between investigative and adjudicative functions." Board Br. at 23. Not so. The Board's disciplinary process against the Doe Plaintiffs differs from the agencies at issue in *Withrow* and its progeny in crucial ways that inject an intolerably high risk of bias. The Board's attempts to sidestep these differences fall flat.

### A.    Unlike in *Withrow*, the Doe Plaintiffs Are Excluded Entirely from the Board's Decisions to Initiate an Investigation or Institute Disciplinary Proceedings

The Board readily admits that, when deciding whether to institute disciplinary proceedings, the Board "may be briefed by Enforcement Division staff about the law and facts *outside of the putative respondent's presence*." Board Br. at 25 (emphasis added). The Board argues that this does not violate the Fifth Amendment's guarantee to a fair trial before a fair tribunal because

---

[15] *Free Enter. Fund LLP v. PCAOB*, 537 F.3d 667, (D.C. Cir. 2008), *aff'd in part, rev'd in part, and remanded*, 561 U.S. 477 (2010).

"Board rules prohibit any communication between any staff involved in the proceeding and the

Board (or the hearing officer)." *Id.* But, as the Board also admits, these rules only kick in "once

[*i.e.*, after] a disciplinary proceeding has been instituted" Board Br. at 25:

- PCAOB Rule 5403(b)(2), regarding "Ex Parte Communications," provides that "any Board staff that substantially assists the interested division on the particular matter, *whether before or during the hearing,*[16] may [not] … communicate with the Board or any member of the Board on a fact in issue, unless on notice and opportunity for all parties to participate." (emphasis added). *See* Board Br. at 25.

- PCAOB Rule 5200(d), regarding "Separation of Functions," provides that "[t]he staff of the Division of Enforcement and Investigations may not participate or advise in *the [hearing officer's] decision* or in Board review of *the [hearing officer's] decision.*" (emphasis added). *See* Board Br. at 24.

- Similarly, the Charter of the Office of Hearing Officers of the Board provides that "[n]either the staff of the Division of Enforcement and Investigations nor any other staff who engaged in investigative or prosecutorial functions in a proceeding set before a hearing officer may participate or advise in the initial decision *in that proceeding.*" (emphasis added). *See* Board Br. at 24.

In other words: these so-called "guardrails" do not prevent the Board from "routinely

engaging in the practice of receiving confidential advice from their staff, including investigative

staff, up to the point when the agency authorizes an enforcement proceeding."[17] In the Board's

own words: "It is only after that point that the rules on *ex parte* communications constrain the

agency's contact with its staff."[18] Thus, the Board's focus on these rules misses the point.[19] By the

---

[16] PCAOB Rule 5403(b)'s prohibition of communications "before … the hearing" does not apply to communications between Enforcement Division staff and the Board before the Board decides whether to authorize disciplinary proceedings. Indeed, when the Board adopted Rule 5403, it stated that its purpose was to "expand[] the scope of the Board's staff that is covered by restrictions on ex parte communications with the Board *after a disciplinary proceeding is authorized.*" Rules on Investigations and Adjudications, PCAOB Rel. No. 2003-015 (Sept. 29, 2003), *available at* https://pcaobus.org/Enforcement/Documents/Release2003-015.pdf, at p. 4 (emphasis added).

[17] Rules on Investigations and Adjudications, PCAOB Rel. No. 2003-015 (Sept. 29, 2003), *available at* https://pcaobus.org/Enforcement/Documents/Release2003-015.pdf, at p. A2-101 (emphasis added).

[18] *Id.*

[19] The Board quibbles with the term "*ex parte,*" apparently taking the position that secret communications between the Board and its Enforcement Division staff are proper because no proceeding has begun. Board Br. at 25. "*Ex parte*" or not, the problem remains: the Doe Plaintiffs' exclusion from the Board's charging decision violates due process.

time disciplinary proceedings have begun, the damage has been done: the respondent has been cut out of the Enforcement Division's presentation of evidence to the Board and the Board has authorized an investigation and/or disciplinary proceedings based on that presentation.

Perhaps knowing that these Board rules do nothing to protect respondents from secret communications between the Board and its prosecution staff when the Board authorizes an investigation or disciplinary proceedings, the Board argues that it is not constitutionally required to include respondents in these communications. Relying on *Withrow*, the Board claims that these secret communications are merely "part of the process by which the Board decides *whether to authorize* an investigation or proceeding—the sort of agency deliberative activity that is ubiquitous throughout the government." Board Br. at 25-26 (emphasis in original). But the agency in *Withrow* had exactly what the Board does not: the opportunity for the respondent to hear the evidence presented against him and respond to that evidence *before* the agency instituted disciplinary proceedings against him.

In *Withrow*, the state medical board at issue held a non-adversarial "investigative hearing," at the end of which the board would determine whether to hold a "contested hearing." 421 U.S. at 40-41. At the end of the "contested hearing," the medical board would determine whether to suspend the physician's license. *Id.* at 40. The initial "investigative hearing" was an evidentiary hearing that included witness testimony. *See id.* Although the respondent-physician could not cross-examine witnesses, the respondent and his attorney were permitted to attend the entire investigative hearing—and the attorney *did* attend it. *Id.* at 39. At the end of the investigative hearing, the respondent was invited to "appear before the Board to *explain any of the evidence presented*." *Id.* at 40 (emphasis added).

As in *Withrow*, the Board hears witness testimony and receives other evidence during its investigatory process. *See* PCAOB Rule 5102. And as in *Withrow*, the Board's prosecution staff presents that testimony and evidence to the Board, which then determines whether to institute disciplinary proceedings that will determine sanctions, including suspension or revocation of the respondent's Board registration. *See* PCAOB Rule 5200; 15 U.S.C. § 7215(c)(4); 17 C.F.R. § 201.1001. But here is the crucial difference: neither the Doe Plaintiffs nor any respondents in Board proceedings are allowed to bear witness to the testimony and other evidence gathered during the Enforcement Division's investigation or their presentation of that evidence to the Board. *See* Board Resp. to SOMF ¶¶ 11, 13.

That difference matters. Sure, "[s]ubjects of investigations have a right to 'submit a written statement to the Board setting forth their interests and positions in regard to the subject matter of the investigation.'" Board Br. at 26 (quoting PCAOB Rule 5109(d)). But the quoted rule explicitly leaves it to Board staff's direction whether and to what extent they will inform respondents of the specific charges they will face. And this process does not, as the Board claims, give a respondent the "'opportunity to rebut or contextualize evidence'" before the Board makes critical charging decisions. *Id.* at 26 (quoting Pls. Br. at 21). The respondent cannot explain, contextualize, or rebut the evidence collected and presented by Enforcement Division staff to the Board, because the respondent has not even seen or heard that evidence. Further rigging the game, Enforcement Division staff *does* have the benefit of reviewing—and rebutting—any written statement the respondent chooses to make when the staff makes its case that the Board should authorize disciplinary proceedings against the respondent. *See* PCAOB Rule 5109(d). The doubly one-sided nature of the Enforcement Division staff's secret communications with the Board renders the Board the very kind of "biased decision maker [that is] constitutionally unacceptable," *Withrow*,

421 U.S. at 47, and that "impugn[s] the fairness of … board members at a later" appellate proceeding. *Id. at* 55.

None of the caselaw the Board points to changes this reality. For example, the Board cites *Simpson v. Off. of Thrift Supervision*, 29 F.3d 1418 (9th Cir. 1994) for the proposition that "involvement by agency heads in both investigative and adjudicative functions has long been ubiquitous" and that "[c]ourts have repeatedly upheld such structures." Board Br. at 22. In *Simpson*, the Ninth Circuit upheld an administrative process in which "the Director of the [Office of Thrift Supervision] both commences the proceedings by issuing the Notice of Charges and makes the final administrative determination." 29 F.3d at 1424. In rendering its opinion, the court emphasized that "[a]lthough the Director is the head of the OTS, his participation at the commencement of the proceedings is minimal." *Id.* That is not the case here. Here, the Board "commences [disciplinary] proceedings" after receiving presentations of evidence from Enforcement Division staff and making a formal determination that disciplinary proceedings are warranted. The Board's role is neither "minimal" nor a formality: the Board is *the* decisionmaker both at the time of "commenc[ing] the proceedings" and making "the final administrative determination" on appeal. *Id.*

The Board also cites *Chem. Waste Mgmt., Inc. v. EPA*, 873 F.2d 1477 (D.C. Cir. 1989). Board Br. at 22. There, the D.C. Circuit upheld an agency structure in which the agency's attorneys were permitted to serve "as Presiding Officers, provided only that they have 'had no prior connection with the case, including the performance of any investigative or prosecuting functions.'" *Id.* at 1484 (quoting 40 C.F.R. §§ 24.09, 24.13(a)). That is exactly the opposite of the way the Board operates. The Board has a significant "prior connection with the case" at the time

it sits as an appellate body: it made the key discretionary decision to institute the disciplinary proceedings in the first place.[20]

In short, the Board's proceedings look nothing like the agency proceedings in *Withrow* and its progeny where the administrative agency was "'mere[ly] expos[ed] to evidence presented' in 'nonadversary investigative procedure[].'" Board Br. at 26 (quoting *Withrow*, 421 U.S. at 26). Rather, the Board (i) receives one-sided evidence from its Enforcement Division staff—who obtain and can rebut the respondent's side of the story before making their presentation to the Board; (ii) makes the decision to institute disciplinary proceedings based on that one-sided evidence; and (iii) after having made that decision, makes the final determination on appeal.

