## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, | |
| *Plaintiff*, | |
| v. | Civil Action No. 1:24-cv-780-ACR |
| PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, | |
| *Defendant*. | |
| JOHN DOE, | |
| *Plaintiff*, | |
| v. | Civil Action No. 1:25-cv-186-ACR (consolidated with No. 1:24-cv-780 (lead)) |
| PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, | |
| *Defendant*. | |

## DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................1

ARGUMENT ............................................................................................................3

I.      Plaintiffs' Jury-Trial Claims Are Jurisdictionally Barred and Meritless ...........................3

      A.     This Court Lacks Subject-Matter Jurisdiction over the Jury-Trial Claims .............3

      B.     Plaintiffs' Jury-Trial Claims Are Meritless ...........................................7

II.     Plaintiffs' Due-Process Claims Fail ............................................................11

      A.     The Board's Limited Combination of Prosecutorial and Adjudicatory Functions Does Not Violate Due Process ..........................................11

             1.     Plaintiffs' Attempt To Distinguish *Withrow* Is Unavailing .................12

             2.     The Board's Orders Concerning Plaintiffs' Employers Do Not Give Rise To Unconstitutional Bias .............................14

      B.     Plaintiffs' Confidentiality Claim Fails on Jurisdictional Grounds and on the Merits ..........................................16

III.    Plaintiffs' Appointments Clause Claim Fails ................................................18

IV.    Plaintiffs' Removal-Protection Claim Fails ..................................................21

V.     Plaintiffs' Private Nondelegation Claim Fails ...............................................22

VI.    The Board's Funding Scheme Is Constitutional .............................................23

VII.   Injunctive Relief Would Be Inappropriate ..................................................25

CONCLUSION .........................................................................................................25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Al-Tamimi v. Adelson*,
916 F.3d 1 (D.C. Cir. 2019)...................................................................................21

*Allen v. McCurry*,
449 U.S. 90 (1980)..................................................................................................5

*Alpine Sec. Corp. v. FINRA,*
121 F.4th 1314 (2024)........................................................................................2, 23

*AT&T, Inc. v. FCC*,
149 F.4th 491 (5th Cir. 2025) ................................................................................11

*Atlas Roofing Co. v. Occupational Safety & Health Review Commission*,
430 U.S. 442 (1977)...........................................................................................9, 11

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ...................................................................................... *passim*

*Carr v. Saul*,
593 U.S. 83 (2021)..................................................................................................6

*CoreCivic, Inc. v. Governor of New Jersey*,
145 F.4th 315 (3d Cir. 2025) .................................................................................22

*Department of Transportation v. Association of American Railroads*,
575 U.S. 43 (2015).................................................................................................22

*Doe v. Hill*,
141 F.4th 291 (D.C. Cir. 2025)..............................................................................17

*Duffield v. Charleston Area Med. Ctr., Inc.*,
503 F.2d 512 (4th Cir. 1974) ............................................................................13, 14

*FCC v. Consumers' Research*,
606 U.S. 656 (2025)...............................................................................3, 23, 24, 25

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010)...................................................................................... *passim*

*FTC v. Cement Institute*,
333 U.S. 683 (1948)...............................................................................12, 13, 14, 15

*Hannam Chain USA v. NLRB*,
2025 WL 3204539 (D.D.C. Nov. 17, 2025) ............................................................4

*Kennedy v. Braidwood Mgmt., Inc.*,
 606 U.S. 748 (2025) ...................................................................................2, 19, 20, 21

*Kim v. FINRA*,
 698 F. Supp. 3d 147 (D.D.C. 2023) ...................................................................25

*Laccetti v. SEC*,
 885 F.3d 724 (D.C. Cir. 2018) ...........................................................................16

*Lebron v. National Railroad Passenger Corp.*,
 513 U.S. 374 (1995) ............................................................................................22

*Lemelson v. SEC*,
 793 F. Supp. 3d 1 (D.D.C. 2025), *appeal docketed* No. 25-5208 (D.C. Cir.) ......................4, 7

*Manis v. USDA*,
 796 F. Supp. 3d 178 (M.D.N.C. 2025) ..............................................................4, 9

*Marcus v. Geithner*,
 813 F. Supp. 2d 11 (D.D.C. 2011) .....................................................................21

*Mathews v. Eldridge*,
 424 U.S. 319 (1976) ............................................................................................18

*Nat'l Nutritional Foods Ass'n v. FDA*,
 491 F.2d 1141 (2d Cir. 1974) .............................................................................17

*National Horsemen's Benevolent & Protective Association v. Black*,
 53 F.4th 869 (5th Cir. 2022) ...............................................................................23

*NLRB v. Donnelly Garment Co.*,
 330 U.S. 219 (1947) ............................................................................................15

*Ortega v. OCC*,
 155 F.4th 394 (5th Cir. 2025) .............................................................................11

*Pershing Div. v. United States*,
 22 F.3d 741 (7th Cir. 1994) ..................................................................................7

*Red Rock Resorts v. NLRB*,
 2025 WL 2784607 (D. Nev. Sept. 30, 2025), *appeal docketed*, No. 25-6404
 (9th Cir.)................................................................................................................4

*Riggins v. Goodman*,
 572 F.3d 1101 (10th Cir. 2009) .........................................................................16

*SEC v. Jarkesy*,
 603 U.S. 109 (2024)...................................................................................... *passim*

*Seila Law v. CFPB,*
    591 U.S. 197 (2020)..........................................................................................22

*Simpson v. Off. of Thrift Supervision,*
    29 F.3d 1418 (9th Cir. 1994) ........................................................................14

*Sun Valley Orchards v. U.S. Department of Labor,*
    148 F.4th 121 (3d Cir. 2025) ........................................................................11

*Sztrom v. SEC,*
    2026 WL 61262 (D.D.C. Jan. 8, 2026)........................................................5, 8

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994)............................................................................... *passim*

*U.S. Ass'n of Reptile Keepers, Inc. v. Jewell,*
    103 F. Supp. 3d 133 (D.D.C. 2015) ..............................................................25

*U.S. Marine v. United States,*
    478 F. App'x 106 (5th Cir. 2012) ...................................................................7

*Withrow v. Larkin,*
    421 U.S. 35 (1975)................................................................................. *passim*

*Wulferic v. FDA,*
    793 F. Supp. 3d 830 (N.D. Tex. 2025) ...........................................................4

**FEDERAL STATUTES**

15 U.S.C. § 78s(c)...............................................................................................21

15 U.S.C. § 7211.................................................................................................21

15 U.S.C. § 7211(a) ..............................................................................................9

15 U.S.C. § 7211(f).................................................................................18, 19, 20

15 U.S.C. § 7211(f)(4)...................................................................................18, 19

15 U.S.C. § 7211(g).......................................................................................19, 20

15 U.S.C. § 7215(b)(5)(A).............................................................................17, 18

15 U.S.C. § 7215(c)(1)(A)....................................................................................6

15 U.S.C. § 7215(c)(2).........................................................................................17

15 U.S.C. § 7215(c)(4)...................................................................................6, 10

15 U.S.C. § 7215(c)(7)(b) ....................................................................................10

15 U.S.C. § 7217 ................................................................................18, 19, 21

15 U.S.C. § 7217(a) ...........................................................................18, 19, 20

15 U.S.C. § 7217(b)(5) .......................................................................................21

15 U.S.C. § 7217(c) .....................................................................................14, 23

15 U.S.C. §§ 7261-7266 .......................................................................................9

28 U.S.C. § 1367(a) .............................................................................................7

**STATUTES - OTHER**

DC Code § 2-1402.11(a) .....................................................................................21

