**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE,<br><br>*Plaintiff*,<br><br>v.<br><br>PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD,<br><br>*Defendant*. | Case No. 1:24-cv-780 (ACR) |
| JOHN DOE,<br><br>*Plaintiff*,<br><br>v.<br><br>PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD,<br><br>*Defendant*. | Case No. 1:25-cv-186 (ACR)<br>(consolidated with 1:24-cv-780) |

**MEMORANDUM OPINION**

Public companies need auditors. Turns out, those auditors need auditors of their own. Just ask anyone who lost money when Enron filed for bankruptcy.[1] That accounting scandal, and a spate of others, spurred Congress to action. S. Rep. No. 107–205, at 2 (2002). It created the Public Company Accounting Oversight Board to "protect the interests of investors

[1] Numerous books dissect what occurred. The Court commends to the interested reader: Bethany McLean & Peter Elkind, *The Smartest Guys in the Room: The Amazing Rise and Scandalous Fall of Enron* (2003); and Kurt Eichenwald, *Conspiracy of Fools: A True Story* (2005).

and further the public interest in the preparation of informative, accurate, and independent audit reports." 15 U.S.C. § 7211(a). And it tapped the Securities and Exchange Commission to supervise this new entity. *Id.* §§ 7217, 7219(b).

This case asks whether Congress overstepped. Dkt. 108 at 13–14.[2] Plaintiffs are two accountants facing separate Board disciplinary proceedings. Seeking to face justice in a different forum (namely, this one), they have filed suit claiming a slew of constitutional harms. They contend that the Board's proceedings violate their Seventh Amendment right to a jury trial; the Board's proceedings deny them the due process guaranteed by the Fifth Amendment; and the Board's structure violates Article I, Article II, and constitutional nondelegation principles. *Id.*

These challenges take circuitous routes but reach the same destination. Plaintiffs must return to the Board. The Court **DENIES** Plaintiffs' Motion for Summary Judgment, Dkt. 108, and **GRANTS** the Board's Cross-Motion for Summary Judgment, Dkt. 110.

## I. BACKGROUND[3]

### A. Statutory and Regulatory Background

Congress created the Board through the Sarbanes-Oxley Act of 2002 to oversee the audits of public companies subject to the federal securities laws. Pub. L. No. 107-204, 116 Stat. 745; 15 U.S.C. § 7211(a). Organizing it as a nonprofit corporation, Congress specified that the Board "shall not be an agency or establishment of the United States Government." 15 U.S.C. § 7211(b). Even so, the Supreme Court has treated the Board as "part of the Government" for

[2] The Court cites the ECF-generated page numbers appearing at the top of each filing.

[3] Unless otherwise noted, the parties do not dispute these background facts.

constitutional purposes. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 486 (2010) (cleaned up). As do, for the most part, the parties.[4] Dkt. 108 at 28 n.15; Dkt. 110-1 at 54.

The SEC oversees the Board in various ways. It appoints each of the Board's five members. 15 U.S.C. § 7211(e)(1), (4). It approves the Board's budget and rules, and reviews its disciplinary sanctions. *Id.* §§ 7217(b)–(c), 7219(b). And it may "relieve the Board of any responsibility to enforce compliance with any provision of [the Sarbanes-Oxley] Act, the securities laws, the rules of the Board, or professional standards." *Id.* § 7217(d)(1).

Subject to that oversight, the Board has broad enforcement authority. 15 U.S.C. § 7215(b)(1). The Board may inspect registered accounting firms, investigate possible violations of regulations or professional standards, and institute disciplinary proceedings against registered firms and persons associated with them. 15 U.S.C. §§ 7214, 7215. And it has wide reach. Every accounting firm "that participates in auditing public companies under the securities laws must register with the Board, pay it an annual fee, and comply with its rules and oversight." *Free Enter. Fund*, 561 U.S. at 485.

The Board's five members cannot undertake this work alone. And so the Board may appoint "employees, accountants, attorneys, and other agents" to assist in its duties. 15 U.S.C. § 7211(f)(4), (g)(2).

## B. Investigatory and Adjudicatory Process

### 1. Investigations

Relevant here, the Board employs staff in its Division of Enforcement and Investigations (DEI) and in its Office of Hearing Officers. PCAOB Rules 5101–09, 5200; PCAOB Office of Hearing Officers Charter (Mar. 25, 2021), at 1. DEI staff conduct investigations and prosecute

[4] The parties disagree only as to Plaintiffs' private-nondelegation claim. *See infra* Section III.E.

disciplinary proceedings. PCAOB Rules 5101–09. Hearing officers preside over disciplinary proceedings. *Id.* at Rule 5200.

Board enforcement proceedings generally begin with the DEI. The DEI Director may initiate an "informal inquiry where it appears that, or to determine whether," a registered firm or associated person may have committed a violation.[5] *Id.* at Rule 5100(a). During an informal inquiry, DEI staff may request documents, information, testimony, or an interview. *Id.* at Rule 5100(b). Compliance, however, is optional. Dkt. 115-1 at 4.

On its own initiative or upon the DEI Director's recommendation, the Board may issue "an order of formal investigation." PCAOB Rule 5101(a)(1). Before doing so, the Board can receive communications from DEI staff about the relevant facts and legal issues. Dkt. 115-1 at 4–6. Potential respondents cannot access these communications. PCAOB Rule 5108(a). However, they may submit a written statement to the Board setting out their "interests and positions in regard to the subject matter of the investigation." *Id.* at Rule 5109(d); Dkt. 115-1 at 4–6.

If the Board authorizes a formal investigation, the Board or its staff may issue the target accounting board demands for documents and testimony. 15 U.S.C. § 7215(b)(2); PCAOB Rules 5101–5104. At that stage, compliance is no longer optional. A registered firm or associated person who fails to comply with a demand or otherwise cooperate with an investigation may face Board sanctions. 15 U.S.C. § 7215(b)(3), (c)(4); PCAOB Rule 5110.