### B.    The Board Admits It Has Already Resolved the Same Factual and Legal Issues Alleged Against the Doe Plaintiffs

The bias in the Board's cases against the Doe Plaintiffs is especially alarming: the Board *admits* that it has already made "findings … concerning factual and legal issues that are alleged by the DEI [Division of Enforcement and Investigations] in the Order[s] Instituting Proceedings" against the Doe Plaintiffs. Board Resp. to SOMF ¶ 42. The Board contends that neither the CHO (as trial judge) nor the Board (as appellate body) would be "influenced by" those findings when they sit in judgment of the Doe Plaintiffs' cases. Board Br. at 28. Rest assured, the Board says, because there is a boilerplate footnote stating that those orders "are not binding on any other person or entity in this or any other proceeding." Board Br. Opp. at 28; Board Resp. to SOMF ¶ 42.

---

[20] The other cases the Board cites fare no better. Board Br. at 22. *See Sw. Airlines Co. v. TSA*, 554 F.3d 1065, 1074-75 (D.C. Cir. 2009) (no due process violation because statute at issue did not require "opportunity for agency hearing" before final adjudication); *FTC v. Cement Inst.*, 333 U.S. 683, 700 (1948) (no due process violation when decision makers had previously expressed general opinions about general types of misconduct, unrelated to the specific case at issue); *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976) (no due process violation where school board's dismissal of striking teachers after school board had merely participated in preceding settlement negotiations); *Riggins v. Goodman*, 572 F.3d 1101, 1112-13 (10th Cir. 2009) (no due process violation because respondent merely "believed" that decision-makers were biased, but there was no allegation that decision makers had previously made "statements on the merits").

Footnote or no footnote, prior "statements on the merits by those who must make factual determinations on contested fact issues … le[ave] no room for a determination that" either the CHO's or the Board's decisions are "decisions by a fair tribunal, with the appearance of fairness." *Riggins v. Goodman*, 572 F.3d 1101, 1113 (10th Cir. 2009) (internal quotation and citation omitted). Indeed, unlike a settled consent order in an Article III court, which commonly includes only allegations in a complaint and a Consent Order entered on a "neither admit nor deny" basis, the Board's orders against the Doe Plaintiffs' employers are factual "findings," not mere allegations, and those purported "findings" are vigorously disputed by the Doe Plaintiffs.

The Board's reliance on the Supreme Court's decision in *FTC v. Cement Inst.*, 333 U.S. 683 (1948), for the proposition that "'judges frequently try the same case more than once and decide identical issues each time' without raising bias concerns" is misplaced. Board Br. at 28 (quoting *id.* at 703). There, members of the FTC had "expressed an opinion as to whether certain types of conduct were prohibited by law." *Id.* at 702. The FTC did *not*—as the Board did here—express an opinion on the very same factual and legal issues alleged against the party that would appear before it. Obviously, courts and administrative agencies routinely decide the same or even identical "issues," and do not violate due process by "express[ing] an opinion as to whether certain types of conduct were prohibited by law" in one case, and then sitting as judge in a different case involving similar conduct. *Cement Inst.*, 333 U.S. at 703. But that is not what is happening here. The Board, by its own admission, has already made "findings … concerning factual and legal issues that are alleged" *against the Doe Plaintiffs*. Board Resp. to SOMF ¶ 42.

Even if the Board has the best of intentions to set those prior factual and legal findings aside and review the Doe Plaintiffs' cases with fresh eyes, "'[t]he circumstances themselves, by presenting a significant danger of bias, create[] the inherent impropriety.'" *Wildberger v. American*

*Fed. of Gov. Employees*, 86 F.3d 1188, 1196 (D.C. Cir. 1996) (quoting *Tincher v. Piasecki*, 520 F.2d 851, 855 (7th Cir. 1975)). Because there is no dispute that the Board has already made findings on factual and legal issues identical to those alleged against the Doe Plaintiffs, "we can no longer assume that [the Board's] procedures guarantee[]" the Doe Plaintiffs their Fifth Amendment right to fair trial before an impartial tribunal. *Id.* at 1196.

In summary, not only is there a "risk of actual bias or prejudgment," the Board actually has, at two points in time, prejudged the Doe Plaintiffs' cases. *Withrow*, 421 U.S. at 47. It initiated disciplinary charges against the Doe Plaintiffs—based on a one-sided presentation from its Enforcement Division staff—and then issued public factual findings and legal conclusions on exactly the same matters that are alleged against the Doe Plaintiffs in virtually identical cases brought against their former employers and colleagues. The Board cannot now reliably doff its prosecutorial hat and don the robes of a purportedly neutral appellate judge. That is enough to "convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same [Board] … must be forbidden if the guarantee of due process is to be adequately implemented." *Id.*

## VI. *Secrecy:* THE UNLEVEL PLAYING FIELD CREATED BY ONE-SIDED SECRECY VIOLATES DUE PROCESS[21]

The Board admits that (i) its hearing officers "presiding over disciplinary proceedings have issued non-public decisions citing, applying, or otherwise referring to PCAOB Rules," "procedural law," and "federal securities law and SEC rules," Board Resp. to SOMF ¶¶ 33-34; (ii) the CHO "ha[s] issued non-public initial decision(s) in Board disciplinary proceedings finding in favor of the respondent, *id.* at ¶ 35; and (iii) "[Enforcement Division] staff may obtain any [non-public]

---

[21] The Government states that Doe Plaintiffs raised this claim for the first time in their motion for summary judgment. U.S. Br. at 26. But both Doe Plaintiffs made this claim in their complaints. Dkt. No. 1:24-cv-00780-ACR, ECF No. 1 at ¶ 52 (Doe 1); Dkt. No. 1:25-00186-ACR, ECF No. 1 at ¶ 53 (Doe 2).

decision issued by the Board and its hearing officers," *id.* at ¶ 36, but these decisions "are not available to respondents in proceedings before the Board,"[22] *id.* at ¶ 37. In other words, both sides agree: the Board and its prosecution staff have access to decades of prior non-public decisions applying Board rules, SEC rules, and securities laws, but the Doe Plaintiffs and other respondents do not.

The Board argues that this lopsided playing field is constitutionally appropriate because "'neither the Board nor the PCAOB hearing officers *have a practice of* citing such decisions' in proceedings involving different respondents, and Enforcement Division staff do not *have a practice of* citing such decisions in their briefing in proceedings involving different respondents." Board Br. at 30-31 (citing Board Resp. to SOMF ¶¶ 33-34) (emphasis added). It is not surprising that the Board, CHO, and Enforcement Division do not "have a practice of" citing to prior, non-public decisions, as those citations would make no sense to respondents, and would fly in the face of the Board's insistence that respondents "will know all the legal arguments that the Enforcement Division makes." Board Br. at 31. And in any event, the fact that the Board, CHO, and Enforcement Division staff do not "have a practice of" *citing* to the non-public decisions they have access to does not matter. What matters is that those decisions are known and available to Enforcement Division staff in making and presenting its prosecutorial case, to the CHO in deciding

---

[22] The Board adds that "non-public decisions are not available to respondents in proceedings before the Board *unless such non-public decisions are sought and ordered to be disclosed*." Board Resp. to SOMF ¶ 37 (emphasis added). This response cynically implies that if respondents in Board proceedings want to review prior decisions in which the CHO or the Board ruled in favor of the respondent or in which the CHO or the Board reviewed similar conduct and applied similar law, the respondent need only ask. But the rules the Board cites relate to the filing of motions generally, PCAOB Rule 5408, and the process by which the CHO can certify a ruling in a particular case for interlocutory review to the Board, PCAOB Rule 5408. Board Resp. to SOMF ¶ 37. Nowhere in its opposition does the Board argue or even suggest that there is any avenue for respondents to obtain CHO or Board rulings or final decisions in previously decided cases—because there is no such avenue. *See* Board Br. at 30-32. In fact, the Board objected to producing such information in this case, citing the confidentiality provision in Section 7215. 15 U.S.C. § 7215(b)(5)(A).

the case, and to the Board in ruling on any appeal. But they are not equally known or available to the Doe Plaintiffs in making and presenting their defense case at any stage of the process.