**LEGISLATIVE MATERIALS**

S. Rep. No. 107-205 (2002) ...............................................................................10

**OTHER AUTHORITIES**

Yonatan Gelblum, *The Myth that Agency Adjudications Cannot Address
    Constitutional Claims*, 32 Geo. Mason L. Rev. 223 (2025) ..........................6

PCAOB Auditing Standard 3 ................................................................................8

PCAOB Auditing Standard 1105 ..........................................................................8

PCAOB Auditing Standard 1201 ..........................................................................8

PCAOB Auditing Standard 1215 ..........................................................................8

PCAOB Auditing Standard 2501 ..........................................................................8

PCAOB Rule 5110...............................................................................................8

PCAOB Rule 5200(a) ........................................................................................14

PCAOB Rules 5201-5204 ..................................................................................13

*Public Company Accounting Oversight Board Hearing Officers*, SEC Release No.
    34-85437 (Mar. 28, 2019).........................................................................20

## INTRODUCTION

After hundreds of pages of summary judgment briefing, it is clear that plaintiffs' constitutional challenges to the regulatory authority of the Public Company Accounting Oversight Board ("PCAOB" or "Board") have no merit whatsoever.

**Seventh Amendment and Article III.**  Plaintiffs cannot show that this Court has subject-matter jurisdiction to consider their Seventh Amendment and Article III challenges to the Board's enforcement authority.  The best they can do is assert that the Board might assess a monetary penalty rather than the equitable remedies the Board has authority to impose.  But even if plaintiffs had a valid constitutional objection to the Board's imposition of a monetary penalty—and they do not—any theoretical constitutional injury would not accrue until the conclusion of Board proceedings that impose such a penalty.  If a monetary penalty is imposed, plaintiffs can raise their Seventh Amendment and Article III challenges through the statutorily prescribed review process, just as Jarkesy did.  *See SEC* v. *Jarkesy*, 603 U.S. 109 (2024).  But they cannot do so now.  In all events, plaintiffs are wrong on the merits.  The provisions the Board is enforcing against them are technical accounting standards that have no roots in or connection to traditional common-law claims that must be tried to a jury.  Such regulatory provisions did not even exist when the Seventh Amendment was adopted and have been uncontroversially enforced by private, state, and now federal regulatory bodies for more than a century without any suggestion that a jury was required.

**Due process.**  Plaintiffs have likewise failed to overcome the subject-matter jurisdiction bar to consideration of their due process challenge to Congress's decision in Sarbanes-Oxley to maintain the confidentiality of Board proceedings.  This claim, like their jury-trial claim, does not challenge the Board's authority to act at all, but instead complains about one particular issue that may or may not arise in the proceedings against them.  So it too must be raised through the statutory review procedure Congress prescribed, which would allow the issue to be evaluated in a concrete,

case-specific context on the basis of a record. And it too is meritless in all events because plaintiffs will suffer no harm at all, much less a deprivation of due process, from the confidentiality of certain nonprecedential decisions. While this Court does have jurisdiction to consider plaintiffs' structural combination-of-functions due process argument (but not their case-specific challenge based on the Board's previous orders against their employers), there is nothing to that argument on the merits. The Supreme Court's decision in *Withrow v. Larkin*, 421 U.S. 35, 56 (1975), forecloses it, and plaintiffs have not persuasively distinguished *Withrow*.

**Appointment and removal.** Plaintiffs' constitutional challenges to the Board's authority to appoint and remove hearing officers lack any substantial basis. As for appointment, the SEC— indisputably the Head of a Department—has clear statutory authority to approve or reject the Board's selection of hearing officers. The Appointments Clause requires nothing more. *See Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748 (2025). As for removal, it is now undisputed that hearing officers are removable at will, which disposes of that argument. Plaintiffs' newly-minted D.C. Human Rights Act argument is both forfeited and wrong, as that statute does not limit the SEC's at-will control over hearing officers.

**Private nondelegation.** There is no private nondelegation problem because the Board is a governmental entity for purposes of this claim, just as it is for all of plaintiffs' other claims. Even if the Board were considered a private entity for purposes of this argument, there would still be no constitutional problem because the SEC indisputably exercises controlling supervisory authority over the Board. In *Alpine Securities Corp. v. FINRA*, the D.C. Circuit held that the SEC's nearly identical oversight of FINRA precluded a private nondelegation challenge to FINRA's similar regulatory authority. 121 F.4th 1314, 1325 (D.C. Cir. 2024). That decision forecloses plaintiffs' argument, and plaintiffs have offered no response.

**Taxing power.** Plaintiffs' taxing power challenge rests on the same misconceived premise as their private nondelegation challenge—namely, that the Board acts as a private entity and not a governmental entity when it assesses fees. In all events, the SEC's supervisory authority would eliminate any private nondelegation problem with respect to the Board's authority to assess fees, just as it does more generally. *See FCC v. Consumers' Research*, 606 U.S. 656 (2025).

The Court should therefore dismiss the jury-trial claim and the case-specific due process challenges, and should grant summary judgment to the Board on all remaining claims.

## ARGUMENT

## I.    Plaintiffs' Jury-Trial Claims Are Jurisdictionally Barred and Meritless

As a mountain of post-*Axon* district-court decisions confirms, plaintiffs' jury-trial claims are procedural, not structural, and must be channeled through the statutory review scheme. Accordingly, this Court lacks jurisdiction. If this Court nevertheless reviews those claims on the merits, the Court should grant summary judgment to the Board, as PCAOB disciplinary proceedings involve only adjudication of public rights, for which a jury trial is not required.

### A.    This Court Lacks Subject-Matter Jurisdiction over the Jury-Trial Claims

1. In an effort to evade the statutory review scheme, plaintiffs contend that the scheme has no force at all or, if it does, that their claims are structural ones that fall outside of it. Not so.

Plaintiffs first suggest (Reply.6-7) that the Securities Exchange Act cannot be interpreted to "divest district courts of their presumptive jurisdiction to adjudicate" *any* pre-enforcement constitutional challenge. That is a non-starter, as *Axon* recognizes that the Exchange Act's review scheme in fact "divests district courts of their ordinary jurisdiction" over some such challenges. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023) (citing, *inter alia*, *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-12 (1994)).

Plaintiffs next contend that the Exchange Act does not "strip district courts of jurisdiction

3

to consider *structural* constitutional challenges to the Board." Reply.8 (emphasis added). True enough. But the *question* is whether plaintiffs' jury-trial claims are structural or procedural. *Axon*, 598 U.S. at 189. As the Board and the United States have explained at length, the claims are procedural. *See* Board.Br.7-9; U.S.Br.10-13.

Plaintiffs' attempts to categorize their claims as structural are unpersuasive. First, contrary to plaintiffs' argument (Reply.9, 12), the fact that all Board disciplinary proceedings are conducted without juries does not render their claims structural. Procedural claims are no less procedural merely because the challenged procedures apply widely. *Thunder Basin* itself held that a plaintiff's due-process objection to an agency's general practice of imposing fines before holding hearings was a procedural claim that the agency could adjudicate and that a plaintiff would then have to pursue through the applicable statutory review scheme. *See* 510 U.S. at 214-16.