After investigation, DEI staff may recommend to the Board that it initiate a disciplinary proceeding. PCAOB Rule 5109(d); Dkt. 115-1 at 6. As it considers that recommendation, DEI

[5] Violations of the following are covered: any provision of Sarbanes-Oxley, Board Rules, provisions of certain securities laws, and professional standards. PCAOB Rules 5100(a), 5101(a).

staff can again communicate with the Board. Dkt. 115-1 at 6–8. Potential respondents may submit written statements to accompany the DEI's recommendation but still cannot access DEI communications with the Board. *Id.*

### 2. Disciplinary Proceedings

Either the Board or a hearing officer presides over disciplinary proceedings. 15 U.S.C. § 7211(g)(2); PCAOB Rule 5200(b). The Board appoints and removes hearing officers subject to the SEC's approval. PCAOB Bylaws art. VI, § 6.3(d). Hearing officers report to the Board, manage ongoing proceedings, rule on procedural motions and the admissibility of evidence, conduct hearings, issue initial decisions, and, when appropriate, impose sanctions. PCAOB Rules 5200(c), 5204(b), 5441.

Board rules require separation of functions between DEI staff and hearing officers. *Id.* at Rule 5200(d). A hearing officer does not report to or take direction from anyone who performs investigative or prosecutorial functions on the Board's behalf. *Id*. And no staff that investigated or prosecuted a claim, or a factually related claim, can "participate or advise in [a hearing officer's] decision" other than as witness or counsel. *Id.*; Dkt. 115-1 at 8–9. After disciplinary proceedings commence, *ex parte* communications with the hearing officer are prohibited. PCAOB Rule 5403.

### 3. Decisions

Initial decisions of a hearing officer "include findings and conclusions, including sanctions, if appropriate." PCAOB Rule 5204(b). Sanctions may include censure, suspension, permanent bars from association with registered firms, and civil monetary penalties. 15 U.S.C. § 7215(c)(4). Decisions are presumptively confidential, though DEI staff may access them. Dkt.

115-1 at 12–14. They are unavailable to respondents in future Board proceedings unless a respondent seeks and obtains their disclosure from the Board. *Id.* at 14.

Initial decisions are also just that—initial. Either the respondent or the DEI may seek *de novo* review from the Board, and the Board may also order review on its own initiative. PCAOB Rules 5204(d), 5460. If neither initiates review, the hearing officer's decision "become[s] the final decision of the Board." *Id.* at Rule 5204(d).

The Board's review is itself subject to review by the SEC. The SEC may enhance, modify, cancel, reduce, or require remission of a Board sanction it finds unnecessary, "excessive, oppressive, inadequate, or otherwise not appropriate." 15 U.S.C. § 7217(c)(3). Final SEC orders are subject to review in a federal court of appeals. *Id.* §§ 7217(c)(2), 78y(a).

**C. Plaintiffs**

Plaintiffs Doe 1 and Doe 2 are accountants who previously worked at different Board-registered accounting firms. They have no personal or professional relationship with one another and are respondents in separate Board disciplinary proceedings. Dkt. 115-1 at 1, 14–15.

After a formal investigation in December 2022, the Board instituted disciplinary proceedings against Doe 1. *Id.* at 14. The Board alleges, *inter alia*, that Doe 1 improperly modified audit documents, misled Board inspectors about those documents, and failed to cooperate with a Board investigation. *Id.* at 14, 17–18. After a formal investigation in September 2023, the Board instituted disciplinary proceedings against Doe 2, alleging that he failed to adequately evaluate significant accounting estimates during an audit he performed in 2018. *Id.* at 15. The Board contends that each Plaintiff violated several Board rules and auditing and professional standards. *Id.* at 14–18. Both Plaintiffs deny the allegations against them. *Id.*

Before instituting disciplinary proceedings against Plaintiffs, the Board publicly issued disciplinary orders against their respective former employers. *Id.* at 15–16. Those orders contain findings on factual and legal issues that the DEI also alleges in the proceedings against Plaintiffs. *Id.* The orders' findings, however, "are not binding on any other person or entity in this or any other proceeding." *Id.* at 16.

The Board assigned then-Chief Hearing Officer Marc B. Dorfman[6] to preside over each proceeding, which remain stayed pending this litigation. Dkt. 108 at 20; Dkt. 110-1 at 19. The orders instituting proceedings direct the hearing officer to determine "what, if any, sanctions are appropriate" against each Plaintiff. Dkt. 115-1 at 18. However, because the proceedings have not yet concluded and remain stayed, the Board has not yet sanctioned—and may never sanction—Plaintiffs.

### D. Procedural History

Plaintiffs filed separate actions in federal court challenging the Board's disciplinary proceedings against them. Dkt. 1; Dkt. 1, *Doe v. Pub. Co. Acct. Oversight Bd.* (*Doe II*), No. 3:24-cv-254 (M.D. Tenn. Mar. 5, 2024). Doe 1 filed suit in the Northern District of Texas, and Doe 2 filed suit in the Middle District of Tennessee. Dkt. 1; Dkt. 1, *Doe II*. The respective courts transferred their cases to this Court, which later consolidated them. Dkt. 63; Dkt. 51, *Doe II*; Min. Order (Feb. 19, 2025).[7]

Plaintiffs now move for summary judgment seeking declaratory and injunctive relief. They argue that the Board's proceedings violate the Seventh Amendment right to a jury trial, the

---

[6] From 2013 until his retirement in 2025, Dorfman served as the Board's Chief—and only—Hearing Officer. Dkt. 115-1 at 8–10. Today, the CHO role sits vacant. *Id.* at 10.

[7] This Court also consolidated a third action, *John Doe Corp. v. PCAOB*, No. 25-cv-70 (D.D.C. Jan. 10, 2025), which the parties stipulated to dismiss with prejudice. Dkt. 106.