Perhaps realizing the weakness of its argument, the Board accuses the Doe Plaintiffs of "cit[ing] no decision of any court holding that a procedure like the Board's violates due process" and failing to "contend …. [t]hat they will be denied an opportunity to be heard." Board Br. at 30. Not so. As explained in the Doe Plaintiffs' opening brief, denying respondent's access to prior CHO and Board decisions violates their "presumptive right to transparent judicial proceedings" because it prevents them, other enforcement targets, and the public from "understand[ing] the issues before the [Board], the consequences of the [Board's] ruling, and the manner in which the [Board] reached its decision." *Doe v. Hill*, 141 F.4th 291, 300 (D.C. Cir. 2025). *See* Pls. Br. at 24-26. And one obvious reason for the lack of precedent directly on point—in either direction—is that there are few (if any) other adjudication processes that feature this odious informational imbalance.

The Board next argues that the *Matthews v. Eldridge* factors[23]—the Supreme Court's test for determining whether the Fifth Amendment demands a requested procedure—somehow weigh in favor of preserving the Board's exclusive access to prior Board and CHO decisions. But the Board's *Matthews* analysis is flawed.

First, the Board flippantly argues that "[t]he 'private interest that will be affected by the official action' is negligible: plaintiffs are not disadvantaged by the existence of confidential decisions that neither side invokes." Board Br. at 31 (quoting *Matthews*, 424 U.S. at 335). The Board does not explain why the Doe Plaintiffs' disadvantage is "negligible," presumably because

---

[23] *Matthews v. Eldridge* requires courts to weigh three factors: (i) the private interest that will be affected by the official action; (ii) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (iii) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976)

it can't. When weighing the nature of the private interests at issue, courts consider "the degree of potential deprivation that may be created by a particular decision" and "'the possible length of [the] wrongful deprivation.'" *Matthews*, 424 U.S. at 341 (quoting *Fusari v. Steinberg*, 419 U.S. 379, 389 (1975)). Here, the liberty, property, and reputational interests that the Doe Plaintiffs stand to lose are significant and potentially permanent, including high monetary fines and deprivation of their livelihood. *See* Pls. Br. at 16-18. That is anything but "negligible." Moreover, the Board's comment that the Doe Plaintiffs cannot be "disadvantaged by the existence of confidential decisions that neither side invokes" walks right into the point. Board Br. at 31. The Doe Plaintiffs have no opportunity to invoke those decisions because they have no idea what those decisions say. The Board, its CHO, and its Enforcement Division staff, on the other hand, *can* rely on those decisions, even if not citing them expressly, by employing their reasoning without citation.

Second, the Board argues that the "probable value" of granting respondents access to anonymized precedent is "low" because, although those decisions "might give plaintiffs ideas about additional legal arguments," they "are fully capable of developing those arguments themselves." Board Br. at 31-32. This argument does not make sense. Respondents are not "fully capable" of guessing how the CHO or the Board has decided questions of procedure or interpreted Board or SEC rules and securities laws in prior cases with comparable facts, much less capable of identifying inconsistencies in case outcomes. And the probative value extends beyond the Doe Plaintiffs: it also protects "the public's historic and presumptive right to monitor whether" federal adjudicative procedures "are doing justice between parties." *Doe v. Hill*, 141 F.4th 291, 297 (2025).

Finally, the Board argues that its interest in depriving respondents of access to precedent is "substantial" because "[c]onfidentiality is required by statute and serves important fairness

interests for other respondents." Board Br. at 32. The Board protests that redacting personally-identifying information from prior decisions does not comply with the statutory direction that "'all documents and information prepared or received by or specifically for the Board' remain 'confidential.'" Board Br. at 32 (quoting 15 U.S.C. § 7215(b)(5)(A)). The statute seeks to protect identifying features of the documents to minimize reputational harm. Indeed, that is why final Board decisions favorable to the Board and against the respondent are made public, even though they, too, are "documents and information prepared or received by or specifically for the Board." 15 U.S.C. § 7215(b)(5)(A). Anonymizing prior decisions by redacting identifying information accomplishes the goal of preserving confidentiality.

In short, neither the Board nor prior respondents who have taken on the Board and won have anything to lose by granting subsequent respondents access to anonymized nonpublic decisions. The Doe Plaintiffs, on the other hand, will be severely impaired in defending against charges that could land them in significant debt and strip them of their livelihoods if they do not have the same access to information as the entity prosecuting them.

## VII. *Delegation of Executive Powers:* THE BOARD OPERATES WITHOUT THE SEC'S PERVASIVE SURVEILLANCE OF ITS DISCIPLINARY PROCEDURES

The Board and the United States agree with the Doe Plaintiffs that Congress may not impermissibly delegate executive powers to a private entity. In its defense, the Board, joined by the United States, argues that it should not be deemed to be a private entity, and even if it is, the SEC provides adequate supervision. Board Br. at 40-41. But for purposes that are meaningful to the non-delegation principles, the Board and its employees are <u>not</u> part of the Government. And while the SEC may adequately supervise some aspects of Board activity, its disciplinary process is woefully unsupervised.

41

The Board and the Government suggest the Doe Plaintiffs are arguing inconsistently that the Board is "part of the government" for purposes of individual constitutional claims (*e.g.* jury trial and due process claims), but not for the Doe Plaintiffs' delegation claims. *See* Board Br. at 40; U.S. Br. at 33. There is no inconsistency there. In fact, the cases that the Board and the Government rely on *support* the Doe Plaintiffs' position that private entities created by Congress are "part of the government" for some purposes but not others. In *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), the Court held that Amtrak, a private for-profit corporation created by Congress, was part of the government for purposes of the First Amendment. But the Court did not hold that Amtrak was part of the government for other purposes, including delegation purposes, and in fact noted that "our cases deciding when private action might be deemed that of the state have not been a model of consistency." *Id.* at 378 (internal citation omitted). *Lebron* involved Amtrak's potential restraint on free speech, and its holding was expressly limited to rights under the First Amendment. *Id.* at 399. Similarly, in *Dep't of Trans. v. Assoc. of Am. Railroads*, 575 U.S. 43 (2015), the Court treated Amtrak as a government actor for purposes of issuing metrics and standards for the performance of passenger trains. *Id.* at 55. And again, the Court's holding was expressly limited to issuance of metrics and standards, where a "practical reality of federal control and supervision" prevailed over Amtrak's conduct in that case. *Id.*

The question here is whether the Board should be deemed part of the Government for executive delegation purposes, a question of first impression for this Court. There is no dispute that constitutional obligations under appointments, removal, and taxation clauses, and the Fifth and Seventh Amendment apply to the Board. But prohibition on unsupervised delegation of executive powers is materially different from those constitutional rights because it speaks to the status of private individuals carrying out governmental acts, and the checks and balances on their

behavior. Unlike in a *true* government agency, the Board's employees can exercise federal executive powers unrestrained by important legislation that restrains their federal employee counterparts, among these: the Administrative Procedure Act (which governs administrative agency conduct generally), the Government in the Sunshine Act (which requires open meetings), the Freedom of Information Act (which provides public access to agency documents), the Federal Advisory Committee Act (which provides access to agency advisory committee information), and importantly, the Equal Access to Justice Act (which provides remedies to individuals aggrieved by unjustified government enforcement proceedings).