The relevant question in determining whether a claim is structural is not whether an alleged defect arises in every agency proceeding, but whether the claim concerns the agency's fundamental "power to proceed." *Axon*, 598 U.S. at 192. And as a raft of district courts have held, jury-trial claims like plaintiffs' do not. *See* Board.Br.7-8; U.S.Br.12 & n.2; *see also, e.g.*, *Hannam Chain USA v. NLRB*, 2025 WL 3204539, at *8 & n.7 (D.D.C. Nov. 17, 2025); *Red Rock Resorts v. NLRB*, 2025 WL 2784607, at *4-6 (D. Nev. Sept. 30, 2025), *appeal docketed*, No. 25-6404 (9th Cir.).[1]

Second, plaintiffs assert that their challenge is structural because they would face a "here-

---

[1] Plaintiffs identify one district-court decision holding otherwise, *see Wulferic v. FDA*, 793 F. Supp. 3d 830, 843 (N.D. Tex. 2025), and another that does not address jurisdiction but rejects a jury-trial claim on the merits, *see Manis v. USDA*, 796 F. Supp. 3d 178, 187, 203-07 (M.D.N.C. 2025). Those courts lacked jurisdiction, as several courts in this District have recognized. *See, e.g.*, *Lemelson v. SEC*, 793 F. Supp. 3d 1, 9-10 (D.D.C. 2025) (collecting cases), *appeal docketed* No. 25-5208 (D.C. Cir.). In addition, plaintiffs are mistaken in suggesting (Reply.10.n.2) that the Board "effectively conceded" jurisdiction by describing the "far-reaching consequences" of this case in a separate proceeding unrelated to jurisdiction. Jurisdictional objections cannot be waived; this case involves some procedural and some structural claims; and even procedural claims may be far-reaching.

and-now" injury if subjected to "an illegitimate proceeding, led by an illegitimate decisionmaker." Reply.10 (quoting *Axon*, 598 U.S. at 191). But plaintiffs' participation in Board proceedings would not create a "here-and-now" injury because the injury plaintiffs allege—violation of their jury rights—will *not* accrue "irrespective of the outcome of the proceeding." Reply.10. If the Board were to press claims that do not implicate the jury-trial right, or were to impose only equitable remedies (or no remedies at all), plaintiffs would *never* suffer any Article III or Seventh Amendment injury. *See* Board.Br.8-9; U.S.Br.12-13. Undergoing a proceeding presided over by an "illegitimate" ALJ, *Axon*, 598 U.S. at 191, which is illegitimate no matter what law the ALJ applies or what decision the ALJ ultimately renders, is fundamentally different. Nor do plaintiffs rebut the Board's authority explaining that equitable relief is not exclusive to Article III courts (Board.Br.8.n.6), and no court has embraced plaintiffs' theory that all administrative adjudication is limited to cases involving public rights. *Jarkesy* did not go nearly that far.

Plaintiffs' only response—that their jury-trial claims "should be determined" immediately in court to avoid loss of "time and treasure," Reply.13—lacks merit. The Exchange Act "divests district courts of their ordinary jurisdiction" over claims addressing "procedural or evidentiary matters," *Axon*, 598 U.S. at 185-86, 193, and Congress's judgment is conclusive—regardless of plaintiffs' preferences or policy concerns, *see Allen v. McCurry*, 449 U.S. 90, 103 (1980) ("scope" of district courts' "jurisdiction" is left solely to "wisdom of Congress").

2. Plaintiffs' invocation of the *Thunder Basin* factors fails for much the same reason. *See Sztrom v. SEC*, 2026 WL 61262, at *3 (D.D.C. Jan. 8, 2026). Plaintiffs insist (Reply.15-17) that they might not receive meaningful judicial review because such review is rare and could not unwind their "here-and-now" injuries. But as *Axon* explains—and as plaintiffs essentially admit (Reply.17)—plaintiffs would be free to "obtain review of their constitutional claims through an

appeal from an adverse agency action to a court of appeals." 598 U.S. at 190; *see* Board.Br.4-5 (describing statutory review scheme); Board.Br.9 & n.8 (explaining that Board sanctions affirmed by the Commission would be subject to judicial review). That is true regardless of how many previous litigants have chosen to appeal to the SEC and then to a court of appeals. Reply.15. Indeed, in *Jarkesy*, the plaintiff's Seventh Amendment claim was vindicated in statutory review proceedings indistinguishable from the proceedings available here.

Plaintiffs also assert (Reply.17) that the collateralism factor favors jurisdiction because their jury-trial claims do not challenge the substance of the Board's charges. But the question is whether plaintiffs' claims are "wholly collateral to [the] statute's review provisions." *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212). Claims concerning "procedural … matters an agency often resolves on its way to a merits decision" are hardly collateral to the review of such decisions. *Id.* at 193. Rather, Congress has affirmatively committed those matters to the Board in the first instance. *See id.*; 15 U.S.C. § 7215(c)(1)(A), (c)(4); U.S.Br.13-14.

Finally, plaintiffs contend (Reply.18) that the Supreme Court has decided that agencies are not competent to resolve "standard questions of administrative and constitutional law." But that is of course not true. The Court has observed that "agency adjudications are generally ill-suited to address *structural* constitutional challenges." *Carr v. Saul*, 593 U.S. 83, 92 (2021) (emphasis added).[2] As discussed (Board.Br.10), plaintiffs' jury-trial claims are not structural because they challenge the procedures that the Board applies.

3. As a fallback, plaintiffs urge the Court to end-run the statutory review scheme by exercising supplemental jurisdiction over their procedural claims. Reply.18-20. But supplemental jurisdiction cannot sweep a claim into court where, as here, Congress has affirmatively *precluded*

---

[2] *But see* Yonatan Gelblum, *The Myth that Agency Adjudications Cannot Address Constitutional Claims*, 32 Geo. Mason L. Rev. 223, 236-41 (2025).

jurisdiction over that claim. *See, e.g.*, *Lemelson*, 793 F. Supp. 3d at 11; *see also U.S. Marine v. United States*, 478 F. App'x 106, 110 (5th Cir. 2012) (supplemental jurisdiction did not cover claim that Congress had assigned exclusively to another court); *Pershing Div. v. United States*, 22 F.3d 741, 743-44 (7th Cir. 1994) (similar); *see also Free Enter. Fund v. PCAOB*, 561 U.S. 477, 489 (2010) (procedures in statutory review scheme "are to be exclusive" (citation modified)). [3]

### B.    Plaintiffs' Jury-Trial Claims Are Meritless

On the merits, plaintiffs focus on the remedies that the Board might impose in disciplinary proceedings and on the assertion that the Board can impose only legal sanctions. Reply.20-22. That assertion is flatly incorrect. *See, e.g.*, Board.Br.8 & n.6 (rebutting that argument); U.S.Br.16-17 (same). But plaintiffs' jury-trial claims should be dismissed on the merits no matter the remedies the Board might impose, as plaintiffs' proceedings before the Board involve the adjudication of only public rights, such that "no involvement by an Article III court in the initial adjudication is necessary." *Jarkesy*, 603 U.S. at 128; *see* Board.Br.10-21; U.S.Br.18-21. [4]

Plaintiffs' responses to the public-rights argument are deeply flawed. First, plaintiffs assert in conclusory fashion that because Doe 1 is accused of "altering documents" and lying about it, the allegations against him are analogous to "common-law fraud," and because Doe 2 is accused of "failing to conduct an adequate audit," the allegations against him are analogous to "professional negligence." Reply.22. But plaintiffs never explain why an allegation that Doe 1 violated Board rules by modifying documents in anticipation of a Board inspection is effectively a common-law

---

[3] Plaintiffs briefly suggest (Reply.18-19) that a court cannot dismiss only some claims as jurisdictionally barred. That is incorrect. Courts conduct the *Thunder Basin* inquiry to "decide when a *particular claim* is of the type to fall outside a statutory review scheme," *Axon*, 598 U.S. at 194 (citation modified), and the whole point of supplemental jurisdiction is to allow for jurisdiction over specific "claims" that would otherwise be dismissed, 28 U.S.C. § 1367(a).