Due Process Clause of the Fifth Amendment, the Appointments and Vesting Clauses of Article II, the nondelegation doctrine, and the Taxing Clause of Article I. Dkt. 108 at 13–14. The Board, on its cross-motion for summary judgment, argues that the Court lacks subject-matter jurisdiction over Plaintiffs' jury-trial claim and certain due-process claims, and that Plaintiffs' claims otherwise fail on the merits. Dkt. 110-1 at 15–18.[8] The Court addresses each argument in turn.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The nonmoving party "may not rest upon . . . mere allegations" and "must set forth specific facts showing that there is a genuine issue for trial." *Id.* (cleaned up). The Court views the admissible evidence and "all reasonable inferences derived therefrom in a light most favorable to the nonmoving party." *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016) (cleaned up); Fed. R. Civ. P. 56(c).

"When faced with cross-motions for summary judgment, the Court must review each motion separately on its own merits to determine whether either of the parties deserves judgment

[8] The United States, as intervenor, filed a brief in opposition to Plaintiffs' motion for summary judgment and in support of the Board's cross-motion. Dkt. 112. Because the United States and the Board advance substantially the same arguments, the Court considers those arguments together.

as a matter of law." *Trudel v. SunTrust Bank*, 288 F. Supp. 3d 239, 245 (D.D.C. 2018) (cleaned up).

## III. ANALYSIS

### A. Seventh Amendment Right to a Jury Trial

Plaintiffs contend first that a civil jury in an Article III court—not some Board-appointed hearing officer in a closed disciplinary proceeding—must decide their cases. They have a jury right, they claim, because the Board can impose civil monetary penalties. *See* Dkt. 108 at 21–27.

Maybe. But this Court lacks jurisdiction to hear the issue.[9] Congress has the power to strip a federal district court's subject-matter jurisdiction over claims challenging agency action. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994); *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). And here, Congress has done just that. Federal district courts retain jurisdiction to hear only "structural" claims challenging the Board's "power to proceed" in "all or a broad swath of its work." *Axon*, 598 U.S. at 189, 191–92. Congress directed that all other claims proceed through the administrative process and then to a federal circuit court. *See* 15 U.S.C. § 78y(a)(1). Plaintiffs' Seventh Amendment claim falls into this latter category.

Plaintiffs resist this conclusion. They argue first that Congress did not preclude federal district court review of their claim. And second, even if it did, they contend that their claim is structural. The Court reviews the first contention under *Thunder Basin* and the second under *Axon*. It rejects each.[10]

---

[9] The Court thus does not analyze the merits of Plaintiffs' Seventh Amendment claim. It discusses Seventh Amendment jurisprudence only insofar as it informs the jurisdictional inquiry.

[10] Plaintiffs' argument that the Court may extend supplemental jurisdiction to cover their Seventh Amendment claim, notwithstanding Congress's jurisdiction-stripping scheme, is unpersuasive. *See* Dkt. 114 at 27–29. The Court cannot review in a round-about way what Congress and Supreme Court precedent prohibit it from reviewing directly.

### 1. *Thunder Basin* Factors

The Court begins by asking whether Congress's intent to preclude district court jurisdiction is "fairly discernible in [Sarbanes-Oxley's] statutory scheme" and whether Plaintiffs' claim is "of the type Congress intended to be reviewed within this statutory structure."[11] *Thunder Basin*, 510 U.S. at 207, 212. The Supreme Court's *Thunder Basin* factors provide three considerations to aid this inquiry. *See id*. at 212–13; *Axon*, 598 U.S. at 185–86. The Court must first consider whether preclusion would "foreclose all meaningful judicial review of the claim"; second, whether the claim is "wholly collateral to [the] statute's review provisions"; and finally, whether the claim falls "outside the agency's expertise." *Thunder Basin*, 510 U.S. at 212–13 (cleaned up).

Applying these factors, the Court concludes that Congress intended to preclude district court jurisdiction over Plaintiffs' Seventh Amendment claim.

The first *Thunder Basin* factor is not a close call. The statutory scheme preserves meaningful opportunity for judicial review. If the Board imposes a sanction, Plaintiffs may seek review from the SEC. *See* 15 U.S.C. §§ 7215(e), 7217(c). If the SEC sustains the sanction, Plaintiffs may raise their Seventh Amendment challenge before a federal circuit court. *See id.* § 78y(a). That path to relief "does not usually demand a district court's involvement." *Axon*, 598 U.S. at 190. And so a plethora of district courts, when considering analogous statutory schemes, have held that federal circuit courts can meaningfully review Seventh Amendment challenges to agency adjudications. *See Vape Cent. Grp., LLC v. FDA*, No. 24-3354, 2025 WL

[11] The Court evaluates the *Thunder Basin* factors on a claim-by-claim basis. *See Axon*, 598 U.S. at 186; *contra* Dkt. 114 at 14–15, 27–28.

637416, at *5–6 (D.D.C. Feb. 27, 2025) (collecting cases). The Court sees no reason to break from that good company.

Plaintiffs do. They highlight that "of the Board's more than 500 publicly issued final sanctions orders since its creation in 2002, only eight have ever been subsequently appealed to, and decided on the merits by, the SEC." Dkt. 114 at 24. "This track record," they conclude, "confirms that, absent district court jurisdiction, the Doe Plaintiffs (and most other Board respondents) 'might never have . . . judicial recourse.'" *Id*. (quoting *Axon*, 598 U.S. at 190).

The response? *Solvitur ambulando*.[12] Consider *Jarkesy v. SEC* (*Jarkesy I*), 803 F.3d 9, 18 (D.C. Cir. 2015), in which the plaintiff also raised a Seventh Amendment claim in contesting an SEC administrative proceeding. The D.C. Circuit held that he needed to pursue his claims through the SEC's administrative process, and after a final SEC order, in a federal circuit court. *See id.* at 16–18. And so he walked. Jarkesy completed the administrative process, petitioned the Fifth Circuit for review of the SEC's final order, and ultimately prevailed in the Supreme Court on his Seventh Amendment claim. *See Jarkesy v. SEC* (*Jarkesy II*), 34 F.4th 446 (5th Cir. 2022); *SEC v. Jarkesy* (*Jarkesy III*), 603 U.S. 109, 119–20 (2024).[13]

Ignoring *Jarkesy I*, Plaintiffs rely on *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010). The reliance is not entirely misplaced. There, the Supreme Court held that Sarbanes-Oxley's review scheme did not provide meaningful judicial review of a challenge to

[12] The Court had to look it up: "It is solved by walking." The Greek philosopher Zeno of Elea argued that, as a matter of logic, motion is impossible. Diogenes the Cynic is said to have responded to him by standing up and walking across the room. *See* Nick Huggett, *Zeno's Paradoxes*, The Stanford Encyclopedia of Philosophy (Mar. 6, 2024).