The Board notes several ways in which the SEC supervises its conduct, but most of these relate to rulemaking. Board Br. at 43. The Board is notably silent about the SEC's supervision of its disciplinary proceedings. It points to no real-time supervision over the Board's discretion in the initiation of investigations, the method of investigation, the initiation of enforcement proceedings, or the conduct of disciplinary hearings and internal appeals. The Board also points to no real-time SEC supervision over Board settlements, which constitute the vast majority of its enforcement activity. At most, the Board notes that the SEC retains authority to vacate settlement orders and dismiss Board members. *See* Board Br. at 45. But this very generalized, after-the-fact form of supervision falls far short of the type of "pervasive surveillance" that is required. Thus, the facts here are much more like *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872 (5th Cir. 2022), where generalized "oversight" by the FTC was insufficient to permit executive powers to be delegated to a private entity.

## VIII. *Illegal Taxation:* THE BOARD'S TAXING POWER IS INCONSISTENT WITH *CONSUMERS' RESEARCH*

The Board's reliance on *FCC v. Consumers' Research* to support its essentially unfettered taxing power is misplaced. 606 U.S. 656, (2025). The FCC's funding mechanism in that case

involved a conventional executive branch agency directly accountable to a President. As the Government conceded during oral argument in that case, the FCC is not an "independent" agency as a President can remove its commissioners at will. *Consumers' Rsch.*, 606 U.S. at 708 (citing oral argument transcript).

Here, Congress assigned fundraising and spending authority to a private entity that is accountable to a President only through multiple layers of protections. Assessing the Board's taxing power cannot be separated from the question of to whom the power is delegated. *Id.* at 671-72. In *Consumers' Research*, the Court upheld delegation to the FCC itself, a government agency, with a private entity merely assisting in ministerial and mathematical tasks. Here, Congress did the opposite, giving primary responsibility to the private Board to determine its own budget, with the SEC simply approving the budget, and allowing the Board to set fees which it determines, without oversight, are "necessary or appropriate to establish and maintain the Board." 15 U.S.C. § 7219(e)(1). This is not a private entity assisting a government agency, it is a private entity driving the determination, and what Justice Kavanaugh described as "substantial questions under Article II." *Consumers' Rsch.,* 606 U.S. at 699 (Kavanaugh, J. concurring).

The Board argues Plaintiffs are improperly trying to "smuggle" in structural challenges and advancing an improper "combination theory" which was rejected in *Consumers' Research*. Board Br. at 48. But there, the FCC itself was a directly accountable agency and retained primary authority. Here, the structural framework of the Board is not a separate issue but the reason the delegation is unconstitutional. The same structure that protects the Board from accountability makes the delegation of taxing power unconstitutional. The delegation and accountability questions operate on the same axis, which is whether the entity exercising Congress's taxing power is sufficiently accountable to the governmental branches.

The Board asks this Court to allow an unprecedented funding scheme: a private corporation, protected from accountability to a President or Congress, exercising Congress's taxing power to fund its own operations with only the approval of an independent agency. Neither *Consumers' Research* nor *CFPB v. Community Financial Services Association*, 601 U.S. 416 (2024) contemplated or endorsed this scheme.

## IX.    A PERMANENT INJUNCTION IS APPROPRIATE

Finally, in seeking entry of a declaratory judgment rather than a permanent injunction, the Board overstates the Doe Plaintiffs' request. The Doe Plaintiffs request only that the Board be permanently enjoined from prosecuting the currently pending disciplinary proceedings *against them*, because those proceedings are unconstitutional. The relief they seek would impose no direct prohibition on the Board's ability to investigate, discipline, or reach settlements with other accountants and firms, especially those located outside the District of Columbia. While a ruling in the Doe Plaintiffs' favor might cause other litigants to raise similar challenges, that is true in any case of first impression and should not, standing alone, deter the Court from entering an injunction here. Even if the Court issued the requested injunction, moreover, the Board could—especially in conjunction with the SEC—potentially devise a lawful and constitutional alternative process for seeking penalties and other relief against the few accountants and firms who choose to defend themselves, such as referring those cases to the SEC for prosecution in federal district courts. *See* 15 U.S.C. § 78u(d) (authorizing SEC to seek injunctions, penalties, and other relief against those who violate, among other things, the rules of the Board); *id.* § 7215(b)(4)(B) (authorizing the Board to refer its investigations to SEC or others). In short, the enforcement sky will not fall if the Court enters the limited injunction the Doe Plaintiffs have requested.

## CONCLUSION

For the foregoing reasons and those stated in Plaintiffs' opening brief, Plaintiffs request that this Court enter summary judgment in their favor on all counts.

Dated: December 23, 2025

Respectfully Submitted,

/s/ Russell G. Ryan
Russell G. Ryan (DC Bar # 414472)
Casey Norman (DC Bar # 90016178)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
Telephone: (202) 869-5210
Email: russ.ryan@ncla.legal

*Attorneys for Plaintiffs John Doe 1 (No. 24-cv-780) and John Doe 2 (No. 25-cv-186)*

Thomas K. Potter, III (*pro hac vice*)
BURR & FORMAN, LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
Telephone: (615) 724-3231
Email: tpotter@burr.com

*Attorney for Plaintiff John Doe 2 (No. 25-cv-186)*

/s/ Ian D. Roffman
Ian D. Roffman (*pro hac vice*)
Melanie V. Woodward (*pro hac vice*)
NUTTER, McCLENNEN & FISH LLP
Seaport West, 155 Seaport Blvd.
Boston, MA 02210
Telephone: (617) 439-2421
Email: iroffman@nutter.com

*Attorneys for Plaintiff John Doe 1 (No. 24-cv-780)*

<u>CERTIFICATE OF SERVICE</u>

     I certify that, on December 23, 2025, a copy of the foregoing document was served upon all counsel of record through the Court's ECF system.

                                           */s/ Ian D. Roffman*

7671514

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE,<br><br>      *Plaintiff*,<br><br>      v.<br><br>PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD,<br><br>      *Defendant*. | Civil Action No. 1:24-cv-780-ACR |
| JOHN DOE,<br><br>      *Plaintiff*,<br><br>      v.<br><br>PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD,<br><br>      *Defendant*. | Civil Action No. 1:25-cv-186-ACR (consolidated with No. 1:24-cv-780 (lead)) |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE AND COUNTER-STATEMENT OF DISPUTED FACTS

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| 1.    Plaintiff Doe 1 is an accountant who previously worked as an auditor at an accounting firm ("Doe 1's Employer") registered with Defendant Public Company Accounting Oversight Board (the "Board"). (Compl., Doe 1 ECF No. 1, at ¶ 3.) | Admitted. |
| 2.    Plaintiff Doe 2 has no personal, professional, or other relationship with Doe 1, and is an accountant formerly employed by a different Board-registered accounting firm ("Doe 2 Employer"). (Compl., Doe 2 ECF No. 1, at ¶ 3.) | Admitted. |

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| 3.     The Board is a private, nonprofit corporation, headquartered in the District of Columbia. (Compl., Doe 2 ECF No. 1, at ¶ 4.) | Admitted that the Board is a nonprofit corporation headquartered in the District of Columbia.  The Sarbanes-Oxley Act provides that the "Board shall not be an agency or establishment of the United States Government" and that "[n]o member or person employed by, or agent for, the Board shall be deemed to be an officer or employee of or agent for the Federal Government by reason of such service."  15 U.S.C. § 7211(b). |
| | Denied that the Board is a "private" entity on the ground that whether the Board is "private" is a legal question.  *See, e.g.*, *Burt v. Nat'l Republican Club of Capitol Hill*, 828 F. Supp. 2d 115, 119 (D.D.C. 2011) (statement of material facts may not "merely repeat the complaint's allegations and [legal] conclusions" (alterations accepted)); *Lee v. Geren*, 480 F. Supp. 2d 198, 207 (D.D.C. 2007) (similar).  To the extent the question of whether the Board is "private" is a factual issue, denied.  *See, e.g.*, *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 50 (2015); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 486 (2010); *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995). |
| 4.     The Board is treated as "part of the government" for purposes of certain constitutional claims. (*Free Enter. Fund v. Pub. Co. Acct'g Oversight Bd.*, 561 U.S. 477, 486 (2010).) | The Board's governmental status is a legal question.  *See, e.g.*, *Burt*, 828 F. Supp. 2d at 119; *Lee*, 480 F. Supp. 2d at 207. |
| | To the extent Plaintiffs' statement is a factual rather than legal assertion, admitted that the Board is "part of the government" for constitutional purposes.  *See, e.g.*, *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. at 50; *Free Enter. Fund v. PCAOB*, 561 U.S. at 486; *Lebron*, 513 U.S. at 399. |
| 5.     The individual Board members and the Board's other nearly 1,000 staff employees are private actors. (15 U.S.C. § 7211(b).) | Whether Board members and Board employees are "private actors" is a legal question.  *See, e.g.*, *Burt*, 828 F. Supp. 2d at 119; *Lee*, 480 F. Supp. 2d at 207. |