[4] Plaintiffs seem to confuse arguments about whether the Seventh Amendment is implicated with arguments about the public-rights exception. Reply.20. That exception applies unless the claim at issue is "made of the stuff of the traditional actions at common law." *Jarkesy*, 603 U.S. at 128.

fraud claim—an argument that they did not raise in their opening brief. And they have no response to the Board's extensive arguments (Br.18-21) that the Board's allegations do not resemble claims of professional negligence.

The bottom line is that the Board is enforcing rules that have no analogues in 1789 common law. Doe 1 is accused of violating Board rules and auditing standards that set forth "requirements for documentation the auditor should prepare and retain," including then-operative Auditing Standard ("AS") 3. The asserted violation against Doe 1 is that he instructed others to modify work papers without identifying who made the modifications or recording the dates and reasons for the modifications. SMF ¶¶ 45-46. Doe 1 also is accused of violating PCAOB Rule 5110, prohibiting noncooperation during investigations, by making what Enforcement staff alleges are untrue statements to PCAOB investigators, and is further accused of violating Rule 5110 and PCAOB ethics rules by pressuring another employee to lie to attorneys during an internal investigation conducted by Doe 1's former employer. SMF ¶ 47; *contra* Reply.22 n.11 (stating that Doe 1 was accused of noncooperation "*solely*" because he denied misconduct). Doe 2 is accused of violating a host of Board rules and auditing standards, including standards governing appropriate evidence for audits, supervising audit team members, preparing and retaining documents, and evaluating fair-value measurements. *See* SMF ¶ 49; AS 1105; AS 1201; AS 1215; AS 2501. Plaintiffs never explain how those novel, technical, and industry-specific allegations borrow causes of action from traditional common law or "reiterate common law terms of art." *Jarkesy*, 603 U.S. at 136-37; *see* Board.Br.12-13, 18-21.

Second, plaintiffs try to shrink the public-rights exception, contending (Reply.23) that it applies only "in situations with unique historical underpinnings." That, however, is not the test the Supreme Court set forth in *Jarkesy*. *See* Board.Br.10-16; *Sztrom*, 2026 WL 61262, at *5. It

also ignores *Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977). *See* Board.Br.16-17. *Atlas Roofing* does not involve any unique historical underpinnings; rather, it involves regulators' claims brought under a "novel" statutory scheme designed to address "occupational safety and health problems" through "innovative methods, techniques, and approaches." *Jarkesy*, 603 U.S. at 137. And it holds that such claims, "unknown to the common law," involve only public rights as to which no jury-trial right attaches—particularly where they arise under building-code-like technical regulations. *Id.* at 137-38 (quoting *Atlas Roofing*, 430 U.S. at 461). For that reason, even after *Jarkesy*, courts have continued to apply the public-rights exception where, as here, regulators bring statutory or regulatory claims that are similarly "unknown to the common law." *Id.*; *see, e.g., Manis*, 796 F. Supp. 3d at 203-07 (USDA allegations under the Horse Protection Act).

Third, plaintiffs try to distinguish *Atlas Roofing*, arguing (Reply.24) that Sarbanes-Oxley did not address any novel problems through innovative methods because Congress meant to "improve public company financial reporting, not reform the accounting industry." That argument has no basis in reality. Congress certainly wanted to improve public-company financial reporting, *see* 15 U.S.C. §§ 7261-7266, but Congress also created the Public Company *Accounting Oversight* Board specifically to reform public-company accounting in response to devastating and costly accounting scandals, *see* 15 U.S.C. § 7211(a) (establishing the Board to "oversee the audit of companies that are subject to the securities laws … in order to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports"). The legislative history is unambiguous: following hearings "on accounting reform," Congress set out to overhaul an "extensive, Byzantine, and insufficient" system of state oversight and

voluntary self-regulation that had proved "unsatisfactory" in "assur[ing] discipline" among accountants. S. Rep. No. 107-205, at 4-5 (2002) (citation modified); *see* Board.Br.15, 17; *Free Enter. Fund*, 561 U.S. at 484 (Congress created the Board to "introduce[] tighter regulation of the accounting industry" after "a series of celebrated accounting debacles").[5]

Fourth, plaintiffs argue (Reply.25) that the claims here have a sufficient common-law analogue because in the decade or so before Sarbanes-Oxley was enacted, the Commission sometimes sued auditors in federal court. That argument is riddled with flaws. For one thing, it is based on a false factual premise. The suits to which plaintiffs refer involved pre-Sarbanes Oxley violations of federal securities laws. *See* Reply.25 (citing pre-2002 cases involving provisions on securities fraud and required filings with the SEC). Sarbanes-Oxley did not displace those "securities laws." Rather, it authorized a new, technical scheme of federal "auditing, quality control, ethics, and independence standards" to address a deficit in "public trust" concerning audit reliability. S. Rep. No. 107-205, at 4, 6 (2002). There is no pre-Sarbanes-Oxley history of claims based on *those* standards in federal court. That is presumably why Congress authorized the Board to enforce those standards only in an administrative forum. *See* Board.Br.17.n.10.

For another thing, even if the Commission had brought claims in court under twentieth-century securities laws that are comparable to the claims here, that would not come close to establishing that this action involves private rights. In deciding whether the public-rights exception applies, the question is not whether similar claims were *ever* brought in court based on *any* source of law. The question is whether the claims at issue are "made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Jarkesy*, 603 U.S. at 128. They are

---

[5] Plaintiffs continue to misrepresent the implications of a bar on being an associated person of a registered public accounting firm. Reply.25 n.12; *see* Board.Br.21.n.13. The statutes speak for themselves, *see* 15 U.S.C. § 7215(c)(4), (c)(7)(B); *id.* § 7201(9), although the Board would be glad to address at any hearing any questions the Court might have about such bars.

not, *see* Board.Br.12-21, and plaintiffs never try to show otherwise.

Finally, plaintiffs' passing citations (Reply.26) to *AT&T, Inc. v. FCC*, 149 F.4th 491 (5th Cir. 2025), and *Sun Valley Orchards v. U.S. Department of Labor*, 148 F.4th 121 (3d Cir. 2025), are beside the point. In *AT&T*, the Fifth Circuit held that an FCC enforcement action implicated the Seventh Amendment because that action was "analogous to common law negligence" and because the "common carrier doctrine is deeply rooted in the common law." 149 F.4th at 498, 501. But in *Ortega v. OCC*, 155 F.4th 394 (5th Cir. 2025), the Fifth Circuit distinguished *AT&T* in rejecting a Seventh Amendment challenge to an OCC enforcement action against banks, explaining that no "regulatory causes of action" existed "against such banks in the 18th century." *Id.* at 406, 409. This case is like *Ortega*, not *AT&T*. Board.Br.17-18. Similarly, in *Sun Valley Orchards*, the Third Circuit held that a DOL enforcement action implicated the jury-trial right because the claim "resemble[d] common law breach of contract." 148 F.4th at 128 n.4. But in that very decision, the court distinguished cases like *Atlas Roofing*, "involv[ing] technical … regulations with no common law origins." *Id.* (citation modified). That perfectly describes this case.