[13] Although the Supreme Court ruled for Jarkesy on his Seventh Amendment claim, in doing so, it did not displace the D.C. Circuit's holding that such claims must first be brought through the administrative process and then appealed to a federal circuit court. The Court's reliance on *Jarkesy I* is limited to that holding.

the Board's constitutionality. *See id*. at 490–91. So far, so good for Plaintiffs. But the Court reached that conclusion because the statutory scheme "provides only for judicial review of *Commission* action, and not every Board action is encapsulated in a final Commission order or rule." *Id.* at 490. The relevant investigation had not produced a sanction, only an uncomplimentary—and unreviewable—inspection report. *See id.* "Key to the Court's reasoning" was that, because the report was not subject to judicial review, the petitioner "would have needed to manufacture a dispute or provoke a sanction" to obtain a final order subject to judicial review. *Jarkesy I*, 803 F.3d. at 20.

Not so here. Plaintiffs need not take new action to tee up judicial review. They are subject to disciplinary proceedings for alleged conduct that has already occurred. If the Board sanctions Plaintiffs, it will do so in a final order. If that occurs, Plaintiffs can appeal that order to the SEC. And, if unsuccessful again, they can bring their Seventh Amendment claim to a federal circuit court. On these facts then, *Free Enterprise Fund* is not the get-out-of-hearings-free card Plaintiffs seek.

The second *Thunder Basin* factor is likewise not a close call. A claim is not wholly collateral if it serves as a "vehicle by which" a party seeks to prevail in an administrative proceeding. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012). That aptly describes Plaintiffs' claim. Dkt. 108 at 21–29. As in *Jarkesy I*, Plaintiffs' constitutional claim "do[es] not arise 'outside' the SEC administrative enforcement scheme—[it] arise[s] from actions the Commission [will take] in the course of that scheme." 803 F.3d at 23. Because Plaintiffs' Seventh Amendment claim depends on the nature of the remedy imposed in the administrative process, *see Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989); *Jarkesy III*, 603 U.S. at 122–23, the administrative process "might fully dispose" of the claim, *Elgin*, 567 U.S. at 23.

The final *Thunder Basin* factor is a closer call, but also tilts in favor of the Board. Yes, Plaintiffs' constitutional claim falls outside the Board's expertise. *See Free Enter. Fund*, 561 U.S. at 491. But if constitutional competence were dispositive, Article III courts would trump Article II adjudicators every time. To avoid "creating a far more expansive exception to the statutory review procedures than the Supreme Court has ever embraced," this Court has understood constitutional claims to fall into one of two camps. *Vape Cent. Grp.*, 2025 WL 637416, at *8. "[P]ure question[s] of constitutional law" that are "detached from 'considerations of agency policy'" belong to Article III courts. *Id.* (quoting *Axon*, 598 U.S. at 194). But Article II adjudicators can handle "mixed question[s] of law and fact (or policy)," because "agency action might shed light on the constitutional question or obviate the need for judicial review." *Id.* (cleaned up).

Plaintiffs' Seventh Amendment challenge falls into the second camp. The Board's expertise in its own disciplinary proceedings can be "brought to bear" on constitutional challenges that arise during those proceedings. *Elgin*, 567 U.S. at 23. And, again, if the Board or SEC decline to impose sanctions or impose only equitable sanctions, agency action might well obviate the need for judicial review. *Id.*

Upon evaluation of the *Thunder Basin* factors, the Court concludes that Congress's intent to preclude district court jurisdiction is "fairly discernible in [Sarbanes-Oxley's] statutory scheme." *Thunder Basin*, 510 U.S. at 207 (cleaned up).

### 2. *Axon*-style Structural Claim

The Court next moves to the nature of Plaintiffs' Seventh Amendment claim, which it considers under the Supreme Court's *Axon* decision. *See* Dkt. 108 at 17–23. Again, petitioners there challenged the SEC's and Federal Trade Commission's "power[s] to proceed at all." *Axon*,

598 U.S. at 192. In their view, the administrative law judges enjoyed unconstitutional removal protections and the FTC's combination of adjudicatory and investigatory functions violated their due process rights. *Id.* at 182–83. The Supreme Court held that such structural challenges caused a "here-and-now injury" that petitioners could raise in federal district court in a collateral attack. *Id.* at 192.

*Axon*, however, was no ordinary challenge to agency action. The Supreme Court emphasized that the *Axon* petitioners challenged "the entire proceeding [as] unlawful" because the agency "wield[ed] authority unconstitutionally in all or a broad swath of its work." *Id.* at 182, 189. Subjecting a regulated party to an "illegitimate proceeding, led by an illegitimate descisionmaker," it held, "causes [a] legal injury" that is "independent of any rulings the ALJ might make." *Id*. at 182, 191. Therefore, petitioners "would have the same claim had [they] *won* before the agency." *Id.* at 191 (emphasis in the original).

The Seventh Amendment works differently. It applies only to "suits at common law." U.S. Const. amend. VII. That is, only to "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Granfinanciera*, 492 U.S. at 41 (emphasis in original) (cleaned up). The examination of the "legal or equitable . . . nature" of "the remedy sought" is the "more important" inquiry. *Id.* at 42.

To cram their claim into the *Axon* framework, Plaintiffs assert—without citation—that the jury-trial right attaches as soon as they "are *threatened with*" with *legal* sanctions. Dkt. 114 at 22 (emphasis in original). They argue that because the Board has in its toolbox the ability to impose civil money penalties, which can trigger the Seventh Amendment's jury-trial right, *see Jarkesy III*, 603 U.S. at 125, they can plead a Seventh Amendment defense as soon as

disciplinary proceedings against them begin, *see* Dkt. 114 at 22. Ergo, somehow, a structural claim.