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| | To the extent Plaintiffs' statement is a factual rather than legal assertion, admitted that the Sarbanes-Oxley Act provides that "[n]o member or person employed by, or agent for, the Board shall be deemed to be an officer or employee of or agent for the Federal Government by reason of such service." 15 U.S.C. § 7211(b). |
| | Denied that Board members and Board employees are "private actors" for all purposes in all circumstances. *See, e.g.*, *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. at 50; *Free Enter. Fund v. PCAOB*, 561 U.S. at 486; *Lebron*, 513 U.S. at 399. |
| 6.      Every accounting firm—both foreign and domestic—that participates in auditing public companies or broker-dealers under the U.S. securities laws must register with the Board, pay annual fees, and comply with the Board's rules and oversight. (*Free Enter. Fund*, 561 U.S. at 484-85.) | Admitted. |
| 7.      The Board's organization includes a Division of Enforcement and Investigations ("Enforcement Staff"), which is overseen by a Director of Enforcement and Investigations ("Enforcement Director"), who reports to the Board. (*See* Board Bylaws and Rules, Article VI.[1]) | Admitted. |
| 8.      The Enforcement Director may undertake informal inquiries of Board-registered firms or individuals associated with such firms. (Board Rule 5100.) | Admitted.  "The Director of Enforcement and Investigations may undertake an informal inquiry where it appears that, or to determine whether, an act or practice, or omission to act, by a registered public accounting firm, any associated person of that firm, or both, may violate - (1) any provision of the Act; (2) the Rules of the Board; (3) the provisions of the securities laws relating to the preparation and issuance of audit reports and the obligations |

---

[1] *Available at* https://assets.pcaobus.org/pcaob-dev/docs/default-source/rules/documents/rules-booklet898b4bd3-35e5-44af-a587-e28bdeccd3c4.pdf?sfvrsn=f953259d_2 (last visited Sept. 23, 2025).

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| | and liabilities of accountants with respect thereto, including the rules of the Commission issued under the Act; or (4) professional standards."  PCAOB Rule 5100(a).  "In an informal inquiry, the Director of Enforcement and Investigations may request documents, information or testimony from, or an interview with, any person," but compliance with such requests is not compulsory.  PCAOB Rule 5100(b). |
| 9.      The Enforcement Director may recommend that the Board issue an order of formal investigation of a Board-registered firm or an individual associated with such a firm. (Board Rule 5101.) | Admitted.  "Upon the recommendation of the Director of Enforcement and Investigations or the Director of Registration and Inspections, or upon the Board's own initiative, or otherwise, the Board may issue an order of formal investigation when it appears that an act or practice, or omission to act, by a registered public accounting firm or any person associated with a registered public accounting firm may violate any provision of the Act, the Rules of the Board, the provisions of the securities laws relating to the preparation and issuance of audit reports and the obligations and liabilities of accountants with respect thereto, including the rules of the Commission issued under the Act, or professional standards."  PCAOB Rule 5101(a)(1). |
| 10.     In connection with such recommendations, Board members appointed by the Securities and Exchange Commission ("SEC") routinely receive and consider *ex parte* written communications from Enforcement Staff, and engage in *ex parte* oral discussions with Enforcement Staff, about the relevant facts and legal issues. (Exhibit A, Declaration of Robert H. Cox ("Cox Decl."), at ¶ 4.) | Admitted that Board members are appointed by the Securities and Exchange Commission.  Admitted that, in the course of deciding whether to issue an order of formal investigation, Board members may receive written and/or oral communications from Division of Enforcement and Investigations ("DEI") staff regarding relevant facts and legal issues.  Denied that any such communications are "ex parte," as—by definition—any such communications occur before a disciplinary proceeding has been commenced.  Save for exceptions inapplicable to Plaintiffs' |

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| | proceedings, the Board's rules prohibit the Board from engaging in "ex parte" communications after a disciplinary proceeding has been commenced. *See* PCAOB Rule 5200(d) ("The staff of the Division of Enforcement and Investigations may not participate or advise in the decision, or in Board review of the decision, in any proceeding in which the Division of Enforcement and Investigations is the interested division, except as a witness or counsel in the proceeding.  Any other employee or agent of the Board engaged in the performance of investigative or prosecutorial functions for the Board in a proceeding may not, in that proceeding or one that is factually related, participate or advise in the decision, or in Board review of the decision, except as a witness or counsel in the proceeding."); PCAOB Rule 5403(b)(2) ("Except to the extent permitted for the disposition of ex parte matters as authorized by law or the Board's Rules," "neither a party, nor any Board staff that substantially assists the interested division on the particular matter, whether before or during the hearing, may … communicate with the Board or any member of the Board on a fact in issue, unless on notice and opportunity for all parties to participate or under circumstances in which a party excluded from the communication has waived the rights described in Rule 5205(c)(3) with respect to the matters that are the subject of the communication."); PCAOB Rule 1001(p)(v) (defining "party" to "mean[] the interested division, any person named as a respondent in an order instituting proceedings or notice of a hearing, any applicant named in the caption of any order, or any person seeking Board review of a decision"). |
| 11.    The aforementioned *ex parte* written communications are not disclosed to the accountants and firms who will be | Admitted that if, in the course of deciding whether to issue an order of formal investigation, Board members receive written |

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| investigated, and those accountants and firms are not invited to attend or participate in, and do not attend or participate in, the *ex parte* oral discussions between DEI staff and the Board members. (Exhibit A, Cox Decl., at ¶ 5.) | and/or oral communications from DEI staff regarding relevant facts and legal issues, the contents of any such written communications are not disclosed to the potential subjects of those investigations, and that the potential subjects of those investigations are not invited to attend or participate in, and do not attend or participate in, any such oral communications. |
| | Denied that any such communications are "ex parte." *See* ¶ 10, *supra*. |
| | The subjects of an informal inquiry or formal investigation may submit a written statement to the Board "setting forth their interests and positions in regard to the subject matter of the investigation." PCAOB Rule 5109(d). "In the event a recommendation for the commencement of a disciplinary proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Board in conjunction with the staff recommendation." *Id.* |
| 12.    Enforcement Staff that conducts an investigation of a Board-registered firm or an individual associated with a registered firm may make a recommendation to the Board that it initiate a disciplinary proceeding against that firm or individual. (Board Rule 5109(d).) | Admitted. |
| 13.    In connection with such recommendations, the SEC-appointed Board members routinely receive and consider *ex parte* written communications from Enforcement Staff, and engage in *ex parte* oral discussions with Enforcement Staff, about the relevant facts and legal issues. (Exhibit A, Cox Decl., at ¶ 4; *see* Board Rule 5109(d).) | Admitted that Board members are appointed by the Securities and Exchange Commission. Admitted that, in the course of deciding whether to commence a disciplinary proceeding, Board members may receive written and/or oral communications from DEI staff regarding relevant facts and legal issues. |
| | Denied that any such communications are "ex parte," as—by definition—any such communications occur before a disciplinary proceeding has been commenced. Save for exceptions inapplicable to Plaintiffs' proceedings, the Board's rules prohibit the |

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
|  | Board from engaging in "ex parte" communications after a disciplinary proceeding has been commenced. *See* PCAOB Rule 5200(d) ("The staff of the Division of Enforcement and Investigations may not participate or advise in the decision, or in Board review of the decision, in any proceeding in which the Division of Enforcement and Investigations is the interested division, except as a witness or counsel in the proceeding. Any other employee or agent of the Board engaged in the performance of investigative or prosecutorial functions for the Board in a proceeding may not, in that proceeding or one that is factually related, participate or advise in the decision, or in Board review of the decision, except as a witness or counsel in the proceeding."); PCAOB Rule 5403(b)(2) ("Except to the extent permitted for the disposition of ex parte matters as authorized by law or the Board's Rules," "neither a party, nor any Board staff that substantially assists the interested division on the particular matter, whether before or during the hearing, may … communicate with the Board or any member of the Board on a fact in issue, unless on notice and opportunity for all parties to participate or under circumstances in which a party excluded from the communication has waived the rights described in Rule 5205(c)(3) with respect to the matters that are the subject of the communication."); PCAOB Rule 1001(p)(v) (defining "party" to "mean[] the interested division, any person named as a respondent in an order instituting proceedings or notice of a hearing, any applicant named in the caption of any order, or any person seeking Board review of a decision"). |
| 14.    The aforementioned *ex parte* written communications are not disclosed to the accountants and firms who will be charged, and those accountants and firms are not | Admitted that if, in the course of deciding whether to commence a disciplinary proceeding, Board members receive written and/or oral communications from DEI staff |