## II.    Plaintiffs' Due-Process Claims Fail

### A.    The Board's Limited Combination of Prosecutorial and Adjudicatory Functions Does Not Violate Due Process

Plaintiffs appear to have abandoned most of their combination-of-functions claims, including their attack on the Board's involvement in both initiating proceedings and adjudicating appeals of hearing-officer decisions, as well as their contention that the hearing officer is structurally biased. Only two combination-of-functions theories remain. First, plaintiffs contend that despite *Withrow*'s approval of combined functions, the nonadversarial nature of Board investigations distinguishes the Board's procedures from those upheld in *Withrow*. Second, they contend that they have overcome *Withrow*'s presumption of impartiality because the Board has made findings based

on admissions made in settlement offers by plaintiffs' employers.  Both arguments lack merit, and if accepted, would suggest that commonplace and oft-upheld practices are unconstitutional.

### 1.    Plaintiffs' Attempt To Distinguish *Withrow* Is Unavailing

Plaintiffs do not dispute that *Withrow* "set out the typical model … for agencies combining investigatory and adjudicative functions in a way that comports with due process."  Reply.30.  Nor do they dispute that "innumerable federal, state, and municipal administrative proceedings" deploy these "commonplace administrative structures."  Reply.29-30.  Plaintiffs instead try to distinguish the Board's processes in two ways, neither of which is material.

a.  Plaintiffs first contend that the Board's "unique structure" as a "non-governmental, private corporation" "renders its disciplinary process 'so inherently unfair as to violate due process.'"  Reply.30.  But for constitutional purposes, the Board is a *governmental* entity, subject to all the same constitutional constraints as an agency.  Board members are inferior officers who are appointed and removable by the SEC, and whose decisions are subject to SEC review.  *See Free Enter. Fund*, 561 U.S. at 510.  Board members thus are every bit as entitled as any other constitutional officer to *Withrow*'s "presumption of honesty and integrity in those serving as adjudicators."  421 U.S. at 47.  That the Board is organized for statutory purposes as a not-for-profit corporation does not change that—and plaintiffs do not suggest any reason why it should.

b.  Plaintiffs next contend that the Board's procedures are distinguishable from *Withrow* because the subject of a Board investigation cannot participate in the presentation of evidence to the Board during the investigative phase, rendering the Board biased.  Reply.30-35.  That is wrong.  To be sure, the specific procedure at issue in *Withrow* permitted the respondent to participate in the investigative phase.  But the Court never suggested that due process required such participation.  To the contrary, the Court approvingly discussed *FTC v. Cement Institute*, 333 U.S. 683 (1948), which held that the fact that the FTC had reached certain conclusions "as the result of its

12

prior *ex parte* investigations" did not render the FTC Commissioners unable to fairly adjudicate the legality of respondents' practices, because the respondents were "legally authorized" to participate fully in the FTC's subsequent adjudicatory hearing. *Id*. at 701. That aptly describes the Board's procedures, which provide respondents with a full opportunity to participate in any disciplinary hearings, as well as substantial procedural protections designed to ensure fairness. Board.Br.23-24. *Withrow* also approvingly cited other lower-court decisions upholding ex parte administrative investigative processes followed by adversarial hearings. 421 U.S. at 50 n.16 (citing, e.g., *Duffield v. Charleston Area Med. Ctr., Inc*., 503 F.2d 512, 517 (4th Cir. 1974)). Thus, the Supreme Court has already considered and rejected the very claim that plaintiffs press here.

In all events, plaintiffs cannot show, as *Withrow* requires, that their nonparticipation in Board investigations gives rise to "a risk of actual bias or prejudgment" sufficient to overcome the presumption of impartiality. 421 U.S. at 47. Plaintiffs complain that they are not permitted to rebut staff's evidence in the investigatory proceeding. Reply.33. But they do not explain how that creates any particular risk of bias on the Board's part. If the Board authorizes a disciplinary proceeding, the evidence presented to the hearing officer in *that* proceeding will constitute the entire record, and respondents will have a full opportunity to rebut that evidence. *See* PCAOB Rules 5201-5204; U.S.Br.24. Plaintiffs appear to concede that the disciplinary proceeding itself comports with due process: they no longer contend that the hearing officer is somehow structurally biased, and they no longer dispute that Board rules provide substantial procedural protections. And if a respondent appeals the hearing officer's decision to the Board, the Board must decide that appeal based solely on the adversarial record created before the hearing officer—a record created in a concededly constitutional process. Board.Br.26.[6]

---

[6] As the Board explained, respondents do have the opportunity to submit a written statement during

Plaintiffs' claim therefore boils down to an argument that the Board's exposure to unrebutted evidence at the investigative phase inherently renders it biased in adjudicating any later appeal. But the courts have definitively rejected that argument. *See Cement Institute*, 333 U.S. at 710 (rejecting claim of bias); *Duffield*, 503 F.2d at 516-17 (prior "exposure" to factual basis of sanctions proceeding in "ex parte" proceedings did not create bias); *Simpson v. Off. of Thrift Supervision*, 29 F.3d 1418, 1424 (9th Cir. 1994) (Director of the Office of Thrift Supervision not unconstitutionally biased even though he approves charges after agency investigations and adjudicates appeals from ALJ decisions). If anything, the fact that the investigation is not fully adversarial makes clearer to the Board that the investigative record—and the Board's conclusion in instituting disciplinary proceedings that a violation "appears" to have occurred, PCAOB Rule 5200(a)—are necessarily preliminary. Indeed, decisionmakers routinely reverse findings reached on a preliminary basis; for instance, judges enter temporary ex parte restraining orders and then dissolve them after hearing from both sides. And here, plaintiffs have even greater protections from bias than in *Withrow*: before any Board sanction takes effect, they may obtain review by the SEC, 15 U.S.C. § 7217(c), which plaintiffs do not contend is biased in any way.[7]

### 2. The Board's Orders Concerning Plaintiffs' Employers Do Not Give Rise To Unconstitutional Bias

Plaintiffs' second argument—that the Board has already prejudged their particular cases by reaching settlement agreements with their former employers—is equally unpersuasive. Plain-

---

the investigatory phase. Board.Br.26. Plaintiffs complain that they cannot use those statements to rebut enforcement staff's evidence. But as discussed, even investigatory procedures that are *entirely* ex parte do not violate due process.

[7] If plaintiffs are suggesting that the nonadversarial nature of the investigation increases the likelihood that unwarranted proceedings are initiated, Reply.33, that is irrelevant to the combination-of-functions claim because it does not make Board bias at the disciplinary stage more likely.

tiffs seize on a paragraph of the Board's Counterstatement of Facts that characterizes orders entered against plaintiffs' employers as making "factual findings" to contend that the Board has prejudged the plaintiffs' cases. Reply.35 (quoting Bd.Resp. ¶ 42). This Court lacks jurisdiction over that case-specific challenge to the Board's impartiality in plaintiffs' proceedings because it is not a structural claim. *See* pp. 16-18, *infra*. But in any event, the argument is meritless. The orders make clear that the Board found those facts in connection with settlements in which plaintiffs' employers consented to the orders' entry. *See* Bd.Exs.F-G. Plaintiffs' argument therefore appears to be that due process prohibits an adjudicator who has previously made findings binding on only the settling entity from presiding over an appeal concerning some of those same facts. That sweeping contention is foreclosed by Supreme Court precedent.