Plaintiffs lack any legal support for that argument and so reason by analogy. They highlight that courts do not "allow nonconsensual felony and misdemeanor bench trials just because the court might ultimately acquit the defendant." *Id*. Of course, the Sixth, not the Seventh, Amendment covers criminal trials. But even so, no one would claim that a defendant's jury trial right was violated if a judge dismissed the case under Federal Rule of Criminal Procedure 29(a).[14] Just as no one would claim that a civil plaintiff suffers a Seventh Amendment violation if the court grants her summary judgment. Put differently, "juries are not necessary at every stage of an action, even when the Seventh Amendment might otherwise apply." *Vape Cent. Grp.*, 2025 WL 637416, at *7.

Consider the Supreme Court's recent decision, *FCC v. AT&T, Inc.*, 608 U.S. 531 (2026). There, the Court held that Federal Communication Commission forfeiture orders "did not settle the carriers' legal obligations because, stated simply, they did not create an obligation to pay" without further proceedings. *Id*. at 541. And so even though the forfeiture orders imposed money penalties on the carriers, petitioners did not suffer Seventh Amendment injury. *See id*. That the FCC had in its toolbox the ability to levy money penalties did not mean that the carriers' jury-trial right attached at the outset of the agency proceedings. It would turn *AT&T* on its head to hold that Plaintiffs, who have had no fines entered against them, have suffered a Seventh

[14] Plaintiffs also argue that courts "do not dismiss diversity-of-citizenship cases after trial just because the plaintiff ultimately recovered less than the $75,000 threshold for diversity cases." Dkt. 114 at 22. True. But jurisdiction, by law, is determined at the time of filing. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570–71 (2004).

Amendment injury, while the carriers in *AT&T*, who did have fines entered against them, had not suffered any Seventh Amendment injury.

To explain, a hearing officer has yet to determine "what, if any, sanctions are appropriate in the public interest" in Plaintiffs' disciplinary proceedings. Dkt. 115-1 at 18–20. And even if the Board sustains the sanction, it is stayed until after Commission review. 15 U.S.C. § 7215(e). If the hearing officer imposes no sanctions, or imposes only equitable sanctions, then Plaintiffs will not suffer any Seventh Amendment violation. *See Granfinanciera*, 492 U.S. at 41–42; *see also Sprint Corp. v. FCC*, 151 F.4th 347, 361–62 (D.C. Cir. 2025). Which is all to say that whether the Seventh Amendment is implicated is not "independent of any rulings the [hearing officer] might make." *Axon*, 598 U.S. at 182. And since Plaintiffs' claim rests on future "specific substantive decisions" to be made in future enforcement proceedings, it is not a challenge to the "structure or very existence of [the] agency." *Axon*, 598 U.S. at 189.

At bottom, Plaintiffs' injuries do not accrue here-and-now, at the commencement of disciplinary proceedings, but only if the hearing officer, Board, and SEC each resolve Plaintiffs' pending disciplinary proceedings in a particular way. The Court thus lacks jurisdiction to hear Plaintiffs' jury-trial claim.

**B. Due Process**

Due process requires a "fair trial in a fair tribunal." *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (cleaned up). That "basic requirement" applies to administrative agencies as well as

courts. *Id.* For purposes of this analysis, the Board is a government entity subject to the same constraints as administrative agencies. *See Free Enter. Fund*, 561 U.S. at 510.

The parties agree that Board disciplinary proceedings implicate regulated parties' property interests and, therefore, the Fifth Amendment's Due Process Clause. *See* Dkt. 110-1 at 35 n.13. That is about all they agree on.

**1. Impartial-Adjudicator Claim**[15]

Plaintiffs claim that the Board's "combination of investigative, prosecutorial, and adjudicative roles" violates the Fifth Amendment's Due Process Clause because it permits prosecutors to serve as the decisionmakers in their own cases. Dkt. 108 at 32; U.S. Const. amend. V. It does not. In *Withrow v. Larkin*, a state medical board investigated a physician, found probable cause that he had engaged in misconduct, and then proposed to adjudicate a disciplinary hearing. 421 U.S. at 39–42. The Supreme Court held that agencies can combine functions if "the initial view of the facts based on the evidence derived from nonadversarial processes" does not "foreclose[] fair and effective consideration at a subsequent adversary hearing leading to ultimate decision." *Withrow*, 421 U.S. at 58; *see also Salem Hosp. Corp. v. NLRB*, 808 F.3d 59, 71 & n.17 (D.C. Cir. 2015); *Sprint Corp.*, 151 F.4th at 362. Critically for our purposes, "[t]he mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the board members at a later adversary hearing." *Withrow*, 421 U.S. at 55. "[W]ithout more," the Board's combination of functions does not violate due process. *Id.* at 58; *see also FTC v. Cement Inst.*, 333 U.S. 683, 700–03 (1948).

[15] The Board concedes that the Court has jurisdiction to hear this claim. *See* Dkt. 110 at 35.

Plaintiffs claim the "more" here is that DEI staff present evidence and legal arguments *ex parte* to the Board during the investigative phase, *i.e.*, before the Board institutes proceedings. *See* Dkt. 108 at 32–34. But once the Board institutes disciplinary proceedings, its separation-of-functions rules restrict DEI staff from acting as decisionmakers—or even talking *ex parte* to a decisionmaker. *See* PCAOB Rules 5200(d), 5403. And Plaintiffs have adduced no evidence challenging the Board's or any hearing officer's "fair and effective consideration" during disciplinary hearings. *Withrow*, 421 U.S. at 58.