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| invited to attend or participate in, and do not attend or participate in, the *ex parte* oral discussions between DEI staff and the Board members. (Exhibit A, Cox Decl., at ¶ 5.) | regarding relevant facts and legal issues, the contents of any such written communications are not disclosed to the potential subjects of those disciplinary proceedings, and that the potential subjects of those disciplinary proceedings are not invited to attend or participate in, and do not attend or participate in, any such oral communications.<br><br>Denied that any such communications are "ex parte." *See* ¶ 13, *supra*.<br><br>The subjects of an informal inquiry or formal investigation may submit a written statement to the Board "setting forth their interests and positions in regard to the subject matter of the investigation." PCAOB Rule 5109(d). "In the event a recommendation for the commencement of a disciplinary proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Board in conjunction with the staff recommendation." *Id.* |
| 15.    Enforcement Staff, including Enforcement Staff assigned to investigate and  prosecute Plaintiffs, are not required to take any oath office. (Exhibit B, Board Responses to Discovery Requests, Int. No. 5.) | Admitted. |
| 16.    In the Fall of 2013, the Board hired Marc Dorfman as its Chief Hearing Officer. (*See* Exhibit B, Board Responses to Discovery Requests, Int. No. 2.) | Admitted. |
| 17.    The Chief Hearing Officer is an employee of and reports to the Board. (Charter, Office of Hearing Officers of the Public Company Accounting Oversight Board (March 25, 2021) ("Charter"), at 2[2].) | Admitted that hearing officers, including the Chief Hearing Officer, are employees of and report to the Board, subject to (among others) the following protocols: (1) hearing officers shall not be responsible to, or subject to the supervision or direction of, an employee or agent of the Board engaged in the performance of investigative or prosecuting |

---

[2] *Available at* https://assets.pcaobus.org/pcaob-dev/docs/default-source/enforcement/documents/oho-charter-final.pdf?sfvrsn=f23c6871_4 (last visited Sept. 24, 2025).

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
|  | functions for the PCAOB; (2) the Office of Hearing Officers shall be physically separated from any PCAOB regulatory division and from the offices of Board members and their immediate staff; and (3) hearing officers shall not be assigned tasks that are inconsistent with their duties and responsibilities as hearing officers.  PCAOB, Office of Hearing Officers Charter (Mar. 25, 2021) ("OHO Charter"), at 2; PCAOB Rule 5200(d). |
|  | The oversight and compensation of hearing officers, including the Chief Hearing Officer, are governed by (among others) the following protocols:  (1) no Board member or staff shall attempt to improperly influence, or engage in conduct that could reasonably be perceived as attempting to improperly influence, a hearing officer's decision in any proceeding; and (2) outcomes of proceedings shall not be considered when evaluating the performance or determining the compensation of hearing officers.  OHO Charter at 3; Ex. D, Rog. 18. |
| 18.    The Board contends that, in or around March 2019, the Board unanimously voted to appoint Mr. Dorfman as the Board's Chief Hearing Officer. | Admitted that the Board unanimously voted to appoint Mr. Dorfman as the Board's Chief Hearing Officer. Denied that the Board voted to appoint Mr. Dorfman in March 2019.  *See* Ex. E; *see also* ¶ 44, *infra*. |
| 19.    The Board contends that, on or around March 27, 2019, the SEC approved the appointment of Mr. Dorfman as the Board's Chief Hearing Officer. | Admitted that on March 27, 2019, the Commission approved Mr. Dorfman's appointment as Chief Hearing Officer.  *See* Ex. D, Rog. 1; Ex. E. |
| 20.    On April 8, 2019, Mr. Dorfman took the following oath, which was administered by the Chief Accountant of the SEC: I, Marc B. Dorfman, a hearing officer of the Public Company Accounting Oversight Board, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and | Admitted. |

9

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of my office. So help me God. (Exhibit B, Board's Responses to Discovery Requests, Int. No. 4; *see* News Release, Marc B. Dorfman Sworn in as the PCAOB's Chief Hearing Officer (April 8, 2019)[3].) | |
| 21.    From the Fall of 2013, when he was hired, until June 2025, when he retired, Chief Hearing Officer Marc Dorfman was the Board's only hearing officer. (*See* Press Release, PCAOB Names Marc B. Dorfman as Chief Hearing Officer (Oct. 23, 2013)[4]; Exhibit C, June 2, 2025, Hrg. Tr. at 42:23-43:10.) | Admitted. |
| 22.    The role of Chief Hearing Officer is currently vacant. (*See* Exhibit C, June 2, 2025, Hrg. Tr. at 43:7-10.) | Admitted. |
| 23.    Under the Board's current bylaws, the Chief Hearing Officer is removable by a majority of the Board, subject to approval by the SEC. (Exhibit B, Board Responses to Discovery Requests, Int. No. 2; *see* Board Bylaws Art. 6.3(d); *see also* Board Bylaws Arts. 4.3, 4.4; 17 C.F.R. § 202.150; Bylaw and Rule Amendments to Provide That the PCAOB's Appointment and Removal of its Hearing Officers Are Subject to Commission Approval, PCAOB Release No. 2019-001 (Jan. 29, 2019)[5].) | Admitted. |
| 24.    Because the Board may remove hearing officers only with the approval of the SEC, any such removal is subject to a vote of | Admitted that, under the Board's current rules, the removal of a hearing officer is |

---

[3] *Available at* https://pcaobus.org/news-events/news-releases/news-release-detail/marc-b-dorfman-sworn-in-as-the-pcaob-s-chief-hearing-officer_699 (last visited Sept. 24, 2025).
[4] *Available at* https://pcaobus.org/news-events/news-releases/news-release-detail/pcaob-names-marc-b-dorfman-as-chief-hearing-officer_444 (last visited Sept. 24, 2025).
[5] *Available at* https://pcaobus.org/Rulemaking/Docket045/Release-2019-001-Bylaws-Amendments.pdf (last visited Jan. 1, 2025).

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| both the Board and the SEC. (Exhibit B, Board Responses to Discovery Requests, Int. No. 2; Charter at 2.) | subject to a vote of both the Board and the SEC. |
| 25.    Board Hearings are conducted in secret, outside of public access, unless the Board orders a public hearing for good cause shown and the parties consent to a public hearing. (15 U.S.C. § 7215(c)(1); see Exhibit B, Board Responses to Discovery Requests, Req. for Admission No. 9.) | Admitted that, pursuant to 15 U.S.C. § 7215(c)(2), hearings in disciplinary proceedings "shall not be public, unless otherwise ordered by the Board for good cause shown, with the consent of the parties to such hearing."  15 U.S.C. § 7215(c)(2). |
| 26.    The Board has never held a public disciplinary hearing since its inception. (Exhibit D, Board's Supplemental Responses to Discovery Requests, Int. No. 16.) | Admitted.  No respondent, including Doe 1 and Doe 2, has ever consented to a public disciplinary proceeding.  See Ex. D, Rog. 16. |
| 27.    From its creation in 2002 through September 25, 2025, the Board has publicly issued more than 500 final sanctions orders against Board-registered firms and associated persons. See https://pcaobus.org/oversight/enforcement/enf orcement-actions (searchable public database last visited on September 25, 2025.) | Admitted. |
| 28.    Of those more than 500 publicly issued final sanctions orders, 28 were issued after an adjudicated proceeding conducted by the Chief Hearing Officer or another hearing officer. See https://pcaobus.org/oversight/enforcement/enf orcement-actions (searchable public database last visited on September 25, 2025.) | Admitted. |
| 29.    Of the 28 final sanctions orders publicly issued after an adjudicated proceeding conducted by the Chief Hearing Officer or another hearing officer, approximately half became final without a subsequent decision on the merits by the SEC-appointed Board members, because no party sought Board review of the hearing officer's decision. https://pcaobus.org/oversight/enforcement/enf | Admitted that, of the 28 final sanctions orders publicly issued after an adjudicated proceeding conducted by the Chief Hearing Officer or another hearing officer, approximately half became final without a subsequent decision on the merits by the Board.  Denied that any final sanction order has become final solely because no party sought Board review of the hearing officer's decision, as the Board may on its own initiative order review of any initial decision |