In *FTC v. Cement Institute*, the Supreme Court rejected the claim that the FTC could not constitutionally adjudicate the respondent's case after having stated publicly that practices like those engaged in by the respondent were unlawful, observing that "judges frequently try the same case more than once and decide identical issues each time." 333 U.S. at 703. Plaintiffs attempt to distinguish *Cement Institute* on the ground that the FTC's prior statements were not rendered in connection with the respondent's particular case. Reply.36. But the Court has applied that legal principle in cases that *did* involve prior rulings in the same case. *See, e.g.*, *NLRB v. Donnelly Garment Co.*, 330 U.S. 219, 236 (1947); *Withrow*, 421 U.S. at 49. A fortiori no unconstitutional risk of bias exists here, where the Board's findings were made in connection with settlements by other parties and those findings have no preclusive or precedential effect in plaintiffs' proceedings. *See* Board.Br.28 (citing SMF ¶42). Plaintiffs complain that those legal guardrails provide no assurance that the Board has not made up its mind, but similar arguments were rejected in *Cement Institute* and *Donnelly*. Indeed, under plaintiffs' position, agencies could never constitutionally

adjudicate multi-respondent actions where one respondent settles and others do not.[8]

**B.      Plaintiffs' Confidentiality Claim Fails on Jurisdictional Grounds and on the Merits**

Plaintiffs' second due process theory—that the confidentiality of Board and hearing officer decisions in proceedings where no sanction was imposed creates a "lopsided playing field," Reply.38—is both jurisdictionally barred and meritless.

1.  Plaintiffs' claim challenges the Board's procedures, not its structure, and thus it must be brought in an appeal from the Board's rulings in plaintiffs' proceedings.  *See* Board.Br.28-30.

Plaintiffs try to characterize this claim as "structural" by asserting that confidentiality "applies, by design, across the board in all proceedings."  Reply.12.  But the pertinent question is whether the challenge goes to an agency's "structure or very existence."  *Axon*, 598 U.S. at 189; *see* pp.4-6, *supra*.  Plaintiffs' confidentiality claim is plainly not of that character.

The *Thunder Basin* factors confirm that conclusion.  First, while plaintiffs argue that respondents rarely seek judicial review, they concede that review is available.  Reply.17; *see* Board.Br.29; pp.4-6, *supra*—and such review has resulted in sanctions being canceled, *Laccetti v. SEC*, 885 F.3d 724 (D.C. Cir. 2018) (cited at Reply.17 n.6).  Second, plaintiffs' claim is not collateral because it is intertwined with the Board's decision-making in plaintiffs' cases.  *Free Enter. Fund*, 561 U.S. at 490; *Axon*, 598 U.S. at 192-93.  Third, the Board and the SEC plainly have expertise in deciding what constitutes fair process.  Board.Br.29-30.

2.  Plaintiffs' arguments also fail on the merits.  The confidentiality of decisions in favor of respondents arises not from any Board effort to create an uneven playing field, but instead from *Congress's* decision to protect regulated parties' reputational interests.  Board.Br.30; 15 U.S.C.

---

[8] Plaintiffs' reliance on *Riggins v. Goodman*, 572 F.3d 1101, 1113 (10th Cir. 2009), and decisions cited therein do not help them.  In those cases, the adjudicators publicly stated how they intended to rule in the hearings at issue before those hearings occurred.

§7215(b)(5)(A), (c)(2).  The Board's implementation of that congressional directive does not prejudice plaintiffs in any way, let alone violate due process.

Plaintiffs complain that the Board and enforcement staff, but not plaintiffs, "have access to decades of prior non-public decisions."  Reply.38.  But plaintiffs cannot explain *why* that creates any prejudice at all, much less why it rises to the level of a due process violation.  As the Board explained, those prior decisions are not precedential or even persuasive authority; and the Board, enforcement staff, and hearing officers do not cite them in proceedings involving different respondents.  Board.Br.30-31.  Plaintiffs complain that nonpublic decisions might nonetheless influence the proceedings, for instance if a hearing officer or enforcement staff "employ[s] their reasoning without citation."  Reply.40.  But that argument gives the game away.  Any theory asserted by enforcement staff in a disciplinary proceeding, or any conclusion reached by the hearing officer or the Board, will be shared with the respondent, who can then challenge its legal and factual merit as applied to the respondent's particular case.  And any hearing officer or Board decision will stand on appeal only if its stated reasoning is legally and factually sufficient based on the record in that particular case.  Board.Br.31.  Given all that, the possibility that the Board has employed reasoning that was also used in a nonpublic opinion cannot possibly prejudice plaintiffs.  Beyond conclusory assertions, plaintiffs never explain why access to prior nonprecedential, uncited decisions is necessary to enable effective advocacy in their cases.  *Cf. Nat'l Nutritional Foods Ass'n v. FDA*, 491 F.2d 1141, 1144-46 (2d Cir. 1974) (regulated parties are generally not entitled to inquire into agency's predecisional processes); *accord* U.S.Br.26.

Plaintiffs invoke the D.C. Circuit's recent decision in *Doe v. Hill*, 141 F.4th 291 (D.C. Cir. 2025), but that case only highlights the weakness of their arguments.  Reply.38.  The *Hill* court's

holding—that the plaintiff there could not proceed under a pseudonym—does not support plaintiffs' insistence that due process requires disclosure of prior Board decisions that Congress has determined should be confidential.  And in any event, plaintiffs' own disciplinary proceedings will be fully transparent to them for the reasons stated above.

Plaintiffs' response to the Board's *Mathews v. Eldridge* analysis is similarly unavailing. Reply 39-41; 424 U.S. 319, 349 (1976).  Again, plaintiffs cannot demonstrate the existence of any meaningful "private interest" or any "probable value" arising from access to nonpublic decisions, because they cannot explain why nondisclosure prejudices them.  On the other side of the ledger, confidentiality protects important reputational interests.[9]  Plaintiffs suggest that redaction would protect those interests, Reply.41, but Congress concluded otherwise, mandating that the Board keep confidential "all documents and information," 15 U.S.C. § 7215(b)(5)(A).  The Board is "charged" with implementing that judgment, and its determination that respondents have ample opportunity for "fair consideration" is due "substantial weight."  *Mathews*, 424 U.S. at 349.

## III.    Plaintiffs' Appointments Clause Claim Fails

Plaintiffs do not dispute that a Head of Department satisfies the Appointments Clause by approving an inferior officer's appointment, even if that appointment was made in the first instance by someone else.  Board.Br.32-33.  Instead, plaintiffs advance the narrow argument (Reply.26) that the SEC does not have statutory authority to approve the appointments.  That is incorrect.

The Board has authority "to appoint such … agents as may be necessary or appropriate" to carry out its functions.  15 U.S.C. § 7211(f)(4).  That authority is expressly made "subject to section 7217," *id.* § 7211(f), which vests the SEC with "oversight and enforcement authority over the Board," *id.* § 7217(a).  The most natural reading of those statutes is that the SEC's "oversight …

---

[9] Such interests, however, are less compelling in a "public proceeding," 15 U.S.C. §7215(b)(5)(A), such as where a respondent sues the Board in federal court.

authority" regarding the Board's appointment power includes the authority to approve (or disap-

prove) the Board's appointment decisions. And even if that were not the best interpretation, it is

certainly a reasonable one that this Court must adopt to avoid constitutional questions. *See Braid-*

*wood*, 606 U.S. at 792; Board.Br.35-36.