Plaintiffs highlight that the relevant procedure in *Withrow* permitted the respondent "the opportunity to attend *both* the investigative and adversarial hearings," but "here the respondent is shut out of two critical prosecutorial decisions: the initiation of the investigation and the filing of charges." Dkt. 108 at 33 (citing *Withrow*, 421 U.S. at 40). Two responses. First, as the Board highlights, "that is just wrong." Dkt. 110 at 40. An investigation target can "submit a written statement to the Board setting forth their interests and positions" during the investigatory phase. PCAOB Rule 5109(d). Second, if there is a gap between *Withrow* and this case, *FTC v. Cement Institute*—which *Withrow* discussed with approval, 421 U.S. at 57—fills it. The procedure in *FTC* involved "prior ex parte investigations." 333 U.S. at 701. Those communications did not render the FTC commissioners inherently biased because respondents were "legally authorized" to participate fully in the FTC's subsequent adjudicatory hearing. *Id*. As they are here.

Plaintiffs also claim that a hearing officer can never be neutral because he is a Board employee. *See* Dkt. 108 at 31. Precedent forecloses this argument too. In *Jonal Corp. v. District of Columbia*, 533 F.2d 1192, 1197 (D.C. Cir. 1976), the court held that "the fact that the [Contract Appeals] Board membership was appointed by the Corporation Counsel, and the fact that the Corporation Counsel was also responsible for appointing an individual to prosecute and

defend the case" did not "per se[] constitute a violation of the due process clause." Again, more—such as "evidence of actual personal bias or pecuniary interest"—was necessary. *Id.*

That the Board appoints a hearing officer similarly does not violate due process. To the contrary, PCAOB Rule 5200(d), entitled "Separation of Functions," insulates the hearing officer: "A hearing officer may not be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for the Board." And, again, Plaintiffs have produced no evidence of any hearing officer's actual personal bias or pecuniary interest.

**2. Prior Settlements Claim**

Plaintiffs separately contend that the Board has prejudged facts and legal arguments pertaining to their cases by entering into settlement agreements with their former employers. *See* Dkt. 114 at 44–46.

The Board does not challenge the Court's jurisdiction to hear this claim. Dkt. 110-1 at 35, 42. But the Court has an independent duty to analyze it, *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006), and finds it lacking. Each *Thunder Basin* factor favors the Board: Plaintiffs have a meaningful opportunity for judicial review in the circuit court, the sequence of disciplinary proceedings is not wholly collateral to the statute's review provisions, and the Board has expertise in assessing an individual's culpability separate from that of his employer's. *See supra* Section III.A.

And Plaintiffs do not make any structural claim that would permit them to litigate under *Axon*. They do not point to any requirement that the Board proceed against employers before employees. And even if that requirement existed, bias would not necessarily result. Indeed, "judges frequently try the same case more than once and decide identical issues each time."

*FTC*, 333 U.S. at 703. As the Supreme Court recently reaffirmed, "[t]here is nothing unconstitutional about the Commission finding a fact in one proceeding and, if it is relevant later, again in a second." *AT&T, Inc.*, 608 U.S. at 547.

**3. Confidentiality Claim**

Plaintiffs also maintain that the Board's use of nonpublic decisions—decisions to which they do not have access—creates an "unlevel playing field," in violation of due process. Dkt. 114 at 46–50; *see also* Dkt. 108 at 36–39. Here, the Board does challenge jurisdiction. *See* Dkt. 110-1 at 42–44. And the Court agrees it has none.

By way of background, Sarbanes-Oxley generally requires the Board to keep confidential materials prepared or received in connection with an investigation unless the Board presents them in a public proceeding. *See* 15 U.S.C. § 7215(b)(5)(A). Consistent with that requirement, decisions in proceedings that do not result in sanctions are generally not available to the public. On the other hand, when the Board imposes a sanction, it reports the sanction and the basis for it to the public. *See id.* § 7215(d)(1)(C), (d)(2).

Plaintiffs claim this system denies them due process because DEI staff, the hearing officer, and the Board have access to these nonpublic decisions, while they do not. *See* Dkt. 108 at 36–39. Those decisions, Plaintiffs say, may contain interpretations of substantive and procedural rules—including reasoning favorable to respondents—that could help them defend against the Board's charges. *See id.* They argue that to comply with due process, the Board must provide respondents with anonymized or redacted versions of those decisions. *See id.* at 38–39.

Evaluation of the *Thunder Basin* factors confirms that this claim is "of the type Congress intended to be reviewed within [Sarbanes-Oxley's] statutory structure." *Thunder Basin*, 510 U.S. at 212.

First, Sarbanes-Oxley provides meaningful judicial review. Plaintiffs may raise their claim during the administrative process and, if necessary, seek review of a final SEC order in a federal circuit court. *See* 15 U.S.C. §§ 7215(e), 7217(c), 78y(a); Dkt. 114 at 26. Second, the claim is not wholly collateral to the statutory review scheme. Plaintiffs claim that they are injured because the Board's confidentiality policy "introduces opportunity for . . . the proverbial winks and nods among those in the know." Dkt. 108 at 37. That claim "arise[s] from actions the [agency] took," or will take, "in the course of [the administrative] scheme." *Jarkesy I*, 803 F.3d at 23 (cleaned up). And third, the claim implicates the Board's administration of Sarbanes-Oxley's express statutory confidentiality requirements. *See* 15 U.S.C. § 7215(b). The Board has relevant expertise in interpreting its own confidentiality procedures, which can be "brought to bear" on this constitutional claim. *Elgin*, 567 U.S. at 22–23.

Separately, the Board's confidentiality procedure says nothing about the agency's structure. Plaintiffs plead no "here-and-now" injury by alleging that a particular hearing officer might consider confidential decisions in certain hearings. *Axon*, 598 U.S. at 195. Claiming that a decisionmaker is biased is different to claiming, as in *Axon*, that all agency decisionmakers are "illegitimate." *Id.* at 191. Thus, *Axon* does not confer a jurisdictional hook on this claim.

### C. Appointments Clause

Court dockets today are rife with claims that the appointment of an agency hearing officer violates the Appointments Clause, which provides that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts

of Law, or in the Heads of Departments."[16] U.S. Const. art. II, § 2, cl. 2. Add this one to the mix.