11

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| orcement-actions (searchable public database last visited on September 25, 2025.) | at any time before the initial decision becomes final. *See* PCAOB Rules 5204(d), 5460(b). |
| 30. The Board has not reviewed a hearing officer's decision *de novo* and issued a subsequent public decision on the merits since 2017. (https://pcaobus.org/oversight/enforcement/en forcement- actions (searchable public database last visited on September 25, 2025.) | Admitted that the Board has not reviewed a hearing officer's initial decision de novo and issued a decision on the merits since 2017. Denied that the Board has not made public a decision on the merits following de novo review of a hearing officer's decision since 2017; the Board made public four such decisions in 2018. Additionally, since 2017, there have been only four final sanctions orders that have been publicly issued after an adjudicated proceeding conducted by the Chief Hearing Officer or another hearing officer that were not reviewed by the Board. |
| 31. Of the Board's more than 500 publicly issued final sanctions orders since its creation, eight have been subsequently appealed to, and decided on the merits by, the SEC. https://pcaobus.org/oversight/enforcement/enf orcement-actions (searchable public database last visited on September 25, 2025.) | Admitted that of the Board's publicly issued final sanctions orders, 28 of which were issued after an adjudicated proceeding and the rest of which were settled, eight have been subsequently appealed to, and decided on the merits by, the SEC. In one of those appeals, the SEC issued an order cancelling the Board's disciplinary sanctions. *See In the Matter of the Application of Cynthia C. Reinhart, CPA*, SEC Release No. 34-85964, 2019 WL 2297280 (May 29, 2019). |
| 32. The SEC has not reviewed and issued a final decision on the merits with respect to a final Board sanctions order since 2019. https://pcaobus.org/oversight/enforcement/enf orcement- actions (searchable public database last visited on September 25, 2025.) | Admitted. |
| 33. The Chief Hearing Officer and other presiding hearing officers have issued non-public decisions in Board disciplinary proceedings on Board rules and procedural law. (Exhibit B, Board Responses to Discovery Requests, Req. for Admission Nos. 5, 7.) | Admitted that hearing officers presiding over disciplinary proceedings have issued non-public decisions citing, applying, or otherwise referring to PCAOB Rules. However, neither the Board nor PCAOB hearing officers have a practice of citing such decisions in their decisions in litigated proceedings involving different respondents, nor does DEI staff have |

12

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| | a practice of citing such decisions in its briefing in litigated proceedings involving different respondents. *See* Ex. B, RFA 5. |
| | Admitted that hearing officers presiding over disciplinary proceedings have issued non-public decisions concerning procedural law. However, neither the Board nor PCAOB hearing officers have a practice of citing such decisions in their decisions in litigated proceedings involving different respondents, nor does DEI staff have a practice of citing such decisions in its briefing in litigated proceedings involving different respondents. *See* Ex. B, RFA 7. |
| 34.    The Chief Hearing Officer and other presiding hearing officers have issued non-public decisions in Board disciplinary proceedings on the application of the federal securities laws and SEC rules. (Exhibit B, Board Responses to Discovery Requests, Req. for Admission No. 6.) | Admitted that hearing officers presiding over disciplinary proceedings have issued non-public decisions citing, applying, or otherwise referring to the federal securities law and SEC rules.  However, neither the Board nor PCAOB hearing officers have a practice of citing such decisions in their decisions in litigated proceedings involving different respondents, nor does DEI staff have a practice of citing such decisions in its briefing in litigated proceedings involving different respondents.  *See* Ex. B, RFA 6. |
| 35.    The Chief Hearing Officer and other presiding hearing officers have issued final, non-public decisions in Board disciplinary proceedings finding in favor of the respondent. (*See* Exhibit C, June 2, 2025, Hrg. Tr. at 46:7-13.) | Admitted that the Chief Hearing Officer and/or presiding hearing officers have issued non-public initial decision(s) in Board disciplinary proceedings finding in favor of the respondent. |
| | Denied that any decision issued by the Chief Hearing Officer and/or presiding hearing officers is "final" on the ground that whether any such decision is "final" is a legal question.  To the extent that the question of whether any decision issued by the Chief Hearing Officer and/or presiding hearing officers is "final" is a factual issue, denied. *See* PCAOB Rules 5204(b), (d). |

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| 36.    Because the Enforcement Division is the prosecuting entity in all Board disciplinary proceedings, Enforcement Staff has access to all non-public decisions of the Board and the Chief Hearing Officer or any other presiding hearing officers. (Exhibit A, Cox Decl., at ¶ 6; Exhibit B, Board Responses to Discovery Requests, Req. for Admission No. 10.) | Admitted that DEI staff may obtain any decision issued by the Board and its hearing officers, including those that remain non-public. |
| 37.    Non-public decisions issued by the Board, the Chief Hearing Officer, or any other presiding hearing officers are not, as a general matter, available to the public or to respondents in Board disciplinary proceedings. (Exhibit B, Board Responses to Discovery Requests, Req. for Admission No. 9.) | Admitted that non-public decisions issued by the Board or its hearing officers are not, as a general matter, available to the public. Admitted that non-public decisions are not available to respondents in proceedings before the Board unless such non-public decisions are sought and ordered to be disclosed.  *See* PCAOB Rule 5408; *see also* PCAOB Rule 5461. |
| 38.    In December 2022, after a formal investigation, the Board instituted its formal disciplinary proceedings against Doe 1 by issuing a confidential Order Instituting Proceedings. (Compl., Doe 1 ECF No. 1, ¶ 57.) | Admitted. |
| 39.    The Order Instituting Proceedings against Doe 1 alleges that he led an effort to modify audit documentation after the fact and in anticipation of a Board inspection, misled Board inspectors about that documentation during the Board's inspection, lied to Board staff about that documentation during the Board's investigation, and pressured others to do the same, in violation of Board Rule 3100 (Compliance with Auditing and Related Professional Practice Standards), Rule 3200T (Interim Auditing Standards), Rule 3500T (Interim Ethics and Independence Standards), Rule 4006 (Duty to Cooperate With Inspectors), Rule 5110 (Noncooperation with an Investigation), Board Standard ET § 102 (Integrity and Objectivity), and Auditing Standard No. 3 (Audit Documentation). | Admitted. |

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| (Order Instituting Proceedings, PCAOB No. 105-2022-006.) | |
| 40.    In September 2023, after a formal investigation, the Board instituted its formal disciplinary proceedings against Doe 2 by issuing a confidential Order Instituting Proceedings. (Compl., Doe 2 ECF No. 1 at ¶ 59.) | Admitted. |
| 41.    The Order Instituting Proceedings against Doe 2 alleges that he failed, during a 2018 audit, to adequately evaluate certain accounting estimates used by the client to value one of its revenue sources and the associated accounts receivable, in violation of Board Rule 3100 (Compliance with Auditing and Related Professional Practice Standards), Board Rule 3200 (Auditing Standards); Auditing Standard No. 1015 (Due Professional Care in the Performance of Work); Auditing Standard No. 1105 (Audit Evidence); Auditing Standard No. 1201 (Supervision of the Audit Engagement), Auditing Standard No. 1215 (Audit Documentation), Auditing Standard No. 2301 (The Auditors Responses to the Risks of Material Misstatement), Auditing Standard No. 2401 (Consideration of Fraud in a Financial Statement Audit), Auditing Standard No. 2501 (Auditing Accounting Estimates, Including Fair Value Measurements), Auditing Standard No. 2805 (Management Representations), Auditing Standard No. 2810 (Evaluating Audit Results), and Auditing Standard No. 3101 (The Auditors Report on an Audit of Financial Statements When the Auditor Expresses an Unqualified Opinion). (Order Instituting Proceedings, PCAOB No. 105-2023-003.) | Admitted. |
| 42.    Before instituting the disciplinary proceedings against Doe 1 and Doe 2, the Board filed an Order Instituting Disciplinary Proceedings, Making Findings, and Imposing | Admitted that the Order Instituting Disciplinary Proceedings, Making Findings, and Imposing Sanctions against Doe 1's former employer (Ex. F, PCAOB Release No. |

| Plaintiffs' Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| Sanctions against each of their respective employers, which contained (i) factual findings by the Board that are substantively identical to the unproven allegations made against the underlying Plaintiff and (ii) legal conclusions by the Board based on those same factual findings. (*See* Exhibit C, June 2, 2025, Hrg. Tr. at 34:12-22.) | 105-2022-034) contains findings of the Board concerning factual and legal issues that are alleged by the DEI in the Order Instituting Disciplinary Proceedings against Doe 1 (PCAOB No. 105-2022-006).  The Order Instituting Disciplinary Proceedings, Making Findings, and Imposing Sanctions against Doe 1's former employer expressly states that "[t]he findings herein … are not binding on any other person or entity in this or any other proceeding."  Ex. F, at p.2 n.1; *see* Ex. C, 33:22-35:16.