Rather than offer an alternative understanding of Sections 7211(f) and 7217(a), plaintiffs

simply ignore the text, asserting (Reply.27) that "Section 7211(f)(4) says nothing about the SEC's

authority." That is incorrect: Section 7211(f) expressly incorporates Section 7217 by reference.

Plaintiffs also argue that the SEC lacks statutory authority to approve hearing officers' appoint-

ments because Section 7211(f) does not identify hearing officers by name. Reply.27. But plain-

tiffs concede (as they must) that Section 7211(f)(4) permits the Board to appoint "other agents" of

the Board, and plaintiffs offer only ipse dixit (Reply.27) for why the statutory term "agents" could

not include "inferior officers" who assist the Board in carrying out its statutory duties. Plaintiffs

observe that the Board could not, consistent with the Appointments Clause, unilaterally appoint

inferior officers. But that is not a reason to read "other agents" to be limited to "mere employees,"

as plaintiffs insist (Reply.27). It is instead a reason to construe Sections 7211(f)(4) and 7217(a)

together, such that they vest the Board with statutory authority to appoint inferior officers and the

SEC with statutory authority to approve those appointments. *See Braidwood*, 606 U.S. at 792.[10]

Plaintiffs also misunderstand the import of Section 7211(g), which provides that the Board

may, "subject to the approval of the Commission," adopt rules delegating "any of its functions"

---

[10] Plaintiffs' assertion that "[t]he Board has not promulgated any rule that the CHO must be ap-
pointed or approved by the SEC" (Reply.27) is incorrect and irrelevant. The Board did issue such
a rule and filed it with the SEC pursuant to Sarbanes-Oxley's statutory review procedures.
Board.Br.34 n.20. And to the extent that plaintiffs' veiled argument is that the Board adopted a
*bylaw*—not a "rule"—for appointment of the hearing officer, that argument fails, too, as PCAOB
bylaws *are* Board rules. 15 U.S.C. §7201(13). In all events, the SEC's issuance of its own, sepa-
rate order requiring approval for hearing officer appointments under Section 7217(a) is sufficient
to satisfy the Appointments Clause. Board.Br.34.

(including "functions with respect to hearing") to an "employee of the Board." 15 U.S.C. § 7211(g). The Board's argument is not, as plaintiffs assert (Reply.27), that the SEC's authority to appoint hearing officers "originates from a rule or policy promulgated by [the Board]." Rather, Section 7211(g) demonstrates that Congress contemplated that the Board would use hearing officers and that the SEC would have authority to supervise that use. That is additional evidence that the SEC's authority includes approval of individual hearing officers' appointments.[11]

*Braidwood* confirms that the Appointments Clause is satisfied by Congress's decision to give the SEC authority that is capacious enough to encompass approving the Board's appointment of hearing officers. Board.Br.34-35. Plaintiffs attempt to avoid *Braidwood* by pointing to its holding that the "power to 'convene' … include[s] the power to appoint," 606 U.S. at 781, and arguing that Section 7217(a) contains no "comparable language" conferring on the SEC authority "to appoint" hearing officers. Reply.26-27. That misses the point. Plaintiffs do not dispute that the Appointments Clause is satisfied when a Head of Department approves another's appointment of an inferior officer, so the question here is not whether Sections 7211(f) and 7217(a) confer on the SEC authority to appoint hearing officers in the first instance, but instead whether they confer authority to approve the Board's appointments. They do. And *Braidwood* confirms that "Congress need not use magic words to confer appointment authority." 606 U.S. at 780. That is because, contrary to plaintiffs' suggestion (Reply.27), Congress may vest a Head of Department with appointment or appointment-approval authority without mandating that he or she appoint (or approve) any particular inferior officer; it is enough that the "statutory scheme[]" as a whole gives

---

[11] Nor does anything about the hearing officer framework "turn Constitutional interpretation on its head" (Reply.27) merely because the Board *also* has a rule governing appointment/removal. The SEC adopted its own, separate regulation, which includes that "No action by the Board proposing to appoint or remove from office a hearing officer shall be final absent Commission approval." 17 C.F.R. §202.150; *see Public Company Accounting Oversight Board Hearing Officers*, SEC Release No. 34-85437 (Mar. 28, 2019).

the Head of Department authority broad enough to include such appointments or approvals. *Braid-wood*, 606 U.S. at 785; *see also id*. at 779-80.  That is precisely what Sections 7211 and 7217 do.

## IV.    Plaintiffs' Removal-Protection Claim Fails

As the Board has explained, hearing officers are at-will employees, and there is, at most, only one level of for-cause removal protection between hearing officers and the President (the for-cause protection that SEC Commissioners are understood to enjoy).  The Board's opening brief explained why the procedures for removing hearing officers—including that the Board and the SEC must agree on removal—do not unconstitutionally shield hearing officers from accountability.  Board.Br.36-39.  Plaintiffs offer no response.  Reply.28-29.

Instead, casting about for some other ostensible restraint on removal, plaintiffs for the first time point to the District of Columbia Human Rights Act's ("DCHRA") prohibition on terminating employment "based upon … political affiliation."  DC Code § 2-1402.11(a).  That argument is forfeited.  *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief.").  Forfeiture aside, it fails for the same reason as plaintiffs' original (now-abandoned) argument:  regardless of the DCHRA's effect on the Board, the SEC retains at-will control over hearing officers because it is not bound by the DCHRA.  The SEC, which is indisputably a federal agency, cannot be sued under the DCHRA.  *See Marcus v. Geithner*, 813 F. Supp. 2d 11, 17 (D.D.C. 2011); Reply.28-29.  And the SEC has statutory authority to alter the Board's rules on its own initiative.  15 U.S.C. §§ 78s(c), 7217(b)(5).  Therefore, if the President or the SEC wished to remove a hearing officer based on political affiliation (or any other reason), and the Board refused, the SEC could simply strip the Board of any decision-making authority over hearing-officer terminations.  *See* Board.Br.38.  Thus, the DCHRA cannot "insulate[]" hearing officers "from the Commission's control."  *Free Enter. Fund*, 561 U.S. at 486.

21

Even if the SEC's authority were not sufficient to eliminate any Appointments Clause concern, "the appropriate remedy" would be to invalidate the DCHRA provision in question as applied to hearing officers—not injunctive relief against the officers' actions.  *Seila Law v. CFPB*, 591 U.S. 197, 232-38 (2020); U.S.Br.32-33; Board.Br.39-40.  That is true in the context of federally enacted removal protections, and is true a fortiori in the context of a provision enacted by the D.C. Council rather than Congress.  *Cf. CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 329 (3d Cir. 2025) (state law that unconstitutionally regulates federal entity cannot be given effect).

## V.    Plaintiffs' Private Nondelegation Claim Fails

A.    Plaintiffs acknowledge that their private nondelegation claim depends on this Court treating the Board as private, even though they argue that the Board should be treated as part of the government for their other claims.  Reply.41-42.  Plaintiffs cannot have it both ways.