Plaintiffs first claim that Congress never, "by Law," authorized the SEC or the Board to appoint a "hearing officer." Dkt. 108 at 42–43. To be sure, Sarbanes-Oxley does not expressly direct the Board to appoint a hearing officer. But Congress "need not use magic words to confer appointment authority." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 780 (2025); *see also id.* at 781–83 (to "convene" a task force includes the authority to "appoint" a task force). And the statute authorizes the Board, subject to the SEC's approval, "to appoint such employees, accountants, attorneys, and other agents as may be necessary or appropriate" to carry out its statutory duties. 15 U.S.C. § 7211(f)(4), (g)(2). Those duties include conducting disciplinary proceedings. *See id.* §§ 7211(c)(4), 7215, 7217. A hearing officer is a Board employee—typically an attorney—who conducts disciplinary proceedings. *See* Dkt. 123-1 at 4. The Board therefore has the requisite congressional authorization to appoint hearing officers.[17]

Plaintiffs also argue that the Board is not a "Department," and therefore lacks a constitutionally authorized "Head of Department" to make appointments. Dkt. 108 at 42–43. But that ignores that "an inferior officer's appointment of another inferior officer" may "satisf[y] the Appointments Clause," so long as a Head of Department approves the appointment. *Braidwood*, 606 U.S. at 761 (cleaned up). Such is the case here: the Board's members (inferior officers) appoint the CHO (another inferior officer), subject to the approval by the SEC

[16] The parties, mercifully, agree (for present purposes) that a Board hearing officer is an "inferior Officer." Dkt. 108 at 40; Dkt. 110-1 at 46 n.18.

[17] To hold otherwise would needlessly deem a statute unconstitutional even though "a reasonable alternative reading" is available. *Braidwood*, 606 U.S. at 792 (cleaned up); *see also Edmond v. United States*, 520 U.S. 651, 658 (1997).

Commissioners (the Head of Department). *See* 15 U.S.C. § 7211(f)(4); 17 C.F.R. § 202.150; PCAOB Bylaws art. VI § 6.3.

**D. Removal**

Courts today are also rife with claims that agency hearing officers' removal protections violate the Vesting Clause, which provides that "[t]he executive Power shall be vested" in the President. U.S. Const. art. II, § 1, cl. 1. Add this one to that mix as well.

By way of background, as of 2010, Sarbanes-Oxley permitted the SEC to remove Board members only for cause, and SEC commissioners themselves also enjoyed for-cause removal protection. *See Free Enter. Fund*, 561 U.S. at 486–87. That arrangement placed "two layers of for-cause tenure" protection between the President and Board members. *Id.* at 497. In *Free Enterprise Fund*, the Supreme Court struck down that arrangement, holding that "dual for-cause limitations on the removal of Board members contravene the Constitution's separation of powers." *Id*. at 492. But one level of protection between the President and an officer exercising executive power survived. *See id.* at 509. Then, in *Trump v. Slaughter*, the Court struck down that remaining layer as well, holding that officers who exercise executive power and fall within the President's "general administrative control" must remain removable by him at will. 146 S. Ct. 2283, 2306 (2026).

Today, there is no for-cause protection that separates the Board from the SEC or the SEC from the President. *See* Dkt. 123 at 2–3; Dkt. 124 at 2–3. Nor is there for-cause protection between the CHO and the Board: a Board majority may remove the CHO at will, subject to the SEC's approval. *See* 17 C.F.R. § 202.150; PCAOB Bylaws arts. IV, §§ 4.3, 4.4; *id.* art. VI, § 6.3(d).

Plaintiffs nonetheless contend that this arrangement is unconstitutional. They argue that the Board and SEC's joint participation in the CHO's removal creates an unconstitutional layer of tenure protection. *See* Dkt. 108 at 46. It's hard to see how. If the SEC seeks to remove the CHO and the Board refuses, the SEC can remove the holdout Board members. *See Free Enter. Fund*, 561 U.S. at 509. Indeed, because the joint-vote requirement arises from regulation and Board bylaws rather than statute, the SEC can even eliminate the Board's role in the CHO's removal process altogether. *See* 15 U.S.C. §§ 7217(b)(5), 78s(c); Dkt. 110-1 at 52; Dkt. 124 at 4. And if both the SEC and Board refuse to fire the CHO, the President can issue the pink slips to the inferior officers involved. *See Slaughter*, 146 S. Ct. at 2306.

Plaintiffs grasp at one "remaining" for-cause restriction: the District of Columbia Human Rights Act. Dkt. 123 at 3; *see also* Dkt. 116 at 5. That argument fails twice over. Plaintiffs raised it for the first time in their reply brief, *see* Dkt. 114 at 37–38, thus waiving it, *see MBI Grp., Inc. v. Credit Foncier du Cameroun*, 616 F.3d 568, 575 (D.C. Cir. 2010). Anyway, Plaintiffs acknowledge that the SEC is not bound by the DCHRA. *See* Dkt. 114 at 37–38. And even if the DCHRA afforded Board staff some protection, Plaintiffs have not shown that it would meaningfully restrict removal such that the CHO is no longer removable at will by the President.

**E. Private Nondelegation**

Plaintiffs next contend that Congress violated the private-nondelegation doctrine by allowing the Board to exercise investigative, prosecutorial, and adjudicatory authority without sufficient governmental supervision. *See* Dkt. 108 at 48–54.

This contention suffers the fatal problem that the Board is no private Willy Wonka chocolate factory. It is a government entity.[18] Congress created it; it serves the governmental interest of ensuring accurate and independent audit reports of public companies; and the SEC appoints each of its board members and oversees its work. *See supra* Sections I.A–B. Under well-settled precedent, then, the private-nondelegation doctrine does not apply. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995); *see also Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 51–55 (2015).