Admitted that the Order Instituting Disciplinary Proceedings, Making Findings, and Imposing Sanctions against Doe 2's former employer (Ex. G, PCAOB Release No. 105-2023-024) contains findings of the Board concerning factual and legal issues that are alleged by the DEI in the Order Instituting Disciplinary Proceedings against Doe 2 (PCAOB No. 105-2023-003).  The Order Instituting Disciplinary Proceedings, Making Findings, and Imposing Sanctions against Doe 2's former employer expressly states that "[t]he findings herein … are not binding on any other person or entity in this or any other proceeding."  Ex. G, at p.2 n.1. |

| Board's Statement of Material Facts Not in Dispute | Plaintiffs' Counter-Statement of Disputed Facts |
|---|---|
| 43.    Board hearing officers, including the Chief Hearing Officer, are removable at will. *See* PCAOB Bylaws Arts. 4.3, 4.4, 6.3(d); 17 C.F.R. § 202.150; OHO Charter at 2; Ex. B, Rog. 2; Ex. H.  The Board's offer letter to Marc Dorfman stated expressly that, "[l]ike other employees of the PCAOB, you are employed on an at-will basis, which means that … the PCAOB may terminate your | Admitted that the Board's offer letter to Marc Dorfman stated expressly that, "[l]ike other employees of the PCAOB, you are employed on an at-will basis, which means that … the PCAOB may terminate your employment at any time for any lawful reason, or for no reason."  Plaintiffs further state that removal of a hearing officer requires an affirmative vote of both the SEC and the Board. |

| Board's Statement of Material Facts Not in Dispute | Plaintiffs' Counter-Statement of Disputed Facts |
|---|---|
| employment at any time for any lawful reason, or for no reason."  Ex. H. | |
| 44.    On February 5, 2019, the Board voted unanimously to appoint Marc Dorfman as Chief Hearing Officer.  *See* Ex. D, Rog. 1; Ex. E. | Admitted. |

| Plaintiff's Additional Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| 45.    The Board's Order Instituting Proceedings against Doe 1 alleges that Doe 1 led an effort to improperly add to and modify Doe 1 Employer's audit documentation for a 2015 audit after the applicable audit documentation completion date. The Board alleges that this conduct violates accounting rules and standards. Doe 1 denies the Board's allegations. | |
| 46.    The Board's Order Instituting Proceedings against Doe 1 further alleges that Doe 1 lied when he denied the allegations stated paragraph 45.  The Board alleges that this conduct constitutes "noncooperation" with the Board investigation. Doe 1 denies that he lied when he denied the allegations in paragraph 45. | |
| 47.    The Board's Order Instituting Proceedings against Doe 1 further alleges that Doe 1 pressured another employee to misrepresent facts to attorneys hired by Doe 1's Employer during an internal investigation by Doe 1's Employer. The Board alleges that this conduct constitutes "noncooperation" with the Board investigation. Doe 1 denies the Board's allegations. | |
| 48.    The Board's Order Instituting Proceedings against Doe 1 directs the hearing | |

| Plaintiff's Additional Statement of Material Facts Not in Dispute | Board's Counter-Statement of Disputed Facts |
|---|---|
| officer to determine "what, if any, sanctions are appropriate in the public interest against [Doe 1] pursuant to Section 105(b)(3) and (c)(4) of the [Sarbanes-Oxley Act] and PCAOB Rule 5300(a) and (b)." | |
| 49.     The Board's Order Instituting Proceedings against Doe 2 alleges that Doe 2 failed to adequately evaluate significant accounting estimates that an audit client used to value a majority of its client-related revenue and all related accounts receivable for 2017. The Board alleges that this conduct violates accounting rules and standards. Doe 2 denies the Board's allegations. | |
| 50.     The Board's Order Instituting Proceedings against Doe 2 directs the hearing officer to determine "what, if any, sanctions are appropriate in the public interest against [Doe 1] pursuant to Section 105(c)(4) of the [Sarbanes-Oxley Act] and PCAOB Rule 5300(a)." | |

Dated: December 23, 2025          Respectfully Submitted,

*/s/ Russell G. Ryan*
Russell G. Ryan (DC Bar # 414472)
Casey Norman (DC Bar # 90016178)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
Telephone: (202) 869-5210
Email: russ.ryan@ncla.legal

*Attorneys for Plaintiffs John Doe 1 (No. 24-cv-780) and John Doe 2 (No. 25-cv-186)*

Thomas K. Potter, III (*pro hac vice*)
Burr & Forman, LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
Telephone: (615) 724-3231
Email: tpotter@burr.com

*Attorney for Plaintiff John Doe 2 (No. 25-cv-186)*

*/s/ Ian D. Roffman*
Ian D. Roffman (*pro hac vice*)
Melanie V. Woodward (*pro hac vice*)
NUTTER, MCCLENNEN & FISH LLP
Seaport West, 155 Seaport Blvd.
Boston, MA 02210
Telephone: (617) 439-2421
Email: iroffman@nutter.com

*Attorneys for Plaintiff John Doe 1 (No. 24-cv-780)*

<u>CERTIFICATE OF SERVICE</u>

I certify that, on December 23, 2025, a copy of the foregoing document was served upon all counsel of record through the Court's ECF system.

*/s/ Ian D. Roffman* _____

7711832

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, | |
|     *Plaintiff,* | |
| v. | |
| PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, | Civil Action No. 1:24-cv-780-ACR |
|     *Defendant.* | |
| JOHN DOE, | |
|     *Plaintiff,* | |
| v. | Civil Action No. 1:25-cv-186-ACR (consolidated with Nos. 1:24-cv-780 (lead), 1:25-cv-70) |
| PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, et al., | |
|     *Defendants.* | |

## [PROPOSED] ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

The Court having considered (i) Plaintiffs' motion for summary judgment and supporting documents, along with the responsive documents filed by the Defendant and Intervenor and (ii) Defendant's cross-motion for summary judgment and supporting documents, along with responsive documents filed by the Plaintiffs and Intervenor, and the Court being satisfied that there is no genuine dispute as to any material fact and that Plaintiffs are entitled to judgment as a matter of law, it is hereby

ORDERED, pursuant to Fed. R. Civ. P. 56, that Plaintiffs' motion for summary judgment is GRANTED and Defendant's cross-motion for summary judgment is DENIED; and it is

FURTHER ORDERED, that Defendant Public Company Accounting Oversight Board is hereby permanently restrained and enjoined from continuing its disciplinary proceedings against Plaintiffs (PCAOB Nos. 105-2022-006 and 105-2023-003); and it is

FURTHER ORDERED, that the Defendant's disciplinary proceedings against Plaintiffs are hereby declared unconstitutional and unlawful because they (i) deprive Plaintiffs of their rights to an Article III adjudication and their Seventh Amendment rights to a jury trial; (ii) deprive Plaintiffs of their Fifth Amendment rights to due process of law; (iii) are superintended, and will be initially decided, by an inferior officer who is not appointed in conformity with the Appointments Clause of the Constitution and not sufficiently accountable to and removable by the President, as required by Article II of the Constitution; (iv) are prosecuted and adjudicated by private citizens who are not subject to the pervasive surveillance and supervision of any other governmental official; and (v) are funded in violation of Article I of the Constitution.

**SO ORDERED.**

_____                    _____
Date                                       ANA C. REYES
                                           United States District Judge
7531402