Plaintiffs point to *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), and *Department of Transportation v. Association of American Railroads*, 575 U.S. 43 (2015), as support for their "position that private entities created by Congress are 'part of the government' for some purposes but not others."  Reply.42.  But those decisions unambiguously support the Board.  In *Association of American Railroads*, the plaintiffs contended that *Lebron*'s holding that Amtrak was governmental for First Amendment purposes did not control with respect to private nondelegation—the very claim plaintiffs press here.  *See* 575 U.S. at 55.  The Supreme Court *rejected* that argument.  *See id.*  In doing so, the Court analyzed all of the mechanisms by which the government controlled Amtrak, not just the "metrics and standards" that were the subject of the private nondelegation claim at issue.  Reply.42.  A comparable analysis applies here.[12]

_____

[12] Plaintiffs' contention that the Board and its employees are private because statutes like FOIA do not apply to the Board is incorrect.  *Lebron* and *Association of American Railroads* did not rely on those statutes' applicability in holding Amtrak to be part of the government.  Board.Br.41.

B.   Even if the Board were considered a private entity, plaintiffs' claim would still fail because Sarbanes-Oxley grants the SEC extensive supervisory power over the Board.  Plaintiffs assert that the Board has failed to identify any "real-time supervision" by the SEC over various aspects of the Board's disciplinary proceedings.  Reply.43.  But plaintiffs ignore the D.C. Circuit's decision in *Alpine*, which held that the SEC's *identical* oversight of ordinary FINRA enforcement proceedings sufficed to defeat a private nondelegation claim.  *See* Board.Br.44 (discussing *Alpine Sec. Corp.*, 121 F.4th at 1325).  *Alpine* is dispositive here.  And in all events, "real-time" supervision is not, and never has been, the constitutional standard. [13]

The only decision on which plaintiffs rely, *National Horsemen's Benevolent & Protective Association v. Black* ("*NHPBA*"), 53 F.4th 869 (5th Cir. 2022), does not aid them.  The Fifth Circuit found a private nondelegation problem there because the FTC had insufficient authority over a private entity's rulemaking.  *See id.* at 872, 886-87.  But the court contrasted that scheme with the SEC's constitutionally permissible oversight of FINRA rules, which was acceptable because the SEC "has the final word on what those rules are."  *Id.* at 887; *see* U.S.Br.37.  By statute, the SEC likewise has the "final word" on the Board's disciplinary sanctions, *see* 15 U.S.C. § 7217(c)— as it does on the Board's personnel, rules, funding, and other key functions.  Board.Br.4-5.

## VI.   The Board's Funding Scheme Is Constitutional

Plaintiffs do not dispute that the Board's funding scheme, standing alone, is constitutional under *Consumers' Research*.  They instead contend that the scheme is an unconstitutional delegation of Congress's Taxing Clause Power because the Board is a "private entity that is accountable to a President only through multiple layers of protections."  Reply.44.  That argument fails.

---

[13] Plaintiffs err to the extent they conflate the SEC's quantum of supervisory authority over the Board (which is what matters) with the extent of its use (which does not).  "It is sufficient in such schemes that the private party's recommendations . . . cannot go into effect without an agency's say-so, regardless of how freely given."  *FCC v. Consumers' Rsch.*, 606 U.S. 656, 695 (2025).

First, the argument rests on a misconceived premise. The Board is not an unaccountable "private entity." It is a part of the government for all relevant purposes in this case. *See* p.22, *supra*. Board members are overseen, and removable at will, by the SEC. *See Free Enter. Fund*, 561 U.S. at 492. To the extent plaintiffs suggest that a single layer of removal protection (i.e., that of SEC Commissioners, *see* Board.Br.38 & n.23) renders the Board's otherwise constitutional funding structure unlawful, *Consumers' Research* forecloses that argument. There, the Court approvingly cited multiple revenue-raising schemes for agencies with tenure-protected leaders, including the Federal Reserve. *See Consumers' Rsch.*, 606 U.S. at 676; U.S.Br.39-40.

Second, plaintiffs' "combination theory" lacks merit in all events because the constitutional principles on which they rely do not act on the "same axis" as limits on delegation under the Taxing Clause. *See Consumers' Rsch.*, 606 U.S. at 696-97; Board.Br.47-49. The Taxing Clause argument relates to Congress's control over the taxing power, whereas the argument about removal protection relates to the President's control over the executive branch. A restraint relating to congressional power and a restraint relating to presidential power self-evidently operate on different axes.

Plaintiffs' responses are unpersuasive. They say (Reply.44) that *Consumers' Research* is distinguishable—even though it rejected a similar "combination theory"—because it concerns a private entity "merely assisting" an independent agency, whereas here "a private entity" is "driving the determination" of the fees to be paid. That ignores the SEC's power to approve or disapprove the Board's funding-related actions. *See* Board.Br.46; p.23 n.13, *supra*. And to the extent there were some greater private nondelegation concern here than in *Consumers' Research* (and there is not, *see* p.22-23, *supra*), that would not alter the "axis" on which such concerns operate. Plaintiffs also cite Justice Kavanaugh's concurrence in *Consumers' Research*, but that opinion is not binding, and in all events, it suggests only that "congressional delegations to independent agencies"

might not comport with Article II, *see* 606 U.S. at 699 (Kavanaugh, J., concurring) (emphasis omitted)—but plaintiffs have not made that argument.  *See* Reply.44.

## VII.    Injunctive Relief Would Be Inappropriate

Even if plaintiffs prevailed on any of their claims, they would not be entitled to an injunction against "prosecuting … disciplinary proceedings against [plaintiffs]."  Reply.45 (emphasis omitted).  A permanent injunction is an "extraordinary remedy" that must be "narrowly tailor[ed]" to "the specific harm shown."  *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 166 (D.D.C. 2015) (citations omitted); *see* Board.Br.49.  And in the context of separation-of-powers violations, the availability of tailored remedies such as severance often renders any injunction inappropriate.  Board.Br.49-50.  If this Court were to find a constitutional violation, a declaratory judgment or narrow injunction may provide a complete remedy; further briefing on that question would be warranted.  *See* Board.Br.50.

Moreover, when considering the appropriateness of any such remedy, this Court would have to weigh the balance of equities and public interest, including the "ripple effect" that any injunction would have for the Board's "regulatory mission and ability to enforce its own rules." *Kim v. FINRA*, 698 F. Supp. 3d 147, 170 (D.D.C. 2023).  It blinks reality to assume (Reply.45) that a decision establishing that a subject of Board disciplinary proceedings may obtain a permanent injunction against those proceedings would have no appreciable effect on the Board's mission.  Plaintiffs' blithe suggestion that the Board simply refer its investigations to the SEC for prosecution (Reply.45) makes plain plaintiffs' evident aim:  to deprive the Board of any real enforcement authority.

## CONCLUSION

The Court should grant defendant's motion for summary judgment on all of plaintiffs' claims and deny plaintiffs' motion for summary judgment on those claims.

Dated:  January 13, 2026

/s/ Donald B. Verrilli, Jr.
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Rachel G. Miller-Ziegler
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001
Telephone:  (202) 220-1100
Fax:  (202) 220-1100

Jeffrey A. Lamken (DC Bar # 440547)
Robert K. Kry (DC Bar # 490545)
MOLOLAMKEN LLP
600 New Hampshire Ave. NW, Suite 500
Washington, DC 20037
Telephone: (202) 556-2000

*Attorneys for Public Company Accounting
Oversight Board*

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2026, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.


DATED: January 13, 2026                    */s/ Donald B. Verrilli, Jr.*
                                           Donald B. Verrilli, Jr.