To be sure, Congress created the Board as a nonprofit corporation and specified that it "shall not be an agency or establishment of the United States Government." 15 U.S.C. § 7211(b). But that is not dispositive. "If [the Board] is, by its very nature, what the Constitution regards as the Government, congressional pronouncement that it is not such can no more relieve it of its [constitutional] restrictions than a similar pronouncement could exempt the Federal Bureau of Investigation from the Fourth Amendment." *Lebron*, 513 U.S. at 392. In short, if the Board walks and quacks like a government entity, then, "for purposes of determining the constitutional rights of citizens affected by its actions," that is how the Court must treat it. *Id.*

The private-nondelegation argument would fail even if the doctrine applied. The doctrine limits the Government's ability to vest governmental power in private entities. But a private entity may assist in carrying out federal law, so long as it "function[s] subordinately" to a

[18] Plaintiffs claim that even if the Board is a government entity, its hearing officers are not government employees. *See* Dkt. 108 at 48. This cannot be reconciled with Plaintiffs' position that "the CHO is an inferior officer subject to the Appointments Clause," *id.* at 40, a position necessary to their removal claim. But even so, the level of the SEC's "authority and surveillance" over those officers is sufficient to survive this nondelegation challenge. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940).

governmental agency that retains "authority and surveillance" over its actions. *Sunshine Anthracite Coal*, 310 U.S. at 399. The SEC maintains such control over the Board. *See* 15 U.S.C. § 7217.

*Alpine Securities Corp. v. FINRA* is instructive. 121 F.4th 1314 (D.C. Cir. 2024). There, the D.C. Circuit considered a proceeding initiated by the Financial Industry Regulatory Authority that could have expelled Alpine from FINRA membership. *See id*. at 1322–23. Because FINRA's expulsion order could take effect before the SEC reviewed the merits of the order, the D.C. Circuit concluded that Alpine had shown a likelihood of success on its private-nondelegation claim. *See id.* at 1328.

But the D.C. Circuit cabined its holding in a way important here. It distinguished between FINRA's ability to effect sanctions without meaningful governmental review through its expedited review processes, and, on the other hand, FINRA's "typical[]" procedures, where the "SEC conduct[s] its own review of any final decision or sanction." *Id.* at 1326 (cleaned up). The circuit court did not question "the constitutionality of enforcing an expulsion order, or any other sanction, after the SEC has affirmed it" through the typical procedure. *Id.* at 1331.

Here, if requested, all sanctions imposed by the Board are stayed until after Commission review. *See* 15 U.S.C. § 7215(e). Thus, there is no concern that Plaintiffs will suffer any damages absent SEC review. But, Plaintiffs argue, DEI staff may investigate suspected violations, demand documents and testimony, recommend that the Board institute disciplinary proceedings, and prosecute those proceedings without the SEC's participation. *See* Dkt. 108 at 48–51; Dkt. 114 at 51–52. True. *Alpine Securities*, however, does not require the SEC to participate in every investigative, prosecutorial, or adjudicatory act. It requires instead that the Government retain ultimate control over the exercise of delegated authority. *See Alpine*

*Securities*, 121 F.4th at 1331. And Sarbanes-Oxley gives the SEC ultimate authority over the Board's decisions. *See* Dkt. 110-1 at 57; 15 U.S.C. § 7217; *supra* Sections I.A–B.

### F. Funding Scheme

Last, and arguably least, Plaintiffs challenge the Board's funding mechanism. Sarbanes-Oxley authorizes the Board, with the SEC's approval, to impose an annual accounting support fee on issuers, brokers, and dealers to fund its operations. *See* 15 U.S.C. § 7219(b)–(d). Plaintiffs contend that this arrangement impermissibly delegates Congress's Article I taxing power to the Board. *See* Dkt. 108 at 54–60. They also argue that the Board's funding arrangement is unconstitutional when combined with Plaintiffs' nondelegation and removal arguments. *See id.*

The Constitution gives Congress the power to "lay and collect Taxes." U.S. Const. art. I, § 8, cl. 1. Congress may delegate that power so long as it supplies an "intelligible principle to guide what it has given the agency to do." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (cleaned up); *see also Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 220–21 (1989). That standard is not demanding. Congress need not prescribe a "number or a rate" on the amount an agency may collect, and even broad directives—such as instructions to act in the "public interest"—may supply sufficient guidance. *Consumers' Rsch.*, 606 U.S. at 680–84; *see also Gundy v. United States*, 588 U.S. 128, 146 (2019) (plurality opinion). What matters is whether Congress sufficiently identified the ends the delegate should pursue and bound the means available to achieve them. *See Consumers' Rsch.*, 606 U.S. at 683–86.

*Consumers' Research* controls here. It involved Section 254 of the Communications Act of 1934, which requires telecommunications carriers to contribute to a fund administered by the FCC to support universal telecommunications services. 606 U.S. at 666–70. The FCC

determines how much money the program requires and sets a contribution factor that determines how much carriers pay. *See id.* As the Court held, this statutory scheme adequately constrains the FCC by limiting collections to amounts "sufficient" to accomplish statutorily identified objectives. *Id.* at 681–86. "Sufficient" imposes both a floor and a ceiling: enough to fund the program, but no more. *Id.* at 681–82.

Section 7219 imposes similar constraints. Congress authorized the Board, with the approval of the SEC, to establish "a reasonable annual accounting support fee (or a formula for the computation thereof), as may be necessary or appropriate to establish and maintain the Board." 15 U.S.C. § 7219(d)(1). The Board must prepare an annual budget subject to SEC approval and can only collect fees to fund the Board's "recoverable budget expenses." *Id.* § 7219(b), (c)(1), (f). And the duties and functions of the Board are defined by statute. *See id.* §§ 7211–15. *Consumers' Research* requires no more.

Plaintiffs' combination theory also fails. Two "meritless" arguments "cannot equal a meritorious combination claim." *Consumers' Rsch.*, 606 U.S. at 697 (cleaned up); *see also* Sections III.D–E (rejecting Plaintiffs' nondelegation and removal claims).

## IV. CONCLUSION

For these reasons, the Court **DENIES** Plaintiffs' Motion for Summary Judgment, Dkt. 108, and **GRANTS** the Board's Cross-Motion for Summary Judgment, Dkt. 110. Because Plaintiffs do not prevail on their claims, the Court also **DENIES** their request for a permanent injunction. A separate Order consistent with this Memorandum Opinion issues this day.

Date: September 30, 2026

ANA C. REYES
United States District Judge